### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PEARL E. COHEN, on behalf of herself and all others similarly situated, | : | CLASS ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHICAGO TITLE INSURANCE COMPANY | : | C.A. No. 06-0873 |
| | : | |
| Defendant. | : | |

### ORDER

AND NOW, upon consideration of Plaintiff's Motion for Class Certification (the "Motion") and Memorandum of Law and exhibits submitted in support thereof, and Defendant's response thereto,

IT IS, this _____ day of _____, 2007, HEREBY ORDERED that the Motion is GRANTED. This action shall be maintained as a class action in accordance with Federal Rule of Civil Procedure 23 pursuant to the following findings of fact:

1. The "Class," defined as:

All persons or entities in the Commonwealth of Pennsylvania who within 10 years of having previously purchased title insurance in connection with their mortgage or fee interest, refinanced the identical mortgage or fee interest, and were charged a title insurance premium by Chicago Title that exceeded the applicable premium discount for title insurance on file with the Pennsylvania Insurance Commissioner that such persons or entities should have been charged,

is so numerous that joinder of all members is impracticable under Rule 23(a)(1);

2. There are questions of law and/or fact common to the Class under Rule 23(a)(2), including but not limited to the following questions:

(a)    Whether the Defendant and its agents systematically collected premiums from Class members in amounts not permitted under the Rate Manual;

(b)    Whether by filing their discounted rates with the Commonwealth of Pennsylvania, the Defendant is offering insurance at a certain price and that the Class is entitled to receive that price;

(c)    Whether the Defendant's protocols, guidelines and oversight of its agents precluded the Class from receiving the discounted, filed rates to which they were entitled;

(d)    Whether the Defendant uniformly applied the discounted rates pursuant to the terms of filed rates;

(e)    Whether the Defendant and its agents intentionally and/or negligently omitted to disclose material facts to the Plaintiff and the Class that they need only pay the discounted premiums for the reissuance of title insurance on the refinancing of their mortgages or fee interests;

(f)    Whether the Defendant and its agents were unjustly enriched by their improper conduct;

(g)    Whether the Defendant and its agents should be enjoined from further engaging in such improper conduct;

(h)    Whether the Plaintiff and members of the Class have suffered an ascertainable loss that is the result of the Defendant's misconduct and unfair and deceptive business practices; and

(i)    Whether Plaintiff and members of the Class have sustained damages and the proper measure of such damages.

3.    The claims of Plaintiff Pearl Cohen are typical of the claims of the Class under

Rule 23(a)(3);

    4.    Plaintiff will fairly and adequately protect the interests of the Class pursuant to Rule 23(a)(4);

    5.    Under Rule 23(b)(1)(A), the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would confront the defendant with incompatible standards of conduct; and under Rule 23(b)(1)(B) adjudications with respect to individual members of the Class would as a practical matter be dispositive of the interests of other members not parties to the adjudications or would substantially impair or impede their ability to protect their interests;

    6.    Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final equitable or declaratory relief appropriate with respect to the Class under Rule 23(b)(2);

    7.    The questions of law and/or fact common to the members of the Class predominate over any questions affecting only individual members under Rule 23(b)(3), and a class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

    a)    There is no interest in individual members of the Class in individually controlling the prosecution or defense of separate actions as the amount which may be recovered by individual Class members will be small in relation to the expense and effort of administering the class action;

    b)    There is no suggestion that there is any other pending litigation concerning this controversy already commenced by or against members of the Class;

c)     This Court is an appropriate forum for the litigation of the claims of the Class; and

d)     There are no difficulties likely to be encountered in the management of the action as a class action;

It is further ORDERED, that Plaintiff Pearl Cohen is certified as Class representative; and it is further

ORDERED, that Richard S. Gordon of the firm Quinn, Gordon & Wolf, Chtd. is appointed as Lead Class Counsel; and Philip S. Friedman of the firm Friedman Law Offices, PLLC, and David A. Searles and Michael D. Donovan of the firm of Donovan Searles, LLC are also appointed as Class Counsel; and it is further

ORDERED, that excluded from the Class are all officers and directors of the Defendant; and it is further

ORDERED, that Plaintiff shall submit a proposed form of notice to the Class within thirty (30) days of entry of this Order.

_____
Juan R. Sánchez, U.S.D.J.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PEARL E. COHEN, on behalf of herself and all others similarly situated, | : | CLASS ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHICAGO TITLE INSURANCE COMPANY | : | C.A. No. 06-0873 |
| | : | |
| Defendant. | : | |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff Pearl Cohen, by counsel, hereby moves this Court, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify this action as a class action and plaintiff Pearl Cohen as class representative. Plaintiff seeks certification of a class of all persons or entities in the Commonwealth of Pennsylvania who within 10 years of having previously purchased title insurance in connection with their mortgage or fee interest, refinanced the identical mortgage or fee interest, and were charged a title insurance premium by Chicago Title that exceeded the applicable premium discount for title insurance on file with the Pennsylvania Insurance Commissioner that such persons or entities should have been charged. Excluded from the Class are all officers and directors of the Defendant.

The grounds for this Motion are set out in detail in Plaintiff's simultaneously filed memorandum of law and are incorporated herein.

Dated: December 4, 2006                    Respectfully submitted,

                                           **DONOVAN SEARLES, LLC**

                                           *s/ David A. Searles*
                                           David A. Searles
                                           1845 Walnut Street, Suite 1100
                                           Philadelphia, PA 19103
                                           (215) 732-6067

                                           Philip S. Friedman
                                           Friedman Law Offices, PLLC
                                           2401 Pennsylvania Avenue, N.W., Suite 410
                                           Washington, D.C. 20037
                                           (202) 293-4175

                                           Richard S. Gordon
                                           Quinn, Gordon & Wolf, Chtd.
                                           102 W. Pennsylvania Ave., Ste 402
                                           Towson, Maryland 21204
                                           (410) 825-2300

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PEARL COHEN, on behalf of herself**<br>**and all others similarly situated,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A. No. 06-0873** |
| | : | |
| **CHICAGO TITLE INSURANCE** | : | |
| **COMPANY** | : | **CLASS ACTION** |
| **Defendant.** | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

I.    INTRODUCTION ...............................................................1

II.   FACTUAL  BACKGROUND ................................................2

      A.    The Allegations of the Complaint ................................2

      B.    The Business of Title Insurance ...................................4

      C.    The Statutory Regulation of Title Insurance Premiums.........................9

      D.    In Pennsylvania, Title Insurers Such as the Defendant Work
            Exclusively Through Appointed "Agents"......................................12

      E.    The Title Insurance Industry is a Cash Cow......................................15

      F.    Defendant Chicago Title Overcharged Plaintiff and the
            Class for Title Insurance ...........................................................16

III.  THE COURT SHOULD CERTIFY THE CLASS IN THIS CASE....................24

      A.    Rule 23 Favors Certification.......................................................24

      B.    Legal Requirements for Certification............................................25

|  | 1. | Numerosity | 26 |
|  | 2. | Commonality of Issues | 27 |
|  | 3. | Typicality of Claims | 30 |
|  | 4. | Adequacy of Representation | 32 |
|  | 5. | A Class Action Is Appropriate Because the Criteria of Rule 23(b) Are Satisfied | 33 |
|  |  | a. Rule 23(b)(1) | 33 |
|  |  | b. Rule 23(b)(2) | 35 |
|  |  | c. Rule 23(b)(3) | 37 |
|  | 6. | Plaintiff's Proposed Trial Plan | 43 |

