# EXHIBIT B

COPY

# In The Matter Of:

## *Cohen*
## *v.*
## *Chicago Title Insurance Company*

---

### JODI REIMER
### October 17, 2006

---

## REPORTING ASSOCIATES, LLC

*Certified & Registered Professional Reporters*

*Cherry Hill  --  Philadelphia  --  Trenton*

(888) 795-2323



*www.ReportingAssociates.com*

**Page 1**

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PHILADELPHIA
CLASS ACTION
C.A. NO. 06-0873
```

PEARL E. COHEN, on behalf of herself
and all others similarly situated,

    Plaintiffs,
vs.
CHICAGO TITLE INSURANCE COMPANY,
    Defendant.

Philadelphia, Pennsylvania
October 17, 2006

TRANSCRIPT of testimony JODI REIMER as taken by and before MARGARET M. REIHL, RPR, CRR, CSR and Notary Public, at the offices of DONOVAN SEARLES, LLC, 1845 Walnut Street, commencing at 9:38 a.m. in the forenoon.

**Page 2**

APPEARANCES:

QUINN GORDON & WOLF, CHTD
BY: RICHARD S. GORDON, ESQUIRE
    CORY ZAJDEL, ESQUIRE
102 W. Pennsylvania Avenue, Suite 402
Towson, Maryland 21204
Counsel for Plaintiff

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
BY: DARRYL J. MAY, ESQUIRE
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599
Counsel for Defendant

---

Also Present: Barry Forman, Videographer

---

**Page 3**

I N D E X

| WITNESS | PAGE |
|---|---|
| Jodi Reimer | |
|   By: Mr. Gordon | 6 |

E X H I B I T S

| NUMBER | | PAGE |
|---|---|---|
| No. 1 | Notice of Deposition | 14 |
| No. 2 | Chicago Title Agency Bulletin dated April 12, 2006 [CHI0116] | 32 |
| No. 3 | Issuing Agency Contract [CHI 0534 to CHI0544] | 53 |
| No. 4 | Agent Premium Register Detail for Agent PA2606, as of period 2002/'03 [CHI0545 to 0564] | 58 |
| No. 5 | Schedule of Rates effective July 1, 2002 [CHI0130 to 131] | 84 |
| No. 6 | Chicago Title Web Page 1 | 93 |
| No. 7 | Chicago Title Web Page 2 | 93 |

**Page 4**

| NUMBER | | PAGE |
|---|---|---|
| No. 8 | Chicago Title Web Page 3 | 93 |
| No. 9 | Chicago Title Web Page 4 | 93 |
| No. 10 | Chicago Title Web Page 5 | 93 |
| No. 11 | Chicago Title Web Page 6 | 93 |
| No. 12 | Policy Report, Company Examination System [CHI0001 to 00015] | 100 |
| No. 13 | Policy Report, Company Examination System [CHI0016 to 0031] | 100 |
| No. 14 | Policy Report, Company Examination System [CHI0032 to 47] | 100 |
| No. 15 | Policy Report, Company Examination System [CHI0048 to 64] | 100 |
| No. 16 | Policy Report, Company Examination System [CHI0065 to 80] | 100 |
| No. 17 | Policy Report, Company Examination System [CHI0081 to 096] | 100 |
| No. 18 | Chicago Title Lenders and Owner's Policies issued 2000 to 2005, with attached Chicago Title insurance putative class action lawsuits involving reissue or refinance title rates | 98 |
| No. 19 | Chelsea Land Transfer, Inc. Title Express Escrow Accounting System [Chelsea 001 through 0164] | 101 |

** All exhibits were retained by Mr. Gordon

## Page 5

(It was stipulated by and between counsel for the respective parties that signing, sealing, certification and filing are waived, and that all objections, except as to the form of the question, are reserved to the time of trial.)

THE VIDEOGRAPHER: This is the video deposition of Jodi Reimer taken by the plaintiff in the matter of Pearl E. Cohen on behalf of herself and all others similarly situated versus Chicago Title Insurance Company. This is in the U.S. District Court, Eastern District of Pennsylvania, Class Action, Docket Number C.A. 06-0873.

This deposition is being held at the offices of Donovan Searles on Walnut Street in Philadelphia, Pennsylvania on the 16th of October, 2006. My name is Barry Foreman from the firm of Reporting Associates with offices in Cherry Hill, New Jersey and Philadelphia, Pennsylvania and I am the videographer. The reporter is Peggy Reihl, also of Reporting Associates.

We're going on the record at approximately 15 minutes past ten o'clock. Will counsel please state their appearances for the record.

MR. GORDON: Richard Gordon on behalf of Ms. Cohen, the plaintiff.

## Page 6

MR. ZAJDEL: Cory Zajdel on behalf of the plaintiff.

MR. MAY: Darryl May on behalf of defendant.

MR. SNYDER: Steve Snyder on behalf of the defendant.

THE VIDEOGRAPHER: Will the court reporter please swear in Ms. Reimer.

... JODI REIMER, having been duly sworn as a witness, was examined and testified as follows...

THE VIDEOGRAPHER: We may proceed.

EXAMINATION
BY MR. GORDON:
Q. Good morning, Ms. Reimer. How are you today?
A. Fine, thank you.
Q. Have you ever had your deposition taken before?
A. Yes, I have.
Q. How many times?
A. One other time.
Q. What was the occasion?
A. A personal matter.
Q. And when was it?
A. In the '90s.

## Page 7

Q. In the '90s, okay. Well, let me run through the basic ground rules for today.

I'm going to ask you a series of oral questions, to which I need oral responses. If at any point you don't understand a question or need me to repeat it or rephrase it, I will be glad to, just please make me aware of it. If you do not make me aware of it, I'll work on the understanding that you understood the question.

And if at any point you need to take a break, let me know that as well and I'll try to accommodate at a reasonable time, okay?
A. Okay.
Q. What is your position with Chicago Title?
A. My position is I am an agency representative and assistant vice president.
Q. How long have you been with Chicago Title?
A. I have been with Chicago Title just a little bit over two years.
Q. Two years. Where were you before that?
A. Prior to that I was with Fidelity National Title.
Q. Is that part of the same company of Chicago?
A. It's a sister company.
Q. Does it generally operate the same way as

## Page 8

Chicago Title?
MR. MAY: Object to form.
THE WITNESS: It operates the same way, although we are separate entities.
BY MR. GORDON:
Q. Okay. But there wasn't any great difference in the way that one title company worked versus another?
MR. MAY: Object to form.
THE WITNESS: In what respect?
BY MR. GORDON:
Q. General operations?
A. There would be a difference in possibly how remittances were received or uploaded to a corporate office, you know, do we use the same rate forms, you know, provided by ALTA? Yes. Do we abide by all the same laws in the State of Pennsylvania? Yes.
Q. Title policies are all the same?
A. The title policies would be, yes, the same.
Q. And you're in the Western District; are you not?
A. Yes, I am.
Q. Could you explain to me how Chicago Title is split up in that respect?
A. I cover the western portion of Pennsylvania as

JODI REIMER

**Page 9**

1 the western agency representative and then the reps in
2 the eastern side of the state cover the eastern
3 portion.
4 Q. What would constitute the western portion?
5 A. I travel probably as far north and east as
6 State College, as far north as Erie and then south as
7 far as maybe Uniontown.
8 Q. The rest of the state would be part of the
9 eastern territory?
10 A. Probably, although I do have -- I do have the
11 availability to travel to Scranton, if need be.
12 Q. Okay. Other than the geographic distinction,
13 are there any other distinctions between the eastern
14 and western districts insofar as how Chicago Title
15 operates within the State of Pennsylvania?
