JODI REIMER

65

1  Q.   Does it also address how borrowers' funds are
2  maintained?
3  A.   Such as -- do you mean such as if the funds
4  are wired in?
5  Q.   That would be one example, yes.
6  A.   There's procedures -- there's procedures in
7  the manual recommending -- making recommendations on
8  how to run, you know, wires, who should have
9  responsibility for that, as well as who should check
10 the bank statement, you know, the reconciliation
11 should be reviewed by an outside party, you know, the
12 same person who was writing the checks or signing
13 the -- you know, you should have, you know, possibly
14 two signers on the checks.
15      MR. GORDON:  And, Mr. May, I believe
16 that the Escrow Accounting Manual would have been part
17 of our Request for Production of Documents and I asked
18 that it be produced.
19      MR. MAY:  All right.  Well, we'll take
20 that under advisement.  I would have had no inkling
21 that it would be.  It doesn't -- I don't think it has
22 anything to do with the issues in the case, but --
23      MR. GORDON:  Well, it may or may not,
24 it was something that was requested and I think it
25 very well could bear on the issues in the case.

66

1       MR. MAY:  Well, I'll look into it.  I
2  didn't know that it was requested.  I wouldn't have
3  imagined that it would have been requested so -- but
4  now that you say that, we'll certainly, certainly
5  review that request.
6       MR. GORDON:  I appreciate that.  I
7  believe that the request was of any manuals or
8  included any manuals that were provided to the agents.
9       MR. MAY:  Well, I think our response --
10 and I'm doing this from memory so bear that in mind.
11 I think our response would have -- I don't remember
12 what the request was, but I think the response
13 certainly would have talked about limiting it to
14 anything relevant to the issues in this case involving
15 rates.
16      Thus, for example, if you could provide
17 instructions to an agent on what to do if there is an
18 easement that crosses somebody's property and, you
19 know, how do you resolve the easement issue?  I mean,
20 I don't think that was included in the request and --
21 and, likewise, if it's escrow accounting, which make
22 sure that funds for one -- one issue is that they
23 don't get misappropriated, for example, I mean, I
24 didn't think that that was an issue in the case.
25      But if you want me to take that under

67

1  advisement, I certainly will, but, as you can -- as
2  you can imagine, I'm sure -- I'm sure there's plenty
3  of things, instructions given to agents about all
4  sorts of title issues and problems with title and what
5  you do with this unrecorded deed or what you do with
6  that that I don't think have anything to do with the
7  issues in this case.
8       MR. GORDON:  I don't necessarily
9  disagree with you, but without seeing the manual,
10 obviously, I can't say that there's nothing in there
11 that isn't relevant to the case, so if you could
12 please take a look at that and get back to me.
13      MR. MAY:  I will, I will.
14 BY MR. GORDON:
15 Q.   Could you also please, Ms. Reimer, take a look
16 at Paragraph J and read that out loud.
17 A.   "Comply with all applicable laws and
18 regulations relating to the conduct of agent's
19 business."
20 Q.   And Paragraph K?
21 A.   "Comply with all bulletins, manuals and other
22 instructions furnished to agent in writing by
23 facsimile or other electronic transmission by
24 principal.  If any reasonable doubt exists with regard
25 to insurability or marketability of title or as to

68

1  whether a particular risk is extraordinary or extra
2  hazardous, agents shall contact principal or
3  principal's designated underwriting counsel for
4  guidance and approval."
5  Q.   Now, is there an underwriting manual that's
6  also given to agents in connection with their
7  appointment?
8  A.   There is an underwriting manual available,
9  it's not necessarily disbursed to every new agent.
10 Q.   Okay.  Some agents have it, though, or do you
11 not know?
12 A.   I don't know of any of my agents that have
13 one.
14      MR. GORDON:  Well, in any event,
15 Mr. May, I would also ask that the underwriting manual
16 also be provided to us in connection with our Request
17 for Production of Documents.
18      MR. MAY:  Well, I'll take that under
19 advisement as well, but what -- what is the relevance
20 of it?
21      MR. GORDON:  Well, there may very well
22 be information in connection with the underwriting
23 manual that's relevant to the issues raised in this
24 case.  We're certainly entitled to review it.
25      MR. MAY:  Well, I actually can't fathom

**Page 69**

1  what they are, but I'll look into it.
2         MR. GORDON: I appreciate that.
3         MR. MAY: I will get back to you on
4  that.
5  BY MR. GORDON:
6  Q.   And this contract does mention audits; does it
7  not?
8  A.   It should, yes.
9  Q.   Auditing the agent?
10 A.   Mm-hmm.
11 Q.   What issues are looked at in the audits of
12 agents?
13 A.   Actually, it's a -- to begin with, the first
14 part, the audit is reviewing all the escrow or trust
15 accounts or attorney IOLTA accounts, if that may be
16 the case.
17 Q.   I-o-l-t-a. What else?
18 A.   They're reviewed for several reasons, they're
19 reviewed for shortages and funding and canceled
20 checks are also reviewed, the bank reconciliation for
21 the past three months are reviewed, which consists of,
22 you know, disbursements, cleared transactions,
23 uncleared transactions, cleared deposits, uncleared
24 deposits. The escrow trial balance is reviewed and
25 maintained.

**Page 70**

1         In addition, uncleared checks are investigated
2  and questioned such as were they yet uncleared if
3  they're substantially old, six months old.
4  Recommendations are then made to the agent as to what
5  to do -- what they need to do to clear this. The
6  auditor also reviews files. Usually five files per
7  closer is the standard case.
8  Q.   Anything else?
9  A.   You asked about an audit specifically,
10 correct?
11 Q.   Correct.
12 A.   We also collect at that point the licenses of
13 the business entity, the license of all the attorneys
14 there, their E&O insurance, their Fidelity bonds,
15 their surety bonds, and make sure they're all current,
16 we get copies of all those.
17 Q.   Anything else?
18 A.   Not off the top of my head.
19 Q.   Okay. What, if any, review is undertaken to
20 determine whether or not the agent charged and
21 collected from the borrower the correct rate? Is
22 there any review?
23 A.   No, there is no review. The review that is
24 done on the HUD, once you review a file, is based on
25 the loan amount or the owner's policy amount, is the

**Page 71**

1  correct fee charged.
2  Q.   Okay. There's no review, however, of whether
3  the borrower should have gotten a different rate?
4  A.   No, there isn't. That's actually up to the
5  agent to follow the TIRBOP manual.
6  Q.   Okay.
7  A.   And --
8  Q.   What information does --
9         MR. MAY: Were you finished with your
10 answer?
11        THE WITNESS: And if an agent at any
12 point would have a question on what rate to charge,
13 they -- they would call the office.
14 BY MR. GORDON:
15 Q.   I apologize. I thought you were done with
16 your answer.
17 A.   That's okay.
18 Q.   What information does Chicago Title give to
19 its agents concerning the appropriate rates that need
20 to be charged in connection with the borrower's
21 transactions?
22 A.   We provide all agents with a TIRBOP manual.
23 Q.   Anything other than the TIRBOP manual?
24 A.   We provide them with the, you know,
25 Pennsylvania statutes.

**Page 72**

1  Q.   Okay.
2  A.   We provide them at seminars information
3  that -- that has come to light and will affect them.
4  We also discuss various topics at seminars. But, as
5  always, in a customer service business, we remind
6  them -- I remind them all the time we're a phone call
7  away should you have any questions.
8  Q.   Okay.
9  A.   As they are also in the customer service
10 business.
11 Q.   I'm looking for written material.
12        What do you give them other than the TIRBOP
13 manual and statutes?
14 A.   We give -- we don't -- we don't feel we're
15 required to give them anything else.
16 Q.   Are there any instructional videos you give
17 them?
18 A.   No.
19 Q.   Any training on how to calculate the correct
20 rate?
21 A.   No, no training on how to calculate a correct
22 rate. They can call us if they need help with
23 calculations.
24 Q.   Okay. So assuming that an agent doesn't call
25 you, they're on -- it's up to them and up to their

JODI REIMER

73

1  discretion to determine when it's appropriate to give
2  the reissue rate, for example?
3      MR. MAY: Object to form.
4      THE WITNESS: Yes, it is, it's their
5  case and their closing and their file and that's
6  something they should know.
7  BY MR. GORDON:
8  Q.   And it's also up to the agent to determine
9  whether or not the refinance rate is appropriate for
10 any given transaction?
11 A.   Yes, it's also their responsibility to know if
12 that's appropriate.
13 Q.   Okay.
14      MR. GORDON: And, Mr. May, a discussion
15 that we had -- I had had with Mr. Snyder was that
16 there is no audit of Chelsea that addresses whether or
17 not it charged the appropriate rates to borrowers,
18 that just doesn't exist?
19      MR. MAY: Correct, that -- that there's
20 no written materials regarding whether the correct
21 rate was selected for the files, yes, that is -- that
22 is correct, there's no such materials.
23 BY MR. GORDON:
24 Q.   During the seminars, Ms. Reimer, that you
25 attend -- how many have there been in the last two

74

1  years at Chicago Title?
2  A.   That Chicago Title has hosted?
3  Q.   Yes.
4  A.   Three.
5  Q.   Three. And before that, at Fidelity National
6  Title, how many were hosted by Fidelity National?
7  A.   I don't know how many they hosted. I had
8  attended two.
9  Q.   You had attended two.
10      During any of those conferences, that's
11 roughly five over the last four years, how many
12 included written materials about the necessity of
13 charge -- of providing the proper discount to
14 consumers in connection with reissue rates and
15 refinance rates?
16 A.   I would really have to go back and -- and
17 review seminar records to see if that was specifically
18 written down.
19 Q.   Do you recall any?
20 A.   I recall that -- I'm thinking the dates of
21 seminars.
22      I recall that in our November seminar of 2005
23 we opened with the -- the information about any rate
24 changes, any changes.
25 Q.   Who gave the presentation on that?

