# EXHIBIT G



## ISSUING AGENCY CONTRACT

This Issuing Agency Contract ("Contract") is made and entered into this 25th day of May, 2000 by and between *Chicago Title Insurance Company*, a Missouri corporation, hereafter referred to as "Principal" and *Chelsea Land Transfer, Inc.*, a Pennsylvania Corporation, hereafter referred to as "Agent".

In consideration of the promises and the mutual covenants herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Principal and Agent agree as follows:

1.   **APPOINTMENT OF AGENT.**  Principal hereby appoints Agent as a policy issuing agent of Principal for the sole purpose of issuing title insurance commitments, policies, endorsements and other title assurances approved by Principal and by all required regulatory agencies, now in existence or hereafter developed, relating to real property located in the all county(ies) in the Commonwealth of Pennsylvania in accordance with the terms of this Contract.  During the term of this Contract,

Agent shall have the right to issue title insurance commitments, policies and endorsements of any title insurance company in the referenced geographic area.

Principal or its affiliates shall have, and do retain, the right to appoint other agents in the referenced geographic area.

Notwithstanding the foregoing, pertaining to the referenced geographic area, Principal and its affiliates shall have, and do retain, the right to service directly any customer, and Principal or its affiliates may, without limitation, do any of the following:
(i)    issue directly, from any of its offices, or from any location nationwide, commitments, policies, endorsements, or any other title assurance or evidence, search or real estate information product, or any other product whatsoever, now in existence or hereafter developed (all of the foregoing are hereafter collectively referred to as "Information");
(ii)   purchase or otherwise obtain from any source any search data or Information.

2.   **CONTRACT TERM.**  The term of this Contract shall commence on *MAY 25, 2000*  and may be terminated by either party giving notice to the other pursuant to the terms of Paragraph 9A herein.

3.   **DUTIES OF PRINCIPAL.**  Principal shall:

A.    Furnish Agent forms of commitments, policies, endorsements and other forms required for transacting Agent's title insurance business.

B.    Furnish Agent guidelines and instructions for transacting Agent's title insurance business.

C.    Resolve all risk assumption questions submitted by Agent.

Rev: 2/98



DEPOSITION
EXHIBIT
D-3
10/17/06  MR
PENGAD 800-631-6989

CHI0534

D.    Arrange for reinsurance where required, to the extent such reinsurance is available.

4.    **DUTIES OF AGENT.**  Agent shall:

A.    Receive and process applications for title insurance in a timely, prudent and ethical manner with due regard to recognized title insurance underwriting practices and in accordance with Principal's bulletins, manuals and other instructions of Principal.

B.    Base each policy issued on behalf of Principal upon a determination of insurability of title which includes
  (i)    a search from earliest public records or in accordance with Principal's written instructions; and
  (ii)    an examination of all documents affecting title to the subject property.

C.    Supply, at Agent's expense, office space and qualified personnel for conducting business pursuant to this Contract by the date hereof.

D.    Prepare, preserve and maintain in Agent's possession a separate file for each application for title insurance containing all documents upon which Agent relied to make its determination of insurability, including, but not limited to: affidavits, maps, plats, lien waivers, surveys, title reports, searches, examinations, and work sheets, together with a copy of each commitment, policy, endorsement and other title assurance issued as well as closing statements, disbursement worksheets, copies of all checks disbursed and receipted, deposit slips, escrow agreements and any other instruments or documents executed or created at Closing. Title to files shall vest in Principal. Upon termination of this Contract, Agent shall deliver such files to Principal, which files may not be copied by Agent without the written consent of Principal. Agent hereby grants to Principal the right to enter upon the premises of Agent or other locations where such files are maintained, during business hours, for purposes of recovering possession thereof.

E.    Send to Principal a copy of each policy, endorsement and other title assurance issued by Agent.

F.    Maintain a policy register in a form approved by Principal showing the disposition of all policies and other pre-numbered forms furnished by Principal.  Upon request by Principal, Agent shall furnish a statement accounting for all such forms and shall return all spoiled, obsolete or canceled policies and forms to Principal.  Agent shall safely maintain and store all forms furnished by Principal and hereby assumes liability for loss or damage suffered by Principal by reason of Agent's wrongful or negligent use or storage of such forms.

G.    Provide Principal each year, copies of annual financial statements of the agency and an updated Information Affidavit, such financial statements to be kept confidential by Principal.

