# EXHIBIT C

## In The Matter Of:

*Cohen*
*v.*
*Chicago Title Insurance Company*

---

*MARIA ROZNIAKOWSKI*
*October 18, 2006*

---

**REPORTING ASSOCIATES, LLC**

*Certified & Registered Professional Reporters*

*Cherry Hill  --  Philadelphia  --  Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

MARIA ROZNIAKOWSKI

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 06-0873
--------------------------------
PEARL E. COHEN, on behalf of
herself and all others
similarly situated,

    Plaintiff,

v.

CHICAGO TITLE INSURANCE COMPANY,

    Defendant.
--------------------------------

Philadelphia, Pennsylvania
Wednesday, October 18, 2006

TRANSCRIPT of testimony of MARIA ROZNIAKOWSKI, as taken by and before Sean M. Fallon, a Federally-Approved Registered Professional Reporter and Notary Public, at the offices of DONOVAN SEARLES, LLC, 1845 Walnut Street, Suite 1100, commencing at 10:13 o'clock in the forenoon.

---

**Page 2**

1  APPEARANCES:
2  QUINN, GORDON & WOLF, CHTD
   BY:  RICHARD S. GORDON, ESQ.
3  102 West Pennsylvania Avenue, Suite 402
   Towson, MD  21204
4  (410) 825-2300
   rgordon@quinnlaw.com
5  Attorneys for Plaintiff
6  BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
   BY:  DARRYL J. MAY, ESQ.
7       STEVEN J. SNYDER, ESQ.
   1735 Market Street, 51st Floor
8  Philadelphia, PA  19103-7599
   (215) 864-8103
9  may@ballardspahr.com
   snyder@ballardspahr.com
10 Attorneys for Defendant
11 ALSO PRESENT:
12 Barry Forman, Videographer

---

**Page 3**

          I N D E X
WITNESS                            PAGE
MARIA ROZNIAKOWSKI
   By Mr. Gordon            6,98
   By Mr. May               85

          E X H I B I T S

NUMBER      DESCRIPTION          PAGE

D-20  Subpoena to Maria P. Rozniakowski   12

D-21  Subpoena to Custodian of Records    13

---

**Page 4**

1        THE VIDEOGRAPHER:  This is the
2  videotaped deposition of Marie Rozniakowski, taken
3  by the Plaintiff in the matter of Pearl E. Cohen,
4  on behalf of herself and all others similarly
5  situated, versus Chicago Title Insurance Company.
6        This is in the U.S. District Court,
7  Eastern District of Pennsylvania, Class Action
8  Docket Number CA 06-0873.  This deposition is being
9  held at the offices of Donovan Searles, on Walnut
10 Street in Philadelphia, Pennsylvania, on
11 October 18, 2006.
12       My name is Barry Forman, from the
13 firm of Reporting Associates, with offices in
14 Philadelphia, Pennsylvania and Cherry Hill, New
15 Jersey, and I am the videographer.  The reporter is
16 Sean Fallon, also from Reporting Associates.
17       We are going on the record at
18 approximately 13 minutes past 10:00 o'clock.  Will
19 counsel please state their appearances for the
20 record.
21       MR. GORDON:  Richard Gordon, on
22 behalf of Plaintiffs.
23       MR. MAY:  Darryl May, on behalf of
24 Defendant, Chicago Title.

Page 5

1    THE VIDEOGRAPHER: Will the court
2 reporter please swear in our witness.
3    MR. SNYDER: And Steve Snyder, on
4 behalf of Defendant, Chicago Title.
5    THE VIDEOGRAPHER: Thank you, Mr.
6 Snyder.
7    MR. MAY: And, I think, Richard, we
8 should just note for the record, although I'm sure
9 it will be on the cover sheet, that Ms.
10 Rozniakowski, the witness, is un -- is not
11 represented at today's deposition.
12    MR. GORDON: I was going to ask
13 her --
14    MR. MAY: Okay, well --
15    MR. GORDON: -- as part of the
16 deposition.
17    MR. MAY: -- I don't want to
18 interfere with that.
19    THE VIDEOGRAPHER: Court reporter,
20 please swear in our witness.
21    MARIA ROZNIAKOWSKI, after having
22 been first duly sworn, was examined and testified
23 as follows:
24    THE VIDEOGRAPHER: We may proceed.

Page 6

1 EXAMINATION
2 BY MR. GORDON:
3    Q.   Good morning, Ms. Rozniakowski.
4    A.   Hi.
5    Q.   How are you today?
6    A.   Fine, thank you.
7    Q.   My name is Richard Gordon. I
8 represent the Plaintiffs in the case of Cohen
9 versus Chicago Title.
10       Have you ever had your deposition
11 taken before?
12    A.   No.
13    Q.   Are you represented today by
14 counsel?
15    A.   No.
16    Q.   Well, let me give you the basic
17 ground rules for today. It's very simple. I'm
18 going to ask you a series of oral questions to
19 which I need oral responses. The court reporter
20 will be taking down your testimony and cannot
21 interpret any nods or gestures on your part, so
22 it's very important that you verbalize your
23 response.
24    A.   Understood.

Page 7

1    Q.   If you don't understand any
2 questions, or need me to rephrase them or restate
3 them, I'd be glad to. If you don't ask me to
4 rephrase them or restate them, I will work on the
5 understanding that you understand the question that
6 you've answered.
7    A.   Okay.
8    Q.   If at any point you need to take a
9 break, please let me know, I'll try to accommodate
10 at a reasonable time.
11    A.   Okay.
12    Q.   Okay?
13       What's your position with Chelsea
14 Land Transfer, Inc.?
15    A.   I am a settlement clerk.
16    Q.   And what is a settlement clerk?
17    A.   We conduct closings.
18    Q.   Is that the same position as a
19 settlement officer?
20    A.   Settlement officer, settlement
21 agent. A number of names for it.
22    Q.   Okay.
23       What are your general areas of
24 responsibility at Chelsea?