IV. COURTS IN FIVE DIFFERENT STATES HAVE RECENTLY CERTIFIED VIRTUALLY IDENTICAL CLASS ACTIONS ...... 45

A. In Maryland Federal District Court, the Court Certified an Identical Title Insurance Class Action and the Fourth Circuit Declined to Review the Decision on Appeal ...... 45

B. In New York State, the Court Certified *In re Coordinated Title Insurance Cases* ...... 46

C. In Ohio, the Appellate Court Recently Reversed the Denial of Class Certification ...... 46

D. The Minnesota Courts, as Well, Certified an Identical Class Action ...... 47

E. A Pennsylvania State Court Has Certified Identical Claims Against a Title Insurance Company ...... 47

V. CONCLUSION ...... 47

# TABLE OF AUTHORITIES

## CASES

Allison v. Citgo Petroleum Corp.,
        151 F.3d 402 (5th Cir. 1998) ......................................................................36

Amchem Products, Inc. v. Windsor, et al.,
        521 U.S. 591 (1997)...........................................................................2, 25, 38

American Finance System, Inc. v. Harlow,
        65 F.R.D. 94 (D. Md. 1974)..........................................................................30

Baby Neal v. Casey,
        43 F.3d 48 (3d Cir. 1994)...........................................................28, 29, 30, 32

Barabin v. Aramark Corporation,
        2003 WL. 355417 (3d Cir. Jan. 24, 2003) ..................................................36

Bogosian v. Gulf Oil Corp.,
        561 F.2d 434 (3d Cir. 1977).........................................................................37

Brooks v. Educators Mutual Life Insurance Co.,
        206 F.R.D. 96 (E.D. Pa. 2002).................................................................26, 28

Cass Clay Inc. v. Northwestern Public Service Co.,
        63 F.R.D. 34 (D.S.D. 1974) .........................................................................34

In re Cigna Corp Sec. Litigation,
        2006 WL. 2433779 (E.D. Pa. Aug. 18, 2006) .............................................39

In re Coordinated Title Insurance Cases,
        784 N.Y.S.2d 919, 2004 WL. 690380 (N.Y. Sup. 2004)...................... passim

Cullen v. Whitman Med. Corp., 188 F.R.D. 226 (E.D. Pa. 1999)).................................25

Cummings v. Express Financial Services, Inc., et. al.,
        March Term 2005, No. 747 (C.P. Phila.).................................................4, 47

DeBoer v. Mellon Mortg. Co.,
        64 F.3d 1171 (8th Cir. 1995) .......................................................................34

Deposit Guaranty National Bank v. Roper,
        445 U.S. 326, reh'g denied, 446 U.S. 947 (1980).......................................24

Dubin v. Security Title Insurance Co.,
    832 N.E.2d 815 (Ohio 2005)..................................................................4, 46

Eisen v. Carlisle & Jacqueline,
    417 U.S. 156 (1974)............................................................................25

Eisenberg v. Gagnon,
    766 F.2d 770 (3d Cir. 1985)......................................................2, 24, 28

Eshaghi v. Hanley Dawson Cadillac Co.,
    214 Ill. App. 3d 995, 574 N.E.2d 760 (Ill. 1991)........................................25

George v. Baltimore City Public Schools,
    117 F.R.D. 368 (D. Md. 1987)...............................................................35

Goldman v. Radioshack,
    2005 U.S. Dist. LEXIS 8742 ................................................................38

Grasty v. Amalgamated Clothing and Textile Wkrs. Union,
    828 F.2d 123 (3d Cir. 1987)..................................................................31

Gulf Oil Co. v. Bernard,
    452 U.S. 89 (1981).............................................................................24

Hanrahan v. Britt,
    174 F.R.D. 356 (E.D. Pa. 1997)............................................................31

Harris v. Palm Springs Alpine Estates,
    329 F.2d 909 (9th Cir. 1964) ...............................................................30

Hassine v. Jeffes,
    846 F.2d 169 (3d Cir. 1988)..............................................................31, 32

Heastie v. Community Bank of Greater Peoria,
    125 F.R.D. 669 (M.D. Ill. 1989) ...........................................................36

Himmler v. Weinberger,
    422 F. Supp. 196 (E.D. Mich. 1976), *rev'd on other grounds*, 611 F.2d 137
    (6th Cir. 1979)................................................................................30

Janicik v. Prudential Ins. Co.,
    305 Pa. Super. 120, 451 A.2d 451 (Pa. Super. 1982) ..................................33

Johnston v. HBO Film Management, Inc.,
    265 F.3d 178 (3d Cir. 2001)................................................................28

Lake v. First Nationwide Bank,
     156 F.R.D. 615 (E.D. Pa. 1994)...................................................................42

Lewis v. Bayer AG,
     2004 WL 1146692 (C.P. Phila. Nov. 18, 2004)........................................41

Mitchell-Tracey v. United General Title Insurance Co.,
     237 F.R.D. 551 (D. Md. 2006)............................................................ passim

Mitchell v. Chicago Title Insurance Co.,
     2003 WL. 23786983 (Minn. Dist. Ct. Aug 13, 2004)...........................4, 47

Myer v. CUNA Mutual Group,
     2006 U.S. Dist. LEXIS 4478 (W.D. Pa. 1996)..........................................29

Parks v. Portnoff Law Associates, Ltd.,
     210 F.R.D. 146 (E.D. Pa. 2002)...............................................................34

Piper v. Portnoff Law Associates,
     215 F.R.D. 495 (E.D. Pa. 2003)...............................................................34

In re Plastics Additives Antitrust Litigation,
     2006 U.S. Dist. LEXIS 69105 (E.D. Pa. 2006) ........................................40

In Re Prudential Insurance Company America Sales Practices Litigation Agent Actions,
     148 F.3d 283 (3d Cir. 1998)................................................................31, 42

Ramirez v. Webb,
     102 F.R.D. 968 (W.D. Mich. 1984) .........................................................37

Robinson v. Countrywide Credit Industrial,
     1997 WL. 634502 (E.D. Pa. Oct. 8, 1997)...............................................29

Snider v. Upjohn Co.,
     115 F.R.D. 536 (E.D. Pa. 1987)..........................................................27, 38

Stewart v. Abraham,
     275 F.3d 220 (3d Cir. 2001).....................................................................26

In re Sugar Industry Antitrust Litigation,
     73 F.R.D. 322 (E.D. Pa. 1976)..................................................................38

Troutman v. Cohen,
     661 F. Supp. 802 (E.D. Pa. 1987) ............................................................28

In re Universal Service Fund Telephone Billing Practices Litigation,
     219 F.R.D. 661 (D. Kan. 2004)................................................................................37

In Re: Visa Check/Master Money Antitrust Litigation,
     280 F.3d 124 (2nd Cir. 2001)...........................................................................36, 39

In re Visa Check/Mastermoney Antitrust Lit.,
     192 F.R.D. 68 (E.D.N.Y. 2000) ............................................................................36