16 A. No, there are no other distinctions, other
17 than possibly how our -- how we operate internally,
18 such as how we may upload our remittances, we may hold
19 our seminars at our convenience, to our convenience of
20 our agents, where we don't check in with the western
21 side of the state as to when they are holding theirs.
22 Q. It's still part of the same company?
23 A. Part of the same company.
24 Q. And it operates in the same manner, generally?
25 A. In the same manner, but we also have the

**Page 10**

1 authority to run our side of the state, you know, as
2 to what is convenient to us and our agents, such as
3 seminars in these months and these months and we
4 don't, you know...
5 Q. Okay. You mentioned that you were with
6 National Fidelity prior to --
7 A. Fidelity National.
8 Q. Fidelity National, I apologize, prior to your
9 time at Chicago Title.
10   How long were you with them?
11 A. I was with them a little less than two years.
12 Q. And in what capacity?
13 A. I began there as an administrative -- an
14 agency assistant was the position.
15 Q. Would that be the title of someone who would
16 now work for you?
17 A. Correct.
18 Q. Okay. How far did you get in the company by
19 the time you left?
20 A. When I left Fidelity National Title I was
21 being trained to be an agency rep and I was traveling
22 more to southwestern Pennsylvania for Fidelity
23 National Title on a weekly basis, as well as to Erie,
24 as well to Uniontown to talk with agents.
25 Q. Okay.

**Page 11**

1 A. So I was just in my beginning process of
2 learning the rep business.
3 Q. Prior to your time at Fidelity National Title,
4 where were you?
5 A. I was in the field of dentistry.
6 Q. Completely different area?
7 A. Completely different area.
8 Q. So you've been in the title industry for
9 roughly four years?
10 A. Roughly four years.
11 Q. You -- you're generally familiar with the
12 process of issuing title policies in the state?
13 A. Yes, generally familiar.
14 Q. Have you ever worked for a title agent?
15 A. No, I have not.
16 Q. What have you reviewed in preparation for your
17 deposition today? Have you reviewed any documents?
18 A. Only those that were issued by my office, by
19 our underwriting counsel to our agents that were
20 requested to be sent to you.
21 Q. When did you review those?
22 A. Actually, I have -- I have a copy of those on
23 my desk back in my office, counsel made me a copy when
24 they sent them.
25 Q. Mm-hmm.

**Page 12**

1 A. And then -- so I've leafed through them and
2 then I reviewed them again yesterday with -- with
3 Darryl.
4 Q. You are referring to your counsel, Mr. May?
5 A. Yes. I'm sorry.
6 Q. Did you review the Complaint in this case?
7 A. I actually, for the first time, saw a copy of
8 the Complaint in this case yesterday.
9 Q. Did you review it?
10 A. No, no. We didn't go through it -- you mean
11 to go through it line by line, detail by detail; no.
12 Q. Have you read it?
13 A. I've skimmed it.
14 Q. And yesterday was the first time that
15 happened?
16 A. Yes.
17 Q. Have you reviewed any deposition transcripts
18 in connection with your preparation for this
19 deposition?
20 A. A deposition transcript that came -- I don't
21 know if it's actually a deposition transcript, but it
22 was a response from Chicago Title to possibly items
23 that you may have requested.
24 Q. The response to the Request for Production of
25 Documents?

JODI REIMER

**13**

1  A.    Right, that's all I've seen.
2  Q.    Okay. Did you review any testimony of anyone
3  else in any other case similar to this?
4  A.    No, I didn't actually -- you mean read
5  somebody else's deposition?
6  Q.    Yes.
7  A.    No, I didn't actually read anyone else's
8  deposition.
9  Q.    Were you provided a copy of it?
10 A.    No, I was not provided a copy of a deposition.
11 Q.    Were you shown a copy of a deposition
12 transcript?
13 A.    No, I actually was not shown a copy of a
14 deposition transcript.
15 Q.    Have you ever reviewed the file of the named
16 plaintiff in this case, Ms. Cohen?
17 A.    No. I have seen a settlement sheet, a Xeroxed
18 copy of a settlement sheet, I believe that's all that
19 I've seen of her file.
20 Q.    From what you saw was there anything unusual
21 about it?
22        MR. MAY: Object to form.
23        THE WITNESS: Off the top of my head,
24 it seemed as though she had a lot of fees on there for
25 loan origination fees and lender fees.

**14**

1  BY MR. GORDON:
2  Q.    From the broker and from the lender?
3  A.    From the broker, yes.
4  Q.    Other than that with respect specifically to
5  the title section, did there seem to be anything
6  unusual about the transaction?
7        MR. MAY: Object to form.
8        THE WITNESS: I didn't study the -- I
9  did not study it, I just looked at it, so, no, I can't
10 say that I saw anything, you know, other than that
11 dollar amount of broker fees that I thought was on the
12 high end.
13 BY MR. GORDON:
14 Q.    You weren't involved in her -- in the
15 underwriting of her title insurance, were you?
16 A.    No, I was not.
17 Q.    Do you have any personal knowledge with
18 respect to her transaction?
19 A.    No, no, I do not.
20        (Document marked for identification
21        as Defendant's deposition Exhibit Number 1.)
22 BY MR. GORDON:
23 Q.    Ms. Reimer, I'm going to show you what's been
24 marked as deposition Exhibit Number 1 in this case and
25 ask you if you have seen that document before?

**15**

1  A.    (Witness reviews document.)
2        MR. MAY: Let me just state for the
3  record here that per discussion with counsel last
4  week, we are going to produce the data in chart form
5  that's called for in this notice, but that's going to
6  be available and done this afternoon with Ms. Folda,
7  not Ms. Reimer. She doesn't have the answers to these
8  questions.
9        MR. GORDON: Okay. I thought that we
10 were doing it through the first witness but --
11        MR. MAY: I thought we were -- I didn't
12 know we had an agreement as to which witness and it
13 was just in terms of getting the chart ready, frankly.
14        MR. GORDON: It's not ready yet?
15        MR. MAY: It got ready this morning and
16 so I wanted to have --
17        MR. GORDON: Do you have it with you?
18        MR. MAY: -- Ms. Folda to have a chance
19 to look at it before we did it, so we didn't have the
20 opportunity with Ms. Reimer.
21        MR. GORDON: Okay.
22        MR. MAY: But it's our intention to
23 provide that chart and have Ms. Reimer -- I mean have
24 Ms. Folda submit it this afternoon.
25        MR. GORDON: Okay. That's fine. Then

**16**

1  I'll move on.
2  BY MR. GORDON:
3  Q.    Ms. Reimer, what is Chicago Title?
4        MR. MAY: Object to form.
5        THE WITNESS: The number one --
6  probably the best title insurance company there is.
7  BY MR. GORDON:
8  Q.    Okay. When you say "the number one," what do
9  you mean; is it the largest?
10 A.    We're one of the largest. Number one -- by
11 saying number one, my opinion is number one by what we
12 provide, our services, our counsel, our employees.
13 Q.    And your agents?
14 A.    Of course our agents.
15 Q.    What type of insurance does Chicago Title
16 issue?
17 A.    We issue title insurance.
18 Q.    What is title insurance?
19 A.    Well, there are two types of title insurance.
20 A lender's title insurance or a loan policy is issued
21 which guarantees the lender that their lien is in
22 first position and an owner's policy is issued should
23 an owner choose to purchase one that guarantees --
24 it's kind of -- another way to phrase it is backwards
25 insurance.

17

1  Q.	It covers past events?
2  A.	It covers you -- past events.
3  Q.	Other than issuing title insurance, does
4  Chicago Title issue any other types of insurance?
5  A.	No.
6  Q.	In Pennsylvania?
7  A.	No.
8  Q.	No.
9  	Does it issue commercial as well as
10 residential policies?
11 A.	Yes.
12 Q.	And in Pennsylvania does it issue any
13 insurance directly?