75

1  A.   Actually, that -- that seminar was a panel
2  discussion seminar where state counsel Joe Huber
3  spoke, Erin Fagnilli, agency counsel and Steve Emery,
4  Esquire, also vice president, spoke on a panel.
5  Q.   Was there any discussion at that point of
6  lawsuits that had been filed concerning reissue rates
7  and refinance rates?
8  A.   No, at that point there was no discussion.
9  Q.   Was there any discussion about lawsuits that
10 had been filed?
11 A.   At the seminar, no.
12 Q.   At any other seminar you attended?
13 A.   Most recently at a PLTA seminar that I
14 attended.
15 Q.   That's the Pennsylvania Land Title
16 Association?
17 A.   Mm-hmm.
18 Q.   And what was the discussion there?
19 A.   It was -- Ann Anastasia was the speaker, who
20 is also the president and she -- or the outgoing
21 president and she brought up, you know, the fact of
22 the industry being under attack.
23 Q.   And what did she -- what did she suggest was
24 the cause of that?
25 A.   Various causes. One, you know, that -- not to

76

1  be funny, but it's just the -- it's just the title
2  insurance -- it's just the title industry's turn to be
3  under attack, you know, somebody is just looking for
4  something because, you know, we're in a growth
5  industry and we've been very busy for the past five
6  years. Others, that, you know -- there are agents out
7  there who are not doing things properly and correctly,
8  but the majority of our agents out there are being
9  proactive and are correctly handling transactions,
10 they're doing everything they can to do it correctly,
11 not only charge rates correctly, but get title cleared
12 to make it a smooth closing because that's their
13 business.
14 Q.   Specifically with respect to charging the
15 proper discount rate, of the 60 agents that you work
16 with, how many have you personally spoken to about
17 whether or not they charge the correct rate?
18 A.   You mean did I bring it up as a topic?
19 Q.   Let's start there, yes.
20 A.   Such as, hey, are you charging the correct
21 rate today? It comes up in conversation possibly,
22 possibly not. Most of my -- the majority of my agents
23 are attorneys or law firm agents who I -- who have
24 several years of experience in title -- in title
25 industry. They're very knowledgeable individuals. I

Page 77

1  believe every one of them is charging the correct
2  rate.
3  Q.    Okay.  So you leave it up to them?
4  A.    Yes, I do.  I feel it's their responsibility.
5  Q.    With respect to -- I just want to go back for
6  a second.  We talked about the escrow accounting
7  manual?
8  A.    Mm-hmm.
9  Q.    Is that a company-wide manual or a
10 Pennsylvania specific manual?
11 A.    You know, I'm not really sure of that because
12 escrow standards vary from state to state, as well as
13 closing procedures and escrow accounting procedures.
14 I mean, yes, everyone must reconcile, but I believe
15 different states require -- they have different
16 closing mechanisms so I can't say that that escrow
17 accounting manual is applicable to everybody in the
18 United States.
19 Q.    Okay.  It is applicable, though, to everyone
20 in Pennsylvania?
21 A.    It is applicable to everyone in Pennsylvania.
22 Q.    It doesn't change from the Eastern District to
23 the Western District?
24 A.    No, it does not.
25 Q.    And the same would be true for the

Page 78

1  underwriting manual?
2  A.    Correct.
3  Q.    Okay.  Would you turn to the next page of the
4  agency contract, which is Bates numbers CHI0537, and
5  could you please read Paragraph 5.
6  A.    Rates and remittance, attached hereto and made
7  part of -- and made part hereof is a schedule of rates
8  and remittances.  Agents shall quote, charge and
9  collect the rates set forth therein and shall report
10 and remit to principal premiums as set forth therein.
11 Q.    And that would be referring to the last two
12 pages of this exhibit, would it not, which are CHI0543
13 and 0544?
14 A.    Schedule of rates and remittances, rates and
15 remittance schedule, yes.
16 Q.    Have you seen rates and remittances schedules
17 for the current contract?
18 A.    Yes.
19 Q.    Does it --
20 A.    They're actually broken down very differently.
21 Q.    Okay.  How is it broken down differently?
22 A.    Now we have a Schedule A, a Schedule B and
23 Schedule C and then room for schedule D or other.
24 Q.    What would the Schedule A, B, C and D be?
25 A.    Schedule A covers basically, you know, the

Page 79

1  date of the contract, you know, the counties of which
2  the agent is permitted to operate in.  There's an
3  extensive area there if the agent would be an
4  exclusive agent that you would fill out.
5        Schedule B breaks down more into what their
6  rate -- what their rate and remittance is, that they
7  are allowed to operate, that they agree and abide to
8  follow all the rules in the State of Pennsylvania,
9  that they -- you know, their general liability, their
10 maximum liability.
11       Schedule C would then break down into what
12 their E&O coverage -- or their E&O coverage
13 deductible, maximum and aggregate, as well as, you
14 know, they carry a Fidelity bond in the amount of
15 $150,000.
16       Schedule D is a waiver and then -- I'm
17 sorry -- Schedule E then is an optional schedule such
18 as if the rates and remittances by chance -- if your
19 rate would not be a straight 85/15, which is the
20 industry standard, but would be based like some very,
21 very old rates are based, on a net liability amount,
22 then you might want to break that down.
23       MR. GORDON:  Mr. May, could we get a
24 copy of the form contract that's currently used
25 together with the schedule of remittances, since I

Page 80

1  believe the testimony is it changed in 2005?
2        THE WITNESS:  I believe it was the end
3  of 2004, 2005.  They were reviewing it so there were a
4  few different copies out at different times while they
5  were adjusting it.
6  BY MR. GORDON:
7  Q.    Okay.
8  A.    But the most current is out there now, that is
9  the one that we all use.
10 Q.    Were agents who were already on board with
11 Chicago Title required to sign the new agreement?
12 A.    No, they were not.
13 Q.    So they're still operating under the old
14 agreement?
15 A.    Yes, they are.
16 Q.    And some of which look exactly like deposition
17 Exhibit Number 3, correct?
18 A.    I would assume they would look like this.
19 Q.    Okay.
20       MR. MAY:  Take it under advisement.
21       MR. GORDON:  Thank you.
22 BY MR. GORDON:
23 Q.    Once an agent signs the agreement and comes on
24 board with Chicago Title, what training is provided to
25 the agent by Chicago Title?

JODI REIMER

81

1  A.    Well, that depends on our -- A, our
2  comfortability factor with the agent and their
3  experience. They may be a well-established agency
4  that's been in business for 20 years but is just used
5  to completing something another way that was required
6  by another title company and now we're just going to
7  show them our forms and how -- you know, how to
8  complete our forms and get our forms loaded on to the
9  computer system.
10 Q.    Okay. Is there any specific department within
11 your office or within the corporate office for
12 training new agents?
13 A.    I do have a specific person who helps me with
14 training, yes, I do.
15 Q.    And who is that?
16 A.    That would be Mary Majhia.
17 Q.    And what is her position?
18 A.    She is a closer for the direct side of Chicago
19 Title. In addition, she is a trainer for agency.
20 Q.    Does she go out and see every new agent or
21 it's on a case-by-case basis?
22 A.    It's on a case-by-case basis.
23 Q.    And it's to run through the policies and
24 procedures that Chicago Title uses to close loans?
25 A.    Correct.

82

1  Q.    And issue insurance policies?
2  A.    Correct. And, in addition, if, by chance
3  they're using Soft Pro computer software, she's, you
4  know, excellent at it and she will provide training on
5  that.
6  Q.    So she will provide training -- you are
7  talking about the office shelf computer programs that
8  are used by agents?
9  A.    Yes.
10 Q.    Soft Pro you mentioned was one?
11 A.    Soft Pro.
12 Q.    Title Express I believe is another?
13 A.    Is another.
14 Q.    Land Tech is another?
15 A.    Yes.
16 Q.    And all of these programs can be integrated
17 with Chicago Title's system; can they not?
18        MR. MAY: Object to form.
19        THE WITNESS: Integrated in what way?
20 How?
21 BY MR. GORDON:
22 Q.    For example, if the agent wanted to transmit
23 information to you electronically, they could do so?
24 A.    Okay. Right now we don't have that -- we
25 don't have those capabilities in Western Pennsylvania,

83

1  so the answer would be no.
2  Q.    The answer would be no.
3         But the Chicago Title forms can be put on the
4  system?
5  A.    Absolutely.
6  Q.    Chicago Title information necessary for the
7  closing of loans and issuing of policies can be put on
8  the system, correct?
9  A.    Well, the information is provided via the rate
10 manual on, you know, what they'll need to do and
11 they -- you know, that's their bible.
12 Q.    Okay. The TIRBOP manual?
13 A.    Yes.
14 Q.    Okay. What does Ms. Majhia go over with the
15 agents, if anything, with respect to the TIRBOP manual
16 or does she just provide a copy to them?
17 A.    Usually I provide the copy to them from the
18 beginning. She will answer questions if they may have
19 them on the TIRBOP manual, but rarely do we have to
20 sit down with somebody and go page by page. Actually,
21 I don't think we've ever had to sit down with anybody
22 and go page by page. I don't have an agent who is
23 that new in the industry who has no experience.
24 Q.    Okay. We'll mark another exhibit.
25        (Document marked for identification

84

1  as Defendant's Deposition Exhibit Number 5.)
2  BY MR. GORDON:
3  Q.    That has been marked as deposition Exhibit
4  Number 6 -- Number 5.
5         Have you seen that document before?
6  A.    Yes, I have.
7  Q.    What is this document?
8  A.    This is our schedule of rates.
9  Q.    When would this be given to an agent -- strike
10 that.
11        Would this be given to an agent?
12 A.    Yes, a paper -- paper copies -- actually, we
13 have them made out of cardboard more like, are
14 provided to all agents.
15 Q.    It's a tri-fold; is it not?
16 A.    It is.
17 Q.    And these are given to your agents at what
18 time?
19 A.    When they sign up with Chicago Title, when
20 their contract is approved and they are ready to start
21 doing business with Chicago Title.
22 Q.    Okay. Could you please read the paragraph in
23 the middle of the second column where it says reissue
24 rate.
25 A.    "Reissue rate. The reissue rate will be

85

1  applied if the property has been insured within ten
2  years prior to the date of closing of the new
3  transaction. Evidence of prior insurance must be
4  provided to Chicago Title at or prior to the time of
5  closing."
6  Q.   What is given to agents to further inform them
7  as to the meaning of this paragraph?
8  A.   The TIRBOP manual.
9  Q.   Anything else?
10 A.   No.
11 Q.   Is there any statement or is there any written
12 material given to consumer -- to borrowers, about the
13 refinance rate that's also available under the TIRBOP
14 manual?
15 A.   Effective 2005, I believe, or effective 2006,
16 whichever it is, that the rate was -- that the rate
17 was changed, it was changed, section I believe it's
18 2.9 was added, that requires that you give, prior to
19 closing, a notification that the property may be
20 eligible or you may be eligible for a discounted rate.
21 Q.   Prior to that time there was nothing given,
22 was there?
23 A.   There was no requirement for anything to be
24 given.
25 Q.   That wasn't my question, Ms. Reimer.