H.    Perform such services and render such assistance as Principal may reasonably request in connection with any claim or litigation arising from a commitment, policy, endorsement or

CHI0535

other title assurance issued by Agent or by Principal on behalf of Agent or on account of any conduct of Agent, whether such claim or litigation is instituted during the term of this Contract or following termination thereof. In addition, Agent shall promptly forward to Principal:

(i)    all documents received by Agent in which Principal is a party to judicial proceedings;

(ii)    all written complaints or inquiries made to any regulatory agency regarding transactions involving title insurance policies, endorsements, commitments or other title assurances of Principal;

(iii)    any information alleging a claim involving a policy, commitment, endorsement or other title assurance of Principal or a transaction for which Principal may be liable; and

(iv)    all original documentation and work papers associated with the transaction or conduct giving rise to any claim or complaint.

I.    In those instances where Agent closes real estate transactions and receives and disburses funds of others, Agent shall:

a. maintain said funds safely in accounts fully insured by an agency of the Federal Government and in accordance with applicable state laws;
b. maintain separate from Agent's personal or operating accounts all funds received by Agent from any source in connection with transaction(s) in which Principal's title insurance is involved;
c. disburse such funds only for the purposes for which they were entrusted;
d. maintain an escrow ledger for each title insurance order involving fiduciary funds, which ledger shall separately reflect the escrow activity for each order;
e. maintain a control account showing total fiduciary liability for each escrow bank account; and
f. reconcile monthly the control account and ledger records to the monthly bank statement.

Principal shall have the right to examine, audit and approve Agent's accounting procedures to assure compliance with Principal's Escrow Accounting Manual, a copy of which is being delivered to Agent simultaneously with the execution of this Contract.

J.    Comply with all applicable laws and regulations relating to the conduct of Agent's business.

K.    Comply with all bulletins, manuals and other instructions furnished to Agent in writing, by facsimile or other electronic transmission by Principal. If any reasonable doubt exists with regard to the insurability or marketability of title or as to whether a particular risk is extra-ordinary or extra-hazardous, Agent shall contact Principal or Principal's designated underwriting counsel for guidance and approval.

L.    The parties hereto acknowledge that Agent is not an agent of Principal for purposes of conducting a Closing, as defined in Paragraph 7H hereof; however, because Principal may be subject to allegations of liability for acts of Agent with regard to Agent's settlement or escrow business, Agent shall cooperate with Principal in the performance of audits of Agent's escrow records, accounts and procedures. In addition, Agent agrees to provide to

Rev: 2 / 98

CHI0536

Principal, within thirty (30) days following receipt, a copy of any audit conducted by any accounting firm with respect to Agent's escrow records, accounts or procedures.

M.   Timely furnish the insured with a title insurance policy and other title assurances Agent is obligated to issue.

N.   Maintain in confidence the terms and conditions of this Contract.

5.   **RATES AND REMITTANCES.**   Attached hereto and made a part hereof is a Schedule of Rates and Remittances. Agent shall quote, charge and collect the Rates set forth therein and shall report and remit to Principal premiums as set forth therein.

6.   **INSURANCE.** Agent shall immediately obtain and keep in full force, at Agent's expense, during the term of this Contract

(i)   Title Insurance Agent's Errors and Omissions Policy with opinion of title coverage, with an insurance company acceptable to Principal in a sum of not less than **$250,000** per claim and **$500,000** aggregate with a deductible provision of no more than **$5,000** per loss; and

(ii)   Fidelity Insurance of **$150,000** covering all officers, employees shareholders, partners, members and other principals of Agent with a loss payee provision in favor of Principal.

Agent agrees to furnish Principal annually with a copy of such policies and any renewals thereof and any other evidence that Principal may deem necessary to demonstrate compliance with this provision. Agent hereby assigns to Principal, Principal's legal representatives and assigns, all sums claims, demands and causes of action of whatsoever kind, that Agent may have against Agent's Errors and Omissions insurance company and against Agent's Fidelity insurance company, in connection with all claims arising out of the actions of Agent, its employees, agents, independent contractors and subcontractors which fall within the scope of Paragraph 6 hereof.