Page 8

1    A.   I --
2    Q.   And is it okay if I call the company
3 "Chelsea," for purposes of this deposition?
4    A.   Yes, you can call the company
5 Chelsea.
6       I overlook files. Obviously,
7 perform settlements, talk to clients, answer
8 questions.
9    Q.   Are you a notary public?
10    A.   I am getting my notary public right
11 now.
12    Q.   Okay.
13       Are you involved with title insurers
14 at all, the title underwriters?
15    A.   Only when we have questions.
16    Q.   Okay.
17       At some point Chelsea, as I
18 understand it, was an appointed agent for Chicago
19 Title?
20    A.   Correct.
21    Q.   Were you involved at all with
22 Chicago Title? Did you ever have any dealings with
23 them?
24    A.   Is your question, did I ever have a

MARIA ROZNIAKOWSKI

### Page 9

1  need to call Chicago to answer title issues?
2  Because I don't believe I can answer that. I
3  wouldn't be able to remember.
4     Q.   Okay, okay.
5          How many years have you been in the
6  title industry?
7     A.   Approximately 22.
8     Q.   And could you go through the types
9  of positions that you've had, other than settlement
10 clerk.
11    A.   I've been in management positions --
12    Q.   Have you always --
13    A.   -- where I oversaw an office.
14    Q.   Have you been involved in all
15 aspects of the title process?
16    A.   Yes.
17    Q.   And the escrow process, as well?
18    A.   Yes.
19    Q.   So that would be from the time that
20 the referral comes in and up until the time that
21 the policy is issued?
22    A.   Yes.
23    Q.   Would you say that you are fairly
24 familiar with the entire title process?

### Page 10

1     A.   Yes.
2     Q.   How long have you been with Chelsea
3  Land Transfer?
4     A.   I've been with them for about five
5  years. July of '01 is when I started.
6     Q.   July of '01.
7          And, when you began with them, were
8  you also a settlement clerk at that time?
9     A.   Yes.
10    Q.   What was your position before July
11 of '01?
12    A.   I managed another title agency.
13    Q.   Which company?
14    A.   Global Abstract Agency, Inc.
15    Q.   Where is Global located?
16    A.   1420 Lombard, in Philadelphia.
17    Q.   What did you do with Global?
18    A.   I managed the office.
19    Q.   How long were you with Global?
20    A.   About 18 years.
21    Q.   Any other companies, other than
22 Chelsea and Global?
23    A.   No.
24    Q.   Why did you leave Global?

### Page 11

1     A.   Needed a change.
2     Q.   Is it your experience that -- that
3  title agents run all about the same?
4          MR. MAY:  Object to form.
5          THE WITNESS:  I would think so.
6  BY MR. GORDON:
7     Q.   In preparing for your deposition
8  today -- and you've been subpoenaed to appear
9  today, is that correct?
10    A.   Correct.
11    Q.   Did you review any documents prior
12 to coming here today?
13    A.   No.
14    Q.   Did you talk with anyone in
15 preparation for your deposition?
16    A.   No.
17    Q.   Did you talk to any attorneys?
18    A.   No.
19    Q.   Were you -- do you recall Ms. Cohen?
20    A.   Vaguely.
21    Q.   You were involved in her
22 transaction?
23    A.   I was.
24    Q.   You were the closer?

### Page 12

1     A.   I was the closer.
2     Q.   Do you have any specific
3  recollection of that closing?
4     A.   I probably remember her mortgage
5  broker.
6     Q.   Anything more than that?
7     A.   I can't say definitively that I
8  specifically remember her settlement.
9          (Exhibit D-20 is marked for
10 identification.)
11 BY MR. GORDON:
12    Q.   Okay.
13         Let me show you what's been marked
14 as Deposition Exhibit Number 20 in this case, and
15 that's the subpoena that brought you here today.
16    A.   Right.
17    Q.   And if you could please turn to the
18 Notice of Deposition -- I thought there was a
19 document schedule, but clearly I was wrong on that.
20         Were you requested to bring with you
21 today a copy of the Agency Agreement, if you could
22 find it?
23    A.   Yes.
24    Q.   Did you -- did you find it?

MARIA ROZNIAKOWSKI

**Page 13**

1  A.  No.
2  Q.  Do you have any records whatsoever
3  with respect to Chelsea's relationship with Chicago
4  Title?
5  A.  Not that I was able to find, other
6  than our closing file.
7      (Exhibit D-21 is marked for
8  identification.)
9  BY MR. GORDON:
10 Q.  Okay.
11     Let me show you what's been marked
12 as Deposition Exhibit Number 21, and this is
13 another subpoena that was issued in April of this
14 year -- I'm sorry, in March of this year to Chelsea
15 that has a document schedule attached to it.
16     It's my understanding that you were
17 the primary contact for responding to this subpoena
18 on behalf of Chelsea.
19 A.  Yes, I was.
20 Q.  What did you do to gather records in
21 connection with this?
22 A.  Well, I first -- I tried to
23 determine exactly what you needed, so, if it was in
24 terms of files -- well, since Chelsea was not

**Page 14**

1  automated prior to 2000 or late 2000, and you were
2  asking for records from 1999, I believe I spoke to
3  David at some point about gathering all this
4  information, because that would have -- we would
5  have had to pull every single folder and made
6  copies of those documents, which would have taken
7  quite some time, and certainly not enough time
8  given to us by the subpoena.
9  Q.  Okay.  And, when you say "David,"
10 you mean Mr. --
11 A.  Searles.
12 Q.  -- you mean David Searles?
13 A.  Right.
14 Q.  Okay.
15 A.  I spoke to him about what else we
16 could give him and, of course, as a result of that
17 conversation, you were given a log and the entire
18 contents of Ms. Cohen's file.
19 Q.  Okay.
20     Did you talk to anyone within
21 Chelsea to see if they had any records --
22 A.  Oh, yes.
23 Q.  -- that would have been responsive
24 to the document requests?