Wachtel v. Guardian Life Insurance Co. of America,
     453 F.3d 179 (3d Cir. 2006)........................................................................24, 42, 43

Watkins v. Simmons and Clark, Inc.,
     618 F.2d 398 (6th Cir. 1980) ...........................................................................41, 42

Weiss v. York Hospital,
     745 F.2d 786 (3rd Cir. 1984) ................................................................................26

Williams v. Empire Funding Corp,
     183 F.R.D. 428 (E.D. Pa. 1998)............................................................................35

Williams v. Lane,
     129 F.R.D. 636 (N.D. Ill. 1990)............................................................................35

Zachary v. Chase Manhattan Bank,
     52 F.R.D. 532 (S.D.N.Y. 1971) ...........................................................................35

Zeno v. Ford Motor Company,
     2006 U.S. Dist. LEXIS 69957 (W.D. Pa. 1996) ..................................................29, 32

## STATUTES AND RULES

40 P.S. § 910-1 *et seq*..................................................................................................9

40 P.S.§ 910-24...........................................................................................................13

40 P.S.§ 910-26...........................................................................................................13

40 P.S. § 910-37.......................................................................................................9, 16

Fed. R. Civ. P. 23 ............................................................................................... passim

## MISCELLANEOUS

NEWBERG ON CLASS ACTIONS.................................................................................. passim

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PEARL COHEN, on behalf of herself and all others similarly situated,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **C.A. No. 06-0873** |
| | : | |
| **CHICAGO TITLE INSURANCE COMPANY** | : | **CLASS ACTION** |
| **Defendant.** | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## I.   INTRODUCTION

This case challenges a uniform and illegal practice of the Defendant, Chicago Title Insurance Company ("Chicago Title") for which Plaintiff seeks both declaratory relief and damages on behalf of herself and potentially thousands of other victims of that practice. As set forth below, the case should be certified as a class action as the matter easily meets all of the requirements of the Federal Rules of Civil Procedure governing class actions. Fed. R. Civ. P. 23.

Based upon the allegations of this case, and subsequent discovery, Plaintiff proposes a class (the "Class") consisting of the following:

> All persons or entities in the Commonwealth of Pennsylvania who within 10 years of having previously purchased title insurance in connection with their mortgage or fee interest, refinanced the identical mortgage or fee interest, and were charged a title insurance premium by Chicago Title that exceeded the applicable premium discount for title insurance on file with the Pennsylvania Insurance Commissioner that such persons or entities should have been charged.

Because Defendant's scheme to cheat consumers – as described in detail below – was uniform and consistent, relied upon standard forms, contracts, and other documents, involved its own agents, and victimized literally thousands of consumers, the Court should certify the Class.

## II.    FACTUAL BACKGROUND

There is only one principal issue here, and all members of the proposed Class stand in the identical posture with respect to that issue and with respect to the Defendant – namely, whether Defendant and its appointed agents properly gave borrowers refinancing their mortgage loans, the tariffed discounted rates for title insurance – either 10% or 28% off of the basic rate – under Defendant's filed rates with the Pennsylvania Insurance Commissioner.  This case, therefore, is much like other straightforward consumer cases which are routinely certified as class actions by courts in Pennsylvania and elsewhere, including nearly identical claims against title insurers.  In fact, the Supreme Court in *Amchem Products, Inc. v. Windsor, et al.*, 521 U.S. 591 (1997), noted that cases "alleging consumer or securities fraud or violations of the antitrust laws" are especially appropriate for class action treatment.  *Id.* at 625.

Although the burden of showing each of the elements of Rule 23 is on the class proponent, the burden is not a heavy one, there being a general policy that decisions in favor of maintaining a class action should be liberally made.  *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action.").

### A.    The Allegations of the Complaint

This is a class action by homeowners seeking relief from the predatory practices of a title insurance company for violations of statutory and common law obligations.  Complaint at ¶ 1.

The purpose of the Defendant's scheme to cheat consumers is simple – to circumvent the requirements of state law by systematically charging Pennsylvania consumers who refinance their mortgages premiums for title insurance that are far in excess of the rates permitted under Pennsylvania law.  *Id.*  Thus, instead of charging consumers a ten percent (10%) discounted

2

premium filed with and approved by the Pennsylvania Insurance Commissioner as the tariffed "Reissue Rate" for Pennsylvania purchasers of title insurance who refinance their mortgages *within ten years* of a previously issued title insurance policy, the Defendant, through its agents and/or employees, actually collected a much higher premium – the "Basic Rate" **or more** – from the Plaintiff and Class members. Complaint at ¶ 2-3. Rather than provide the Reissue Rate or the appropriate "Refinance Rate" (*i.e.*, an additional discount for refinancing done within three years of a previous mortgage) for which the consumer qualified, as required under Pennsylvania law, the Defendant charged the Plaintiff and Class members an amount of money they were neither entitled to have nor receive. Complaint at ¶¶ 9-23.

As a direct result of the Defendant's illegal acts, the named Plaintiff alleges that she and the Class were damaged and suffered injury and loss.[1] This lawsuit also asserts that this scheme to cheat consumers was not isolated or particular to the named Plaintiff, but was uniform, consistent, and repeated over and over again. Complaint at ¶¶ 34-43. Discovery has shown that thousands of consumers who refinanced their loans and were eligible for a Reissue or Refinance Rate never obtained the rate entitled to them under Pennsylvania law. Rather, in violation of Pennsylvania law, the Defendant simply took for itself what it was never entitled to collect in the first place. Complaint at ¶ 33.

---

[1]    *See e.g.*, Complaint at ¶ 33 ("Despite full knowledge that the Plaintiff and the Class members were eligible for a "reissue rate," Chicago Title willfully and knowingly overcharged the Plaintiff and other Class members insurance rates in excess of filed rates); ¶¶ 46-48 ("Chicago Title has come into the possession of money in the form of premium payments for title insurance that it had no right to at law or in equity . . . [and] as a consequence Plaintiff and members of the Class have been damaged."); ¶ 51 ("Defendant has been unjustly enriched at the expense, and to the detriment of, the Plaintiff and each member of the Class by charging excessive amounts for title insurance premiums. The Plaintiff and the Class are therefore entitled to recover from Defendant, as restitution, all money they paid for excessive title insurance premiums, any benefits received by Defendant as a result of such charges, plus interest thereon from the time of payment."); ¶ 60 ("As a result of the Defendant's actions, Plaintiff and the Class have suffered ascertainable losses of money or property.").

The scheme in this case is virtually identical, in both scope and allegations, to other class action title insurance discount rate cases that have come before other courts in the past two years. *Cummings v. Express Financial Services, Inc., et. al.*, March Term 2005, No. 747 (C.P. Phila.) (class certification granted in case alleging failure of Stewart Title Guaranty Company to provide reissue rate under Pennsylvania law); *Mitchell-Tracey v. United General Title Ins. Co.*, 237 F.R.D. 551 (D. Md 2006) (court certified class against two title insurers for failing to provide reissue rate to consumers) (Rule 23(f) petition for appeal denied). *See also, e.g., Dubin v. Security Title Insurance Co.*, 832 N.E. 2d 815 (Ohio 2005) (certifying class action alleging, as in this case, that defendants failed to provide the reissue rate); *In re Coordinated Title Insurance Cases*, 2 Misc.3d 1007, 784 N.Y.S.2d 919, 2004 WL 690380 (N.Y. Sup. 2004) (certifying class against insurers for uniformly failing to provide the discounted reissue rate); *Mitchell v. Chicago Title Insurance Co.*, 2003 WL 23786983 (Minn. Dist. Ct. Aug 13, 2004) (certifying class against insurers, including Chicago Title, alleging that insurers, either directly or through their title agents, charged premiums for title insurance policies in excess of the applicable rates in connection with refinancing transactions).