14 A.	Explain.
15 Q.	Are policies issued through agents or directly
16 through Chicago Title?
17 A.	The Pittsburgh office has a direct operations
18 that does issue direct policies, majority of those are
19 commercial.  The Pittsburgh office also has a national
20 business unit, an NBU, which issues policies not only
21 in Pennsylvania, but, you know, throughout the United
22 States.  They work on large, multi-site operations.
23 Q.	And you said that most of the policies issued
24 out of Pittsburgh directly are commercial policies?
25 A.	The majority of policies issued directly are

18

1  commercial policies.
2  Q.	What percentage would be residential?
3  A.	I don't work in the direct operations so I --
4  I can't really tell you.
5  Q.	What's your understanding?
6  A.	My understanding is that 80 to 90 percent
7  would be commercial, 10 percent would be residential.
8  Q.	Other than the portion -- the small portion
9  that's issued directly through the Pittsburgh office,
10 for the other operations in the Western district are
11 the policies issued exclusively by agents?
12 A.	Yes.
13 Q.	And these agents are appointed by Chicago
14 Title?
15 A.	Yes, they are.
16 Q.	They act on your behalf?
17 A.	Yes, they do.
18 Q.	They are contractually obligated to act on
19 your behalf; are they not?
20 A.	They're contractually obligated, as well as
21 certified with the state.
22 Q.	And they -- in issuing policies on your behalf
23 they have the authority to underwrite those policies;
24 do they not?
25 A.	Yes, they do.

19

1  Q.	To make the decision on underwriting?
2  A.	Yes, they do.
3  Q.	And, also, the decisions with respect to rates
4  are made by the agents; are they not?
5  A.	No, rates in the State of Pennsylvania are
6  filed rates.
7  Q.	Okay.  That isn't really what I was getting
8  to, but I appreciate that answer and I'll get to the
9  file rate issue in a few minutes.
10 	What I was getting to, though, is the
11 determination of what rate is appropriate for a
12 particular policy is determined by the agent; is it
13 not?
14 A.	Correct, it's determined by the agent.  Should
15 they have any questions, they would call underwriting
16 or call counsel at Chicago Title.
17 Q.	Okay.  Would they ever call you with questions
18 about that?
19 A.	Sure they could.
20 Q.	How often does that happen?
21 A.	It has happened over the two years I've been
22 there, half a dozen times, to me directly.  How many
23 times they call counsel with a situation, I don't -- I
24 can't fathom those numbers.
25 Q.	What were the nature of the questions that

20

1  were asked of you with respect to the rates?
2  A.	Well, when we have a rate change or a change
3  in the rate manual, you know, questions always arise
4  as to, you know, what does this mean I have to do, how
5  do I change this, you know, what does this mean, you
6  know, that we correctly follow the rate manual.
7  Q.	Now, in your position you have significant
8  contact with the agents?
9  A.	Yes, I do.
10 Q.	Are you the primary contact for the Western
11 district with the agents?
12 A.	Yes, I am.
13 Q.	Can you generally describe what you do on a
14 daily basis vis-a-vis agents?
15 A.	Sure.  My position is actually that of
16 building a relationship between -- my -- our agents
17 and Chicago Title and within the building of the
18 agency and this relationship we, you know, provide
19 seminars for the agents, we help them in any ways that
20 we can with underwriting questions, with problems,
21 with how to clear certain issues that they may run
22 into.
23 	You know, I also review their escrow accounts,
24 review files.  You know, I may -- I may take them to
25 lunch with an attorney in our office to discuss their

**21**

1  business.
2  Q.  They're your customers?
3  A.  Correct.
4  Q.  And they're Chicago Title's customers?
5  A.  Correct, we're a customer service industry, as
6  they are as well.
7  Q.  And is one of the things that you are trying
8  to do, is that to increase the amount of title
9  insurance policies that your agents underwrite using
10 Chicago Title?
11 A.  Yes.
12 Q.  Is it fair to say that agents often will have
13 more than one underwriter that they are appointed by?
14 A.  I -- I recommend that agents have more than
15 one underwriter.
16 Q.  Okay. Why do you recommend that?
17 A.  It's just a good business practice.
18 Q.  Why is it a good business practice?
19 A.  If you have a question and you -- you need an
20 answer right now and you are at closing and you can't
21 reach underwriter A, you need a fall back, you need
22 somebody to reach out to, so it's always good business
23 practice to have two underwriters.
24 Q.  Okay. In Pennsylvania, though, the types of
25 policies that are issued are going to be the same from

**22**

1  one underwriter to another; are they not?
2  A.  Correct.
3  Q.  They are all going to be standard, altered
4  policies?
5  A.  As long as they are a member of TIRBOP, yes.
6  Q.  And what is TIRBOP?
7  A.  The Title Insurance Rating Bureau.
8  Q.  And that's the organization that comes up with
9  consistent rates and policies for title underwriters
10 in the State of Pennsylvania; is it not?
11 A.  Correct.
12 Q.  As a member of TIRBOP, is Chicago Title bound
13 to adhere to TIRBOP's manuals?
14 A.  Yes, we are.
15 Q.  Can Chicago Title deviate from that manual in
16 any way?
17 A.  I believe there's a section in the TIRBOP
18 manual that allows you to apply for a deviation and
19 there is a process, but, you know, other than that,
20 no.
21 Q.  Well, let's say in an individual consumer's
22 case, when they are closing on a loan and there is a
23 lender's title policy issued, the agent acting on
24 behalf of Chicago Title can't deviate from the TIRBOP
25 manual just because they want to?

**23**

1  A.  No, no.
2  Q.  They can't come up with their own rates?
3  A.  Oh, no.
4  Q.  In fact, it would be unlawful to deviate from
5  the rates; would it not?
6  A.  Correct.
7  Q.  How many agents do you service in your
8  territory?
9  A.  I service approximately 60 agents.
10 Q.  Do you know how many there are in the Eastern
11 District?
12 A.  No, I do not know that.
13 Q.  Of the 60 agents, how many are title
14 companies?
15 A.  Explain that, what do you mean? They are all
16 title companies. The majority of them are law firms
17 who have -- who either, you know, have an attorney
18 that works in title and is the licensed title agent or
19 they've created, you know, an additional LLC for the
20 title company.
21 Q.  Well, let me break it down this way: I've
22 seen in the TIRBOP manual that there's a rate for the
23 approved attorney rate; are you familiar with that?
24 A.  Yes.
25 Q.  And then there's the other rates that are

**24**

1  applicable to title companies?
2  A.  To agents.
3  Q.  To agents.
4     Of the 60 agents that you deal with, how many
5  would not be in the category of approved attorney
6  agents?
7  A.  They would -- of those 60 agents that I'm
8  speaking of, they are all title agents.
9  Q.  How big are these companies; what's the range?
10    MR. MAY:  I just object to the form
11 because of the word companies.
12    MR. GORDON:  That's fine.
13 BY MR. GORDON:
14 Q.  Do you understand the question?
15 A.  How big are they?
16 Q.  Yeah.
17 A.  Do you mean by number of employees, by
18 remittances, by policies issued, by --
19 Q.  Yes.
20 A.  -- you know, the amount of the loans?
21 Q.  Let's do it by remittances on a monthly basis;
22 what's the range?
23 A.  I have ranges in a year that -- that run from
24 75 to 100 to, you know, $100,000.
25 Q.  How about in number of loans remitted?

**25**

1  A.    That's -- that's something I don't know off
2  the top of my head.
3  Q.    Okay. On the low end, though, what would it
4  be; do you know?
5  A.    No, I couldn't --
6  Q.    What's the smallest agent you deal with?
7  A.    An agent that remits about $7,500 a year, but
8  that could be five policies.
9  Q.    Okay. $7,500 in premiums?
10 A.    In premium.
11 Q.    Okay. How many loan -- that could be five
12 policies you said?