86

1       Was there anything given that you are aware
2  of?
3       MR. MAY: Object to form.
4       THE WITNESS: No, no.
5  BY MR. GORDON:
6  Q.   And with the schedule of rates, is there
7  anything that was given to borrowers prior to I
8  believe it was the 2005 changes to the TIRBOP manual?
9  A.   I can't answer if agents gave borrowers.
10 Q.   Is there anything that you are aware of?
11 A.   Well, they certainly could have handed these
12 out. They had these full and plentiful. Many agents
13 keep these very promptly displayed in their office in
14 the tri-fold position in a plastic, you know, holder
15 where they're out in the open, along with maybe any
16 other information they may have about, you know, what
17 is title insurance, what is the relevance of title
18 insurance.
19 Q.   Okay. Looking at deposition Exhibit Number 5,
20 would you agree that there is no indication that there
21 is even a refinance rate available?
22 A.   Correct, based on this.
23 Q.   So I guess my question again is what written
24 information was given to borrowers about a refinance
25 rate?

87

1  A.   Well, as there was no requirement for any
2  information to be given, there was none given.
3  Q.   Okay. What effort --
4  A.   Prior, we're still talking prior to the
5  effective rate manual changes, correct?
6  Q.   Sure, sure.
7       What date did you come on board with Chicago
8  Title?
9  A.   I believe it was July 24, give or take a day
10 or two.
11 Q.   Of?
12 A.   2004.
13 Q.   So the schedule of rates would have been
14 given -- that's in front of us as deposition Exhibit
15 Number 5 would have been given out during your tenure,
16 correct?
17 A.   Correct.
18 Q.   And, in fact, it has your name on it; does it
19 not?
20 A.   Yes, correct.
21 Q.   What effort did you make to disseminate any
22 information to consumers or borrowers about the
23 availability of the refinance rate?
24 A.   Effort I ever made was to correctly answer any
25 agents' questions that they may have that I was able

88

1  to answer via referring to the TIRBOP manual. I don't
2  deal directly with consumers in my business, in my job
3  function and rely that my agents who, in fact, are
4  quoting some of the information for closing, just a
5  cold call, will ask the correct questions to find out
6  if a reissue or a refinance rate is applicable.
7  Q.   What did you do in your position as agency
8  representative to ensure that's exactly what your
9  agents did, if anything?
10 A.   Probably nothing. I have a lot of other
11 responsibilities in my position.
12 Q.   Well, I would like you to turn to the back
13 page of deposition Exhibit Number 5. And is there any
14 indication -- this is CH0131.
15      Is there any indication on the back page under
16 schedule of rates under the company or agent procedure
17 that indicates that there is anything called a
18 refinance rate that's available?
19 A.   No. On this schedule of rates this isn't --
20 it is not here. I will go one step further and please
21 clarify this, and maybe I should have earlier, all of
22 my agents have an access database that was created
23 previously by someone at Chicago Title. I really
24 can't find out at this point who, that is a rate
25 chart. It is loaded on their computers, I believe

JODI REIMER

89

1  90 percent of my agents use this. You plug in the
2  amount of the loan and -- or the amount of the policy
3  and it calculates automatically for you the basic
4  rate, the reissue rate, the approved attorney rate,
5  the refinance rate, all of those rates.
6      In addition, all of my agents have, based on
7  their split, a complete paper chart of rates usually
8  from one to a million where there is a complete
9  breakout of all the rates that are -- that could
10 happen in a loan from zero to 30,000; here is the
11 basic, here is the reissue, here is the approved
12 attorney rate.
13 Q.   Is that to help agents to calculate what their
14 percent or what their cut of the premium is going to
15 be?
16 A.   How to divide that up and it also -- you know,
17 to make sure that they correctly charge the consumer
18 on the HUD.
19 Q.   Okay.
20 A.   Do you have a copy of that there?
21 Q.   I might.
22 A.   So just so you understand, in addition to this
23 paper, our agents are supplied with other avenues --
24 Q.   Internally?
25 A.   -- of rate calculation.

90

1  Q.   Are any of those provided to consumers?
2  A.   Not to my knowledge. I would not provide it
3  to a consumer, I don't meet the consumers.
4  Q.   Now, Chicago Title also has a web page; does
5  it not, a website?
6  A.   We do.
7  Q.   Is that website available to the public?
8  A.   It's very easy to find, yes.
9  Q.   How do you find it?
10 A.   Type in Chicago Title, Google Chicago Title.
11 Q.   Have you gone to the website before?
12 A.   Yes, I have.
13 Q.   Do you go to it frequently?
14 A.   Not -- not -- not frequently, but I do have
15 reason to use it if I need to contact somebody in
16 another state, at another Chicago Title office. If an
17 agent who may be looking to expand into another area,
18 by that I mean another state, they may want
19 information and that leads me to the go-to/talk-to
20 person.
21 Q.   Does the website have a portion that's only
22 available through a password?
23 A.   The Chicago Title website? No, I don't
24 believe the main Chicago Title website is password
25 protected.

91

1  Q.   Is there a separate website for agents?
2  A.   There is a separate website for agents.
3  Q.   And how does one find that?
4  A.   The agents are given the web address, as well
5  as their password.
6  Q.   If I wanted to access that website, how would
7  I do it?
8  A.   You wouldn't do it.
9  Q.   How would I do it, though, if I wanted to?
10 A.   Well, you couldn't.
11 Q.   I would need a password?
12 A.   Well, no, you can -- you can look at the
13 website, if that's what you mean.
14 Q.   Where is it located?
15 A.   PACTIC.bis.
16 Q.   Say that a little slower.
17 A.   No. PACTIC.bis.
18 Q.   Is this only for Chicago Title or is it for
19 all the Ticor companies?
20 A.   This still includes the Pennsylvania Ticor
21 company as well. This is also -- actually, I just
22 received an e-mail from IT because we've been working
23 with corporate IT in order to get this moved and
24 changed into a whole other form of the website, not
25 only updated but it will be moved, it will be

92

1  integrated into our corporate, you know, dot net
2  webbing.
3  Q.   What information is available on I'll call it
4  the secure website?
5  A.   The secure website, well, you can find out any
6  information about who's in Western Pennsylvania
7  working for Chicago Title, who is in Eastern
8  Pennsylvania working for Chicago Title. Meet our
9  staff. You can complete an approved attorney
10 application on there or print out what you need for an
11 approved attorney application. You can find out who
12 to talk to if you have agency-related questions or
13 you're interested in becoming a Chicago Title agent.
14 There is a rate chart on there as well, bulletins.
15 There's an area -- there's a section where
16 bulletins -- agency memos and bulletins are to be
17 posted, and I also believe the TIRBOP manual in full
18 is posted on that website.
19 Q.   The TIRBOP manual is up there?
20 A.   I believe it is.
21 Q.   Okay. Are there any -- any other information
22 about refinance rates or reissue rates and how to
23 apply them and what to look for or just the TIRBOP
24 manual?
25 A.   I don't really recall. I'm not there often,

**Page 93**

but I just don't recall. As I'm working on the new one, I'm a little more focused on pulling the new website together.

Q. Okay. Is there going to be something on the new website about appropriately applying the reissue and refinance discounts?

A. Well, we probably want to make sure we post that everyone remembers that the TIRBOP manual has changed and with these revisions, although the revision pages will be in the TIRBOP manual, that will be posted on the site. But we will make an effort to make sure we notate any changes, you know, in addition to mailing out changes that we do to everybody.

Q. So there will be some additional material on refinance rates and reissue rates on the website?

A. And other changes.

   (Documents marked for identification as Defendant's Deposition Exhibit Numbers 6, 7, 8, 9, 10 and 11.)

BY MR. GORDON:

Q. Okay. I'd like to show you, these are marked a little bit out of order and I apologize for that, it's Exhibit 6 through 11. Exhibit 11 is actually the first one, but I would like you to look through these. This is actually purely for identification purposes.

**Page 94**

MR. GORDON: And if, Mr. May, you would stipulate to the authenticity of these web pages, that would save us some time, but they were, in fact, printed right off of the Chicago Title website.

MR. MAY: I'll tell you what, they certainly look that way to me, but why don't I just let Ms. Reimer look through them, since she may have more familiarity with them.

THE WITNESS: It's Page 1?

MR. MAY: You know, just page through them and if it looks authentic, you can state that.

THE WITNESS: Yes, they look as though they're the corporate website of Chicago Title.

BY MR. GORDON:

Q. So this would not be part of the -- the secure website that we discussed?

A. Correct.

Q. But those do appear to be true and accurate copies of what is on the website, corporate website?

A. Correct, correct. I'm sorry, let me backtrack one second, I did forget one important thing.

Q. Certainly.

A. On the PACTIC.bis website, which is the reason for password protection is that that is the area where our agents created their closing protection letters,

**Page 95**

closing service letters, they were created right there.