7.   **LIMITATIONS ON AGENT'S AUTHORITY.**   Agent shall not, without prior written approval of Principal:

A.   Commit Principal to a risk in excess of **$500,000.**   This limit shall include not only the commitment, policy, endorsement and/or other title assurance immediately being issued, but also risks where

(i)   Agent knows or has reason to believe that additional title insurance will be ordered covering substantially the same real property; or

(ii)   the aggregate liability will exceed the referenced limit, such as condominium and time share projects (hereafter referred to as the "Risk Limit").

B.   Commit Principal to insure a title involving a risk which, if disclosed to Principal, would have been determined to be extra-ordinary or extra-hazardous, or which Agent knew or could have discovered, through the exercise of reasonable diligence, to have been based upon a disputed title. The provisions hereunder shall apply notwithstanding the fact that the dollar amount of the transaction or the risk is less than the Risk Limit set forth in Paragraph 7A hereof.

C.   Alter the printed language of any commitment, policy, endorsement or other form furnished by Principal, or commit Principal to any particular interpretation of the terms or

CHI0537

provisions thereof or issue any policy, endorsement or other title assurance which has not been approved for use by all required state regulatory agencies and by Principal.

D.   Adjust or otherwise settle or attempt to settle any claim for loss for which Principal may become liable or engage counsel to represent Principal or the insured.

E.   Accept service of process on Principal. Agent shall immediately notify Principal of any attempted service of process upon Agent for Principal. Agent shall also immediately notify Principal of any matter that is or may become a claim against Principal of which Agent has knowledge.

F.   Incur bills or debts chargeable to Principal.

G.   Commit Principal to a risk with respect to a transaction in which Agent, a member of Agent's immediate family, a partner, member or shareholder of Agent or a member of the immediate family of a partner, member or shareholder of Agent has or will have a legal or an equitable interest.

H.   Handle escrow funds or conduct a Closing, as hereafter defined, of a transaction in which Agent, a member of Agent's immediate family, a partner, member or shareholder of Agent or a member of the immediate family of a partner, member or shareholder of Agent has or will have a legal or an equitable interest. The term "Closing" as used in this Contract shall mean: the handling and disbursement of settlement funds or the providing of settlement services.

I.   Insure or commit to insure any property for an amount other than the fair market value of the estate or interest to be insured or the amount of the mortgage or portion thereof and other indebtedness secured thereby to be insured.

J.   Neither Agent nor any Affiliated Attorney of Agent will represent any insured as against the interests of Principal. The term "Affiliated Attorney" as used herein shall mean any attorney who is an employee, associate, member, shareholder, or partner of Agent or any law firm that owns any legal or beneficial interest in Agent.

8.   **LIABILITY OF AGENT.** Agent shall be liable to and agrees to indemnify and to save harmless Principal for all attorney's fees, court costs, administrative and other expenses and loss or aggregate of losses resulting from any one or more of the following:

A.   Errors or omissions in any commitment, policy, endorsement or other title assurance which were disclosed by the application, by the abstracting, examination or other work papers or which were known to Agent or which, in the exercise of due diligence, should have been known to Agent;

B.   Errors and/or omissions in any commitment, policy, endorsement or other title assurance caused by the abstracting or examination of title by Agent, Agent's employees, Agent's subcontractors or Agent's independent contractors;

CHI0538

C.   Failure of any title insurance commitment, policy, endorsement or other title assurance to correctly reflect the status of title, the description of the insured real property or the vesting of title;

D.   Failure of Agent, its officers and employees to comply with the terms of this Contract or with the guidelines, regulations or instructions given to Agent by Principal;

E.   Any improper Closing or attempted Closing by Agent, including but not limited to:
   (i)    loss or misapplication of customer funds, documents, or any other thing of value entrusted to Agent in any custodial or fiduciary capacity resulting in loss to Principal;
   (ii)   failure to disburse properly or close in accordance with escrow and/or closing instructions;
   (iii)  misappropriation of escrow or closing funds by Agent, its officers, subcontractors or employees;
   (iv)   any loss pursuant to an Insured Closing Letter issued by Principal on behalf of Agent; or
   (v)    failure to disburse immediately available funds.

F.   Issuance of a commitment, policy, endorsement or other title assurance insuring an extra-ordinary risk, extra-hazardous risk, or a risk Agent knew or should have know to be based upon a disputed title, not approved by Principal in advance of the issuance by Agent of documents committing Principal to insure.

G.   Any act or failure to act by Agent or its employees, officers, agents, independent contractors or subcontractors which results in allegations of liability with respect to Principal or which results in Principal being liable for punitive, contractual or extra-contractual damages.