**Page 15**

1  A.  Sure.
2  Q.  Who else did you talk to?
3  A.  Everyone in the office.  All the
4  conveyancers, the receptionists, if they had
5  anything, looked through their offices.
6  Q.  And what you produced to the
7  Plaintiffs is Deposition Exhibit 19, and I'd like
8  you to just take a quick second to look through
9  that to make sure that that's a complete and
10 accurate representation of what was produced in
11 this case.
12 A.  Yes.
13 Q.  To the best of your knowledge today,
14 are there any other documents in the possession of
15 Chelsea that relate to the relationship between
16 Chelsea and Chicago Title?
17 A.  I have not found any, other than,
18 obviously, our files.
19 Q.  Okay.
20     What is Chelsea?
21 A.  Chelsea is a title insurance agency.
22 Q.  What does that mean?
23 A.  It means we insure owners -- well,
24 we issue owners' and lender policies for title

**Page 16**

1  insurance.
2  Q.  When was it --
3  A.  Sell title insurance, so....
4  Q.  When was it established?
5  A.  I do not have the answer to that.
6  Q.  You don't know what year it was
7  opened?
8  A.  No.
9  Q.  Do you know approximately how long
10 it's been open?
11 A.  I would guess -- I believe it might
12 be 1985.
13 Q.  Do you know who the founders were?
14 A.  Robert Cook.
15 Q.  Is Mr. Cook still with the company?
16 A.  Yes.
17 Q.  Is he the owner of the company
18 today?
19 A.  He is.
20 Q.  Is there any other principals in the
21 company?
22 A.  Not that I'm aware of.
23 Q.  Do you have any ownership interest
24 in the company?

**17**

1    A.   No, I do not.
2    Q.   In the -- in the flowchart of people
3  and responsibilities within Chelsea, where do you
4  fall?
5    A.   At -- right under Mr. Cook.
6    Q.   Okay.
7         So, it's yourself and then -- Mr.
8  Cook and then yourself.  Are there any others on
9  your --
10   A.   Along with another co-worker.
11   Q.   And who would that be?
12   A.   Denise Latta.
13   Q.   She's another settlement clerk?
14   A.   Yes.
15   Q.   How many other people are in the
16  office, other than the three of you?
17   A.   We have two conveyancers, a
18  receptionist, an REO specialist, and a part-time
19  bookkeeper/accountant.
20   Q.   What is an REO specialist?
21   A.   Someone who specializes in closings
22  for banks.
23   Q.   Okay.
24        And is Chelsea currently appointed

**18**

1  by any title insurance underwriters?
2    A.   Yes.
3    Q.   Which ones?
4    A.   Old Republic and Fidelity National,
5  and I believe also Stewart.
6    Q.   It's pretty typical to have more
7  than one company that underwrites you?
8    A.   I'm not sure if it's typical.
9    Q.   In the two companies that you've
10 been in, has that always been the case, it's been
11 more than one company that appointed --
12   A.   No.  The company I worked for
13 previously only had one underwriter the whole time
14 I was there.
15   Q.   Okay.
16        What was the underwriter there?
17   A.   First American.
18   Q.   First American.
19        Other than the -- the three
20 underwriters that you mentioned, have there been
21 others in your -- during your tenure at Chelsea?
22   A.   Other than -- along with Chicago?
23   Q.   Well, that's --
24   A.   Well, then, Chicago.

**19**

1    Q.   -- part of my question.
2    A.   Sure.
3         Chicago.
4    Q.   When did the relationship with
5  Chicago end?
6    A.   I can't give you a definitive date
7  on that.  I can only tell you when, you know, we
8  last did a check to them.
9    Q.   Was that sometime in 2003?
10   A.   I'm not sure what was in here.
11 Whatever was in here, the last date.  I don't think
12 I saw a check for '03.
13        Oh, June 30th.
14        I -- I guess I could find the answer
15 to that question or I guess Chicago would know.
16   Q.   Do you know if the relationship with
17 Chicago Title was terminated by Chicago Title or
18 was it the decision of Chelsea?
19   A.   I don't know that information.
20   Q.   Do you know what brought it about at
21 all?
22   A.   I do not.
23   Q.   Who would have that information?
24   A.   I believe Chicago and the owner of

**20**

1  the company.
2    Q.   But it's your understanding that
3  your company no longer underwrites any title
4  insurance with Chicago Title?
5    A.   Correct.
6    Q.   Does Chelsea handle commercial as
7  well as residential properties?
8    A.   Periodically.
9    Q.   What percentage of the business is
10 residential?
11   A.   The majority of the percentage is
12 residential.
13   Q.   Almost all of it?
14   A.   Almost all of it, yes.
15   Q.   In excess of 95 percent?
16   A.   Yes.
17   Q.   Okay.
18        And, as part of your duties and
19 responsibilities, you handle closings?
20   A.   Correct.
21   Q.   You disburse funds?
22   A.   Correct.
23   Q.   You -- the company acts as the title
24 insurance agent?