### B.    The Business of Title Insurance

Title insurance is an essential part of virtually every real estate transaction. *Mitchell-Tracey,* 237 F.R.D. at 553. Title insurance guarantees that the purchaser or borrower owns a parcel of property free and clear of all liens and encumbrances except as specifically disclosed in the title policy. *See* American Land Title Association ("ALTA") webpage "Questions About Title Insurance," attached hereto as Exhibit A.[2]

---

[2]    Chicago Title is a member of ALTA.  Reimer Dep., Exhibit B, at 35.  According to the 10-K of Fidelity National Title Group, Inc., the parent company of Chicago Title, "[i]n a real estate transaction financed with a mortgage, virtually all real property mortgage lenders require their borrowers to obtain a title insurance policy at the time a mortgage loan is made. This lender's policy insures the lender against

As noted by Jodi Reimer, Chicago Title's Assistant Vice President and Agency Representative (the liaison to title agents to answer underwriting questions, reinsurance, agency licensing, contracts, agency applications and agency reviews), there are two types of title insurance policies: (1) owner's policies and (2) lenders' policies. Deposition of Jodi Reimer (Reimer Dep.) at 16, 20, attached hereto as Exhibit B. Owners' policies are those in which the property owner is the insured; these policies protect the homeowner's property interests and typically provide coverage in an amount equal to the purchase price. The owner's policy is generally issued at the time of purchase to the buyer of the property. Deposition of Maria Rozniakowski[3] (Rozniakowski Dep.) at 26-27, attached hereto as Exhibit C. Lender's policies are those in which the lender/mortgagee is the insured; this coverage protects a lender's security interest in the property and typically provides coverage in an amount equal to the amount of the secured loan. *Id.* at 27-29. *See also Mitchell-Tracey*, *supra* (generally discussing title insurance).

When a consumer buys real property in Pennsylvania, the consumer typically purchases an owner's title insurance policy. *See* Exhibit D (Fidelity National Title Group 10-K). Similarly, the lender's policy is issued in almost every case where there is a first mortgage issued on the property, because virtually every lender in Pennsylvania requires lender's title insurance. Rozniakowski Dep. at 28. Regardless of which type of title insurance policy is purchased, the premium is only paid once – at closing – ***typically by the borrower***. Deposition of Elizabeth

---

any defect affecting the priority of the mortgage in an amount equal to the outstanding balance of the related mortgage loan. An owner's policy is typically also issued, insuring the buyer against defects in title in an amount equal to the purchase price. In a refinancing transaction, only a lender's policy is generally purchased because ownership of the property has not changed. In the case of an all-cash real estate purchase, no lender's policy is issued but typically an owner's policy is issued." Exhibit D at p. 5.

[3]    Ms. Rozniakowski, a settlement clerk, is the number two person with Chelsea Land Transfer, Inc., the title agent appointed by Chicago Title to handle Ms. Cohen's refinancing. Rozniakowski Dep. at 7-8, 17.

Ray[4] (Ray Dep.) at 35, attached hereto as Exhibit E; Rozniakowski Dep. at 28. The owner's coverage remains in effect as long as the consumer owns the home. The lender's policy remains in effect until the mortgage loan is satisfied. *See* Fidelity National title Group10-K, Exhibit D, at p. 5. Chicago Title's owner's and lender's policies are standard in the industry – that is, the policy form itself, is grounded upon a uniform and standard model adopted and approved by ALTA. Reimer Dep. at 35-36.

A typical purchase transaction involves the issuance of both types of title insurance policies. For example, if an individual buys a home for $100,000 and takes out an $80,000 mortgage to finance the purchase, the purchaser receives an owner's title insurance policy in the amount of $100,000 that lasts for as long as that person owns the home. The lender receives a lender's policy in the amount of $80,000 that lasts for as long as the mortgage remains unsatisfied. Although the lender is the insured under the lender's policy, the owner typically pays for both the owner and lender policies. Ray Dep. at 35; Rozniakowski Dep. at 27-28.

Typically, a refinance transaction involves the issuance of a lender's policy only. Thus, if the same individual in the previous example decides to refinance the loan, the new lender will receive a lender's policy in the amount of the new loan. The owner's policy, issued in connection with the initial purchase of the home, remains in force. The homeowner pays for the new lender's policy, but the actual policy is issued to, held by, and protects the lender. Ray Dep. at 35-6; *see also* Fidelity National Title Group10-K, Exhibit D, at 5.

The process by which title insurers, like Chicago Title, issue a title insurance policy is the same *in every case*. These steps include opening the title order and referral to the title agent; title search; title examination; issuance of the title insurance commitment; checking accuracy of

---

[4]    Elizabeth Ray is Chicago Title's Assistant Vice President and Agency Representative (the liaison to title agents to answer underwriting questions, reinsurance, agency licensing, contracts, agency applications and agency reviews) for the Eastern District of Pennsylvania and Delaware.

information; preparation of HUD-1; settlement/closing the transaction. *See* Fidelity National Title Group 10-K Exhibit D at 4, explaining title insurance process.

The typical refinance transaction, such as the transactions at issue in this case, begins when the owner of the property arranges for a refinance loan from a lender. The lender selects the title insurance agent and notifies the agent of the need for title insurance and a settlement of the refinancing transaction. The agent, through an abstractor, searches the title, which typically reveals both: (1) the existing mortgage; and (2) the date that the property was last purchased. Ray Dep. at 66; Rozniakowski Dep. at 55-56; Reimer Dep. at 112; Exhibit D at 4. This process often takes place as much as a month before the loan closing. Ray Dep. at 64.

At this point in the process, the consumer/borrower has not met or spoken to either the title agent or the insurer. In fact, in the standard transaction in Pennsylvania, the borrower will not likely have any contact with title agent until the actual closing. Rozniakowski Dep. at 72. The agent typically selects the title insurance underwriter and obtains a title commitment from the underwriter to issue a lender's title insurance policy. *Id.* at 58-64. The title commitment is a key document in this process. It is a standard form that memorializes the insurer's agreement to issue the policy to the insured. Ray Dep. at 56-7. In the title commitment, the title agent states the type of policy(s) that the insurer will underwrite and binds the insurer to issue that particular coverage if the loan closes. Ray Dep. at 66-7; Rozniakowski Dep. at 60-1.