13 A.    It could be five policies, it could be 20
14 policies, depending on where they're located.
15 Q.    Okay. And the agent who is remitting $100,000
16 in premiums --
17 A.    Correct.
18 Q.    -- what would -- how many loans would that be
19 for?
20 A.    They could be issuing, you know, 60 policies a
21 month, depending on -- once again, it depends on the
22 cost of the property, you know, what the title
23 policy --
24 Q.    Okay. And when you say that they are
25 remitting $7,500 to $100,000 in premiums, is that the

**26**

1  total premium?
2  A.    That is the net premium.
3  Q.    That's the net premium, that is the portion
4  that Chicago Title would receive?
5  A.    Correct.
6  Q.    So, in fact, these agents are doing
7  significantly more work or more premiums?
8  A.    Correct.
9  Q.    The gross premium is going to be significantly
10 higher?
11 A.    Gross premium, correct.
12 Q.    Well, I want to make sure that for the balance
13 of this deposition we understand some of the terms
14 that we're working on.
15       Can you tell me what an endorsement is?
16 A.    Sure. An endorsement is -- is applied to a
17 title policy to either remove a restriction or allow a
18 restriction. Most commonly in Pennsylvania, in a
19 residential situation, you know, you would issue the
20 PA100, the PA300 and possibly the 8.1.
21 Q.    And these also -- these endorsements are also
22 part of the TIRBOP manual?
23 A.    Yes, they are.
24 Q.    Do they cost any additional amount?
25 A.    Yes, they do.

**27**

1  Q.    And that's also filed?
2  A.    Right, filed rates.
3  Q.    You mentioned owner's title insurance. Is it
4  my understanding that that is issued almost always in
5  the case of purchase money mortgages; when someone
6  buys the home?
7  A.    Mm-hmm.
8  Q.    And it's issued only once?
9  A.    It's issued only once. It's recommended.
10 Q.    And it remains in effect for the life of the
11 loan?
12 A.    For the life.
13 Q.    And a lender's title insurance policy, that's
14 issued in almost all cases where there is a first
15 mortgage; isn't that correct?
16       MR. MAY: Object to the form.
17       THE WITNESS: Correct.
18 BY MR. GORDON:
19 Q.    Virtually every case?
20 A.    Well, there are exceptions to that. Not
21 everybody requires, you know, a lender's policy.
22 Q.    Can you name for me any lenders that don't?
23 A.    Well, in certain areas of Pennsylvania you
24 have attorney's opinion of title, which an attorney
25 will review the search and write his opinion and the

**28**

1  lender will accept that as -- as truth and fact and
2  there is no title insurance then to be sold or asked
3  for.
4  Q.    How often does that happen, Ms. Reimer?
5  A.    It was more prevalent years -- years ago.
6  Q.    About 20 or more years ago?
7  A.    I don't even know if it was 20 or more years
8  ago, being that I've only been in the business for
9  four, but I still know of areas that -- that it is
10 prevalent in.
11 Q.    What areas?
12 A.    The Chambersburg area it's very prevalent in,
13 certain parts of the Wilkes-Barre area it's prevalent
14 in.
15 Q.    And which lenders, in your experience, will
16 accept this attorney opinion letter?
17 A.    It tends to be that the smaller banks in those
18 areas accept the attorney title of opinion.
19 Q.    Can you name any of them?
20 A.    No, not off the top of my head I can't a name.
21 Q.    Can you name one?
22 A.    Not with -- not off the top of my head, no.
23 Q.    Have you ever seen any bank accept an attorney
24 opinion letter, in your experience?
25 A.    I've been told by agents in the Chambersburg

**29**

1  area that they don't issue title insurance because
2  they rely on the attorney's opinion of title.
3  Q.    And which agents have told you that?
4  A.    I would need to go back and go through my
5  notes. I don't travel to the Chambersburg area now.
6  I did that for a brief time when I was with Fidelity.
7  Q.    Okay. In your experience with Chicago Title
8  have any agents told you that they don't issue lenders
9  title insurance because they accept an attorney
10 opinion letter?
11 A.    No, not with my position with Chicago Title.
12 Q.    Okay. It was only with your previous position
13 that that happened?
14 A.    Correct.
15 Q.    And in your experience with Fannie Mae ^CK SP
16 loans, doesn't Fannie Mae require title insurance?
17 A.    I don't really know that.
18 Q.    Okay. And like owner's title insurance, the
19 premiums are only paid once?
20 A.    They're only paid once.
21 Q.    Policies are uniform in the industry?
22 A.    Uniform in the industry.
23 Q.    The lender's title insurance or with respect
24 to lender's title insurance the beneficiary is, in
25 fact, the lender; is it not?

**30**

1  A.    It is.
2  Q.    Isn't lender's title insurance really just
3  foreclosure protection for the lender?
4           MR. MAY: Object to form.
5           THE WITNESS: No, I believe that it is
6  probably one part of it, to protect against
7  foreclosure but, you know, it also protects against
8  other issues that may come up that may keep the -- you
9  know, the purchaser from being able to pay their
10 mortgage.
11 Q.    Such as?
12 A.    You know, they come into a conflict because
13 there is a defect in the title that arises and maybe
14 they quit paying, you know, their mortgage until this
15 is straightened out. They certainly don't want to
16 head to foreclosure but they want it straightened out.
17 Q.    But the borrower at that point has defaulted
18 on the loan because they're not paying?
19 A.    Well, if it's gone that far.
20 Q.    What does title insurance cover? You said
21 past events. Could you give me some examples of what
22 it covers?
23 A.    It covers, you know, the chain of title, was
24 the chain of title correct, is there a right of way on
25 your property that wasn't listed, are the

**31**

1  boundaries -- the meets and boundaries of your
2  property correct, you know, is there -- all of a
3  sudden is there a railroad that owns a piece of your
4  property because at some point the rail -- you know,
5  the railroad system went through your property.
6  Q.    And these are things that would have been on
7  the public record that were not discovered at the
8  point of the title search?
9  A.    Or maybe they were not on the public record,
10 maybe they were missed prior to being put on the
11 public record, which, in fact, is what causes the
12 problems.
13 Q.    Something happens, someone missed something?
14 A.    Correct.
15 Q.    And all of a sudden there's a title problem?
16 A.    Correct.
17 Q.    What is the file rate, do you know what that
18 term means? You used it once.
19 A.    Right.
20 Q.    What does it mean?
21 A.    It's the rates that we agree to follow in the
22 State of Pennsylvania for the issuance of title
23 insurance. It also includes the rates for
24 endorsements.
25 Q.    Now, the rates themselves, have they changed a

**32**

1  whole lot in the last ten years?
2  A.    The last rate change was effective January of
3  2002.
4  Q.    Okay.
5  A.    And they increased.
6  Q.    How much, do you know?
7  A.    I don't know an overall -- the lowest rate at
8  that point increased by $30.
9           (Document marked for identification
10      as Reimer Deposition Exhibit Number 2.)
11 BY MR. GORDON:
12 Q.    Ms. Reimer, I'm going to show you what's been
13 marked as deposition Exhibit Number 2. I'm going to
14 ask if you have seen that document before?
15 A.    Yes, I have.
16 Q.    Is that a Chicago Title Agency bulletin?
17 A.    Yes, it is.
18 Q.    Kept in the ordinary course of business?
19 A.    Yes.
20 Q.    And what's the date on that?
21 A.    The effective date of the change is May 1st,
22 2006.
23 Q.    Okay. What I meant was what is the date of
24 the agency bulletin?
25 A.    April 12, 2006.

JODI REIMER

**33**

1  Q.    And what does this bulletin relate to?
2  A.    Rate manual changes that the insurance
3  department approved on behalf of TIRBOP that related
4  to transactional closings after May 1st of 2006. And
5  it specifically talked about a Section 5.6 which
6  were -- are refinance and substitution loans. It
7  changes the percent of reissue rate that you charge
8  and the years that are now customary, and then it also
9  changes the short form residential loan policy fee
10 from $125 to $100, and then it also decreases the
11 additional charge that is imposed on enhanced coverage
12 policies.