Q. What do you mean, they're created there? Is there a form on the website?

A. There's a form on the website, the agent goes in and inputs the information required by the lender and then --

Q. Prints it out?

A. Prints it, and then faxes it, e-mails it, scans it, you know, whomever else it may need to go to.

Q. Now, you're, I take it, also generally familiar with the protocol for issuing title insurance, are you not, in Pennsylvania?

A. Mm-hmm, generally, yes.

Q. Could you tell me if I've missed any steps along the way; let's say someone wants to refinance their house, how do they find an agent like Chelsea or one of the other Chicago Title agents?

MR. MAY: Object to the form.

THE WITNESS: In my opinion, they -- they would find them several ways. In my opinion they would ask and have a word of mouth referral, which is usually the best and strongest, which is why we're considered in the customer service business. They may

**Page 96**

look it up in a telephone book. They may call a friend who is a mortgage broker. They may call a realtor. They may call a loan officer. They may call their local bank and ask do you do refinances.

BY MR. GORDON:

Q. Typically, is it the borrower who actually contacts the title agent or is it a referral from a third party?

A. In this day and age sometimes -- often, I'll say often it is a referral from a real estate agent, from the loan officer, from the mortgage broker, but that's all it is is a referral.

Q. Does the borrower generally, at this stage of the process, have contact with the title agent?

A. Not at the referral stage as of yet, no.

Q. Okay. After the referral is made there is a title search that's ordered, correct?

A. Once the information is given to a title agency, then, you know, the file is opened and the first thing we would do would be to order a title search.

Q. The borrower is not involved in that process; are they?

A. At this point I believe that the buyer knows who is going to do the -- or knows that the file has

JODI REIMER

97

1  been opened and the search has been begun, the search
2  has started.
3  Q.    But the borrower doesn't participate in the
4  search, do they?
5  A.    No, the buyer wouldn't have any idea how to do
6  a search.
7  Q.    Right. And then a title examination is
8  generated; is it not?
9  A.    A raw search is given back to the title
10 agency, the title agency then turns that raw search
11 into a commitment.
12 Q.    And that's not something that the borrower has
13 any involvement with, do they?
14 A.    They have no involvement in the doing of it
15 because, once again, unless they're in the title
16 business, they don't even, you know, know what that
17 means or understand at this point what all this whole
18 process involves, they just want it done, they want to
19 call on Monday and they want to close on Friday.
20        MR. GORDON: Why don't we go off the
21 record.
22        THE VIDEOGRAPHER: This will be the end
23 of tape number one. We're going off the record. The
24 time is 37 minutes past 12:00.
25        (Brief recess.)

98

1         THE VIDEOGRAPHER: This is the
2  beginning of tape number two, we are going back on the
3  record. The time is 1:00 p.m.
4  BY MR. GORDON:
5  Q.    Ms. Reimer, I would like to refer you back to
6  Deposition Exhibit Number 1 and you are here today as
7  corporate representative to testify on behalf of that
8  deposition notice; are you not?
9  A.    Yes, I am.
10        (Document marked for identification
11        as Defendant's Deposition Exhibit Number
12        18.)
13 BY MR. GORDON:
14 Q.    And what we've been provided is deposition
15 Exhibit Number 18, which I am going to hand to you,
16 and I just have a couple of very brief questions for
17 you that perhaps your counsel could even jump in to
18 confirm.
19        Deposition Exhibit Number 18 has two pages,
20 the first is a break down of the numbers of policies
21 that were issued, both the total number as well as the
22 reissue rate and the refinance rate policies for
23 lenders and owners policies from 2000 through 2005.
24 And the second page contains a list of lawsuits
25 similar to this one filed around the country.

99

1         MR. GORDON: And it's my understanding,
2  Mr. May, that the page one was compiled from the
3  Pennsylvania Title Insurance statistical reports that
4  have been provided in this case; is that correct?
5         MR. MAY: That's correct. That chart
6  was prepared by counsel in response to the questions
7  set forth in the 30(b)(6) notice and then the second
8  chart was prepared in response to the final question
9  of that notice, also prepared by counsel.
10 BY MR. GORDON:
11 Q.    And, Ms. Reimer, it's your understanding that
12 the numbers that are provided and the list of cases
13 that are provided are accurate?
14 A.    Yes.
15        MR. MAY: I'm going to instruct the
16 witness that she is entitled to rely on counsel for
17 that since she has not previously seen this chart
18 before about five minutes ago.
19        THE WITNESS: That's right, I am
20 relying on counsel for that answer.
21 BY MR. GORDON:
22 Q.    That it is true and accurate?
23 A.    Correct.
24        (Documents marked for identification
25        as Defendant's Deposition Exhibit Numbers

100

1         12, 13, 14, 15, 16 and 17.)
2  BY MR. GORDON:
3  Q.    Okay. Now, I would like to show you what's
4  been marked as deposition Exhibits 12 through -- 13,
5  14, 15, 16, 17 -- through 17 and these are the
6  statistical reports that we just referred to. Have
7  you seen these before?
8  A.    No, I have not seen these before.
9         MR. GORDON: Mr. May, can you just
10 represent these are the statistical reports off of
11 which the numbers were produced?
12        MR. MAY: So represented.
13        MR. GORDON: And it's my understanding
14 that specifically they compile the numbers off of
15 Pages 9 and 10 of each report?
16        MR. MAY: That the chart takes the data
17 from Pages 9 and 10?
18        MR. GORDON: Yes.
19        MR. MAY: That was certainly the case
20 with the one report that we were looking at before the
21 break and whether the page numbers vary different
22 years, I haven't checked.
23        MR. GORDON: Mr. Snyder, do you
24 believe -- I don't believe the page numbers vary at
25 all.

JODI REIMER

101

1  MR. SNYDER: They don't.
2  MR. GORDON: And will you stipulate as
3  to the authenticity of these documents?
4  MR. MAY: Yes, yes, they were produced
5  by Chicago Title.
6  (Document marked for identification
7  as Defendant's Deposition Exhibit Number
8  19.)
9  BY MR. GORDON:
10 Q.  Now, Ms. Reimer, I would like to hand you
11 deposition Exhibit Number 19, which actually are
12 documents that have been produced by Chelsea, the
13 agent for Ms. Cohen's transaction, relating to her
14 transaction, and I would ask you if you could take a
15 minute and flip through them. Also, let me know if
16 you have seen these before.
17 A.  I have never seen them before. (Witness
18 reviews documents.) Okay. Go ahead.
19 Q.  I noticed that you pulled a couple of pages
20 from the document. Could you tell me why?
21 A.  I actually just wasn't sure about this. I
22 guess this is a list of judgements against Edward
23 Cohen for various dollar amounts, filed by the City of
24 Philadelphia.
25 Q.  Okay. What was the other page that you

102

1  pulled? And if I could ask that you put them back
2  into the exhibit in the order in which they were
3  identified -- they were listed.
4  A.  Sure. The other page I pulled was just the
5  disbursement statement.
6  Q.  Okay. Now, in reviewing the file -- I'm not
7  going to ask you to authenticate it, because,
8  obviously, you can't, it's not your records, but did
9  you see anything unusual in that file --
10 MR. MAY: Object to form.
11 BY MR. GORDON:
12 Q.  -- that you wouldn't normally see in a title
13 agent's file for a borrower?
14 A.  Well, without studying the entire file which
15 there is several pages of, you know, I really can't
16 say that I saw anything unusual. One of the things
17 that did jump out at me is that they have check
18 registers from two different banks, a Sovereign Bank
19 and a First Trust Bank.
20 I don't have the time right now here to go
21 through to see if checks were issued related to the
22 Cohen case or related to -- excuse me, to the Cohen
23 closing, if they were issued from both -- two
24 different bank accounts.
25 Q.  Okay. But to the -- putting aside the check

103

1  register, do the documents in the file appear to be
2  sort of the standard type documents you would find in
3  a title agent's file?
4  A.  So far, yes. I have not gotten through all of
5  them.
6  Q.  Well, please do.
7  A.  Is there -- is there -- you can probably just
8  tell me. Oh, here it is, copy of drivers' licenses as
9  identification. I saw the payoffs. Copies of the
10 checks, of course I didn't verify all of them.
11 Several faxes.
12 MR. MAY: Richard, could you --
13 THE WITNESS: Is there something you
14 want me to look for?
15 MR. MAY: Excuse me one second.
16 There -- in addition, there's a check register; are
17 you saying that that's part of this particular Cohen
18 file?
19 MR. GORDON: This is what was produced
20 to us as the Cohen file. I'm sure that I will find
21 out tomorrow if that's part of the standard file or if
22 it was just produced in addition to, but I thought for
23 integrity purposes, we should keep it all together.
24 MR. MAY: Okay.
25 THE WITNESS: To my knowledge, a full

104

1  check register like that would not be part of a file.
2  BY MR. GORDON:
3  Q.  Okay. I did say other than the check register
4  because I have questions about that too.
5  A.  Yeah, right.
6  Q.  Does this just appear to have the standard
7  title forms in it?
8  A.  It appears, it appears so, yes.
9  Q.  If I could ask you to please turn to Chelsea
10 0043.
11 A.  Okay.
12 Q.  What document is that?
13 A.  This is the marked up title commitment.
14 Q.  That's Chicago Title's standard form?
15 A.  Yes.
16 Q.  And this would have been a document used by a
17 Chicago Title agent in the normal course of business;
18 would it not?
19 A.  Yes.
20 Q.  And it would be issued in every borrower's
21 case where there's title insurance, correct?
22 A.  Correct.
23 Q.  And the information that is on the title
24 commitment, if you could flip, for example, to
25 Page 0045, under Schedule A, that's the normal type

**105**

1 information that's going to be on a title commitment;
2 is it not?
3  A.  Correct.
4  Q.  And from the title commitment we can tell a
5 lot of information, can't we?
6  A.  Yes.
7  Q.  We could tell the names of the borrowers who
8 are the homeowners?
9  A.  Mm-hmm, correct.
10  Q.  We know from the title commitment when the
11 property was purchased, correct?
12  A.  Mm-hmm.
13  Q.  Is that a yes?
14  A.  I'm sorry. I'm sorry. Yes, yes, we do.
15  Q.  From the title commitment we can also tell
16 what the prior mortgages were?
17  A.  We can tell that there is a mortgage on the
18 property, yes.
19  Q.  And we can tell the date of that mortgage,
20 correct?
21  A.  Yes.
22  Q.  And we can tell the amount of the mortgage;
23 can we not?
24  A.  Yes.
25  Q.  We could also tell who the lender is for that

**106**

1 mortgage; could we not?
2  A.  Yes.
3  Q.  And that's going to be true for every title
4 commitment that's issued?
5  A.  Correct.
6  Q.  And this information, obviously, is available
7 to the title agent; is it not?
8  A.  Yes.
9  Q.  And it's inputted by the title agent?
10  A.  Correct.
11  Q.  From information that they gather as part of
12 the -- from the public record?
13  A.  Correct.
14  Q.  Please turn to Page 0058. What document is
15 that?
16  A.  Their settlement statement.
17  Q.  Also known as the HUD-1?
18  A.  Correct.
19  Q.  Or in this instance, I guess, the HUD-1A?
20  A.  HUD-1A.
21  Q.  It's a standard form; is it not?
22  A.  It is.
23  Q.  Used in every mortgage loan transaction in the
24 United States just about?
25  A.  Just about.