H.   Assessment of a fine against Principal by the State Department of Insurance or the entity which supervises title insurance as a result of Agent's violation of any regulations of the State Department of Insurance or State laws or regulations applicable to title insurance.

I.    Failure of Agent to timely furnish insured with a title policy which Agent is obligated to issue.

Agent agrees to immediately notify its fidelity bond carrier or errors and omissions insurance carrier of any claim for which Agent may be liable to Principal.

9.   **TERMINATION OF ISSUING AGENCY CONTRACT.** Either party hereto may cancel this Contract by giving to the other party thirty (30) days written notice by registered or certified mail of intent to cancel. Such written notice to Principal shall be addressed to the national office of Principal or to the regional office of Principal responsible for Agent's supervision. Such written notice to Agent shall be sent to the last known business address of the Agent. In the event of a material breach of this Contract by either party hereto, the non-breaching may terminate immediately by giving notice in the manner set forth in this paragraph. Material breach on the part of the Agent shall include material deviation from the guidelines and instructions of Principal furnished to Agent.

CHI0539

Upon expiration or termination of this Contract, Agent shall immediately furnish to Principal a true, correct and complete accounting of all remittances due hereunder, all orders involving Principal's title assurances which have not closed, all orders involving Principal's title assurances which have closed but for which no policy has been issued and all commitments, policies, endorsements and other title assurances of Principal which have been issued but not reported to Principal.    Agent shall also provide Principal access to all forms and all files relating to commitments, policies and other title assurances of Principal. Agent shall promptly make and accounting of and deliver to Principal all unused title insurance forms, manuals, advertising, promotional materials, other supplies exhibiting Principal's name or any variation thereof and all other supplies furnished by Principal to Agent, except those which Principal authorizes Agent to retain for purposes of completing pending transactions.

10.    **EXAMINATION OF RECORDS.**  Agent agrees to provide to Principal access for examination purposes at any reasonable time or times to all files, books and accounts and other records of Agent relating to the business carried on hereunder and relating to the Closing of transactions involving a commitment to issue Principal's title assurances.  Such right of examination may also be exercised after termination of this Contract.

11.    **SHORTAGE OF FUNDS.**  In the event a shortage is revealed or discovered in Agent's accounts of funds entrusted to Agent by others or in the remittances due Principal hereunder, then Principal may declare immediately due and payable any debts owed by Agent, including any funds for which Principal may be responsible or have a liability therefor and Agent grants to Principal a lien on all property of Agent as security for the repayment thereof.  On demand by Principal, Agent shall immediately make good the shortage or convey and deliver possession of such property to Principal.  A conveyance of such property shall not of itself relieve Agent of further liability for such shortage, but may be utilized to mitigate the liability of Agent therefor.

12.    **ADVERTISING.**  Agent agrees that it will not use the tradename, trade mark or any variation thereof of Principal or any of its subsidiaries or affiliated entities on any of its advertising without the prior written approval of Principal.

13.    **CLAIMS.**  If a policy claim is made to Agent, if Agent receives notice of a potential claim, or if Agent receives notice of litigation which may result in a claim, Agent shall, immediately, by facsimile transmission or overnight mail, give notice of same to Principal and shall lend all reasonable assistance, without charge to Principal, in investigating, adjusting or contesting said claim.  Agent is not authorized to act as or to provide counsel in connection with said claim; however, Principal may seek Agent's assistance in the selection of counsel.

14.    **NOTICES.**  Except as otherwise specifically set forth in this Contract, all notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand or when mailed first class postage prepaid, certified or registered mail, return receipt requested:

If to Principal, to:        **Chicago Title Insurance Company**
**1601 Market Street, Suite 2550**
**Philadelphia, PA 19103**

Rev: 2 / 98

CHI0540

If to Agent, to:        **Chelsea Land Transfer, Inc.**
**The Hill Building**
**717 Bethlehem Pike**
**Erdenheim, PA 19038**

or to such other address or addresses as each of the parties may communicate in writing to the other.

15.    **NON-WAIVER BY PRINCIPAL.** The failure of Principal to enforce strictly the performance by Agent of any provision of this Contract or to exercise any right or remedy following from Agent's breach of any condition herein or the acceptance by Principal of any payment, remittance or other performance during Agent's failure to perform or during Agent's breach shall not be deemed a waiver by Principal of its rights under this Contract as written and shall not be construed to be an amendment or modification of this Contract as written.