MARIA ROZNIAKOWSKI

Page 21

1   A.   Correct.
2   Q.   You provide notary services?
3   A.   Correct.
4   Q.   And also general settlement and
5   escrow services?
6   A.   Correct.
7   Q.   How many closings would you say you
8   personally have handled during your time at
9   Chelsea?
10  A.   Geez, thousands. You want a number?
11  Q.   I don't want an exact number.
12  A.   I'd have to run you a report.
13  Q.   That's sort of putting you on the
14  spot.
15  A.   I -- let's see -- probably did, on
16  average -- that's kind of hard to say -- maybe the
17  first couple years, probably about 40 a month and,
18  of course, the market has slowed, so --
19  Q.   So that would have been in the --
20  A.   -- we are not anywhere near that
21  right now.
22  Q.   That was in the 2000, 2001
23  time frame?
24  A.   '01, '02, '03, probably even into

Page 22

1   '04.
2   Q.   That was you, personally, each
3   month?
4   A.   Sure. Probably about 40 of them.
5   Q.   Could I double that number, since
6   there is another settlement clerk?
7   A.   Oh, you know what? I'm sorry. You
8   said just Chelsea. I also do settlements for two
9   other companies that are there, so that would have
10  been accumulative (sic), so I -- I really can't
11  give you a number that would just be -- just be
12  Chelsea's number --
13  Q.   Okay.
14  A.   -- right now.
15  Q.   What other companies do you conduct
16  closings for?
17  A.   Northwest Abstract and Equitable
18  Land Transfer.
19  Q.   Equitable Land Transfer?
20  A.   Um-hum.
21  Q.   They are located out of the same
22  offices?
23  A.   Yes.
24  Q.   Are these also entities owned by Mr.

Page 23

1   Cook?
2   A.   They are controlled business
3   arrangements.
4   Q.   What's a controlled business
5   arrangement?
6   A.   It's a company owned by a title
7   insurance agent/owner and maybe a real estate
8   broker or real estate -- someone else in -- in a
9   related field.
10  Q.   Okay.
11       Do you know whose -- so, let's say
12  Northwest Abstract would be owned by Mr. Cook and a
13  real estate agent?
14  A.   Or -- I can't give you -- I can't
15  tell you if they are the actual owners, but Elfant
16  Wissahickon Realtors --
17  Q.   Excuse me?
18  A.   Where -- it's a controlled business
19  arrangement with Elfant Wissahickon. What I'm
20  saying is, I can't tell you whether or not Elfant
21  Wissahickon, the company, is the partner or whether
22  the persons involved with Elfant are the owners
23  with Mr. Cook.
24  Q.   Okay.

Page 24

1        What about Equitable Land Transfer?
2   A.   And that would be Coldwell Banker
3   buying property.
4   Q.   Do -- do either of these companies,
5   Northwest or Equitable, have any employees of their
6   own?
7   A.   Yes.
8   Q.   Who would be an employee of theirs?
9   A.   They would have conveyancers.
10  Q.   Do they work out of your offices?
11  A.   Yes.
12  Q.   For example, with Northwest
13  Abstract, how many separate employees do they have?
14  A.   I believe Northwest has two, I
15  believe Equitable has two.
16  Q.   These are conveyancers. What are
17  conveyancers?
18  A.   Conveyancer, processor, they are the
19  people that take the applications, prepare the
20  commitments, do everything that they need to do in
21  order to get the file to closing. Everything prior
22  to -- to settlement.
23  Q.   Do the two individuals who work for
24  Northwest also work for Equitable?

25

1   A.  No. They are -- no.
2   Q.  They are four separate individuals?
3   A.  Yes.
4   Q.  Okay.
5       Do you also work for Northwest and
6   for Equitable?
7   A.  Only in a capacity of a settlement
8   clerk. It's -- I'm not an employee of those
9   companies.
10  Q.  Okay.
11      They borrow you to close the loans?
12  A.  Yes.
13      Well, they hire me.
14  Q.  Do you know how long Northwest and
15  Equitable have been in business?
16  A.  I do not.
17  Q.  Have they been there the entire time
18  that you've been around?
19  A.  Yes.
20  Q.  How is the office set up? Is it --
21  is it one big open space or does everybody have
22  their own separate office?
23  A.  Everyone has their own separate
24  office, except for the receptionist, who is in the

26

1   front.
2   Q.  Okay.
3       So you -- you walk in the door and
4   is there -- is there a sign that says "Chelsea Land
5   Transfer"?
6   A.  There is a sign that says "Chelsea
7   Land Transfer," yes, and "Northwest," and
8   "Equitable."
9   Q.  There is a separate sign for them?
10  A.  Yes.
11  Q.  Do they just have offices within
12  your office space?
13  A.  Yes.
14  Q.  Does each person from each of these
15  companies have their own offices?
16  A.  Yes.
17  Q.  Well, I'd like to run through some
18  definitions to make sure that we are all operating
19  off the same page today.
20      Can you tell me what an owner's
21  title insurance policy is?
22  A.  An owner's title insurance policy is
23  a policy -- we ensure the owner that the purchase
24  of their property is free and clear from any

27

1   encumbrances, anything that would adversely affect
2   their title to the property by persons who owned it
3   prior to them.
4   Q.  And that would be a policy that's
5   issued in almost every case where there is a
6   purchase money mortgage?
7   A.  Yes.
8       MR. MAY:  Object to the form.
9   BY MR. GORDON:
10  Q.  And it remains --
11  A.  Every case.
12  Q.  Every case, okay.
13      It's issued only once?
14  A.  Yes.
15  Q.  And it remains in effect for the
16  entire time that the individual owns the property?
17  A.  Correct.
18  Q.  What's a lender's title insurance
19  policy?
20  A.  Lender's title insurance policy
21  works the same way as an owner's policy, only for
22  the benefit of the lender. That there are no other
23  intervening liens or encumbrances that would
24  adversely affect their -- the priority of their