Ms. Rozniakowski explained that the title commitment is binding on the insurer:

| | |
|---|---|
| Q. | And what is a title commitment? |
| A. | Our title commitment is a commitment to – to insure the transaction. |
| **** | |
| Q. | And would you agree that the title commitment is binding on Chicago Title in – when you were dealing with Chicago Title? |

| | |
|---|---|
| A. | Binding on Chicago Title – yes – well, you mean could we change the commitments to another underwriter at that point, prior to the payment of insurance?. |
| Q. | No. At the time you issue the commitment, assuming that the loan closes |
| A. | Right. At that point |
| Q. | It's binding on Chicago |
| A. | It's then binding, yes. |
| Q. | You need to let me finish the question. |
| A. | I'm sorry. |
| Q. | That's okay. And it's also binding on Chelsea, is it not? |
| A. | True. |

Rozniakowski Dep. at 57, 61.  Ms. Rozniakowski added that the typical borrower has little control as to what company is used, as the title order is typically handled without any consultation of the borrower.  *Id.* at 64.

At the closing, the agent is clearly in charge.  The agent handles the actual closing of the transaction.  Ray Dep. at 76.  The agent pays off the earlier mortgage from the new loan proceeds and obtains appropriate releases.  The owner signs the settlement sheet (known as the "HUD-1") and other documents presented by the agent.  To complete the transaction, the agent releases the prior loan and records the release, records the appropriate documents to update the public record and issues the title insurance loan policy paid for by the borrower.

As noted above, the closing is the first time that the consumer/borrower meets the agent.  Ray Dep. at 76; Rozniakowski Dep. at 72.  Even though the closing may be the only contact that the consumer has with the title agent or the insurer, Chicago Title did not have or use any form to advise consumers of their various options for title insurance.  Ray Dep. at 77; Reimer Dep. at 85-88; Rozniakowski Dep. at 73.  As was further established during discovery, and as discussed in greater detail below, Defendant did not conduct *any* oversight, audits or reviews of its agents to insure that consumers were given the discounted rates to which they were entitled.  Reimer Dep. at 70-73. *See* Part D below.

Finally, weeks after the closing, the agent issues the title insurance policy. Rozniakowski Dep. at 74-75.

**C.    The Statutory Regulation of Title Insurance Premiums**

All title insurers, including Chicago Title, are governed by the Pennsylvania Title Insurance Company Law. *See* 40 P.S. § 910-1 *et seq*. Complaint at ¶¶ 9-22. This statute regulates the business of title insurers and specifically regulates the rates insurers may charge for title insurance policies. The statute requires title insurers to either: 1) file their own individual proposed rates with the Insurance Commissioner, 40 P.S. § 910-37(a); or 2) elect to become a member of a rating organization that files proposed rates on behalf of all members of the organization, 40 P.S. § 910-37(b). During the relevant time period, Chicago Title and 24 other title insurers in Pennsylvania elected to file their rates through the Title Insurance Rating Bureau of Pennsylvania ("TIRBOP"). Complaint at ¶¶ 13-18 and Exhibit A to Complaint; Reimer Dep. at 22. As the rating organization, TIRBOP files title insurance rates for its members with the Insurance Commissioner, who then approves or denies such rates. Reimer Dep. at 19, 31. The rates and regulations approved and enacted constitute the Manual of Title Insurance Rating Bureau of Pennsylvania ("Rate Manual"), a copy of which is attached hereto as Exhibit F.

The Rate Manual provides for three different rate tiers relevant to this case: 1) the Basic Rate; 2) the Reissue Rate, which is 90% of the Basic Rate; and 3) the Refinance Rate, which is 80% of the Reissue Rate, or 72% of the Basic Rate; a 28% discount of the Basic Rate. The Basic Rate is the default rate that customers receive if neither the Reissue nor Refinance Rates apply. The Reissue Rate, like the Refinance Rate, is a discounted rate that reflects the simple fact that when only a few years have passed since the issuance of a title insurance policy, there is reduced

risk of title defects or other problems that may cause claims against the new title insurance

policy, and also less work involved in examining the title for defects.

During the time relevant to this action, the Rate Manual provided as follows with respect

to the Refinance Rate:

REFINANCE AND SUBSTITUTION LOANS

When a refinance or substitution loan is made within 3 years from the date of
closing of a previously insured mortgage or fee interest and the premises to be
insured are identical to or part of the real property previously insured and there
has been no change in the fee simple ownership, the Charge shall be 80% of the
reissue rate.

See 2003 Rate Manual at section 5.6, at Exhibit F.[5]  Thus, by a plain reading of the Rate Manual,

the Refinance Rate applies when two conditions are met: 1) a refinancing is sought on the

identical real property within three years of the real property being insured; and 2) there has been

no change in the fee simple ownership of the real property. *Id.*  Moreover, the calculation of the

applicable rate is relatively straightforward.  *See* 2003 Rate Manual at 5.50.  Once it is

determined that the Refinance Rate or Reissue Rate applies, the premium charge is determined

---

[5]      Section 5.50 of the Rate Manual also specifies that the "Reissue Rate shall be 90% of the Basic
Rate for all units of insurance or fraction thereof up to and including $2,000,000." Section 5.6 specifies
that the Refinance Rate "shall be 80% of the reissue rate." The Rate Manual provided as follows with
respect to the Reissue Rate:

5.3    REISSUE RATE

A purchaser of a title insurance policy shall be entitled to purchase this coverage at the
reissue rate if the real property to be insured is identical to or is part of real property
insured 10 years immediately prior to the date the insured transaction closes when
evidence of the earlier policy is produced notwithstanding the amount of coverage
provided by the prior policy.

*See* 2003 Rate Manual, Exhibit F.

by "a simple mathematical calculation" from the rates set forth in the TIRBOP Manual.  Ray Dep. at 9, 84, and 124; Rozniakowski Dep. at 79.

Similarly, by a plain reading of the Rate Manual, the Reissue Rate (rather than the refinance rate) applies when two conditions are met: 1) a prior policy on the identical real property was issued within the past ten years; and 2) evidence of the earlier policy is produced. *See* 2003 Rate Manual at 5.3.  Notably, as testified to by Ms. Rozniakowski, there are various ways to satisfy proof of a prior policy, which, in the absence of a physical policy or HUD-1 could include the recording date of the last insured mortgage, or the date of the last insured mortgage.  Rozniakowski Dep. at 38.

Indeed, the limited discovery in this case, to date, establishes that not only were these common sense rules in effect as of September, 2003, but that all of the information necessary to trigger entitlement to the discounted Refinance and/or Reissue Rate was *readily available* to Chicago Title and its agents from standard forms and documents used *in every transaction*.  At a minimum, the title commitment provides all the information necessary to determine whether a prior policy exists.  Ray Dep. at 65-7.  The title commitment, which is prepared by the Defendant's appointed agent off of standard forms, explicitly identifies whether the property was purchased or refinanced within the previous ten years or refinanced within the previous 3 years. Ray Dep. at 65-7 and 116 (stating that title commitments typically contain all existing mortgages on the property, the previous purchaser of the property, and the date the last time the property was purchased).  According to Chicago Title:

| | |
|---|---|
| Q. | If I would ask you to please turn to Chelsea 0043. |
| A. | Okay. |
| Q. | What document is that? |
| A. | That is the marked up title commitment. |
| Q. | That Chicago Title's standard form? |
| A. | Yes. |