13 Q.    And the agency bulletin for Chicago Title, I
14 gather from our discussion during this deposition, as
15 well as from a discussion just prior to, that the
16 Western District office and the Eastern District
17 office of Chicago Title issue their own bulletins to
18 their agents?
19 A.    Correct.
20 Q.    Is it generally the same subject matter?
21 A.    Yes.
22 Q.    Corporate comes down and says you need to tell
23 your agents about this and each -- each district
24 issues their own?
25 A.    Correct, the regional manager informs agency

**34**

1  counsel of the eastern side and the western side of
2  the -- of changes in the rate manual or changes that
3  we need to inform agents about and then usually those
4  two counsel get together and draft the bulletins.
5  Q.    Is the agency bulletin the primary mode of
6  communication with the agents on these types of
7  changes?
8  A.    I would say it is the primary mode.
9  Secondarily, we also discuss any kind of changes at
10 any seminars that we may be having, which usually we
11 have twice a year. So we will discuss at that point,
12 you know, if there's been any change in the industry.
13 Q.    Okay. Other than those two methods of
14 communication, are there any others?
15 A.    No.
16 Q.    And the rates that are charged in the TIRBOP
17 manual for any particular type of policy are uniform
18 and consistent throughout Pennsylvania; are they not?
19 A.    The rates charged in the TIRBOP manual are
20 uniform and consistent?
21 Q.    Yes.
22 A.    Yes, they are.
23 Q.    And we mentioned ALTA a couple of times today.
24 What does ALTA stand for, do you know?
25 A.    The American Land Title Association.

**35**

1  Q.    And what is the American Land Title
2  Association?
3  A.    They are, more or less, the big brother of all
4  the land title associations of each state.
5  Q.    It's a trade organization; is it not?
6  A.    Right.
7  Q.    It's a membership organization?
8  A.    Yes.
9  Q.    Chicago Title is a member of that
10 organization?
11 A.    Yes.
12 Q.    Are you personally a member of ALTA?
13 A.    No, I'm not.
14 Q.    And does ALTA set uniform standards for its
15 members?
16 A.    I don't know that.
17 Q.    They are the industry standard though; are
18 they not?
19 A.    They are the industry standard.
20 Q.    And they also issue uniform forms for use by
21 its members; do they not?
22 A.    Yes, they do.
23 Q.    And those are used by Chicago Title; are they
24 not?
25 A.    Yes, they are.

**36**

1  Q.    Are you familiar with the term the 1992 ALTA
2  policy?
3  A.    No.
4  Q.    Do you know what that means?
5  A.    In comparison to -- is it the most revised of
6  policy?
7  Q.    Do you know what it means?
8  A.    No, no.
9  Q.    Do you know what the 1998 ALTA policy is?
10 A.    No.
11 Q.    Do you know what a basic ALTA policy is, a
12 standard or basic ALTA policy?
13 A.    Yes.
14 Q.    And what is that?
15 A.    The policies that we use and abide by and
16 issue at Chicago Title.
17 Q.    And that's the policy that looks backwards?
18 A.    Correct.
19 Q.    Past events?
20 A.    Past events.
21 Q.    Doesn't that policy really just ensure against
22 the negligence of the agent?
23        MR. MAY:  Object to form.
24        THE WITNESS:  No.
25 BY MR. GORDON:

**37**

1  Q. How does it not?
2  A. It protects the purchaser of the policy
3  against anything that could have been unforeseen from
4  any amount of years ago.
5  Q. Things that should have been found in the
6  title search but were not?
7  A. Or things that were never recorded that should
8  have been.
9  Q. Do you know which company -- who would have
10 priority, if it's not recorded?
11 A. Well, that creates -- that creates a problem,
12 when something is not recorded, because there are
13 things out there that haven't been recorded or a
14 courthouse burns down and the documents are lost, then
15 somebody has to retrace everything and find it.
16 Q. You've mentioned the enhanced policy a couple
17 of times today; what is that policy?
18 A. The enhanced policy not only gives you the
19 backwards coverage but it gives you coverage in the
20 future, for future things that may arise.
21 Q. Such as?
22 A. Issues that can come up to your ownership of
23 the land, ownership of properties of land that touch
24 your land whereas surveys are incorrect, things of
25 that fate.

**38**

1  Q. Well, if a survey is incorrect, wouldn't that
2  be a past event?
3  A. Well, not if you're in a subdivision, that
4  would be a current event, they're just subdividing
5  right now.
6  Q. What else does it cover?
7  A. That's really all I'm familiar with.
8  Q. You encourage agents to sell the enhanced
9  policy; do you not?
10 A. No, actually I do not encourage agents to seel
11 the enhanced policy. I let them know that that is
12 available, but I do not encourage the selling of it.
13 Q. When you tell them that it's available, what
14 do you tell them about the policy?
15 A. Actually, I have a handout that goes into
16 detail about the policy.
17 Q. That wasn't my question.
18 A. And that it is available.
19 Q. Do you tell them what the policy does?
20 A. We prop -- we review the handout that I give
21 them.
22 Q. Okay. And what is the difference in the
23 premium that's charged between the enhanced policy and
24 the standard policy?
25 A. That's actually in the TIRBOP manual.

**39**

1  Q. It is a higher rate; is it not?
2  A. It is a higher rate.
3  Q. And that would be more money for the agent?
4  A. Because -- yes, it would be more money for the
5  agent because you are also getting additional
6  protection.
7  Q. And also more money for Chicago Title?
8  A. Yes.
9  Q. And you said because you are getting
10 additional protection?
11 A. Correct.
12 Q. And I'm just trying to find out from you who,
13 are the primary contact with the agents, what's that
14 additional protection?
15      MR. MAY: Could we -- is this -- is
16 this part of the lawsuit?
17      MR. GORDON: Yes.
18      MR. MAY: The enhanced policy premium
19 is pled in the lawsuit?
20      MR. GORDON: No, but it is relevant to
21 the issues in this case?
22      MR. MAY: Well, due to --
23      MR. GORDON: If I could -- I'm happy to
24 have you make whatever objection you want. If we
25 could ask the witness to leave the room.

**40**

1       MR. MAY: Well, it's not going to tell
2  the witness anything. I'm just stating an objection
3  that due to the nature of objections in depositions,
4  I'm not going the instruct the witness not to answer.
5       MR. GORDON: Okay.
6       MR. MAY: But that I would like to take
7  a -- just an objection to this line of testimony on
8  relevance grounds.
9       MR. GORDON: That's fine. That's fine.
10 Can you read back the last question, please.
11      (The court reporter read back the
12      record as requested.)
13      MR. GORDON: Can you answer the
14 question.
15      MR. MAY: Object to form, other than
16 what she's already testified to.
17      THE WITNESS: I've already answered
18 that question, haven't I?
19 BY MR. GORDON:
20 Q. I'm not so sure that you have. Can you give
21 me any circumstance where the enhanced policy would
22 come into play?
23 A. Well, actually, no, because, to my knowledge,
24 I don't have an agent that has ever sold an enhanced
25 policy.

41

1  Q.    Okay. Do you know of any lender that requests
2  the enhanced policy?
3  A.    No, I don't know of a lender who has requested
4  an enhanced policy.
5  Q.    Do you know of any owner who has ever
6  requested an enhanced policy?
7  A.    No, do I not personally know of any owner who
8  has requested an enhanced policy.
9  Q.    Does Chicago Title have any forms that they
10 give to lenders to advise them of the option of the
11 enhanced policy versus the standard policy?
12 A.    No, not to my knowledge.
13 Q.    How about with respect to owner's policy, same
14 question, any standard form?