**107**

1  Q.  And this document, for example, shows on Line
2 1109 that there was title insurance issued, correct --
3 I'm sorry, 1108?
4  A.  1108.
5  Q.  That there was title insurance issued?
6  A.  Correct.
7  Q.  And this will also provide information about
8 the prior mortgage and the payoff of it, correct?
9  A.  Right, prior mortgage or whether it was a home
10 equity loan, it's still lumped into mortgage, but it
11 could have been a mortgage payoff or a home equity
12 loan payoff.
13  Q.  But, again, this is --
14  A.  But they refer back to the commitment because
15 they call it a mortgage here, but it could have been a
16 home equity loan.
17  Q.  But this is the standard and typical form
18 that's used, correct?
19  A.  Yes, it's standard, typical form.
20  Q.  Could you please turn to the next page,
21 Page 0059. This is a disbursement sheet; is it not?
22  A.  Mm-hmm.
23  Q.  This, again, will appear in every single
24 mortgage loan transaction?
25  A.  Correct.

**108**

1  Q.  In more or less the same format?
2  A.  Mm-hmm.
3  Q.  It's a standard form?
4  A.  Correct.
5  Q.  Is there anything unusual about this form that
6 you can tell?
7         MR. MAY: Object to form.
8         THE WITNESS: No, nothing unusual that
9 I can tell.
10 BY MR. GORDON:
11  Q.  Could you please turn to 0087. This is an
12 owner's Affidavit; is it not?
13  A.  Sorry, I didn't get there yet. Yes, owner's
14 Affidavit.
15  Q.  What's the purpose of this document?
16  A.  It's signed, notarized and sealed that -- you
17 know, saying that, you know, it's marketable and
18 insurable of title and, you know -- you know, it has
19 the premises address on it, it has the parcel number,
20 you know, it's dated. If there's, you know, any other
21 information such that they would want to put in
22 regarding like whatever deed book it was in, wherever
23 they found the information.
24  Q.  Has lots of information about the transaction
25 and the prior history on the property; does it not?

## 109

1  MR. MAY: Object to form.
2  THE WITNESS: Not lots of information,
3  but maybe where they found the information.
4  BY MR. GORDON:
5  Q. Okay. And it's a standard form?
6  A. Yes, it is a standard form.
7  Q. It's, in fact, a Chicago Title form; is it
8  not?
9  A. I believe it is a Chicago Title form.
10 Q. Used in every transaction?
11 A. That would require an owner's Affidavit.
12 Q. When is an owner's Affidavit required?
13 A. I don't know that answer.
14 Q. Do you know if it's used to effect the type of
15 title search that's conducted?
16 A. To effect?
17 Q. Do you need me to clarify that?
18 A. Please.
19 Q. Okay. I'm happy to.
20    Rather than doing the 60-year search maybe
21 only a bring-to-date is necessary?
22 A. No, I can't answer that question.
23 Q. Okay. There is no statement on this standard
24 Chicago Title form, however, relating to prior title
25 insurance, is there?

## 110

1  A. No.
2  Q. Or even any inquiry as to whether there was a
3  prior owner's policy issued to the consumer, is there?
4  A. No.
5  Q. Would you please turn to Page 109.
6  A. All right.
7  Q. This is also -- this is the uniform
8  residential loan application?
9  A. All right.
10 Q. Is that correct?
11 A. Yes, yes. Sorry.
12 Q. And this is also a standard form that's used?
13 A. Yes.
14 Q. In every transaction?
15 A. Yes.
16 Q. Anything unusual about it?
17    MR. MAY: Object to form.
18    THE WITNESS: You know what, I really
19 wouldn't be qualified to say if there was anything
20 unusual about this.
21 BY MR. GORDON:
22 Q. That's fair.
23    Would you agree, though, that it is from this
24 form or this form will always advise when the house
25 was originally purchased by the borrowers?

## 111

1  MR. MAY: Object.
2  THE WITNESS: If it's a refinance, it
3  does ask it to fill it in, you know, the year that the
4  house was acquired.
5  BY MR. GORDON:
6  Q. Is that a yes, it will always advise of that
7  information?
8  MR. MAY: Objection.
9  THE VIDEOGRAPHER: We're going off the
10 video record. The time is 18 minutes past one
11 o'clock.
12 MR. MAY: Objection to lack of
13 foundation and form.
14 THE VIDEOGRAPHER: We are back on the
15 video record at 19 minutes past one o'clock.
16 MR. GORDON: Could you read back the
17 last question, please.
18    (The court reporter read back the
19    record as requested.)
20 THE WITNESS: I don't know. I don't
21 know that because I am not an expert in, you know,
22 uniform residential loan applications. It's not an
23 area that I know well.
24 BY MR. GORDON:
25 Q. Okay. Could you please turn to Page 0133.

## 112

1  A. Okay.
2  Q. Ms. Reimer, this document, and I think one or
3  two pages after it -- one page after it relate to the
4  abstract title search that's conducted, correct?
5  A. Okay. Yes.
6  Q. And these types of documents will always be
7  included in the title file; will they not?
8  A. Yes.
9  Q. And they will always tell in a refinance when
10 the house was originally purchased?
11 A. Yes.
12 Q. Will always tell of existing mortgages and the
13 dates of those mortgages?
14 A. Yes.
15 Q. And the amounts of those mortgages?
16 A. Yes.
17 Q. Could you please turn to Page 0158.
18 A. Okay.
19 Q. And what document is this?
20 A. An Airborne Express shipping label.
21 Q. 0158?
22 A. Oh, next one. Oh, the lender's instructions.
23 Q. There will always be lenders's instructions;
24 will there not?
25 A. There are always lender's instruction.

**113**

1  Q.  The lender's instructions will always set
2  forth that there's a requirement for title insurance,
3  correct?
4  A.  Correct.
5  Q.  Okay. Now, could you turn to the next page.
6  A.  That is if the lender requires title
7  insurance, it will set forth that it's required. If
8  the lender doesn't require it for some chance, it
9  wouldn't be on there.
10 Q.  Okay. Have you seen a number of loan
11 settlement instructions in your days?
12 A.  No, I haven't. Not to the fact that I've
13 studied them, no.
14 Q.  How many have you reviewed in the last four
15 years?
16 A.  Only in the last three years would I have ever
17 even reviewed any to glance through them.
18 Q.  Okay. In the last three years?
19 A.  Maybe I've gone through a couple hundred.
20 Q.  A couple hundred?
21 A.  Mm-hmm.
22 Q.  How many of those did not request title
23 insurance; were there any?
24 A.  There could have been some, that's not really
25 what I was looking for.

**114**

1  Q.  Okay. You don't recall?
2  A.  Often -- I don't recall that. Often the
3  instruction pages are 13 pages long. It's not
4  something I study.
5      MR. MAY: Just want to interpose an
6  objection to the question.
7  BY MR. GORDON:
8  Q.  I'd like to refer you back to Page 0133.
9  A.  Okay.
10 Q.  That's the abstract document, correct?
11 A.  Correct.
12 Q.  Do you know how an agent conducts an abstract?
13 A.  In the majority of -- of my agents they would
14 hire an abstracter to go to the courthouse. They
15 don't usually do the abstract themselves.
16 Q.  Okay. Do you know if there was any way from
17 Chicago Title's own records that the abstract can be
18 conducted?
19 A.  In our direct operations, you know, we do have
20 back title, but, once again, that's in our direct
21 operations. And, to my knowledge, agents don't call
22 and ask if they -- if we have any back title on
23 something.
24 Q.  Have you ever heard of the term title plants?
25 A.  Yes.

**115**

1  Q.  What is a title plant?
2  A.  A title plant is actually more or less a title
3  production center where you can fax in your request
4  for a title search.
5  Q.  Okay. So this is information that's been
6  gathered over the years by Chicago Title, for example,
7  on title histories for houses?
8  A.  Sure, yes. Other title insurance companies
9  also have title plants.
10 Q.  Most title insurance companies have title
11 plants; do they not?
12 A.  Correct.
13 Q.  And they're shared among the title companies;
14 are they not?
15 A.  Not to my knowledge.
16 Q.  They're, in fact, considered a pretty valuable
17 asset of the company?
18     MR. MAY: Object to form.
19     THE WITNESS: Actually, I consider them
20 a pretty valuable asset to my agent.
21 BY MR. GORDON:
22 Q.  Why?
23 A.  Because it's just another way, in customer
24 service, that I can help my agent get turnaround time
25 on a quality abstract.