16.    **ENTIRE AGREEMENT; PRIOR AGREEMENTS.** This Contract sets forth the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. No terms, conditions, or warranties, other than those contained herein, and no amendments or modifications hereto shall be valid unless made in writing and signed by the parties hereto. This Contract supersedes all prior understandings of any kind, whether written or oral, with respect to the Contract and the subject matter hereof.

17.    **ASSIGNMENT; BINDING EFFECT.** This Contract is not assignable by Agent except upon written consent of Principal. This Contract is, however, binding on and inures to the benefit of any corporate successor, parent corporation, affiliate or wholly owned subsidiary of Principal. The duties and obligations of Agent and any signatory or guarantor hereunder shall survive any merger, consolidation, dissolution or change in ownership or structure of Agent.

18.    **INVALID PROVISIONS.** If any provision of this Contract or the other documents contemplated hereby is held to be illegal, invalid, or unenforceable under present or future laws, such provisions shall be fully severable; the appropriate documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof or thereto; and the remaining provisions hereof or thereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision. There shall be added automatically as a part hereof or thereto a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and binding.

19.    **GOVERNING LAW.** This Contract shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

20.    **ATTORNEY'S FEES. COSTS. VENUE.** If a legal action or other proceedings are brought for the enforcement of this Contract, or because of any alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Contract, the prevailing party shall be entitled to recover reasonable attorneys' fees, administrative costs and other costs incurred in that action or proceeding in addition to any other relief to which it may be entitled. in addition, in the event of a material breach by Agent, Principal shall be entitled to recover all costs and loss associated with resolving the matter giving rise to said material breach. Venue for any such proceeding shall be a location of Principal's choice.

CHI0541

21. **OTHER AGREEMENTS VOID.** It is expressly understood and agreed by and between the parties hereto that this Contract sets forth all the promises, agreements, conditions and understandings between Principal and Agent with respect to this Contract and the subject matter hereof. Pertaining to such Contract, there are no promises, agreements, conditions or understandings, either oral or written, between them other than as are herein set forth.

22. **CONTRACT.** The terms and conditions of this Contract shall apply only to Principal named herein and shall not apply to any company now or hereafter affiliated with Principal or with Principal's parent Chicago Title and Trust Company.

**IN WITNESS WHEREOF**, this Contract is executed this _____ day of _____, 2000.

AGENT:

**CHELSEA LAND TRANSFER, INC.**

By: _____
      Robert Willis Cook

Its: <u>President</u>

PRINCIPAL:

**CHICAGO TITLE INSURANCE COMPANY**

By: _____
      Joseph H. Maguire

Its: <u>Resident Vice President</u>

CHI0542

## RATES AND REMITTANCES SCHEDULE

**THIS RATES AND REMITTANCES SCHEDULE** attached to that Issuing Agency Contract ("Contract") dated May 25, 2000, by and between **CHELSEA LAND TRANSFER, INC.** and Chicago Title Insurance Company.

1.    **RATES.**

Agent shall quote, charge and collect the rates set forth in the schedule provided to Agent for the territory covered by this Contract.    Principal reserves the right to revise said rates from time to time upon written notice to Agent.

2.    **AGENT'S COMPENSATION AND PRINCIPAL'S REMITTANCES.**

Agent shall be entitled to compensation on all premium-generating polices, commitments, endorsements and other title assurances which Agent issues on behalf of Principal. Agent's compensation shall be the rates and charges required herein to be collected, less the amounts required herein to be remitted to Principal. Principal's compensation shall be the amount herein required to be remitted by Agent. Agent shall assume full responsibility for the collection of all premiums due to Principal. Agent agrees that Principal's share of premiums collected shall be held in a separate account in trust for the benefit of Principal.

All payments of Principal's share of the premium shall be accompanied by copies of the associated title insurance forms.    The remitted premiums and reported policies and endorsements shall be mailed or delivered to Principal at the following address: 1601 Market Street, Suite 2550, Philadelphia, PA 19103 no later than sixty (60) days following the Effective Date, as hereinafter defined, of the policy, commitment or endorsement.    The Effective Date of the policy or endorsement shall be the policy date set forth in Schedule A of the title insurance policy.