28

1   mortgage in -- in a first position.
2   Q.  And, likewise, this -- a lender's
3   title insurance policy is issued in every case
4   where there is a first mortgage, is it not?
5       MR. MAY:  Object to form.
6       THE WITNESS:  Yes.
7   BY MR. GORDON:
8   Q.  The premiums also were paid only
9   once?
10  A.  The premiums were paid once, yes.
11  Q.  They were paid by the borrower?
12  A.  Paid by the borrower at the highest
13  amount. Owners or lenders, whichever the case may
14  be.
15  Q.  What do you mean, "at the highest
16  amount"?
17  A.  Whatever policy is going to be
18  higher. Sometimes there is a loan policy that
19  might be higher than the purchase price, if it's --
20  if it's a rehab, or they are borrowing more --
21  Q.  Got it.
22  A.  -- money than they are purchasing
23  the property for.
24  Q.  Okay.

### Page 29

1  And, with the lender's title
2  insurance policy, it's for the beneficiary of the
3  lender, is it not?
4  A. Correct.
5  Q. It doesn't benefit the owner at all
6  to have that?
7  A. No.
8  Q. Other than the fact that they are
9  required to get it as part of the mortgage?
10 A. Exactly, right. It's a requirement
11 to get the loan.
12 Q. Do you know what the -- what the
13 filed rate is? Are you familiar with that term?
14 A. Yes.
15 Q. And what is that?
16 A. Filed rates are the rates that
17 insurance companies charge for the issuance of the
18 insurance as set by the insurance commission.
19 Q. And, in Pennsylvania, that's the
20 same rate for all title insurance companies --
21 A. Correct.
22 Q. -- is it not?
23    Are you familiar with the term
24 "TIRBOP"?

### Page 30

1  A. Yes.
2  Q. What is the -- the TIRBOP Manual?
3  A. Right. We have the two manuals, the
4  TIRBOP Manual and the ALTA Manual, where the
5  insurance commission sets -- sets our uses for
6  endorsements and title practices.
7  Q. And you are required to follow the
8  TIRBOP Manual, are you not?
9  A. Um-hum. Yes.
10 Q. Thank you.
11    In fact, it would be illegal not to
12 follow the TIRBOP Manual, wouldn't it?
13 A. Well, when you say -- what do you --
14 can you clarify that? File it with -- with -- what
15 do you mean by "file the TIRBOP Manual"?
16 Q. No. It's illegal to -- it's illegal
17 not to follow the TIRBOP Manual.
18 A. Oh, follow. I thought you said
19 "file."
20 Q. My Baltimore accent.
21 A. Okay, follow.
22 Q. I apologize.
23 A. Sorry.
24    Yes.

### Page 31

1  Q. How many loans overall has Chelsea
2  Land Transfer handled since you started?
3  A. I don't have the answer to that
4  question. I'm not the only closer.
5  Q. Right.
6  A. And I couldn't even give you an
7  answer as to how many I would have done.
8  Q. How many are you doing now?
9  A. Maybe ten a month.
10 Q. Now, you said, in the 2000, 2001
11 time frame, you were doing about 40?
12 A. Correct. Accumulatively, 40.
13 Q. This would be for Chelsea, for
14 Northwest, and for Equitable?
15 A. Correct.
16 Q. At the time that you were -- that
17 you first started, when Chelsea was still
18 underwriting loans for -- I'm sorry, underwriting
19 insurance for Chicago Title, how many other
20 underwriters were they -- was Chelsea dealing with?
21 A. I don't know.
22 Q. Was Chelsea exclusively underwriting
23 the loans -- the insurance policies with Chicago
24 Title?

### Page 32

1  A. I -- I don't know.
2  Q. Well, do you recall, in your
3  experience, if you did -- if you exclusively sent
4  the loans to Chelsea -- to Chicago Title?
5  A. Well, I wouldn't have sent -- I
6  really can't answer that. I'm not sure.
7     I don't know if Chelsea had another
8  underwriter at the time other than Chicago. They
9  could have had an Agency Agreement that wasn't
10 being used. I just don't know.
11 Q. Well, you mentioned three other
12 underwriters, Old Republic, Fidelity National, and
13 Stewart.
14 A. Right.
15 Q. Today, in your office, what
16 percentage of insurance policies are underwritten
17 by the three of those companies?
18 A. Right now, a hundred percent of them
19 are going to Fidelity National.
20 Q. Do you know why that is?
21 A. We just like the rep.
22 Q. Okay. That's a good reason.
23    Who is the representative?
24 A. Dan Hogan.