| | |
|---|---|
| Q. | And this would have been a document used by a Chicago Title Agent in the normal course of business; would it not. |
| A. | Yes. |
| Q. | And it would be issued in every borrower's case where there's title insurance, correct? |
| A. | Correct. |
| Q. | And the information that is on the title commitment, if you could flip, for example to Page 0045, under Schedule A, that's the normal type information that's going to be on a title commitment; is it not? |
| A. | Correct. |
| Q. | And from the title commitment we can tell a lot of information, can't we? |
| A. | Yes. |
| Q. | We could tell the names of the borrowers who are the homeowners? |
| A. | Mm-hmm. Correct. |
| Q. | We know from the title commitment when the property was purchased, correct? |
| A. | Mm-hmm. |
| Q. | Is that a yes? |
| A. | I'm sorry. I'm sorry. Yes, yes, we do. |
| Q. | From the title commitment we can also tell what the prior mortgages are? |
| A. | We can tell that there is a mortgage on the property, yes. |
| Q. | And we can tell the date of that mortgage, correct? |
| A. | Yes. |
| Q. | And we can tell the amount of the mortgage, can we not? |
| A. | Yes. |
| Q. | We could also tell who the lender is for that mortgage; could we not? |
| A. | Yes. |
| Q. | And that is going to be true for every title commitment that's issued? |
| A. | Correct. |
| Q. | And this information, obviously, is available to the title agent; is it not? |
| A. | Yes. |
| Q. | And it's inputted by the title agent? |
| A. | Correct. |
| Q. | From information they gather as part of – from the public record? |
| A. | Correct. |

Reimer Dep. at pp.104-106.

### D.    In Pennsylvania, Title Insurers Such as the Defendant Work Exclusively Through Appointed "Agents"

In Pennsylvania, the Defendant does not typically sell title insurance directly to the public, but rather, through agents. Reimer Dep. at 18. A title agent is an independent licensed entity in Pennsylvania authorized to participate in the practice of title insurance. *Id. See also*

Fidelity National Title Group 10-K at 6, Exhibit D.  In order to serve as a title agent for Defendant in this case, a title agent must be "appointed" by the insurer under a protocol established by Pennsylvania law. Reimer Dep. at 18; Fidelity National 10-K at 68-69. 40 P.S. §§ 910-24; 910-26.

The process of appointing a title agent is the same statewide and results in the title agent having extraordinary authority to act on the insurer's behalf – in this case, Chicago Title.  Reimer Dep. at 18-19.  40 P.S.§ 910-24.  Chicago Title's agency contract specifies that:

> Principal hereby appoints Agent as a policy issuing agent of Principal for the sole purpose of issuing title insurance commitments, policies, endorsements and other title assurances approved by Principal and by all required regulatory agencies, now in existence or hereafter developed, relating to real property located in all the county(ies) in the Commonwealth of Pennsylvania in accordance with the terms of this Contract. During the term of this contract,

> Agent shall have the right to issue title insurance commitments, policies and endorsements of any title insurance company in the referenced geographic area.

Exhibit G hereto ("Agency Contract").  As the Agency Contract demonstrates, the authority of the title agents to act on behalf of Chicago Title is contractual, as well as statutory, with both granting plenary authority to the title agents to issue insurance on behalf of the insurer and to bind the insurer. *Id*.  Additionally, the Agency Contract requires the agent to "[c]omply with all applicable laws and regulations relating to the conduct of Agent's business" and "all bulletins, manuals and other instructions furnished to Agent in writing . . . by Principal" when soliciting and issuing title insurance; both of which Chicago Title interprets as meaning that the agents have to strictly adhere to the TIRBOP and specifically the rates expressed there within.  Agency Contract, Exhibit G at ¶4(J, K).

Despite the authority contractually delegated by Chicago Title to its appointed agents (at least 120 in Pennsylvania)(Reimer Dep. at 23; Ray Dep. at 17), discovery establishes that

***Chicago Title provides virtually no training or oversight to its agents***, especially when it comes to whether the agents are charging the proper rates on the policies issued on behalf of the insurer. Reimer Dep. at 70-73; 83-88; Ray Dep. at 104-5.  Although the Defendant conducts an annual review of its agents to review account procedures and the agent's compliance with escrow guidelines (Agency Contract at ¶4(I)), Chicago Title does not include in its review a determination of the number of times that the agents have applied the Reissue or Refinance Rate. Reimer Dep. at 70-71. Nor do the reviews determine whether the Reissue Rate or Refinance Rate has been properly assessed. *Id*.

In fact, other than answering questions affirmatively put to them by their agents, Chicago Title has no proactive system in place to determine when their agents are properly crediting the borrowers the discounted rates to which they are entitled.    Chicago Title's Agency Representative explained:

| | |
|---|---|
| Q. | What information does Chicago Title give to its agents concerning the appropriate rates that need to be charged in connection with the borrower's transactions? |
| A. | We provide all agents with a TIRBOP manual. |
| Q. | Anything other than the TIRBOP manual? |
| A. | We provide them with the, you know, Pennsylvania statutes. |
| Q. | Okay. |

****

| | |
|---|---|
| Q. | What do you give them other than the TIRBOP Manual and statutes? |
| A. | We give – we don't – we don't feel we're required to give them anything else. |
| Q. | Are there any instructional videos you give them? |
| A. | No |
| Q. | Any training on how to calculate the correct rate? |
| A. | No, no training on how to calculate a correct rate. They can call us if they need help with calculations. |
| Q. | Okay. So assuming that an agent doesn't call you, they're on – it's up to them and up to their discretion to determine when it's appropriate to give the reissue rate, for example. |

Mr. May: object to form.

14

| | |
|---|---|
| A. | Yes, it is, it's their case and their closing and their file and that's something they should know. |
| Q. | An it's also up to the agent to determine whether or not the refinance rate is appropriate for any given transaction? |
| A. | Yes, it's also their responsibility to know if that's appropriate. |

Reimer Dep. at 71-73. *See also* Ray Dep. at 33, 104-5, and 114.

Ms. Rozniakowski of Chelsea Land Transfer, Inc., Chicago Title's appointed agent who handled Ms. Cohen's transaction, testified that she never received any training from Chicago Title about how to issue policies on Chicago Title's behalf:

| | |
|---|---|
| Q. | Did Chicago Title ever talk to you about the rates that were being charged? |
| A. | Personally? |
| Q. | Personally. |
| A. | No. |
| Q. | Do you have any information about Chicago Title ever talking to anyone at Chelsea about the rates that were being charged? |
| A. | I don't. |
| Q. | Did you receive any training from Chicago Title about how to issue policies for them? |
| A. | No. |

Rozniakowski Dep. at 42-43 and 84-85. Additionally, Ms. Rozniakowski was reasonably certain that she never received an underwriting manual or escrow guidelines from Chicago Title. *Id.* at 45, 90.

### E.    The Title Insurance Industry is a Cash Cow

Given the fact that title insurance is required in virtually every residential real estate transaction, it is not surprising that the industry is extraordinarily profitable. One court recently noted that "[n]ews reports indicate that title insurers pay out 47 cents for every $10 collected." *In re Coordinated Title Insurance Cases*, 784 N.Y.S.2d 919, 2004 WL 690380, *2 (N.Y. Sup. 2004). In a recent article appearing in CNNMoney.com, it was reported that the title insurance industry is making billions of dollars at the expense of consumers:

The profits involved appear to be significant. Nationwide, only a tiny percentage of premiums are returned to consumers to settle claims.