15 A.    Not to my knowledge.
16 Q.    Now, Chelsea Land Transfer, Inc. was the agent
17 in respect to the named plaintiff's transaction; are
18 you aware of that?
19 A.    I am aware of that.
20 Q.    Have you ever had any contact with Chelsea
21 Land Transfer?
22 A.    No.
23 Q.    Do you know who they are?
24 A.    No, I do not.
25 Q.    Are they currently an agent of Chicago Title?

42

1  A.    I do not believe they are currently an agent
2  of Chicago Title.
3  Q.    And where do you gain that knowledge from?
4  A.    Agency rep Joyce Folda.
5  Q.    Is she the one who handled their business?
6  A.    No, she is not.
7  Q.    Who handled their business?
8  A.    Elizabeth Ray.
9  Q.    And agents, as I understand it, are also
10 compensated for issuing title policies by Chicago
11 Title through a commission; is that correct?
12        MR. MAY:  Object to form.
13        THE WITNESS:  I don't understand your
14 question.
15 BY MR. GORDON:
16 Q.    Do you know what a commission is?
17 A.    I understand a commission -- what a commission
18 is, yes.
19 Q.    Do agents receive a commission when they issue
20 a title policy on behalf of Chicago Title?
21 A.    No. Chicago Title does not pay them a
22 commission.
23 Q.    How do agents get paid?
24 A.    They get paid based on their charges on the
25 HUD statement, their closing costs and they receive a

43

1  portion of the title premium.
2  Q.    Okay. And on the HUD-1 settlement statement,
3  it's line 1108; is it not, that identifies where title
4  insurance is paid?
5  A.    I believe you're correct.
6  Q.    On that line -- isn't it generally Chicago
7  Title's name on that line as receiving the fee?
8  A.    Actually, it is the agent's name as
9  representative of Chicago Title Insurance Company.
10 Q.    That's what it's going to say?
11 A.    That's what ours say, or as agent for Chicago
12 Title Insurance Company.
13 Q.    Do you know what the split is generally in
14 Pennsylvania?
15 A.    The standard industry split is an 85/15 split.
16 Q.    And that would mean that Chicago Title gets
17 15 percent of the premium?
18 A.    Correct.
19 Q.    And the agent gets 85 percent?
20 A.    Correct, also of endorsements.
21 Q.    Okay. What is the appointment process for
22 agents in Pennsylvania?
23 A.    The initial step is meeting with the agent,
24 which is also part of my job, or the perspective agent
25 at that point.

44

1  Q.    Would this contact be initiated by you or by
2  the agent?
3  A.    It can be initiated both ways. After meeting
4  with the perspective agent, we talk about their
5  knowledge in the title industry, their reasons for
6  wanting to get into the title industry, what their
7  overall plan is, do they have a business plan, how are
8  they going to accommodate closings, how many employees
9  are they going to hire, who are they hiring that is a
10 licensed title agent if, in fact, they are not a
11 licensed title agent. What is their knowledge of the
12 entire title industry, who will they receive their
13 business from.
14        Once we have that discussion, if I feel
15 comfortable that they are -- are a solid enough group
16 or maybe they are already in business and they write
17 with somebody else, but if they are a new start-up
18 company, if we feel that they are a solid enough
19 group, then we'll take it to the next step and present
20 them with all the paperwork that's required from
21 Chicago Title, such as personal information sheets and
22 attorney personal information sheets, the agency
23 contract, the agency information sheet.
24        You know, we'll need information for them to
25 sign off that we can review their bank files or

45

1  contact their bank. He wants to know if they have any
2  claims history, once that is completed and put all
3  together, I write a letter about my opinion of
4  answering specific questions as to why they want to
5  get into title, why did they want to work with Chicago
6  Title, what is their knowledge, what is their
7  background, everything that I've learned from them or
8  what they've told me to be true.
9       We also collect copies of their E&O insurance,
10 their Fidelity bond, their surety bond, copies of
11 their license individually and entity license, and
12 then that is submitted to our regional vice president
13 who once again reviews all that. Oh, in addition, we
14 run credit reports and then the regional vice
15 president reviews everything.
16 Q.    Where are the applications maintained?
17 A.    Completed applications?
18 Q.    Completed applications.
19 A.    I have a copy of the completed application in
20 my office in a file for every agent. The agent
21 receives an original completed application and
22 corporate office in Jacksonville maintains an original
23 application.
24 Q.    Is that the standard procedure throughout
25 Chicago Title, there would be at least three full

46

1  copies of the application?
2  A.    Actually, Chicago Title requests that there be
3  two original copies because a copy that can be kept at
4  my office can be a photocopy.
5  Q.    Okay. The applications are maintained in the
6  ordinary course of business?
7  A.    Explain.
8  Q.    You have it in your office?
9  A.    Sure.
10 Q.    As a routine matter?
11 A.    As a routine party.
12 Q.    It's easily accessible to you?
13 A.    Yes.
14 Q.    For example, if I asked you for the
15 application of Agent XYZ, you could pull it tomorrow?
16 A.    Yes.
17       MR. GORDON: Mr. May, I would point out
18 that we do not have the application for Chelsea in
19 this case and I would ask that that be produced.
20       MR. MAY: I -- can we just represent,
21 and I thought you had the conversation with Mr. Snyder
22 but I may be wrong about that, so we have looked --
23 or, rather, the company has looked for that. Chelsea
24 has not been an agent for some period of time so --
25 but they went and looked and -- well, the bottom line

47

1  is they couldn't find it.
2        MR. GORDON: Okay.
3        MR. MAY: And that, I think, where
4  these are kept, there may have been changes in terms
5  of policies to maintain extra copies that wouldn't
6  have been applicable when Chelsea first, you know, did
7  its application and there may not have been sort of a
8  fail safe like copy at corporate headquarters. In all
9  of the places where it could have been, the company
10 has represented to me that it has looked and has spent
11 some -- some considerable period of time searching for
12 that file and it has been unable to locate it.
13       MR. GORDON: I believe my conversation
14 with Mr. Snyder was about the agency contract.
15       THE WITNESS: Just trying to get over
16 here to get a drink of water; is that okay?
17       MR. GORDON: Sure. Why don't we go off
18 the record.
19       THE VIDEOGRAPHER: Going off the record
20 at five minutes past 11:00.
21       MR. GORDON: My conversation was about
22 the agency contract, not about the application.
23       MR. MAY: No, I think we looked through
24 the whole agency file.
25       MR. GORDON: We didn't discuss that.

48

1        MR. SNYDER: We didn't discuss that,
2  correct.
3        MR. MAY: We couldn't find the contract
4  because we couldn't find the file, that's what I'm
5  saying.
6        MR. GORDON: You found an unsigned copy
7  of the contract?
8        MR. MAY: Yeah, somewhere, but -- yes,
9  and I think it's fine to have this conversation off
10 the record.
11       MR. GORDON: No, let's keep it on.
12       MR. MAY: Okay. We looked for the file
13 and -- to try to produce that and we couldn't find the
14 file.
15       MR. GORDON: I just want to make sure
16 specifically with the contract, there's no question as
17 to authenticity of that?
18       MR. MAY: No. Our understanding, which
19 we can represent -- I believe I can represent because
20 I'm not sure that Joyce Folda was involved in that,
21 we -- it is our understanding that that agency
22 contract that was unsigned is substantively the same
23 as what would have been signed, as far as we know.
24       Now, I -- I frankly --
25       MR. GORDON: And for our purposes,

49

1  that's the authentic contract?
2       MR. MAY: Well, I will ask you a
3  question because I don't know the answer, you
4  subpoenaed Chelsea; did they produce a copy of the
5  contract?
6       MR. GORDON: They did not.
7       MR. MAY: Okay. Well, then, for our
8  purposes, that's the contract.