**116**

1  Q.  Okay. So the agent can gain access to Chicago
2  Title's title plant and that will give them
3  information about a property?
4  A.  They will request, yes, information about a
5  property and then a title report will be returned to
6  them.
7  Q.  Okay. And what information can be provided to
8  them about that property?
9  A.  Because I'm not familiar with the title plant
10 that is in this area, my agents don't use it. If --
11 if one agent has used it in the past two years, I'd be
12 surprised. So I really don't know what all they can
13 access information, but I believe they could find out
14 everything they wanted to know about the title
15 property.
16 Q.  Okay.
17 A.  The chain of title, the -- the lot and block
18 number, the address, are there any liens on it.
19 Q.  And, also, whether or not there have been
20 prior title insurance policies issued on that
21 property?
22 A.  I don't know that always it comes back that
23 there is private title insurance or title insurance
24 that has been issued on a property.
25 Q.  But that information is in there for many

**117**

1  properties, correct?
2      MR. MAY: Object to form.
3      THE WITNESS: It is in there for some
4  properties. I don't know how many.
5  BY MR. GORDON:
6  Q.  Okay. You don't know the extent?
7  A.  I don't know the extent. I'm not qualified.
8  Q.  Who within Chicago Title would know that
9  information; what exactly is in the Chicago Title
10 title plant?
11 A.  I would imagine the woman that runs the title
12 plant, Terry France.
13 Q.  Terry France. Where is she located?
14 A.  In West Chester -- well, with the title plant
15 in West Chester.
16 Q.  Okay. She runs the title plant for Western
17 Pennsylvania?
18 A.  Correct.
19 Q.  Do you know who runs it for the Eastern
20 District?
21 A.  We don't have one in the Eastern District.
22 Q.  What is Ms. France's position?
23 A.  I don't know her exact title. She runs the
24 title plant.
25 Q.  Is she in charge of IT?

**118**

1  A.  No. I think she would be in charge of
2  production, getting the orders in, getting the orders
3  out.
4  Q.  This is some -- the title plant, though, is
5  something that your direct closings uses?
6  A.  If our direct operations had a need for a
7  property in this part of the state, they would use it.
8  Q.  And that would necessarily allow them to
9  forego the need for a -- an abstract company?
10 A.  Yes.
11 Q.  Do you know if in the Eastern District if
12 Chicago Title accesses any other title company's title
13 plants?
14 A.  To my knowledge, we do not access any other
15 title plants, but I'm not in direct operations.
16 Q.  So you don't know?
17 A.  No.
18 Q.  There should be some more of these.
19 A.  Here you go.
20 Q.  Would you please take a look at deposition
21 Exhibit Number 10.
22 A.  Mm-hmm.
23 Q.  And, again, this is just to refresh your
24 recollection, this is a page from Chicago Title's
25 Internet site, public site. And what is the title of

**119**

1  this page?
2  A.  "What's In A Title Search?"
3  Q.  And at the bottom of the first page it
4  indicates, the Chicago Title and Trust Family of
5  Companies provides the following step-by-step review.
6  A.  Mm-hmm.
7  Q.  What does "Chicago Title and Trust Family of
8  Companies" mean?
9  A.  I would -- I would take that to mean -- I
10 would take that to mean our additional sister
11 companies.
12 Q.  And could you please read the paragraph at the
13 very top of the next page.
14 A.  The Chain of Title. This is simply a history
15 of the ownership of a particular piece of property,
16 telling who bought it and sold it and when. The
17 information may be arrived -- may be derived from
18 public records, usually a county clerk's or recorder's
19 office, or obtained from title plants privately owned
20 and maintained by title companies. There are great
21 varieties of such plants; index cards, punch cards,
22 track books, even sophisticated computerized plans.
23 However, they all contain essentially the same
24 information from which the history of any title may be
25 secured.

**120**

1  Q.  Do you know how far back title plants go?
2      MR. MAY: Object to form.
3      THE WITNESS: No, I don't know. Our
4  requirements at Chicago Title are a 60-year search.
5  BY MR. GORDON:
6  Q.  Would it surprise you that the Chicago Title
7  title plant began accumulating information in the
8  1920s on properties?
9      MR. MAY: Object to form.
10     THE WITNESS: No, it wouldn't surprise
11 me.
12 BY MR. GORDON:
13 Q.  It has a lot of stuff in it, correct?
14 A.  Sure, yes.
15 Q.  Have you ever -- have you ever looked up a
16 particular property on a title plant?
17 A.  No.
18 Q.  And I take it the title plant for the Western
19 District or used by the Western District of Chicago
20 titled in Pennsylvania is computerized?
21 A.  The Western District of Pennsylvania doesn't
22 have a title plant. You mean the one that we have in
23 our office that the direct operations use?
24 Q.  Yes.
25 A.  Oh, no, it's index cards.

### 121

1  Q. It's not computerized?
2  A. It's not computerized. Index cards, punch
3  cards. We have some, I think, reel-to-reel tape.
4  That's what it is, to my knowledge.
5  Q. What do you base your knowledge on,
6  Ms. Reimer?
7  A. Seeing it in -- in the room when I walk past
8  it.
9  Q. Okay. Where is it located?
10 A. It's in its own -- it's in a room in our
11 offices in Pittsburgh.
12 Q. Okay.
13      MR. MAY: Can I just interject one
14 thing. I think at one point in the record, and I may
15 be wrong, but I think that Ms. Reimer confused east
16 and west when she talked about a West Chester office.
17 I got the sense at that time that you were -- because
18 you said we in the east and you're an agency
19 representative in the west.
20      THE WITNESS: Oh, correct.
21      MR. MAY: So that may lead to some
22 confusion.
23 BY MR. GORDON:
24 Q. To clarify things, where is the title plant?
25 A. In West Chester, Pennsylvania, the Eastern --

### 122

1  Q. In the Eastern District?
2  A. -- District.
3      MR. MAY: And I believe the prior
4  testimony was that it was at that West Chester plant,
5  which, by the way, is in Southeastern Pennsylvania,
6  was for the Western District, I think that's what the
7  prior testimony was.
8      THE WITNESS: Okay.
9      MR. GORDON: I guess I'm confused now.
10 Maybe I can ask the witness questions to try to
11 clarify it.
12      MR. MAY: You know, like what -- you
13 know, what district is the West Chester plant for.
14 BY MR. GORDON:
15 Q. What district is the Western -- West
16 Chester -- the question that Mr. May asked.
17 A. The entire -- the entire State of Pennsylvania
18 may use the title plant located in West Chester,
19 Pennsylvania.
20 Q. When was the last time you saw it?
21 A. I have never seen it.
22 Q. Ah, you have never seen the title plant?
23 A. Never.
24 Q. Okay. So just -- if I -- I just want to make
25 clear, if I wanted to talk to someone at Chicago Title

### 123

1  in Pennsylvania about the title plant available to
2  agents, that would be Terry France?
3  A. That would be Terry France.
4  Q. Okay. When you were referring to the punch
5  cards and the reel-to-reels, this would be information
6  that your direct operation used out of your office?
7  A. Right.
8  Q. Okay.
9  A. Back policy that they have on locations I
10 would assume -- I would believe, you know, commercial
11 properties in the City of Pittsburgh, possibly some
12 residential, but back title information from closings
13 that they have done.
14 Q. Okay. It would not be the formal title plant
15 used by agents in Pennsylvania, though?
16 A. No.
17 Q. Okay.
18 A. No.
19 Q. Can the operations people in the Western
20 District of Pennsylvania or even in the Eastern
21 District who do direct operations themselves access
22 the title plants in West Chester --
23 A. Yes.
24 Q. -- for residential properties?
25 A. Yes, they can.

### 124

1  Q. Is that system computerized?
2  A. The West Chester, Pennsylvania system?
3  Q. Yes.
4  A. I don't know that.
5      MR. MAY: Just I need to consult with
6  Ms. Reimer about her travel plans.
7      THE VIDEOGRAPHER: We are going off the
8  record at 37 minutes past one o'clock.
9      (Brief pause.)
10     THE VIDEOGRAPHER: We are back on the
11 record at 39 minutes past one o'clock.
12     MR. GORDON: Mr. May, my understanding
13 is that Ms. Reimer has to catch a plane at this time
14 and we're going to terminate the deposition for now
15 and keep it open. I am going to try, where I can, to
16 cover some of the remaining areas with Ms. Ray when
17 she's available. If there are some things that are
18 unique to Ms. Reimer, then we will ask her to reappear
19 for deposition, but at this point I don't know what
20 those are or what they could be, but we're going to
21 keep the deposition open.
22     MR. MAY: It's agreed.
23     THE WITNESS: Agreed.
24     MR. GORDON: Thank you very much.
25     THE WITNESS: You're welcome.