Where Principal purchases reinsurance or excess coinsurance, a decision which rests solely with Principal, the division of the rates as herein provided shall be computed on the net amount remaining after deducting the cost thereof.    Agent shall remit to Principal the cost of such reinsurance or coinsurance.

For each policy and endorsement of Principal issued by Agent pursuant to this Contract, Agent agrees to report and remit **FIFTEEN** percent **(15%)** of the premiums collected pursuant to the Rate Provision herein.

Notwithstanding the foregoing, where orders for title insurance with a face amount in excess of one million dollars ($1,000,000.) are directed to Agent by Principal or by any company affiliated with Principal's parent, Chicago Title and Trust Company, the amount of the premium to be reported and remitted to Principal shall be fifty percent (50%) of the premiums collected pursuant to the Rate Provision herein.

CHI0543

In the event that Agent fails to report and remit as set forth above, Principal shall be entitled to terminate this Contract, in addition to any other remedies provided in this Contract, in law or in equity.

This Rates and Remittances Schedule is executed to be effective

AGENT
**CHELSEA LAND TRANSFER, INC.**

By: _____
                Robert Willis Cook

Its: _President_

PRINCIPAL:
**CHICAGO TITLE INSURANCE COMPANY**

By: _____
                Joseph H. Maguire

Its: _Resident Vice President_

# EXHIBIT H



# CNNMoney.

 PRII

Powered by

# Title insurance: Getting ripped off?
## Critics say industry practices lead to inflated costs.

**By Les Christie, CNNMoney.com staff writer**
January 11, 2006: 10:41 AM EST

NEW YORK(CNNMoney.com) - To hear some critics tell it, millions of Americans spend billions of dollars on a product that few understand or directly benefit from -- title insurance.

Back in 1977, in ruling on a suit by a title insurance company trying to enter the Iowa market, the state Supreme Court called title insurance "an invidious form of business."

Nearly 30 years later, investigations have revealed more recent abuses.

Last year, more than a dozen title insurers settled with regulators for tens of millions of dollars over industry sales practices. Just this week, the California Insurance Commissioner opened hearings on how to change an industry it calls a "dysfunctional market in which consumers pay too much for coverage."

At its best, title insurance serves an important function, according to Nelson Lipshutz, author of "The Regulatory Economics of Title Insurance" and spokesman for the American Land Title Association (ALTA).

Say you buy a home and 10 years later someone turns up with a legitimate claim that they never sold the property. Title insurance protects you against that, and other undiscovered liens or claims, easements, and flawed deeds.

"It makes it possible to trade property with confidence," said Lipshutz.

So what's the problem? It's the way the insurance is sold, according to Birny Birnbaum, a former chief economist of the Texas Department of Insurance who is currently with the Texas Center for Social Justice.

Legally, borrowers are free to buy from any title insurer they choose. But, practically, the insurer is likely to be chosen by the real-estate agent, mortgage broker or lender — and those parties are marketed to heavily by title insurers.

To be sure many of the industry's marketing efforts are legal, according to Birnbaum. The insurers pay for marketing costs, they provide free market analysis, and provide mailing lists and other services.

Others, however, are illegal: kickbacks, free vacations, free use of office space and equipment, and so forth.

**Great Training Starts Here**

**Get Going With Katharine Gibbs School – Philadelphia**

**CLICK HERE**

- Business Administration
- PC Networking
- Criminal Justice
- Visual Communication
- Medical Assisting
- Fashion Merchandising

2501 Monroe Blvd
Norristown, PA 19403

Most consumers know so little about title insurance that "they don't know who their insurer will be until they sit down at the closing table," said ALTA spokeswoman Michelle Sweet.

To the anxious home buyer, the cost of title insurance is negligible, typically 0.5 percent or so of the purchase price of the house. "You just want to get into the house," said Birnbaum. "It's, say, $1,500. If you squawk, it will hold up the closing. You may lose the house."

But that's money home buyers wouldn't need to spend, some say, if the industry were more transparent.

### Making a mint

The profits involved appear significant. Nationwide, only a tiny percentage of premiums are returned to consumers to settle claims.

In 2003, according to ALTA, the industry paid out about $662 million. That's just over 4 percent of the $15.7 billion taken in as premiums. Auto insurers, in contrast, paid out 75 percent of collected premiums, according to the American Insurance Association (AIA).

But that's the wrong way to think about title insurance, according to Lipshutz.