MARIA ROZNIAKOWSKI

33

1  Q.  In the 2001, 2002 time frame, were
2  you also dealing with Fidelity National?
3  A.  No.
4  Q.  That's a more recent occurrence?
5  A.  Yes.
6  Q.  Do you know when that relationship
7  started?  The Fidelity National relationship?
8  A.  Maybe last January.
9  Q.  Insurance policies that are issued
10 today, how many get the refinance rate or the
11 re-issue rate?
12 A.  Should be all of them that get the
13 re-issue rate or the substitution rate, when
14 warranted.
15 Q.  And why do you say that?
16 A.  Why do I say that?
17 Q.  Um-hum.
18 A.  I don't understand what you mean.
19 Why wouldn't I say that?
20 Q.  Because they would all -- is it
21 because they would all be eligible for it?
22     MR. MAY:  Object to form.
23     THE WITNESS:  Whichever one warrants
24 it, the re-issue rates or the substitution rates,

34

1  then they would -- should get the --
2  BY MR. GORDON:
3  Q.  Okay.
4  A.  -- re-issue rate or substitution
5  rate.
6     Did I misunderstand your question?
7  Q.  I think you did.
8  A.  Okay.
9  Q.  I think you did.  And I just want to
10 make sure the record's clear.
11    Do -- do you give the re-issue rate
12 or the refinance rate for every policy that you
13 underwrite?
14 A.  No.
15 Q.  What percentage of the total number
16 of policies that you write do you currently give
17 the re-issue rate or the refinance rate?
18 A.  I don't believe I can give you a
19 percentage.
20 Q.  How about a ballpark?
21     MR. MAY:  And I'm --
22     THE WITNESS:  That's sort of an
23 impossibility.
24     MR. MAY:  Excuse me.  I was just

35

1  going to ask, for the record, since the witness is
2  unrepresented, that she can certainly answer her
3  questions to the best of her ability, but she
4  shouldn't guess about things or speculate.
5     THE WITNESS:  Well, I'm hoping I'm
6  making it clear that -- you know, when you are
7  asking me these questions, that I'm giving you my
8  best guess --
9  BY MR. GORDON:
10 Q.  No.  I understand that.
11 A.  -- when I'm -- say I don't -- I
12 can't give you a definitive answer on percentages
13 or numbers without having that information in my
14 possession.
15 Q.  I'm not asking you --
16 A.  Right.
17 Q.  -- you know, tell me 88.3 percent.
18 I'm asking for a ballpark figure.
19 A.  Right.  Well, in order to give you
20 that, I would have to be -- I would need to know
21 how many policies we write where there is existing
22 coverage and, of course, that's not always the
23 case.  We -- we do have customers who come in whose
24 coverage -- whose ownership has exceeded the

36

1  ten-year limit and they are no longer -- their
2  buyers wouldn't be eligible for the re-issue rate.
3  Q.  Um-hum.
4  A.  I would have no way of giving you
5  the information that you are requesting without
6  looking at every single file to see why he did not
7  get that re-issue rate.
8  Q.  That's fair enough.  That's fair
9  enough.
10    What is your understanding as to the
11 criteria that qualifies someone for the re-issue
12 rate?
13 A.  A buyer is entitled to the re-issue
14 rate if there is existing coverage on the -- on the
15 property within that ten-year limit.  If the -- if
16 the current owner has owned the property with
17 insurance within ten years, the buyer is entitled
18 to the re-issue rate.
19 Q.  Okay.
20    What about on a re-fi?
21 A.  On a refinance, well, we just
22 changed the rates for that now, and we have the
23 first -- there is a 20 percent discount --
24 Q.  For purposes of today --

MARIA ROZNIAKOWSKI

**37**

1   A.   Okay.
2   Q.   -- let's go with the older rate, the
3   one that didn't just come into effect.
4   A.   Okay. Well --
5   Q.   That might be easier for us to deal
6   with for purposes of this lawsuit.
7   A.   Okay. So, for the substitution
8   rate, if there was an existing lender's policy
9   within three years, the borrower would be entitled
10  to 20 percent discount off the re-issue rate.
11  Q.   Which comes out to a blended rate of
12  somewhere around 28 percent, I believe.
13  A.   Correct.
14  Q.   What evidence do you need in order
15  to determine whether or not someone had a prior
16  policy?
17  A.   Just that they --
18       MR. MAY:   And we are -- and we are
19  talking about the time period of Ms. Cohen's
20  transaction?
21       MR. GORDON:   We are talking --
22       THE WITNESS:   Correct.
23  BY MR. GORDON:
24  Q.   Yes, yes, yes.

**38**

1   A.   Right.
2   Q.   Whatever --
3   A.   We are talking about what the --
4   what the rates were or how they were determined --
5   Q.   Yes.
6   A.   -- in '01 --
7   Q.   Yes.
8   A.   -- or '02, when she closed.
9   Q.   Yes.
10       What evidence would have been --
11  what evidence would you have needed in order to
12  give the --
13  A.   Well, that they were --
14  Q.   -- refinance rate or the re-issue
15  rate?
16  A.   The recording date of the last
17  insured mortgage.
18  Q.   Okay.
19  A.   Or the date of the last insured
20  mortgage.
21  Q.   Just to show that she had a mortgage
22  and there is always insurance?
23  A.   That it was a first mortgage --
24       MR. MAY:   Object to form.

**39**

1        THE WITNESS:   -- right. There is
2   not always insurance when people have mortgages,
3   because they might have home equity lines of credit
4   that --
5   BY MR. GORDON:
6   Q.   Talking about first mortgages?
7   A.   First mortgages, yes.
8   Q.   There will always be insurance?
9   A.   Right. If it falls -- right. If it
10  falls into that criteria --
11  Q.   I'd like to show you what's already
12  been marked in this case as Exhibit Number
13  something -- Exhibit Number 3, and ask if you have
14  ever seen that document before?
15  A.   No, I have never seen this document.
16  Q.   For the record, that is the Issuing
17  Agency Contract between Chelsea and Chicago Title.
18       And I believe you were -- one of the
19  requests of you was that we -- we asked you to go
20  back and see if you could find the original signed
21  contract, and you were unable to do that, I
22  understand.
23  A.   Correct.
24  Q.   We had a deposition yesterday in