In 2003, according to ALTA, the industry paid out about $662 millions. That's just over 4 percent of the $15.7 billion taken in as premiums. Auto insurers, in contrast, paid out 75 percent of collected premiums, according to the American Insurance Association (AIA).

CNNMoney.com, January 11, 2006, attached hereto as Exhibit H.

Given the enormous profits potentially to be realized by this scheme, Chicago Title's consistent, systemic and widespread failure to properly credit Pennsylvania consumers with the proper discounted rate for title insurance required by Defendant's own filed rates is especially troubling, though not at all surprising.

F.      **Defendant Chicago Title Overcharged Plaintiff and the Class for Title Insurance**

The rates filed on behalf of Chicago Title by TIRBOP are mandatory. Ray Dep. at 106. Once proposed rates have been filed and approved by the Commissioner, the law prohibits title insurers from charging anything other than the approved rates:

. . . no title insurance company or agent of a title insurance company shall charge any fee for any policy or contract of title insurance except in accordance with filings or rates which are in effect for said title insurance company . . . .

40 P.S. § 910-37(h). Yet, notwithstanding the mandatory nature of the filed rates, Chicago Title disregarded the discounted filed rates and overcharged Ms. Cohen and thousands of putative Class members. Complaint at ¶ 23.

Moreover, according to Chicago Title, borrowers are entitled to be placed in the best price tier for which they qualify:

| Q. | I'm asking you right now, if a borrower qualifies for the reissue rate, are they required to get the reissue rate? |
|----|----|
| A. | Yes. |
| Q. | If the borrower qualifies for a better rate, the refinance rate, are they required to get the refinance rate instead? |

| A. | Yes. |
|----|------|
| Q. | So I'll ask my question again. If a borrower qualifies for a particular rate, is – are Chicago Title and its agents required to provide the best rate possible? |

MR. MAY:    I'm going to object to form again. You can answer.

| A. | Sure, yes. |
|----|------|
| Q. | They can't, for example, give someone the standard rate if the individual qualifies for the refinance rate? |
| A. | They cannot, you said? |
| Q. | That's not permissible, is it? |
| A. | If the borrower qualifies for the re – for the [refinance] rate, the agent is supposed to charge the [refinance] rate or the reissue rate or the basic rate, whichever applies. |
| Q. | The best rate that's available for the consumer? |
| A. | Correct. |

Ray Dep. at 90-1. Chicago Title's Agent, Ms. Rozniakowski, agreed with Ms. Ray's contention without reserve:

| Q. | Do you know if, in Pennsylvania, there is a requirement that borrowers be charged for title insurance the best price tier for which they qualify? |
|----|------|
| A. | Yes. |
| Q. | It would be unlawful not to give them that best price, correct? |
| A. | Yes. |

Rozniakowski Dep. at 84.

Additionally, Chicago Title and its agent readily agree that in Pennsylvania the Rate Manual sets forth the rates that must be charged and that ***must be followed to the letter.*** Ray Dep. at 88-9 and 106.

A failure to follow the filed rate is unlawful. Reimer Dep. at 23. For example, Ms. Rozniakowski described how the filed rate works:

| Q. | Do you know what the – what the filed rate is? Are you familiar with that term? |
|----|------|
| A. | Yes. |
| Q. | And what is that? |
| A. | Filed rates are the rates that insurance companies charge for the issuance of the insurance as set by the insurance commission. |

| | |
|---|---|
| Q. | And, in Pennsylvania, that's the same rate for all title insurance companies – |
| A. | Correct. |
| Q. | Is it not? Are you familiar with the term TIRBOP? |
| A. | Yes. |
| Q. | What is the -- the TIRBOP Manual? |
| A. | Right. We have the two manuals, the TIRBOP Manual and the ALTA Manual, where the insurance commission sets – sets our uses for endorsements and title practices. |
| Q. | And you are required to follow the TIRBOP Manual, are you not? |
| A. | Um-hum. Yes. |
| Q. | Thank you. In fact, it would be illegal not to follow the TIRBOP Manual, wouldn't it? |
| **** | |
| A. | Yes |

Rozniakowski Dep. at 29-30. *Accord,* Ray Dep. at 88-9 (stating that "agents and underwriters must charge the rate that's applicable with the TIRBOP manual" and agents "have to follow the rules and regulations that are in the TIRBOP manual.")

The scheme to cheat consumers alleged in this case is best illustrated through the circumstances of the named Plaintiff in this case, Pearl Cohen, a 67 year old, widowed African American woman. Ms. Cohen purchased her home at 130 W. Pomona Street in Philadelphia in 1969. In February 1999, Ms. Cohen and her husband refinanced their home and obtained a lender's title insurance policy as part of the refinancing. With home values and interest rates remaining favorable, Ms. Cohen, like many homeowners seeking to avail themselves of historically low mortgage rates refinanced again in February 2002. The closing and settlement services were provided by Chelsea Land Transfer Inc., Chicago Title's agent. Rozniakowski Dep. at 11-12. The loan amount for Ms. Cohen's 2002 refinance was $57,600. Complaint ¶¶ 27-28. In connection with the 2002 refinance, Chelsea on behalf of its principal – Defendant Chicago Title – issued a lender's title insurance policy with a face value of $57,600. Line 1108 of Ms. Cohen's 2002 HUD-1 Settlement Statement, attached hereto as Exhibit I, establishes that

Chicago Title charged Ms. Cohen $606.75 for this lender's policy. Ms. Cohen was actually entitled to the Refinance Rate of $436.86 (72% of the basic rate), however, because this transaction occurred within 3 years of the date of closing on a previously insured mortgage on the property. Complaint at ¶¶ 24-33. In fact, based upon the named Plaintiff's title commitment, the appointed agent who originally issued the Cohens' policy in 2002 now patently admits that Ms. Cohen should have received the discounted Refinance Rate because Ms. Cohen's transaction occurred within 3 years of the date of the previously insured mortgage closing on the same property:

| | |
|---|---|
| Q. | Okay. So let's take a look at the Cohens' commitment . . . . So, if we see, at the bottom of Page 46, that there was a mortgage in 1999 – a first mortgage, would that have been – would that have qualified them for the reissue rate? |
| A. | That would have qualified them for the substitution rate? |
| Q. | Why the substitution rate? |
| A. | Well, they are within the three year time frame . . . . |
| Q. | I'm sorry. 1999 to 2002. I think the substitution rate's called the refinance rate? |
| A. | Yeah. Yes . . . . |
| Q. | So the Cohens should have qualified for the refinance rate. |
| A. | Yes. |

Rozaniakowski Dep. at 78-81.

Although Pennsylvania law entitled Ms. Cohen to receive the nondiscretionary discounted Refinance Rate premium for the new title insurance policy issued in connection with her refinancing, Chicago Title failed to provide Ms. Cohen any discount at all. Instead, Chicago Title simply pocketed the difference in the premium it actually charged, $606.75, and the premium it was required to charge, $436.86. Complaint at ¶¶ 29-31.

For its part, Chicago Title readily admits – as it must -- that it had all of the information necessary to give Ms. Cohen the discount to which she was entitled. The title commitment for Ms. Cohen's loan transaction – explicitly identifies that she had refinanced her home within the

previous three years prior to refinancing her home again in 2002. *See* Ms. Cohen's title commitment attached hereto as Exhibit J.  *See also*, Exhibit I hereto, HUD-1 Settlement Statement at line 1501.