9       MR. GORDON: Actually, can I have a
10 minute with you before I forget, with the witness out
11 of the room?
12      MR. MAY: Yeah.
13      MR. GORDON: This is off the record.
14      (Discussion off the record.)
15      (Brief recess.)
16      THE VIDEOGRAPHER: We are back on the
17 video record at 30 minutes past 11:00.
18 BY MR. GORDON:
19 Q.   Ms. Reimer, when we went off the record we
20 were talking about the process for approving a company
21 to be an appointed agent on behalf of Chicago Title?
22 A.   Yes.
23 Q.   We were going through the application process?
24 A.   Yes.
25 Q.   And what sort of background check is conducted

50

1  on the agents by Chicago Title?
2  A.   Locally I conduct a credit check. Corporately
3  a background check is run.
4  Q.   Into the individuals?
5  A.   Into the individuals. And that is done at a
6  higher level and I do not see that.
7  Q.   Okay. Is there a threshold level of
8  experience that's required of agents before they're
9  approved to underwrite insurance for Chicago Title?
10 A.   Yes, there is.
11 Q.   And what is it?
12 A.   It varies. It's not written in stone. It
13 varies on their experience, you know, it depends on
14 their experience, on, you know, who they may be going
15 into business with, who are their employees, you know,
16 where have they worked, have they worked at large
17 title companies or small title companies or, you know,
18 somebody may have 20 years as a licensed title agent
19 but be involved in two closings a year versus somebody
20 else may have four years of title experience and
21 worked at a company that, you know, had 40 closings a
22 month.
23 Q.   Does Chicago Title require that the agent have
24 been appointed by another company prior to approval by
25 Chicago Title as an agent?

51

1  A.   No.
2  Q.   So Chicago Title could be the first company
3  approving --
4  A.   Yes.
5  Q.   Okay. So there really is no threshold number
6  of years that are required in the industry in order to
7  be approved, is there?
8  A.   Not a threshold number of years. It's really
9  based on experience.
10 Q.   Okay. Do you know of any instance where
11 someone was turned down for approval?
12 A.   Yes, I do.
13 Q.   When was that?
14 A.   Probably early 2005.
15 Q.   Was it just one agent or one potential agent?
16 A.   It was one potential agent.
17 Q.   Any others that you know of?
18 A.   Not that I personally know of because if they
19 don't meet the threshold during the conversation, then
20 we're really not going to get to the next step. If
21 they're not going to have the knowledge and the
22 background and the understanding of what title is, I'm
23 not going to present them with an application to sign
24 up to be a title agent.
25 Q.   And how often has that happened?

52

1  A.   That happens probably six to eight times a
2  year at least.
3  Q.   Out of how many potential applicants?
4  A.   Twenty.
5  Q.   So for out of every 20 there's one that you
6  won't even let get to the application process?
7       MR. MAY: Object to form.
8       THE WITNESS: No, for every 20 there's
9  probably six to eight that won't get to the
10 application process.
11      MR. GORDON: Oh, I understand.
12 BY MR. GORDON:
13 Q.   So the ones that get to the application
14 process, do you ever know of an agent who's been
15 turned down? To say it another way, one who has not
16 ultimately been appointed as a Chicago Title agent?
17 A.   No, I don't. I may be required to find out
18 additional information that corporate wants to know
19 specifically in order to have them appointed and if
20 they -- you know, if the information provided is what
21 corporate needs to approve them, then they're
22 approved.
23 Q.   And Chicago Title, in fact, has to be pretty
24 careful who it appoints as its agents, doesn't it?
25 A.   Any title company has to be careful who they

**Page 53**

1  appoint.
2  Q.   Because the agent has authority to act on
3  Chicago Title's behalf; does it not?
4  A.   Correct.
5  Q.   And it has authority to bind Chicago Title;
6  does it not, in issuing a policy?
7  A.   Yes, they issue a policy on behalf of Chicago
8  Title.
9  Q.   And the agents enter into standard agreements
10 with Chicago Title; do they not, agency contracts?
11 A.   Yes.
12         (Document marked for identification
13         as Reimer Deposition Exhibit Number 3.)
14 BY MR. GORDON:
15 Q.   I would like to show you what has been marked
16 deposition Exhibit Number 3 and this was produced by
17 your counsel in this case and we've had a discussion
18 prior to going back on the record that this is, in
19 fact, the only copy that exists of the Chelsea Land
20 Title -- Land Transfer agency agreement that can be
21 produced at this time.
22 A.   Mm-hmm.
23 Q.   Does this appear to be the standard agency
24 agreement?
25         MR. MAY: Object to form, but, also,

**Page 54**

1  just -- if you need time to look through that, take
2  it.
3          MR. GORDON: Oh, please.
4          THE WITNESS: This agency contract was
5  issued in May of 2000 I see. I was not an employee,
6  nor in the title industry in 2000.
7          Since I've been in the title business,
8  title contracts have changed. Chicago Title now has a
9  standard contract that probably became effective in
10 2000 and -- early 2005 where all of our sister
11 companies, we use the same contract, the same wording.
12         At this point in time it is my
13 understanding that this was probably a standard
14 contract for Eastern Pennsylvania, but this may have
15 not been the standard contract for Western
16 Pennsylvania.
17 Q.   Okay. So all the agents in Eastern
18 Pennsylvania would have had this contract but in
19 Western Pennsylvania it might have been slightly
20 different?
21 A.   Correct.
22 Q.   You said all the sister companies now use the
23 exact same contract?
24 A.   Correct.
25 Q.   Which sister companies are you talking about?

**Page 55**

1  A.   That would be Fidelity National Title, Ticor
2  Title.
3  Q.   Any others?
4  A.   Security Union, Ticor Title of Florida.
5  Q.   Any others? And Chicago Title, of course?
6  A.   And Chicago Title, of course.
7  Q.   Any others?
8  A.   No, no, because there's Fidelity National
9  Title of New York, but I think they follow the
10 Fidelity National Title.
11 Q.   Could you take a minute or two and flip
12 through this agency agreement and tell me if this
13 looks to have the same general terms in it as the
14 other contracts that you've seen?
15         MR. MAY: Object to form.
16         THE WITNESS: Yes, in just glancing
17 through it, it looks very similar.
18 BY MR. GORDON:
19 Q.   Nothing unusual about it?
20 A.   Well, without thoroughly reading it and
21 comparing it to a current contract, I wouldn't know
22 that.
23 Q.   Okay. But nothing jumped out at you?
24 A.   At this time, no, nothing jumps out by just
25 skimming it.

**Page 56**

1  Q.   Could you go back to the first page of the
2  document and if you could read for us the first
3  paragraph out loud on appointment of agent?
4  A.   "Principal hereby appoints agent as a policy
5  issuing agent of principal for the sole purpose of
6  issuing title insurance commitments, policies,
7  endorsements and other title assurances approved by
8  principal and by all required regulatory agencies now
9  in existence or hereafter developed relating to real
10 property located in all the counties in the
11 Commonwealth of Pennsylvania in accordance with the
12 terms of this contract." Continue?
13 Q.   Just finish it off. It looks like there's a
14 glitch.
15 A.   "During the term of this contract agent shall
16 have the right to issue title insurance commitments,
17 policies and the endorsements of any title insurance
18 company in the referenced geographic area."
19 Q.   Okay. And with respect to that paragraph, is
20 that, generally, your understanding of the scope of an
21 agent's appointment today in the Western District?
22 A.   Yes.
23 Q.   And could you please turn to the next page,
24 Paragraph 4 and that's, for the record, Bates numbers
25 CHI0535. And could you please read Paragraph D under

57

1  Duties of Agent.
2  A.    Prepare, preserve and maintain --
3  Q.    If I could just stop you.  It starts off agent
4  shall up top.