125

1  THE VIDEOGRAPHER: This concludes our
2  deposition. We are going off the record at
3  approximately 40 minutes past one o'clock.
4  (Witness excused.)
5  ---
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

126

CERTIFICATION

I, MARGARET M. REIHL, a Registered Professional Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, Certified LiveNote Reporter and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

------------------------------
Margaret M. Reihl, RPR, CRR, CLR
CSR #XI01497  Notary Public

(This certification does not apply to any reproduction of this transcript, unless under the direct supervision of the certifying reporter.)

| A | act (3) | 96:9 | 70:20 71:5,11 | 114:21 116:10 |
|---|---|---|---|---|
| abide (3) | 18:16,18 53:2 | agencies (1) | 72:24 73:8 | 123:2,15 |
| 8:16 36:15 79:7 | acting (1) | 56:8 | 79:2,3,4 80:23 | agent's (7) |
| able (4) | 22:23 | agency (36) | 80:25 81:2,20 | 43:8 56:21 57:6 |
| 30:9 62:21 | action (5) | 3:10,13 7:15 | 82:22 83:22 | 64:10 67:18 |
| 64:24 87:25 | 1:2 4:20 5:11 | 9:1 10:14,21 | 84:9,11 88:16 | 102:13 103:3 |
| Absolutely (1) | 126:12,15 | 20:18 32:16 | 90:17 92:13 | aggregate (1) |
| 83:5 | added (1) | 32:24 33:13 | 95:5,18 96:7 | 79:13 |
| abstract (7) | 85:18 | 33:25 34:5 | 96:10,14 | ago (5) |
| 112:4 114:10 | addition (9) | 42:4 44:22,23 | 101:13 104:17 | 28:5,6,8 37:4 |
| 114:12,15,17 | 45:13 70:1 | 47:14,22,24 | 106:7,9 | 99:18 |
| 115:25 118:9 | 81:19 82:2 | 48:21 53:10 | 114:12 115:20 | agree (4) |
| abstracter (1) | 89:6,22 93:12 | 53:20,23 54:4 | 115:24 116:1 | 31:21 79:7 |
| 114:14 | 103:16,22 | 55:12 62:21 | 116:11 | 86:20 110:23 |
| accept (5) | additional (9) | 63:24 75:3 | agents (92) | agreed (2) |
| 28:1,16,18,23 | 23:19 26:24 | 78:4 81:3,19 | 9:20 10:2,24 | 124:22,23 |
| 29:9 | 33:11 39:5,10 | 88:7 92:16 | 11:19 16:13 | agreement (7) |
| access (6) | 39:14 52:18 | 96:19 97:10 | 16:14 17:15 | 15:12 53:20,24 |
| 88:22 91:6 | 93:14 119:10 | 97:10 121:18 | 18:11,13 19:4 | 55:12 80:11 |
| 116:1,13 | address (4) | agency-relate... | 20:8,11,14,16 | 80:14,23 |
| 118:14 123:21 | 65:1 91:4 | 92:12 | 20:19 21:9,12 | agreements (2) |
| accesses (1) | 108:19 116:18 | agent (96) | 21:14 23:7,9 | 53:9 57:16 |
| 118:12 | addresses (1) | 3:16,17 11:14 | 23:13 24:2,3,4 | Ah (1) |
| accessible (1) | 73:16 | 19:12,14 | 24:6,7,8 26:6 | 122:22 |
| 46:12 | adhere (1) | 22:23 23:18 | 28:25 29:3,8 | ahead (1) |
| accommodate... | 22:13 | 25:6,7,15 | 33:18,23 34:3 | 101:18 |
| 7:11 44:8 | adjusting (1) | 36:22 39:3,5 | 34:6 38:8,10 | Airborne (1) |
| account (1) | 80:5 | 40:24 41:16 | 39:13 42:9,19 | 112:20 |
| 64:21 | administrativ... | 41:25 42:1 | 42:23 43:22 | allow (2) |
| accounting (16) | 10:13 | 43:11,19,23 | 50:1,8 52:24 | 26:17 118:8 |
| 4:23 59:1,18,19 | advise (3) | 43:24 44:2,4 | 53:9 54:17 | allowed (1) |
| 63:11,14,19 | 41:10 110:24 | 44:10,11 | 58:5 59:10 | 79:7 |
| 64:10,12,15 | 111:6 | 45:20,20 | 62:14 66:8 | allows (1) |
| 64:17 65:16 | advisement (4) | 46:15,24 | 67:3 68:2,6,10 | 22:18 |
| 66:21 77:6,13 | 65:20 67:1 | 49:21 50:18 | 68:12 69:12 | ALTA (9) |
| 77:17 | 68:19 80:20 | 50:23,25 | 71:19,22 76:6 | 8:16 34:23,24 |
| accounts (4) | affect (1) | 51:15,15,16 | 76:8,15,22,23 | 35:12,14 36:1 |
| 20:23 69:15,15 | 72:3 | 51:24 52:14 | 78:8 80:10 | 36:9,11,12 |
| 102:24 | Affidavit (4) | 52:16 53:2 | 81:12 82:8 | altered (1) |
| accumulating... | 108:12,14 | 56:3,4,5,15 | 83:15 84:14 | 22:3 |
| 120:7 | 109:11,12 | 57:1,3,5,5,8 | 84:17 85:6 | American (2) |
| accurate (4) | affidavits (1) | 57:19,21,21 | 86:9,12 87:25 | 34:25 35:1 |
| 94:18 99:13,22 | 57:10 | 57:23 58:2,18 | 88:3,9,22 89:1 | amount (13) |
| 126:6 | afternoon (2) | 59:3,8 64:13 | 89:6,13,23 | 14:11 21:8 |
| acquired (1) | 15:6,24 | 66:17 67:22 | 91:1,2,4 94:25 | 24:20 26:24 |
| 111:4 | age (1) | 68:9 69:9 70:4 | 95:19 114:13 | 37:4 60:8 |

| | | | | |
|---|---|---|---|---|
| 70:25,25 | 45:19,21,23 | **approving (2)** | **attend (1)** | **Avenue (1)** |
| 79:14,21 89:2 | 46:1,15,18 | 49:20 51:3 | 73:25 | 2:6 |
| 89:2 105:22 | 47:7,22 49:23 | **approximatel...** | **attended (4)** | **avenues (1)** |
| **amounts (3)** | 51:23 52:6,10 | 5:22 23:9 125:3 | 74:8,9 75:12,14 | 89:23 |
| 60:7 101:23 | 52:13 57:7 | **April (2)** | **attorney (17)** | **aware (6)** |
| 112:15 | 92:10,11 | 3:11 32:25 | 20:25 23:17,23 | 7:7,8 41:18,19 |
| **Anastasia (1)** | 110:8 | **area (13)** | 24:5 27:24 | 86:1,10 |
| 75:19 | **applications (5)** | 11:6,7 28:12,13 | 28:16,18,23 | **a.m (1)** |
| **ANDREWS (1)** | 45:16,17,18 | 29:1,5 56:18 | 29:9 44:22 | 1:17 |
| 2:10 | 46:5 111:22 | 79:3 90:17 | 69:15 89:4,12 | |
| **Ann (1)** | **applied (2)** | 92:15 94:24 | 92:9,11 | **B** |
| 75:19 | 26:16 85:1 | 111:23 116:10 | 126:11,13 | **B (4)** |
| **answer (16)** | **apply (3)** | **areas (5)** | **attorneys (2)** | 3:6 78:22,24 |
| 19:8 21:20 40:4 | 22:18 92:23 | 27:23 28:9,11 | 70:13 76:23 | 79:5 |
| 40:13 49:3 | 126:22 | 28:18 124:16 | **attorney's (2)** | **back (33)** |
| 71:10,16 83:1 | **applying (1)** | **arises (1)** | 27:24 29:2 | 11:23 21:21 |
| 83:2,18 86:9 | 93:5 | 30:13 | **audit (4)** | 29:4 40:10,11 |
| 87:24 88:1 | **appoint (1)** | **arrived (1)** | 64:10 69:14 | 49:16 53:18 |
| 99:20 109:13 | 53:1 | 119:17 | 70:9 73:16 | 56:1 62:20 |
| 109:22 | **appointed (6)** | **aside (1)** | **Auditing (1)** | 63:24 64:24 |
| **answered (1)** | 18:13 21:13 | 102:25 | 69:9 | 67:12 69:3 |
| 40:17 | 49:21 50:24 | **asked (6)** | **auditor (1)** | 74:16 77:5 |
| **answering (1)** | 52:16,19 | 20:1 28:2 46:14 | 70:6 | 88:12,15 97:9 |
| 45:4 | **appointment ...** | 65:17 70:9 | **audits (2)** | 98:2,5 102:1 |
| **answers (1)** | 43:21 56:3,21 | 122:16 | 69:6,11 | 107:14 111:14 |
| 15:7 | 68:7 | **asset (2)** | **authentic (2)** | 111:16,18 |
| **anybody (1)** | **appoints (2)** | 115:17,20 | 49:1 94:11 | 114:8,20,22 |
| 83:21 | 52:24 56:4 | **assistant (2)** | **authenticate (...** | 116:22 120:1 |
| **apologize (3)** | **appreciate (3)** | 7:16 10:14 | 102:7 | 123:9,12 |
| 10:8 71:15 | 19:8 66:6 69:2 | **Associates (2)** | **authenticity (3)** | 124:10 |
| 93:22 | **appropriate (6)** | 5:17,20 | 48:17 94:2 | **background (4)** |
| **appear (5)** | 19:11 71:19 | **Association (3)** | 101:3 | 45:7 49:25 50:3 |
| 53:23 94:18 | 73:1,9,12,17 | 34:25 35:2 | **authority (4)** | 51:22 |
| 103:1 104:6 | **appropriately...** | 75:16 | 10:1 18:23 53:2 | **backtrack (1)** |
| 107:23 | 93:5 | **associations (1)** | 53:5 | 94:20 |
| **appearances (...** | **approval (3)** | 35:4 | **automatically...** | **backwards (3)** |
| 5:23 | 50:24 51:11 | **assume (2)** | 89:3 | 16:24 36:17 |
| **appears (2)** | 68:4 | 80:18 123:10 | **availability (2)** | 37:19 |
| 104:8,8 | **approve (2)** | **assuming (1)** | 9:11 87:23 | **balance (3)** |
| **applicable (7)** | 52:21 64:10 | 72:24 | **available (14)** | 26:12 64:20 |
| 24:1 47:6 67:17 | **approved (12)** | **assurances (1)** | 15:6 38:12,13 | 69:24 |
| 77:17,19,21 | 23:23 24:5 33:3 | 56:7 | 38:18 68:8 | **BALLARD (1)** |
| 88:6 | 50:9 51:7 | **attached (2)** | 85:13 86:21 | 2:10 |
| **applicants (1)** | 52:22 56:7 | 4:19 78:6 | 88:18 90:7,22 | **bank (11)** |
| 52:3 | 84:20 89:4,11 | **attack (2)** | 92:3 106:6 | 28:23 44:25 |
| **application (1...** | 92:9,11 | 75:22 76:3 | 123:1 124:17 | 45:1 64:18,19 |