"Title insurance is loss prevention insurance," he said. "Like boiler insurance (where much of the premium dollar is spent on inspections and risk analysis), most of the premium money is spent to *prevent* later losses. Life and auto insurance are intended to *pay off* later losses."

But even with boiler insurance, about 25 percent of premiums is paid out in claims, according to Eric Goldberg, general council of the AIA.

Birnbaum says insurers exaggerate the work involved in researching and cleaning up titles. Most records are now automated. "A small portion of the premium dollar is spent on doing the title search," he says. "You tap a few keys, look at the screen, get a printout and you're done." Birnbaum claims that 30 percent to 50 percent of each premium dollar goes to selling and marketing its products.

Craig Page, VP and council for the California Land Title Association, calls Birnbaum's math "laughable." He says that searching and repairing titles is "much more expensive and time-intensive" than critics claim, that "not all property records are automated," and that there is "a lot of up-front work taken for granted."

ALTA does not track marketing costs so it's difficult to determine if consumers are paying for waste or for quality of work.

### Iowa alternative

Iowa, the only state that bans title insurance sales, can offer some clues to answer that question. Its alternative to title insurance seems to offer big savings to consumers.

Iowa has its own state run Title Guaranty Program. It costs just $110 for up to $500,000 in coverage. Added to the bill in Iowa is the cost ($150) of the "abstractor," who researches the property, and a lawyer ($125), who signs off on the findings. The total cost is usually about $400.

Outside Iowa, according to the Iowa Bar Association, the national average is $5.15 per $1,000, or nearly $1,100 for the median home.

Lipshutz disputes the cost savings in Iowa. He says it takes longer in Iowa to get the title guaranty and because of that, mortgage lenders set their lock-in rates higher, costing home buyers an extra two tenths of a percent on an average mortgage.

Iowans beg to differ.

The ins and outs of title insurance - Jan. 11, 2006

Jim Carney, an Iowa lawyer who has lobbied against title insurance for years, says, "We can close just as quickly."

Lloyd Ogle, director of the Iowa Title Guaranty Program, says the system results in extremely clean titles and a very low incidence of litigation resulting from title defects. But the biggest attraction is the savings. "You won't find anywhere in the country with lower costs," he says.

---------------------------------------------

The housing market seems to be slowing. For more evidence, click here.

How overvalued is the housing market in your home town? Click here for the answer. ■

**Find this article at:**
http://money.cnn.com/2006/01/11/real_estate/title_insurance_exposed/index.htm?cnn=yes

Check the box to include the list of links referenced in the article.

# EXHIBIT I

SETTLEMENT STATEMENT
Optional Form for
Transactions without Sellers

U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT
OMB Approval No. 2502-0491

File Number: 01-10190
Loan Number:
Mtg. Ins. Case Number:

| | |
|---|---|
| NAME OF BORROWER: | Edward J. Cohen and Pearl E. Cohen |
| ADDRESS: | 130 W. Pomona Street, Philadelphia, PA 19144 |
| NAME OF LENDER: | NovaStar Mortgage Inc |
| ADDRESS: | 23046 Ave. De La Carlota, 2nd Floor, Laguna Hills, CA 92653 |
| PROPERTY ADDRESS: | 130 W. Pomona Street, Philadelphia, PA 19144 |
| | City of Philadelphia |
| SETTLEMENT AGENT: | Chelsea Land Transfer, Inc., Tel:215-836-1300 Fax:215-836-7113 |
| PLACE OF SETTLEMENT: | 717 Bethlehem Pike Suite 210, Erdenheim, PA. 19038 |