**40**

1   this case, however, with someone from Chicago Title
2   and this is, in fact, the contract.
3        What is your understanding as to the
4   scope of authority that you, as the title agent,
5   have for issuing title insurance on behalf of,
6   let's say, Chicago Title?
7   A.   I don't believe I understand your
8   question. What do you mean, my scope of authority
9   to issue?
10  Q.   Does Chicago Title -- did Chicago
11  Title look over your shoulder to make sure you were
12  doing it the right way?
13  A.   I would imagine that Chicago Title
14  came in and audited.
15  Q.   Okay.
16  A.   I was not privy to any of that,
17  but --
18  Q.   Do you have any personal knowledge
19  as to whether or not they ever audited?
20  A.   No.
21  Q.   Do you have any information about
22  whether or not Chicago Title was watching every
23  transaction?
24  A.   No.

41

1   Q.   Did you have to get authority from
2   Chicago Title in order to issue a policy?
3   A.   We would have to get authority from
4   Chicago Title to issue policies that exceeded
5   whatever was on the Agency Contract --
6   Q.   Okay.
7   A.   -- or anything that was out of the
8   ordinary.
9   Q.   So --
10  A.   Or that would be high risk.
11  Q.   Okay.
12  A.   Anything that would be a high risk.
13  Q.   And I believe that --
14  A.   We would then need authority from
15  Chicago.
16  Q.   And I believe --
17  A.   I -- you know --
18  Q.   -- the actual limit was --
19  A.   I would imagine that we would need
20  authority from Chicago. That's been my experience
21  with every underwriter that I've been with.
22  Q.   Okay.
23       Looking at the contract, if you
24  could turn to -- and there is a little number in

42

1   the bottom corner, you'll see CHI 0537, which is
2   the fourth page of the agreement. You'll see, in
3   Paragraph 7, it says --
4   A.   Right.
5   Q.   -- that the -- the limits of the
6   risk that you could write policies without prior
7   written approval is $500,000.
8        Is that consistent with your
9   recollection?
10  A.   I believe so.
11  Q.   So let's -- for any policies under
12  $500,000, you could underwrite the insurance
13  without calling Chicago Title?
14  A.   Correct.
15  Q.   You had virtually unlimited
16  authority to do that?
17  A.   Correct.
18  Q.   Did Chicago Title ever talk to you
19  about the rates that you were being charged?
20  A.   Personally?
21  Q.   Personally.
22  A.   No.
23  Q.   Do you have any information about
24  Chicago Title ever talking to anyone at Chelsea

43

1   about the rates that were being charged?
2   A.   I don't.
3   Q.   Did you receive any training from
4   Chicago Title about how to issue policies for them?
5   A.   No.
6   Q.   Did -- did you ever meet with a
7   representative from Chicago Title?
8   A.   I can't recall.
9   Q.   Do you know a woman named Elizabeth
10  Ray?
11  A.   Doesn't sounds familiar.
12  Q.   So, I guess my next question is
13  self-evident. Did you ever meet with Ms. Ray?
14  A.   I can't recall.
15  Q.   Did you ever go to any seminars put
16  on by Chicago Title?
17  A.   No.
18  Q.   Do you know if any were ever
19  offered?
20  A.   I would say, probably.
21  Q.   Do you have any specific
22  recollection?
23  A.   No, I don't.
24       MR. MAY:  I'd just ask that you let

44

1   the witness finish her statement before you
2   interrupt.
3        MR. GORDON:  I didn't think I was
4   interrupting, but I will be mindful of that, Mr.
5   May.
6        MR. MAY:  Thank you.
7   BY MR. GORDON:
8   Q.   Did you obtain any written materials
9   from Chicago Title giving you guidance on what
10  rates to charge for their policies?
11  A.   You know, again, I'm in this area
12  of -- of recollecting specific things that are just
13  pretty much impossible to remember whether or not
14  I've seen -- only because we are constantly given
15  directives from underwriters, and I would not
16  imagine that Chicago would have been any different.
17       I read a lot of material, so, you
18  know, I don't want to say that Chicago did not ever
19  give us anything; I just can't remember it.
20  Whether or not -- you know, how often or when --
21  when we received these materials.
22  Q.   You don't have any recollection,
23  though, as to receiving anything?
24  A.   No.

MARIA ROZNIAKOWSKI

45

1    Q.    Do you recall receiving a copy of
2  the TIRBOP Manual?
3    A.    We had manuals in the office, yes.
4    Q.    Did you ever have --
5    A.    We had a number of manuals in the
6  office. They were all over the place.
7    Q.    Did you ever have an underwriting
8  manual for Chicago Title?
9    A.    I did not have an underwriting
10 manual for Chicago, no.
11   Q.    Have you ever seen an underwriting
12 manual for Chicago Title?
13   A.    I did not, no.
14   Q.    Did you ever have an escrow
15 guideline for Chicago Title?
16   A.    No.
17   Q.    Do you ever recall seeing an escrow
18 guideline for Chicago Title?
19   A.    No.
20   Q.    Did you ever have any bulletins from
21 Chicago Title on what rates to charge?
22   A.    You know, we have lots of bulletins.
23 I just don't recall whether or not they were
24 Chicago's bulletins.