Moreover, such information was readily available to Chicago Title prior to the closing of the refinancing through the title search or title abstract, a task generally accomplished by the title agent utilizing the services of the title insurer's own "title plant."[6]

| | |
|---|---|
| Q. | What information can you get through title plant searches? |
| A. | I don't – well, I would imagine all the information that you need. |
| Q. | Do you know if you can obtain a copy of the prior title insurance policy through the title plant search. |
| A. | You know, I don't know. Okay. |
| Q. | But you can certainly gain all the information about the prior mortgages – |
| A. | I believe so. |
| Q. | Correct? You can obtain information about when the property was purchased by the current owners? |
| A. | Yes. |
| Q. | About the prior owners of the – of the property. |
| A. | I believe so. |

Rozniakowski Dep. at 54-56.  *See also id*. at 62-65 (the title commitment, issued after the title plant search, will include the name of the borrowers, address of the property, information about outstanding loans, date of sale and purchase of the property and the name of the mortgage holder); *see also* Reimer Dep. at 115-117 (Chicago Title's title plant is a valuable asset to Chicago's agent and would enable agents to "find out everything they wanted to know about the title property," including the chain of title, the lot and block number, the address, the existence of any liens and whether prior title insurance has issued on the property). Notably, in the

---

[6]    As noted in Fidelity National's 10-K at p. 5, "[p]rior to issuing policies, title insurers and their agents attempt to reduce the risk of future claim losses by accurately performing searches and examinations. A title company's predominant expense relates to such searches and examinations, the preparation of preliminary title reports, policies or commitments and the maintenance of 'title plant,' which are indexed compilations of public records, maps, and other relevant historical documents." Exhibit D hereto. *See also id*. at 96-97 (explaining how subsidiaries of Fidelity National, such as Chicago Title, have access to computerized title plants).

overwhelming majority of instances, a title commitment will be issued before the closing. This being the case, we also know that "virtually all" real property mortgage lenders require their borrowers to obtain title insurance. Fidelity National 10-K at p. 5. Regardless, neither Chicago Title, nor its agent Chelsea, ever apprised Ms. Cohen of her eligibility for discounted title insurance. Nor did Chicago Title ever instruct its agents to be sure to inform borrowers of their right to discounted title insurance. Rozniakowski Dep. at 73. In fact, Ms. Rozniakowski testified that the first time Chelsea would ever have contact with the borrower would be at the closing. *Id.* at 72.

Ms. Cohen's experience with Chicago Title is neither unique nor isolated. As noted by Ms. Reimer of Chicago Title, Ms. Cohen's closing file contained the standard type of documents that would be found in a title agent's file, such as the title commitment issued in every borrower's transaction, the HUD-1 settlement statement, a disbursement sheet form, a standard form of owner's affidavit, a uniform residential loan application, an abstract title search, and the lender's instructions. Reimer Dep. at 103-113. In short, Ms. Cohen's file contained multiple pieces of information that unambiguously disclosed the existence of prior title insurance that entitled her to a discounted rate on her title insurance.

Additionally, Chicago Title's summary of transactions over the time period relevant to this suit establishes the consistent failure of Chicago Title to provide the mandated, discounted rates for title insurance. Documents produced to date include six annual reports submitted by Chicago Title to TIRBOP for the years 2000-2005. The relevant portions of those annual reports for the years 2000 through 2005 are attached hereto as Exhibits K - P. Also, attached hereto as Exhibit Q, is a spreadsheet based on that information, representing the amounts paid to Chicago Title for title insurance by Pennsylvania homeowners in those six calendar years.

21

The spreadsheets based on Chicago Title's annual reports reflect the following:

- 97,760 Pennsylvania title insurance policies were underwritten by Chicago Title at the Basic Rate and the ALTA Short Form Basic Rate totaling $118,566,591 in premiums collected.[7]

- 44,298 Pennsylvania title insurance policies were underwritten by Chicago Title at the Reissue Rate totaling $59,373,553.

- Chicago Title reported giving the Refinance Rate to only 15,660 homeowners in all title insurance transactions in Pennsylvania.

*See* Exhibits K-P.

The six year class period, 2000-2005, was a time of historically low interest rates and correspondingly a very busy time for refinancing. The Joint Center for Housing Studies of Harvard University found that once the refinancing boom began in 2000, consumers held their mortgage loans an average of 2 years before refinancing. JOINT CENTER FOR HOUSING STUDIES OF HARVARD UNIVERSITY, THE STATE OF THE NATION'S HOUSING: 2005, at pp. 6, 33 (2005), http://www.jchs.harvard.edu/publications/markets/son2005/index.html. *See also* Fidelity National 10-K, Exhibit D, at pp. 4, 14, and 30.

Consequently, the vast majority of Class members were entitled to either the Reissue Rate or the Refinance Rate. Plaintiff believes that 90% of the Class that were given the Basic Rate or the ALTA Short Form Basic Rate should have instead received at least the 10% discount under the Reissue Rate. In addition to those members who did not receive the Reissue Rate, many thousands undoubtedly were entitled to the Refinance Rate, which, according to Chicago

---

[7]     The ALTA Short Form Rate is a special policy that issues at the closing of the loan rather than, as is typical, at some time after the loan is recorded in the land records (which could be several months after the loan closing). The ALTA Short Form Rate carries an extra fee of $125 in addition to the otherwise applicable charge, *see* section 5.15 of Rate Manual, but does not otherwise alter the consumer's entitlement to receive the Reissue Rate and Refinance Rate discounts. Ray Dep. at 50-54 (stating that the buyer or borrower is entitled to either the basic, reissue, or refinance rate under the ALTA Short Form Rate just as the buyer or borrower would be entitled under the standard policy).

Title's reports, was granted to **only 15,660 people over the course of 157,718 transactions in six years. More importantly, a quick look at the numbers, as produced by Chicago Title, displays a disturbing trend: only approximately 17% of all lender title insurance policies issued by Chicago Title in 2000 received a discounted rate. Furthermore, more than 50% of all the Refinance Rates given to consumers purchasing lender's title insurance policies from Chicago Title took place in 2005. Chicago Title's history of honoring the larger discount Refinance Rate is even more telling. Only 220 consumers received the Refinance Rate in 2001. Although Chicago Title did a better job of properly crediting the discounts to consumers in 2005 (77% received some type of discount) even that percentage is well below the 90% that should have received a discount.**

In short, the evidence in this case establishes that, in Pennsylvania, Chicago Title issued thousands of title insurance policies in refinance transactions that were identical to the Plaintiff's transaction in this respect – the consumer was not charged the proper rate for title insurance. Moreover, as acknowledged in the public filings of Chicago Title's parent company, Fidelity National, as well as industry studies, during the last five years, there have been an historically large number of real estate transactions, which should have entitled a large number of people to both the discounted Reissue and Refinance Rates that are not reflected in the reports produced by Chicago Title.

The reasons why very few Chicago Title customers received the discounted rates for title insurance are apparent: Chicago Title (1) conducts little, if any, oversight of its agents; (2) provides limited, if any, advice; and (3) has in place a policy and protocol that runs counter to the filed rate that makes the discounted rates for title insurance illusory for consumers.