5  A.    I'm sorry.  "Duties of Agent, agent shall
6  prepare, preserve and maintain in agent's possession a
7  separate file for each application for title insurance
8  containing all documents upon which agent relied to
9  make its determination of insurability, including but
10 not limited to affidavits, mats, plats, lien, waivers,
11 surveys, title reports, searches, examinations and
12 work sheets, together with a copy of each commitment
13 policy and endorsement and other title insurance
14 issued, as well as closing statements, disbursement
15 work sheets, copies of all checks disbursed and
16 receipted, deposit slips, escrow agreements and other
17 instruments or documents executed or created at
18 closing.  Title to file shall vest in principal.  Upon
19 termination of this contract, agent shall deliver such
20 files to principal, which files may not be copied by
21 agent without the written consent of principal.  Agent
22 hereby grants to principal the right to enter upon the
23 premises of agent or other locations where such files
24 are maintained during business hours for purposes of
25 recovering possession thereof."

58

1  Q.    And is that paragraph consistent with your
2  understanding of the duties of the agent today insofar
3  as record maintenance and preservation?
4  A.    Yes.
5  Q.    Now, Paragraph F under Duties of Agents,
6  again, on the same page, references a policy register.
7  A.    Mm-hmm.
8  Q.    What does that refer to; is that the
9  remittance log?
10 A.    Yes, it is.
11        (Document marked for identification
12        as Reimer Deposition Exhibit Number 4.)
13 BY MR. GORDON:
14 Q.    Let me show you what's been marked as
15 deposition Exhibit Number 4 and this is another
16 document that was turned over last week by your
17 counsel and I believe that this is for Chelsea, which
18 is the agent involved in Ms. Cohen's transaction, at
19 least I believe that's what was represented to me when
20 it was produced.
21        MR. MAY:  That's my understanding.
22 BY MR. GORDON:
23 Q.    Is this the policy register that Paragraph F
24 refers to?
25 A.    This is a policy register of sorts.  This is a

59

1  policy register created by our national accounting
2  system.  This is not the policy register maintained by
3  the agent.
4  Q.    The one that would be referred to in Paragraph
5  F --
6  A.    Correct.
7  Q.    -- is a copy of that policy register
8  maintained by the agent provided to Chicago Title?
9  A.    No, it is not provided to Chicago Title.  Upon
10 reviews of agents we -- part of our review is to
11 review that title policy register in our process of
12 checking for possibly missing policies or anything
13 that we might need, but we do review it to make sure
14 it's completed and it's filled out.
15 Q.    Okay.  So what is in front of you as
16 deposition Exhibit Number 4 is something that's
17 produced by your national office?
18 A.    Correct, by our accounting system, yes.
19 Q.    By your accounting system.
20        And this is based upon information that's
21 inputted into it?
22 A.    Correct.
23 Q.    Where would that information be inputted?
24 A.    I'm going to say that it's been inputted from
25 the Eastern Pennsylvania office of Chicago Title.

60

1  They have inputted this information based on
2  information they received from Chelsea Title, whether
3  it is in the form of utility report forms, HUD-1s, if
4  by chance they did send a copy of a policy register or
5  if they created their own spreadsheet showing that
6  we've issued these policies, with these policy numbers
7  related to these files in these premium amounts, in
8  this liability amount and collected this much.
9  Q.    Okay.  And if you could look up in the upper
10 left-hand corner, it references Fidelity National
11 Financial; do you see that?
12 A.    Yes.
13 Q.    Fidelity National Financial is the parent
14 company of Chicago Title?
15 A.    At this time it was -- at this time it was in
16 2002.
17 Q.    It was or it was not?
18 A.    It was.
19 Q.    It was.
20        And you are suggesting now it's not?
21 A.    Well, now we are part of a division of
22 Fidelity National Title Group, FNTG.
23 Q.    So it just switched the names around a little
24 bit?
25 A.    Well, we've just divided the company --

JODI REIMER

**61**

1  they've divided Fidelity National Financial and now we
2  have a whole title group on this side and we report to
3  Fidelity National Title Group.
4  Q.    And is it my understanding that the -- the
5  computer systems that are used are consistent and
6  uniform throughout all the sister companies, as you
7  called them?
8         MR. MAY: Object to form.
9         THE WITNESS: What computer systems are
10 we talking about?
11 BY MR. GORDON:
12 Q.    Well, the one that generated this deposition
13 Exhibit Number 4, for example?
14 A.    Okay. So the corporate --
15 Q.    Yes.
16 A.    -- computer system?
17       Yes, to my knowledge I've never seen, you
18 know, a detailed premium register for Ticor or for any
19 of the other companies. I can -- I can only, you
20 know, imply that, yes, I would believe that they would
21 be the same, but I have never seen one from a sister
22 company.
23 Q.    Okay.
24       MR. MAY: Well, don't guess.
25       THE WITNESS: Right. I've never seen

**62**

1  one.
2  BY MR. GORDON:
3  Q.    If there were to be a register produced in
4  the -- of the type as Exhibit 4 today, what would be
5  in the upper left-hand corner in place of Fidelity
6  National Financial?
7  A.    I believe it still does say Fidelity National
8  Financial in the upper left-hand corner.
9  Q.    Okay.
10 A.    But all of our memorandums come from Fidelity
11 National Title Group.
12 Q.    Now, when you worked for Fidelity National was
13 there a similar spreadsheet that was produced for
14 agents?
15 A.    At the time I worked for Fidelity National
16 Title, I did not see a corporate report such as this
17 one.
18       Excuse me, please let me correct that.
19 Q.    Certainly.
20 A.    Yes, now that I'm thinking back, on our
21 national agency system I would have been able to
22 create this premium register detail for Fidelity.
23 Q.    When you were with Fidelity National?
24 A.    Yes, yes, but being new -- being new to the
25 industry at that time, I did maybe -- maybe once.

**63**

1  Q.    You don't create the systems, though, do you,
2  or the spreadsheets --
3  A.    No.
4  Q.    -- as part of your jobs or responsibilities?
5  A.    No, no.
6  Q.    It's all done out of corporate?
7  A.    Correct.
8  Q.    And that corporate office runs each of the
9  sister companies?
10       MR. MAY: Object to form.
11       THE WITNESS: Okay. The accounting
12 department, which is --
13 BY MR. GORDON:
14 Q.    Let's start the accounting department, yes.
15 A.    Which is, you know, who -- where this
16 information goes to, I don't know. I don't believe
17 so. Our information for Chicago Title goes to
18 Schaumburg, Illinois. If I remember correctly,
19 Fidelity National Title, the accounting information
20 went to somewhere in Florida, Maitland -- Maitland,
21 Florida.
22 Q.    If you could turn to the next page of
23 deposition Exhibit Number 3, which is Bates number
24 CHI0536, this is back to the agency contract.
25       Ms. Reimer, if you could look under

**64**

1  Subparagraph I, it talks about how funds are going to
2  be maintained and how funds are disbursed and how
3  they're entrusted, so on and so forth. If you could
4  see that there is a paragraph right before Paragraph
5  J; do you see that, starting off with the word
6  principal?
7  A.    Yes.
8  Q.    Could you please read that out loud.
9  A.    "Principal shall have the right to examine,
10 audit and approve agent's accounting procedures to
11 ensure its compliance with principal's Escrow
12 Accounting Manual, a copy of which has been delivered
13 to agent simultaneously with the execution of this
14 contract."
15 Q.    What is the Escrow Accounting Manual?
16 A.    It's a detailed manual on what we expect as
17 far as accounting records go and requirements that we
18 have involving not just a two-way bank reconciliation
19 but a three-way bank reconciliation, and the
20 requirement of a escrow trial balance some may call it
21 and that you must account for all these funds in
22 the -- if there are any left, in the escrow trial
23 fund, such as funds you may pull for water or sewage
24 payoff, and that you have to be able to tie these back
25 to a file.

Reporting Associates, LLC   1-888-795-2323