65:10 69:20
96:4 102:18
102:19,24
**banks (2)**
28:17 102:18
**Barry (2)**
2:17 5:16
**base (1)**
121:5
**based (9)**
42:24 51:9
59:20 60:1
70:24 79:20
79:21 86:22
89:6
**basic (5)**
7:2 36:11,12
89:3,11
**basically (1)**
78:25
**basis (5)**
10:23 20:14
24:21 81:21
81:22
**Bates (3)**
56:24 63:23
78:4
**bear (2)**
65:25 66:10
**becoming (1)**
92:13
**began (2)**
10:13 120:7
**beginning (3)**
11:1 83:18 98:2
**begun (1)**
97:1
**behalf (16)**
1:4 5:8,24 6:1,3
6:5 18:16,19
18:22 22:24
33:3 42:20
49:21 53:3,7
98:7
**believe (34)**
13:18 22:17

30:5 42:1 43:5
47:13 48:19
58:17,19
61:20 62:7
63:16 65:15
66:7 77:1,14
80:1,2 82:12
85:15,17 86:8
87:9 88:25
90:24 92:17
92:20 96:24
100:24,24
109:9 116:13
122:3 123:10
**beneficiary (1)**
29:24
**best (2)**
16:6 95:24
**bible (1)**
83:11
**big (3)**
24:9,15 35:3
**bind (1)**
53:5
**bit (3)**
7:19 60:24
93:22
**block (1)**
116:17
**board (3)**
80:10,24 87:7
**bond (3)**
45:10,10 79:14
**bonds (2)**
70:14,15
**book (2)**
96:1 108:22
**books (1)**
119:22
**borrower (9)**
30:17 70:21
71:3 96:6,13
96:22 97:3,12
102:13
**borrowers (9)**
65:1 73:17

85:12 86:7,9
86:24 87:22
105:7 110:25
**borrower's (2)**
71:20 104:20
**bottom (2)**
46:25 119:3
**bought (1)**
119:16
**bound (1)**
22:12
**boundaries (2)**
31:1,1
**break (6)**
7:10 23:21
79:11,22
98:20 100:21
**breakout (1)**
89:9
**breaks (1)**
79:5
**brief (5)**
29:6 49:15
97:25 98:16
124:9
**bring (1)**
76:18
**bring-to-date ...**
109:21
**broken (2)**
78:20,21
**broker (5)**
14:2,3,11 96:2
96:11
**brother (1)**
35:3
**brought (1)**
75:21
**building (2)**
20:16,17
**bulletin (6)**
3:10 32:16,24
33:1,13 34:5
**bulletins (6)**
33:17 34:4
67:21 92:14

92:16,16
**Bureau (1)**
22:7
**burns (1)**
37:14
**business (28)**
11:2 17:20 21:1
21:17,18,22
28:8 32:18
42:5,7 44:7,13
44:16 46:6
50:15 54:7
57:24 67:19
70:13 72:5,10
76:13 81:4
84:21 88:2
95:25 97:16
104:17
**busy (1)**
76:5
**buyer (2)**
96:24 97:5
**buys (1)**
27:6

---
**C**
---
**C (6)**
2:1 78:23,24
79:11 126:1,1
**calculate (3)**
72:19,21 89:13
**calculates (1)**
89:3
**calculation (1)**
89:25
**calculations (1)**
72:23
**call (18)**
19:15,16,17,23
64:20 71:13
72:6,22,24
88:5 92:3 96:1
96:2,3,3 97:19
107:15 114:21
**called (3)**
15:5 61:7 88:17

**canceled (1)**
69:19
**capabilities (1)**
82:25
**capacity (1)**
10:12
**cardboard (1)**
84:13
**cards (6)**
119:21,21
120:25 121:2
121:3 123:5
**careful (2)**
52:24,25
**carry (1)**
79:14
**case (25)**
12:6,8 13:3,16
14:24 22:22
27:5,19 39:21
46:19 53:17
65:22,25
66:14,24 67:7
67:11 68:24
69:16 70:7
73:5 99:4
100:19 102:22
104:21
**cases (2)**
27:14 99:12
**case-by-case (...**
81:21,22
**catch (1)**
124:13
**category (1)**
24:5
**cause (1)**
75:24
**causes (2)**
31:11 75:25
**center (1)**
115:3
**certain (3)**
20:21 27:23
28:13
**certainly (11)**

| | | | | |
|---|---|---|---|---|
| 30:15 62:19<br>66:4,4,13 67:1<br>68:24 86:11<br>94:6,22<br>100:19<br>**certification (2)**<br>5:3 126:22<br>**certified (4)**<br>18:21 126:3,4,4<br>**certify (2)**<br>126:5,10<br>**certifying (1)**<br>126:24<br>**chain (4)**<br>30:23,24<br>116:17 119:14<br>**Chambersbu...**<br>28:12,25 29:5<br>**chance (5)**<br>15:18 60:4<br>79:18 82:2<br>113:8<br>**change (7)**<br>20:2,2,5 32:2<br>32:21 34:12<br>77:22<br>**changed (7)**<br>31:25 54:8 80:1<br>85:17,17<br>91:24 93:9<br>**changes (15)**<br>33:2,7,9 34:2,2<br>34:7,9 47:4<br>74:24,24 86:8<br>87:5 93:12,13<br>93:16<br>**charge (10)**<br>33:7,11 71:12<br>74:13 76:11<br>76:17 78:8<br>89:17 117:25<br>118:1<br>**charged (7)**<br>34:16,19 38:23<br>70:20 71:1,20<br>73:17 | **charges (1)**<br>42:24<br>**charging (3)**<br>76:14,20 77:1<br>**chart (10)**<br>15:4,13,23<br>88:25 89:7<br>92:14 99:5,8<br>99:17 100:16<br>**check (10)**<br>9:20 49:25 50:2<br>50:3 65:9<br>102:17,25<br>103:16 104:1<br>104:3<br>**checked (1)**<br>100:22<br>**checking (1)**<br>59:12<br>**checks (7)**<br>57:15 65:12,14<br>69:20 70:1<br>102:21 103:10<br>**Chelsea (15)**<br>4:22,24 41:16<br>41:20 46:18<br>46:23 47:6<br>49:4 53:19<br>58:17 60:2<br>73:16 95:18<br>101:12 104:9<br>**Cherry (1)**<br>5:17<br>**Chester (10)**<br>117:14,15<br>121:16,25<br>122:4,13,16<br>122:18 123:22<br>124:2<br>**CHI (1)**<br>3:14<br>**Chicago (124)**<br>1:8 3:10,23,25<br>4:1,2,3,4,17<br>4:19 5:9 7:14<br>7:17,18,23 8:1 | 8:23 9:14 10:9<br>12:22 16:3,15<br>17:4,16 18:13<br>19:16 20:17<br>21:4,10 22:12<br>22:15,24 26:4<br>29:7,11 32:16<br>33:13,17 35:9<br>35:23 36:16<br>39:7 41:9,25<br>42:2,10,20,21<br>43:6,9,11,16<br>44:21 45:5,25<br>46:2 49:21<br>50:1,9,23,25<br>51:2 52:16,23<br>53:3,5,7,10<br>54:8 55:5,6<br>59:8,9,25<br>60:14 63:17<br>71:18 74:1,2<br>80:11,24,25<br>81:18,24<br>82:17 83:3,6<br>84:19,21 85:4<br>87:7 88:23<br>90:4,10,10,16<br>90:23,24<br>91:18 92:7,8<br>92:13 94:4,13<br>95:19 101:5<br>104:14,17<br>109:7,9,24<br>114:17 115:6<br>116:1 117:8,9<br>118:12,24<br>119:4,7 120:4<br>120:6,19<br>122:25<br>**CHI0001 (1)**<br>4:6<br>**CHI0016 (1)**<br>4:8<br>**CHI0032 (1)**<br>4:10<br>**CHI0048 (1)** | 4:12<br>**CHI0065 (1)**<br>4:14<br>**CHI0081 (1)**<br>4:16<br>**CHI0116 (1)**<br>3:11<br>**CHI0130 (1)**<br>3:21<br>**CHI0535 (1)**<br>56:25<br>**CHI0536 (1)**<br>63:24<br>**CHI0537 (1)**<br>78:4<br>**CHI0543 (1)**<br>78:12<br>**CHI0544 (1)**<br>3:14<br>**CHI0545 (1)**<br>3:18<br>**choose (1)**<br>16:23<br>**CHTD (1)**<br>2:3<br>**CH0131 (1)**<br>88:14<br>**circumstance ...**<br>40:21<br>**City (2)**<br>101:23 123:11<br>**CK (1)**<br>29:15<br>**claims (1)**<br>45:2<br>**clarify (4)**<br>88:21 109:17<br>121:24 122:11<br>**class (3)**<br>1:2 4:20 5:11<br>**clear (3)**<br>20:21 70:5<br>122:25<br>**cleared (3)**<br>69:22,23 76:11<br>**clerk's (1)** | 119:18<br>**close (2)**<br>81:24 97:19<br>**closer (2)**<br>70:7 81:18<br>**closing (17)**<br>21:20 22:22<br>42:25 57:14<br>57:18 73:5<br>76:12 77:13<br>77:16 83:7<br>85:2,5,19 88:4<br>94:25 95:1<br>102:23<br>**closings (6)**<br>33:4 44:8 50:19<br>50:21 118:5<br>123:12<br>**CLR (1)**<br>126:18<br>**Cohen (9)**<br>1:4 5:8,25<br>13:16 101:23<br>102:22,22<br>103:17,20<br>**Cohen's (2)**<br>58:18 101:13<br>**cold (1)**<br>88:5<br>**collect (3)**<br>45:9 70:12 78:9<br>**collected (2)**<br>60:8 70:21<br>**College (1)**<br>9:6<br>**column (1)**<br>84:23<br>**come (8)**<br>23:2 30:8,12<br>37:22 40:22<br>62:10 72:3<br>87:7<br>**comes (5)**<br>22:8 33:22<br>76:21 80:23<br>116:22 |