Loan Number:    SETTLEMENT DATE: 02/04/2002    DISBURSEMENT DATE: 02/08/2002

| L. Settlement Charges | | M. Disbursement to Others | |
|---|---|---|---|
| 800. Items Payable In Connection with Loan | | 1501. Mortgage Payoff | 45,746.07 |
| 801. Loan Origination Fee 0.000% to | | to Homecomings Financial | |
| 802. Loan Discount 0.000% to | | 1502. City of Phila Lien Payoff | 1,649.68 |
| 803. Appraisal Fee | | to City of Philadelphia | |
| 804. Credit Report to Network Mortgage Services | 60.00 | 1503. 2002 Real Estate Taxes | 659.31 |
| 805. Yield Spread Differential to Network Mortgage Service P.O.C.1,440.00 | | to City of Philadelphia-Department of Revenue | |
| 806. Broker Fee to Network Mortgage Services | 2,304.00 | 1504. | |
| 807. Flood Cert to NovaStar Mortgage, Inc. | 16.00 | | |
| 808. Tax Service Fee to NovaStar Mortgage, Inc. | 65.00 | 1505. | |
| 809. Courier Fee to Network Mortgage Services | 35.00 | | |
| 810. Underwriting Fee to NovaStar Mortgage, Inc. | 695.00 | 1506. | |
| 811. Processing Fee to Network Mortgage Services | 550.00 | | |
| 900. Items Required by Lender to be Paid in Advance | | 1507. | |
| 901. Interest From 02/08/2002 to 03/01/2002 @$15.8000 per day | 331.80 | | |
| 902. Mortgage Insurance Premium for to | | 1508. | |
| 903. Hazard Insurance Premium for to | | 1509. | |
| 904. | | 1510. | |
| 1000. Reserves Deposited with Lender | | | |
| 1001. Hazard Insurance mo. @$ per month | | 1511. | |
| 1002. Mortgage Insurance mo. @$ per month | | | |
| 1003. City Property Taxes mo. @$ per month | | 1512. | |
| 1004. County Property Taxes mo. @$ per month | | | |
| 1005. School Taxes mo. @$ per month | | 1513. | |
| 1006. mo. @$ per month | | | |
| 1007. mo. @$ per month | | 1514. | |
| 1008. mo. @$ per month | | | |
| 1100. Title Charges | | 1515. | |
| 1101. Settlement or closing fee | | | |
| 1102. Abstract or title search | | 1516. | |
| 1103. Title examination | | | |
| 1104. Title Insurance Binder | | 1517. | |
| 1105. Document Preparation | | | |
| 1106. Notary Fees to Chelsea Land Transfer, Inc. | 25.00 | 1518. | |
| 1107. Attorney's fees | | | |
| (includes above Items No. ) | | 1519. | |
| 1108. Title Insurance to Chelsea Land Transfer, Inc. | 606.75 | | |
| (includes above Items No. reissue rate ) | | 1520. TOTAL DISBURSED | 48,055.06 |
| 1109. Lender's coverage $ 57,600.00 - 606.75 | | (enter on line 1603) | |
| 1110. Owner's coverage $ - | | | |
| 1111. End 100, End 300, End 710, End to Chelsea Land Transfer, Inc. | 200.00 | | |
| 1112. Wire Fee to Chelsea Land Transfer, Inc. | 15.00 | | |
| 1113. Closing Services Letter to Chicago Title Insurance Company | 35.00 | | |
| 1200. Government Recording and Transfer Charges | | N. NET SETTLEMENT | |
| 1201. Recording Fees Deed $: Mortgage $60.00; Release $ | 60.00 | | |
| 1202. City/County tax/stamps Deed $: Mortgage $ | | 1600. Loan Amount | 57,600.00 |
| 1203. State Tax/stamps Deed $: Mortgage $ | | | |
| 1204. Record Assignment to Chelsea Land Transfer, Inc. | | 1601. PLUS Cash/Check from Borrower | 0.00 |
| 1205. Courier Fee to Chelsea Land Transfer, Inc. | 15.00 | | |
| 1300. Additional Settlement Charges | | 1602. MINUS Total Settlement Charges | 5,013.55 |
| 1301. City Cert-U&O | | (line 1400) | |
| 1302. Pest Inspection | | 1603. MINUS Total Disbursements to Others | 48,055.06 |
| 1303. | | (line 1520) | |
| 1304. | | | |
| 1305. | | 1604. EQUALS Disbursements to Borrower | 4,531.39 |
| 1306. | | (after expiration of any applicable | |
| 1307. | | rescission period required by law) | |
| 1308. | | | |
| 1400. Total Settlement Charges (enter on line 1602) | 5,013.55 | | |

I have carefully reviewed the HUD-1A Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1A Settlement Statement.

_Edward J. Cohen_        _Pearl E. Cohen_        **Chelsea 0058**

Edward J. Cohen
177287680

Pearl E. Cohen
151303453

The HUD-1A Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

SETTLEMENT AGENT By: _____ 2/4/02 DATE

TitleExpress Settlement System Printed 02/08/2002 at 12:41    form HUD-1A (2/94) ref. RESPA