46

1    Q.    Okay.
2    A.    So....
3    Q.    When you went from Global -- Global
4  Abstract to Chelsea in July of 2001, I think your
5  testimony was that you were the office manager at
6  Global --
7    A.    Um-hum.
8    Q.    -- at that point, and then you
9  became a settlement agent --
10   A.    Um-hum.
11   Q.    -- settlement clerk.
12        What training did you receive in
13 order to make that jump?
14   A.    Well, I was a settlement closer at
15 Global, also.
16   Q.    Okay.
17   A.    First -- I was initially trained by
18 First American when I started back in the '80s.
19   Q.    What training did you receive
20 initially when you started closing loans?
21   A.    The training I received was the
22 training I received from First American when I
23 started at Global.
24   Q.    I'm sorry.

47

1    A.    Right.
2    Q.    From First American Title Insurance?
3    A.    From First American Title Insurance,
4  yes.
5    Q.    And, just so that I understand your
6  testimony, when you came over to work for Chelsea,
7  there was no additional training that was offered
8  by Chicago Title for you?
9    A.    No.
10        What training -- what training
11 would -- would they need to give me, I guess?
12   Q.    I'm just trying to find out if there
13 was any training.
14   A.    Okay.
15   Q.    Any training whatsoever.
16        And I did ask this question, but I
17 want to ask a couple of follow-ups on it. You
18 mentioned audits -- that they may have conducted
19 audits, but you didn't know of any in particular.
20   A.    No. At the time I was just a
21 closer. I wouldn't have been involved with those
22 appointments or meetings or any of that.
23   Q.    Are you involved with any of the
24 audits now?

48

1    A.    No.
2    Q.    Are you aware whether Old
3  Republic --
4    A.    Yes.
5    Q.    -- or Fidelity National or Stewart
6  Title conduct audits?
7    A.    Yes.
8    Q.    And do they?
9    A.    Yes, they do.
10   Q.    Do all three of them conduct audits?
11   A.    Yes.
12   Q.    How often?
13   A.    Yearly or every two years, depending
14 how -- how we do, how well we -- we pass.
15   Q.    Okay.
16        Have you checked back in the
17 corporate records to determine whether or not there
18 are any audits that were ever conducted by Chicago
19 Title?
20   A.    I have not checked. I don't know
21 that there are any corporate records that would
22 indicate that there were audits.
23   Q.    If you could specifically ask about
24 that, I would appreciate it.

MARIA ROZNIAKOWSKI

**Page 49**

1   A.   Sure.
2   Q.   And, if there are any, you know, you
3   can apprise Mr. Searles and myself after this
4   deposition.
5   A.   Okay.
6   Q.   I'd like to run through the general
7   protocol for issuing title insurance in
8   Pennsylvania. My understanding is that, and I
9   think your testimony has already stated, that it's
10  basically the same from company to company and it
11  happens the same way, from beginning to end, but I
12  want to make sure I understand the process, and
13  it's my understanding the first step in the process
14  is a referral of the work to Chelsea.
15  A.   Um-hum.
16  Q.   How are does that occur?
17  A.   Well, when we --
18       MR. MAY: Object to the form.
19  BY MR. GORDON:
20  Q.   You can answer the question.
21  A.   Oh. We get referrals from all
22  different sources. We may have an actual borrower
23  or buyer call us to order their insurance, or a
24  real estate agent, an attorney.

**Page 50**

1   Q.   And the companies that make
2   referrals to you, are they -- do you consider them
3   your customers?
4   A.   Yes, we do.
5   Q.   How often is it that borrowers,
6   themselves, self-refer themselves to Chelsea?
7   A.   Well, we have a number of customers
8   that self-refer themselves. I mean, we do business
9   with a lot of customers who buy and sell real
10  estate routinely. Investors.
11  Q.   Okay.
12  A.   We also get -- well, we do -- we do
13  have customers that come back to us after they've
14  purchased a property, come back and refinance, or
15  buy another property.
16  Q.   Those would be repeat customers?
17  A.   Um-hum.
18  Q.   How often is it that just an
19  individual off the street will -- will find you?
20       MR. MAY: Object to the form.
21       THE WITNESS: Oh, gees, I don't
22  know.
23  BY MR. GORDON:
24  Q.   Rarely?

**Page 51**

1   A.   I can't answer that.
2   Q.   Does it happen often?
3   A.   It happens. I don't know if it's
4   happened often. Most -- most buyers already have
5   an ongoing relationship with their real estate
6   agents or their mortgage brokers or their mortgage
7   company that refer them to title insurance
8   companies.
9   Q.   And is it fair to say that, at this
10  initial step of the process, most of the time --
11  A.   Um-hum.
12  Q.   -- the title company doesn't have
13  contact with the borrower, themselves?
14  A.   True.
15  Q.   After the referral of the business,
16  what happens?
17  A.   Their -- their abstract is ordered,
18  we prepare their title commitment, we --
19  Q.   Okay. You are getting ahead of me.
20  A.   Okay.
21  Q.   I want to ask some questions --
22  A.   Okay.
23  Q.   -- about the title abstract.
24       Title abstract is also known as a

**Page 52**

1   title search?
2   A.   Um-hum.
3   Q.   How does -- how do you determine
4   what type of title search or abstract is conducted?
5   A.   Well, if we are issuing title
6   insurance, then we only order one type of abstract.
7   It would be a 60-year chain of title search. The
8   whole shebang.
9   Q.   Are you familiar with the -- the
10  term "Bring-down search"?
11  A.   Yes.
12  Q.   What is a bring-down search?
13  A.   A bring-down search is a
14  subsequent -- a subsequent search that we perform
15  prior to settlement to cover the gap between our
16  effective date of our commitment, our last search,
17  and as close to the closing date as we possibly can
18  get.
19  Q.   Okay.
20       Short of a 60-year search, is there
21  any other type of search that you can do?
22  A.   We can just do mortgage and judgment
23  searches for people who are just looking for
24  information.