MARIA ROZNIAKOWSKI

**Page 53**

1  Q. Okay. Are you familiar with the
2  term "Bring-to-date search"?
3  A. Bring-to-date search. Not really.
4  Q. Maybe I'm not using the right term.
5  I'm looking for the -- the search that's done since
6  the prior refinance or since the prior mortgage,
7  just to bring to it date.
8      Is there a specific term that's used
9  in the industry for that?
10  A. If we did a search -- if we
11  performed -- if we actually insured a person who
12  was then coming back to refinance, we would have a
13  search revised -- updated and revised. If we were
14  the insurer.
15      So, if you purchased your home, and
16  we were the ones that insured it, you came back to
17  us to refinance it --
18  Q. Um-hum.
19  A. -- then the search that we would
20  then order would be an update and revision.
21  Q. Okay. Does Chelsea --
22  A. Because we already have the abstract
23  for that prior title.
24  Q. Right.

**Page 54**

1      Does Chelsea, itself, do the
2  abstract or title search, or do you hire an outside
3  company?
4  A. We hire it out.
5  Q. Are you familiar with the term
6  "Title plants"?
7  A. Yes.
8  Q. And what is a title plant?
9  A. Would be the plant that held
10  information about the recording of deeds,
11  mortgages, liens, judgments.
12  Q. Are these generally through the
13  title insurers?
14  A. Some title insurers have plants.
15  Q. Do you currently work --
16  A. I don't know that all of them do.
17  Q. Okay.
18      Do you know if Chicago Title has
19  one?
20  A. I don't.
21  Q. Did you ever work through Chicago
22  Title's title plant?
23  A. No. I don't -- I didn't, no.
24  Q. Do you -- with any of your other

**Page 55**

1  current underwriters, do any of them have title
2  plants?
3  A. Well, they offer abstract services,
4  so I would assume that they do.
5  Q. What do they tell you they can do
6  for you?
7  A. The abstract. And I believe we
8  might have even used Fidelity National a couple of
9  times.
10  Q. How does it work? You --
11  A. It works like any other. You just
12  order a title -- you just order -- order the
13  search.
14  Q. And it comes back?
15  A. Right.
16  Q. Is there a monthly subscription fee
17  or do you pay per search?
18  A. No. You pay per search, like any
19  searcher.
20  Q. What information can you get through
21  the title plant searches?
22  A. I don't -- well, I would imagine all
23  the information that you need.
24  Q. Do you know if you can obtain a copy

**Page 56**

1  of the prior title insurance policy through the
2  title plant search?
3  A. You know, I don't know. Okay.
4  Q. But you can certainly gain all the
5  information about the prior mortgages --
6  A. I believe so.
7  Q. -- correct?
8      You can obtain information about
9  when the property was purchased by the current
10  owners?
11  A. Yes.
12  Q. About the prior owners of the -- of
13  the property?
14  A. I believe so.
15  Q. After -- you mentioned that, after
16  the title search or title abstract is done, that
17  there is a commitment?
18  A. Yes.
19      THE VIDEOGRAPHER: I'm getting some
20  Blackberry interference.
21      (Discussion is held off the record.)
22      MR. GORDON: I would ask Mr. May to
23  please refrain from his Blackberry use during the
24  deposition.

MARIA ROZNIAKOWSKI

Page 57

1   MR. MAY: I'll note, for the record,
2 Mr. Gordon's sense of humor on that, since mine has
3 been off since the beginning of the deposition.
4   MR. GORDON: Point well taken.
5 BY MR. GORDON:
6   Q.   And what is a title commitment?
7   A.   Our title commitment is a commitment
8 to -- to insure the transaction.
9   Q.   Can you find the title commitment
10 for me in Deposition Exhibit Number 3 -- I'm sorry,
11 Number 19.
12       I'll help you along. You might want
13 to look at Page 43.
14   A.   Oh, there it is. 43. Okay.
15   Q.   This is the document that identifies
16 which title insurance company is going to be
17 issuing the insurance for this particular
18 transaction, correct?
19   A.   Correct.
20   Q.   At what point is the determination
21 made within Chelsea as to which company will be
22 issuing the insurance?
23   A.   I'm sorry. Could you repeat that?
24   Q.   Sure.

Page 58

1       At what point in the process is the
2 decision made about the company that will actually
3 be the underwriter on the insurance?
4   A.   Well, it would be whoever the
5 underwriter is, whoever we are underwriting with.
6 I mean, if we were underwriting with Chicago,
7 obviously, the policy -- the commitment would be
8 with Chicago.
9   Q.   Okay. And I guess I should clarify
10 the question.
11       At what stage in the process is --
12 is it at the point that you get the referral, you
13 will automatically know that it's going to be
14 Chicago Title, or would it be at the abstract
15 stage, or do you wait until you are actually
16 writing the commitment before you determine that it
17 will be Chicago Title?
18   A.   I -- it would be Chicago Title in
19 this instance, because we only underwrote with
20 Chicago at that time, I believe.
21   Q.   Okay.
22   A.   So, I mean, you know, the
23 commitments -- when they get to me, they are
24 already done.

Page 59

1   Q.   Okay.
2       So -- so, at this point in Chelsea,
3 it would automatically have gone to Chicago Title?
4   A.   Correct.
5   Q.   And the borrower at this point still
6 doesn't have any -- any -- any contact with Chelsea
7 or with Chicago Title, do they?
8   A.   I can't absence that --
9       MR. MAY: Object to the form.
10      THE WITNESS: -- definitively. I'm
11 not sure if the Cohens ever called our office or
12 spoke to anyone.
13 BY MR. GORDON:
14  Q.   I'm not asking specifically about
15 the Cohens. I'm asking --
16  A.   Oh.
17  Q.   -- generally. The borrowers don't
18 have contact -- they are not part of writing the
19 title commitment, are they?
20  A.   They are not part of --
21      MR. MAY: Object to the form.
22      THE WITNESS: They are not part of
23 writing the title commitment, but we do have a
24 number of borrowers that -- that call us, even when

Page 60

1 they are represented by a real estate agent or, you
2 know, a mortgage broker.
3 BY MR. GORDON:
4   Q.   Is the borrower involved in the
5 abstract process?
6   A.   No.
7   Q.   They would not play any role in
8 that?
9   A.   No.
10  Q.   They don't write the title
11 commitment?
12  A.   No.
13  Q.   You do that?
14  A.   Right.
15  Q.   Do you consult with them when you
16 are writing the title commitment?
17  A.   No.
18  Q.   Is there a need to consult with them
19 when you are writing the title commitment?
20  A.   No.
21  Q.   And the --
22  A.   Well, other than -- well, I don't
23 know that we would consult with the borrower, but
24 we would verify the information so that the

MARIA ROZNIAKOWSKI

Page 61

1  commitment was correct --
2  Q.    Okay.
3  A.    -- or try to get it as correct as
4  possible as to what we were insuring, before it
5  went out.
6  Q.    And you would agree that the title
7  commitment is binding on Chicago Title in -- when
8  you were dealing with Chicago?
9  A.    Binding on Chicago Title -- yes --
10 well, you mean, could we change the commitments to
11 another underwriter at that point, prior to the
12 payment of insurance?
13 Q.    No. At the time that you issue the
14 commitment, assuming that the loan closes --
15 A.    Right. At that point --
16 Q.    -- it's binding on Chicago --
17 A.    -- it's then binding, yes.
18 Q.    You need to let me finish the
19 question.
20 A.    I'm sorry.
21 Q.    That's okay.
22       And it's also binding upon Chelsea,
23 is it not?
24 A.    True.

Page 62

1  Q.    Now, I'd like to just go through
2  some of the information that's in the commitment.
3  If you could turn a couple pages down to Page 45 --
4  A.    Um-hum.
5  Q.    You're already there?
6  A.    Yes.
7  Q.    Okay.
8        Is it fair to say that the title
9  commitment will include all of the necessary
10 information to issue -- to issue title insurance?
11 A.    Yes.
12 Q.    It has the name of the borrowers?
13 A.    Um-hum.
14 Q.    Always, correct?
15 A.    Um-hum.
16 Q.    Will always have the address of the
17 property, correct?
18 A.    Correct.
19 Q.    It will always have information
20 about the most recent outstanding first mortgage on
21 the property?
22 A.    Correct.
23 Q.    It will always have information
24 about the date of sale -- the date of purchase of

Page 63

1  the -- of the property?
2  A.    Um-hum. Yes.
3  Q.    Including the dates that all of
4  those events took place?
5  A.    Correct.
6  Q.    And, in fact, if we turn to Page 46,
7  which is Schedule B, we can see that the -- the
8  Cohens' most recent mortgage was from Capstone
9  Mortgage Corporation --
10 A.    True.
11 Q.    -- correct?
12 A.    True.
13 Q.    We also know the amount of that
14 mortgage, do we not?
15 A.    Yes.
16 Q.    And the title commitment is -- is
17 always in the same format, isn't it?
18 A.    Generally, yes.
19 Q.    It's a standard form --
20 A.    Yes.
21 Q.    -- that's used throughout the
22 industry, correct?
23 A.    (Witness nods.)
24 Q.    Is there ever contact with the --

Page 64

1  the borrower to ask them what type of lender's
2  policy they want to have purchased for them?
3  A.    No.
4  Q.    Is there ever contact with the
5  borrower to ask them what type of owner's policy
6  they want to have purchased for them?
7  A.    Well, I guess what I -- I need to --
8  you to clarify that. Would we call them to confirm
9  that the information that we received to do the
10 commitment in the first place is correct, before we
11 send it out?
12 Q.    Well, what would be the answer to
13 that?
14 A.    Well, that wouldn't be something
15 that I would do as a -- as a closer. That would be
16 done in -- when the conveyancers are preparing the
17 commitment.
18 Q.    Okay.
19 A.    They may call a borrower to confirm
20 that this is what they need, or they may call the
21 lender to confirm that that's what they need.
22 Q.    Let's say, in a -- in a purchase
23 money mortgage transaction, do you ever contact the
24 borrower to find out if they want to purchase

MARIA ROZNIAKOWSKI

Page 65

1  owner's title insurance?
2      A.   I do not contact the borrower, no.
3      Q.   Okay.
4           Are you familiar with the enhanced
5  policy?
6      A.   Somewhat?
7      Q.   Do you know what it is?
8      A.   They enhance coverages.
9      Q.   Do you know what it does?
10     A.   Not really.
11     Q.   Okay.
12          Do you ever issue an enhanced
13 owner's policy?
14     A.   I've never issued an enhanced
15 owner's policy, no.
16     Q.   Have you ever issued an enhanced --
17 an enhanced lender's policy?
18     A.   No.
19     Q.   Would you please turn to Page 58 of
20 Exhibit 19.
21          Now, what document is this?
22     A.   This is the settlement statement.
23     Q.   Is that your signature at the
24 bottom?

Page 66

1      A.   Yes.
2      Q.   And does that indicate that you, in
3  fact, were the closer of this loan?
4      A.   Yes.
5      Q.   This also is a standard form that's
6  used?
7      A.   Yes.
8      Q.   Industry-wide?
9      A.   Yes.
10     Q.   I'd like to actually go back to the
11 commitment for a second.  I have one more question.
12          What do you do with the commitment
13 after it's issued?
14     A.   After the commitment is issued?
15     Q.   After the commitment is issued.  Who
16 is it sent to?
17     A.   The commitment is sent to all the
18 parties that need it in order to prepare for the
19 closing.
20     Q.   Okay.  And who would that be?
21     A.   Buyers, sellers, lenders, real
22 estate agents, whoever -- attorneys, if borrowers
23 or sellers are being represented.
24     Q.   Would a copy go to Chicago Title?

Page 67

1      A.   Of the commitment?
2      Q.   Of the commitment.
3      A.   No.
4      Q.   At what point does Chicago Title
5  find out that it's actually issuing insurance?
6      A.   I would believe, when they receive
7  the settlement statement with their premium check.
8      Q.   Okay.  So sometime after the
9  closing, is that correct?
10     A.   I believe that -- yes, after the
11 closing, yes.
12     Q.   And how does the information get
13 into the title commitment?  I mean, I see, for
14 example, looking back at Page 46, that there is a
15 lot of information put on this standard form about
16 the mortgages.  If we turn back to 45, it's
17 information about the homeowners.
18     A.   Right.
19     Q.   How does that information get from
20 the abstract that's conducted to the form itself?
21     A.   It's typed by our processors.
22     Q.   Who does that?  Do you have actual
23 word processors in the office?
24     A.   Yes.

Page 68

1      Q.   Do they -- they take the information
2  from --
3      A.   From the abstract and prepare the
4  commitment.
5      Q.   Okay.
6           Is there a computer program used for
7  that purpose?
8      A.   Yes.
9      Q.   And what is that program?
10     A.   Title Express.
11     Q.   Is that one of those off-the-shelf
12 standard programs that's used throughout the title
13 industry?
14     A.   Well --
15          MR. MAY:  Object to form.
16          THE WITNESS:  -- I don't know if
17 it's off the shelf.  It's not something you can buy
18 in a store.
19 BY MR. GORDON:
20     Q.   But it's a pre-packaged program?
21     A.   It's a pre-pack -- yes.
22     Q.   Was Title Express used at Global?
23     A.   No.  We used a different system.
24     Q.   What system did they use there?

MARIA ROZNIAKOWSKI

**Page 69**

1   A.   We used Soft-Pro.
2   Q.   Oh. That's another one of the big
3   computer software programs for the title industry?
4   A.   Correct.
5   Q.   And the -- are there specific
6   screens in Title Express that capture information
7   or ask for specific data to be entered?
8   A.   Yes.
9   Q.   And then that information is
10  automatically transmitted to the title commitment?
11  A.   True.
12  Q.   Is that information then stored in
13  Title Express?
14  A.   Yes.
15  Q.   So, for example, if you wanted to go
16  back and look for the Cohens' file, you could go
17  back today and the information's still in there?
18  A.   Yes.
19  Q.   In the various data fields --
20  A.   Yes.
21  Q.   -- you put it into?
22  A.   We can still merge it, yes.
23  Q.   Okay.
24       Can you do any reports off of Title

**Page 70**

1   Express?
2   A.   Yes.
3   Q.   So, if you wanted to see all
4   transactions that closed within a certain period of
5   time, you just put those search terms in and it can
6   print out a list?
7   A.   Yes.
8   Q.   Do you know if you could put other
9   types of paradigms in?
10       MR. MAY: Object to form.
11       THE WITNESS: Well, I haven't run
12  all of their reports. Their reporting is not --
13  that part of Title Express, I don't believe, is --
14  is that great. They are preset, I guess you would
15  say, to only give you the information that Title
16  Express has there.
17  BY MR. GORDON:
18  Q.   Okay.
19  A.   So, for instance, like this case, if
20  I wanted to know every single file that closed or
21  underwrote -- that we underwrote with Chicago, I
22  was unable to produce that.
23  Q.   Did you call Title Express to ask
24  them if that could be done?

**Page 71**

1   A.   I spoke to someone else in my office
2   who had tried to run some Crystal reports and we
3   couldn't do it.
4   Q.   What are Crystal reports?
5   A.   It's just another software package
6   that ties in with Title Express to give you a
7   broader report range, but we just can't seem to get
8   it to work correctly.
9   Q.   I think, by the way, we actually
10  missed a step in the process, and I want to make
11  sure that that's clear.
12       Before the title commitment, there
13  is a title examination.
14  A.   Yes.
15  Q.   What is a title examination?
16  A.   A title examination is part of what
17  our abstracters do -- or our abstract company does.
18  They gather the information and then they examine
19  the abstract and they give us their -- their
20  completed abstract for us to prepare our commitment
21  from.
22  Q.   Okay. And, again, the borrower is
23  not involved in that process?
24  A.   No.

**Page 72**

1   Q.   What happens after the title
2   commitment's issued and it's sent out to the
3   various parties that need it?
4   A.   Well, we wait for a closing date, or
5   we speak to specific parties about the items that
6   we found on the title report that they are going to
7   need to clear in order to -- to close.
8       Basically waiting.
9   Q.   You are waiting for the closing?
10  A.   Yes.
11  Q.   In most instances, isn't that the --
12  the first time that Chelsea has contact with the
13  borrower?
14  A.   Yes.
15       MR. MAY: Object to form.
16  BY MR. GORDON:
17  Q.   In the time frame that you dealt
18  with Chicago Title, were there any forms that were
19  used to advise consumers that they might be
20  eligible for a re-issue rate?
21  A.   I --
22       MR. MAY: Could you repeat -- I'm
23  sorry. Could you repeat the question?
24       MR. GORDON: Sure.

MARIA ROZNIAKOWSKI

73

BY MR. GORDON:
Q. During the time frame that you worked with Chicago Title at Chelsea, were there any forms that were used to advise consumers that they might be eligible for a re-issue rate?
A. I don't believe so.
Q. Were there any forms that advised consumers that they might be eligible for a refinance rate?
A. I don't believe so.
Q. After the closing is set up, what -- what then happens in connection with the transaction?
A. After the closing is set up?
Q. Um-hum.
A. After it's been scheduled?
Q. Yes.
A. Well, again, we would just go back to the report and make sure that we were ready to close, that there weren't any items that the borrowers needed to bring us that they didn't have, so that they could actually close on the day they come in to close.
Q. Okay. And then the loan closes?

74

A. And then the loan closes.
Q. And, as I understand it, if it's a purchase money mortgage, then the money's disbursed immediately, and, if it's a refinance, you have to wait three days?
A. Correct.
Q. What happens after the closing? After the money is disbursed?
A. The file -- well, the documents go down to recording. Basically wait for the recording document to come back before the final title policy is prepared and sent out.
Q. And at what point is the title policy issued?
A. The title policy is issued when we receive the recorded document back from the recording agency.
Q. How long a time lag is that?
A. Well, let's see. It differs from county to county and it differed, basically, from year to year. I mean, there was a time period where -- you know, Philadelphia is now taking two weeks to get something back, or three weeks to get something back, wherein, you know, a number of

75

years ago, it was taking them nine months, you know --
Q. Um-hum.
A. -- and....
So it -- you know, it would be sent out when we received that document back.
Q. Okay.
Does there come a time when you transmit to Chicago Title the -- their portion of the premium?
A. Yes.
Q. When does that occur?
A. Well, the process the check at the end of closing and I submit that to the person in our office who then submits to it Chicago.
Q. Okay.
So that's done before the policy is actually issued?
A. Yes.
Q. And I think your testimony was that you send a copy of the HUD-1 together with the check.
A. Yes.
Q. Do you send any other information to

76

Chicago Title?
A. I do not send any other information.
Q. Is there someone else in your office who does send additional information?
A. Well, there is someone in the office who -- whose job it is to send that information to the underwriters. I don't know that there is anything else that she sends.
Q. Okay.
A. Whatever it is that they require.
Q. There may have been some additional information; you are just not aware of it?
A. Correct. I -- I don't know.
Q. After the loan's been recorded, and the information is transmitted back to you, you do issue a policy at that point?
A. The office would then issue a policy.
Q. And --
A. I would not.
Q. -- who actually, in the office, issues the policy?
A. That's Janet, in our office. She does the policies.

Page 77

1  Q. What's her position?
2  A. She's our receptionist, but she also
3  does the policies.
4  Q. And Chicago Title would -- would
5  give you a bunch of policy jackets that you would
6  have in stock, and you would just take the next one
7  and issue the policy, is that correct?
8  A. I believe that that's what she would
9  do. I -- I -- it wasn't my job, so I can't --
10 Q. Okay.
11 A. -- say definitively that that's how
12 it was done.
13 Q. Okay.
14    Could you please take a look at
15 Deposition Exhibit Number 19 again, and please turn
16 to Page 52.
17    Could you tell me how -- well, is
18 this the policy?
19 A. Yes.
20 Q. And there is no policy jacket on it.
21 Is that typical, that you don't keep a copy of the
22 policy jacket?
23 A. Yes.
24 Q. Okay. And I see that there are a

Page 78

1  number of endorsements, as well.
2  A. Correct.
3  Q. Is a copy of the policy sent to
4  Chicago Title?
5  A. Yes.
6  Q. How do you send -- how did you send
7  policies -- issued policies to Chicago Title?
8  A. I don't know how Janet sent the
9  policies to Chicago. I don't know if they are
10 mailed or Chicago picked them up.
11 Q. Do you know if there was a
12 remittance form?
13 A. I do not know.
14 Q. Is one of your responsibilities as a
15 settlement clerk -- is it to figure out what the
16 proper rate would be for the title insurance?
17 A. Yes.
18 Q. And that's -- that's really a matter
19 of simple mathematical calculation, is it not?
20 A. Well, you have to look at the
21 commitment to see if they do that right, and then,
22 you know, we have rate manuals that will tell you
23 the rate, or you can calculate it yourself.
24 Q. Okay.

Page 79

1     So it -- it could either be a matter
2  of simple mathematical calculation --
3  A. 10 percent off, yes.
4  Q. It could either be a matter of
5  simple mathematical calculation, correct?
6  A. Yes.
7  Q. Or it could be a matter of just
8  looking it up on a chart?
9  A. Correct.
10 Q. Okay.
11    So, let's -- let's take a look at
12 the Cohens' commitment --
13 A. Okay.
14 Q. -- and maybe you could tell me what
15 rate they would have been entitled to receive --
16 A. Um-hum.
17 Q. -- okay? So, would you look back,
18 starting, I believe, at Page 43 of the -- which is
19 the commitment.
20    Now, do you see at the bottom of
21 Page 46 --
22 A. Um-hum.
23 Q. -- it indicates when the last
24 mortgage was?

Page 80

1  A. Yes.
2  Q. And the loan for the Cohens took
3  place in February of 2002.
4  A. Right.
5  Q. So, if we see, at the bottom of Page
6  46, that there was a mortgage in 1999 -- a first
7  mortgage, would that have been -- would that have
8  qualified them for the re-issue rate?
9  A. That would have qualified them for
10 the substitution rate.
11 Q. Why for the substitution rate?
12 A. Well, they are within a three-year
13 time frame.
14 Q. Okay. From 1997 --
15 A. '99.
16 Q. I'm sorry. 1999 to 2002. I think
17 the substitution rate's also called the refinance
18 rate?
19 A. Yeah -- Yes.
20 Q. Okay. I just want to make sure that
21 we are not talking past each other with terms.
22 A. Okay.
23 Q. So, if I refer to "refinance rate,"
24 I want to make sure you know what I'm talking

81

1  about.
2     A.   If you refer to the substitution
3  rate as the refinance rate, then I'll know what you
4  mean.
5     Q.   Okay.
6          So, the Cohens should have qualified
7  for the refinance rate?
8     A.   Yes.
9     Q.   And that would have been the
10 10 percent off, plus another 20 percent off?
11    A.   Correct.
12    Q.   For the blended discount of 28
13 percent?
14    A.   Right.
15    Q.   And that would have been figured off
16 of the principal amount owed on the loan that
17 was --
18    A.   That would have --
19    Q.   -- being insured?
20    A.   That would have been based on the
21 amount that -- right, the loan that was being
22 insured.
23    Q.   And what was the amount of the loan
24 that was being insured for the Cohens?

82

1     A.   57,6.  57,600 is what's on the
2  commitment.
3     Q.   If you could hold on one second.
4          Do you know what the rate, offhand,
5  would be for $57,600?
6     A.   For the substitution rate?
7     Q.   Well, let's start with the basic
8  rate.  What would that be?
9     A.   At the -- I believe it was the 606
10 that's on the HUD sheet.
11    Q.   Okay.  606.75?
12    A.   75, yes.
13    Q.   Okay.  And then, if we want to
14 figure out what the refinance or substitution rate
15 would have been, what would it have been?
16    A.   10 percent off that, and then
17 another 20 percent off that amount.
18    Q.   Okay.
19         So, another 10 percent off of the
20 606.75 is another discount of $60.67, and that
21 would be $546.08, and then you take another
22 20 percent off that?
23    A.   Um-hum.
24    Q.   And that's $169.87, making the final

83

1  refinance rate $436.88?
2     A.   I trust your math.
3     Q.   So the rate that the Cohens should
4  have received is $436.88?
5     A.   I believe so.
6     Q.   Would you agree that they --
7     A.   That's the amount.
8     Q.   Would you agree that they did not
9  receive that rate?
10    A.   True.
11    Q.   Are you familiar with the term
12 "lender's instructions"?
13    A.   Yes.
14    Q.   What are lender's instructions?
15    A.   Lender's instructions?
16         They are instructions that we, I
17 believe, receive from the lenders in order to
18 conduct their loan closing.
19    Q.   Do you know if a copy of the
20 lender's instructions go to Chicago Title?
21    A.   They wouldn't go to Chicago Title
22 from me.  If they -- I doubt it.  Unless the lender
23 sent it to them.
24    Q.   Do you know if a copy of it would go

84

1  to the Cohens?
2     A.   I don't believe so.
3     Q.   Do you know if, in Pennsylvania,
4  there is a requirement that borrowers be charged
5  for title insurance the best price tier for which
6  they qualify?
7     A.   Yes.
8     Q.   It would be unlawful not to give
9  them that best price, correct?
10    A.   Yes.
11         MR. GORDON:  Let's go off the record
12 for about two minutes.  I may be done.
13         THE VIDEOGRAPHER:  We are going off
14 the record at 27 minutes past 11:00 o'clock.
15         (Discussion is held off the record.)
16         We are back on the video record at
17 28 minutes past 11:00 o'clock.
18 BY MR. GORDON:
19    Q.   Ms. Rozniakowski -- I hope I'm
20 pronouncing that correctly.
21    A.   That's fine.
22    Q.   Thank you.
23         Were you ever contacted by anyone
24 from Chicago Title to tell you that Ms. Cohen did

MARIA ROZNIAKOWSKI

Page 85

1  not receive the correct rate?
2      A.   I was not, no.
3      Q.   Do you know --
4           MR. MAY: I object to form.
5  Belatedly object to form.
6  BY MR. GORDON:
7      Q.   Were you ever contacted by anybody
8  at Chicago Title concerning any of the rates that
9  you ever charged to any customer?
10     A.   I was not.
11     Q.   Do you know if anyone at Chelsea was
12 ever contacted?
13     A.   I'm not aware of it.
14          MR. GORDON: Okay. No further
15 questions.
16 EXAMINATION
17 BY MR. MAY:
18     Q.   Ms. Rozniakowski, as -- as I stated
19 earlier on the record, my name is Darryl May. I'm
20 the attorney for Chicago Title, and I, too, in this
21 deposition, am permitted to ask you questions, and
22 the ground rules for answering them are the same
23 as -- as with Mr. Gordon, so I don't think I need
24 to go over those again, but, if you ever don't

Page 86

1  understand one of my questions, please make sure
2  you tell me that, and I'll rephrase it to make sure
3  that you understand.
4           Ms. Rozniakowski, you were asked a
5  number of questions by Mr. Gordon relating to what
6  is standard in the industry, things of that nature,
7  so I just want to review your experience, once
8  again, in the title industry, and I just -- your --
9  your experience in the title industry is limited to
10 the two positions -- to the positions with the two
11 companies that you described, correct?
12     A.   Correct.
13     Q.   Okay.
14          And I don't mean to denigrate that
15 experience in any way, that's not where I'm going
16 with this, but --
17     A.   Understood.
18     Q.   -- but your -- but your experience
19 is limited, apart from the officer manager -- I'll
20 get to that in a second -- to being a -- a closing
21 agent, correct?
22     A.   Correct.
23     Q.   And you've done lots of those --
24     A.   Yes.

Page 87

1      Q.   -- but, in terms of being someone
2  who has done training in the title industry, for
3  example, have you ever done that?
4      A.   No.
5      Q.   And, as someone whose ever been
6  called upon to interpret the TIRBOP Manual, have
7  you ever done that?
8      A.   No.
9      Q.   Okay.
10          And, as someone whose ever been an
11 executive in a title company --
12     A.   No.
13     Q.   -- have you ever done that?
14          So -- now, then, let's talk about
15 the office manager role for a minute. Could you
16 just explain again what you did as office manager?
17     A.   I just made sure that the office ran
18 smoothly every day.
19     Q.   So, in terms of the -- the title
20 industry, itself, your role as office manager was
21 not --
22     A.   That could have been any -- it could
23 have been any --
24     Q.   Could have been a doctor's office.

Page 88

1      A.   Exactly.
2      Q.   Okay.
3           So, what -- so, what you know about
4  the title industry is limited to what you were
5  taught on-the-job training in those two positions
6  as -- as a closing clerk?
7      A.   Correct.
8      Q.   Okay.
9           Now, for example, let's talk about
10 what you said about when you provided the re-issue
11 rate.
12     A.   Um-hum.
13     Q.   What -- you stated your opinion on
14 that. Where -- where did you come to get that
15 opinion?
16     A.   The opinion of the -- whether --
17 when I'm supposed to charge the re-issue rate?
18     Q.   Right, and the fact that you consult
19 the commitment for doing that, to see whether there
20 is a prior lien.
21          Who -- how did you come to form that
22 opinion?
23     A.   Well, I will -- believe from the
24 manual --

Page 89

```
 1      Q.   Okay.
 2      A.   -- of when we're -- we're to charge
 3  the re-issue rate.
 4      Q.   Okay.
 5           Now, you are familiar that the
 6  manual changed in 2005, correct?
 7      A.   Yes.
 8           MR. GORDON:  Objection.  It's a
 9  mischaracterization.  The manual was clarified in
10  2005.
11           MR. MAY:  Where -- I tell you what,
12  you do the same thing that I do.  You can object to
13  form.
14           MR. GORDON:  I'm only doing it for
15  purposes of -- of stating it for the record.
16           MR. MAY:  Okay.  Yes, but you --
17  okay, just object to form, and there is an
18  objection to the form.
19  BY MR. MAY:
20      Q.   You -- you -- you are familiar with
21  the revision, and he -- and Mr. Gordon may think
22  it's not a revision or whatever, but -- but that's
23  for the court and for the judge, but you -- you are
24  familiar with what happened to the rate manual in
```

Page 90

```
 1  2005, correct?
 2      A.   Yes.
 3      Q.   Okay.
 4           And now the rate manual states that
 5  there are certain things that will be inferred to
 6  be evidence of prior insurance, correct?
 7      A.   Yes.
 8      Q.   Okay.
 9           And one of those is a prior
10  institutional mortgage --
11      A.   Right.
12      Q.   -- correct?  Okay.
13           Do you recall that as being language
14  in the TIRBOP Manual before 2005?
15      A.   No.
16      Q.   And did you have that understanding
17  of what was evidence to be produced -- let me
18  rephrase the question.
19           Before 2005, did you have the same
20  opinion about what is evidence to be produced in
21  order to get a re-issue rate then that you did now?
22      A.   No.
23      Q.   Okay.
24           What was your -- what was your
```

Page 91

```
 1  understanding then?
 2      A.   That a policy needs to be produced.
 3      Q.   Okay.
 4           And is it fair to say that the
 5  reason that the Cohens didn't get the re-issue rate
 6  is because of your understanding of what the TIRBOP
 7  Manual was prior to 2005?
 8      A.   Possibly, yes.
 9      Q.   Okay.
10           And the -- now, by the way, apart
11  from the policy, itself, was there other evidence
12  that could be satisfactory, like -- like the prior
13  HUD-1 statement showing the payment of prior
14  insurance?
15      A.   Yes.
16      Q.   But that your understanding then was
17  that something had to be produced to evidence the
18  prior insurance?
19      A.   Yes.  It was my understanding that
20  that -- that was the directive from all
21  underwriters, that something -- that their
22  policy -- or something had to be produced to show
23  that there was existing owner's coverage, not by
24  just looking at something on the record, and
```

Page 92

```
 1  determining that that -- as it is now.
 2      Q.   And -- and was that -- and did you
 3  actually read the TIRBOP Manual yourself prior to
 4  2005 and come to your own conclusion about what
 5  those words meant?
 6      A.   Well, I've read the manual a number
 7  of times over the years.
 8      Q.   Well, only answer if you -- don't
 9  guess.  Only answer if you recall having a -- this
10  is a mental process on your part.  That, if you
11  recall, prior to 2005, having read the manual and
12  having sort of come to a conclusion about what --
13  what those words meant.
14      A.   Only that, in those instances where
15  the re-issue rate would -- would apply, a policy
16  needed to be produced to show evidence that there
17  was existing coverage.
18      Q.   And -- and where -- you've gotten
19  on-the-job training -- let me step back for a
20  minute.
21           Did you ever take -- is there such a
22  thing as a course of study to become a title --
23      A.   There is a course of study.  I did
24  not take it.
```

MARIA ROZNIAKOWSKI

93

1  Q.  Okay.
2      So, your training has been
3  on-the-job training?
4  A.  Yes.
5  Q.  And I understand that, in the course
6  of many, many, many years of on-the-job training,
7  it's hard to isolate any particular instances, and
8  I'm -- so I'm only asking if you can do that.
9      Do you recall any specific instances
10 in which, in the course of all that on-the-job
11 training, that was part of what you learned; that
12 is to say, when -- prior to 2005, when a re-issue
13 or refinance rate should be given?
14 A.  Right.  During my course of -- of
15 employment through -- yes.
16 Q.  Right.  You remember that generally.
17 A.  Right, sure.  I can't tell you who
18 told me that or where I specifically read it or --
19 Q.  Well, that's my question.
20 A.  -- pinpoint something directly for
21 you, right.
22 Q.  And that's my question.  That,
23 just --
24 A.  Exactly.

94

1  Q.  -- generally that's something --
2  A.  Yes.
3  Q.  -- that you came to know, but you
4  can't point to specific --
5  A.  Exactly.
6  Q.  You were asked about title software,
7  such as Title Express.  I think there were a few
8  other brands mentioned.
9      Do you know whether that software --
10 not the software, itself, but the data from the
11 software, can be uploaded directly to the title
12 insurers that you work with?
13     And, again, these are questions that
14 you should only answer if you know.
15 A.  I don't know --
16     MR. GORDON:  Objection to the form.
17     THE WITNESS:  -- definitively that
18 they can be.
19 BY MR. MAY:
20 Q.  Have you ever done anything like
21 that?
22 A.  No.
23 Q.  If you could turn to the title
24 commitment, I believe it's Page 46 of the exhibit

95

1  that I'm referring to.
2      Do you have that page?
3  A.  Yes.
4  Q.  And I'm referencing the mortgage
5  from Capstone Mortgage.  Do you -- does that tell
6  you definitively that that was a first mortgage?
7  A.  I assumed it was a first mortgage.
8  I mean, looking at it would -- is that what you
9  mean?
10 Q.  Well --
11 A.  Why would I believe it was the first
12 mortgage?
13 Q.  No.  I'm -- but that's the point.
14 I'm not asking for assumptions.  I'm saying, does
15 that tell you definitively that that was a first
16 mortgage?
17 A.  No.
18 Q.  At the closing of the Cohens'
19 refinancing, you stated -- you testified -- I don't
20 want to ask you a question while you are thumbing
21 through documents.
22 A.  Okay.
23 Q.  I just want you to concentrate on
24 the question.

96

1      At your closing -- you stated
2  earlier that you actually have some vague
3  recollection of Mrs. Cohen, herself.
4  A.  I believe I do.
5  Q.  You've done many, many closings.
6  Was there any particular reason that you would
7  remember her from this?
8  A.  I remembered her mortgage broker.
9  Q.  And, in fact, I believe you
10 testified to that.  Now, was there -- who was her
11 mortgage broker?
12 A.  Ameer Saleem.
13 Q.  Any idea of how to spell that?
14 A.  A-m-i-r, I believe, S-a-l-e-e-m,
15 maybe.
16 Q.  And was there anything in particular
17 about Mr. -- is that a Mr. or Ms.?
18 A.  Mr.
19 Q.  About a Mr. Saleem that made you
20 recall that?
21 A.  Just that most of his closings were
22 problematic.
23 Q.  Did -- apart from recalling Mr.
24 Saleem being there, did you -- do you recall

Page 97

1  anything else about that particular closing?
2  And --
3    A.    No.
4    Q.    Okay.
5          And, again, I'm not asking for what
6  might have happened based on practice. I'm just
7  saying your under -- your recollection of that
8  closing.
9    A.    I understand.
10         No, I don't.
11   Q.    And, so, it's fair to say that you
12 don't recall whether there was any discussion by --
13 was Mr. Cohen there, or do you -- do you know? Was
14 it Mr. and Ms. Cohen?
15   A.    Yes.
16   Q.    Okay.
17         And you don't recall whether either
18 of them asked you any questions about the process?
19   A.    No, no.
20   Q.    Okay.
21         And -- and there may have been
22 routine communication, but you -- you don't recall
23 any communication with the Cohens at this --
24   A.    Nothing that would be out of the

Page 98

1  ordinary that I would recall it.
2    MR. MAY:  That's all the questions I
3  have.
4  FURTHER EXAMINATION
5  BY MR. GORDON:
6    Q.    I just have a couple of follow-ups
7  and -- and one additional question that I forgot.
8  It should not cause you any angst, however.
9          If you can please take a look at the
10 beginning of Deposition Exhibit 19, and you'll see
11 a check register -- a list of checks. It's called
12 "Check Register," and it's about 40 -- 40 pages
13 long.
14         What is that check register?
15   A.    The list of checks for title
16 premiums that were sent to Chicago.
17   Q.    Would this be the comprehensive
18 list, from 2000 to sometime in 2003, of all the
19 title policies that would have been issued by --
20   A.    Well, I ran --
21   Q.    -- by Chelsea on --
22   A.    Sorry.
23   Q.    -- on behalf of Chicago Title?
24   A.    I ran this from the earliest time to

Page 99

1  April 11th of '06. Any checks written to Chicago
2  from the earliest time in our system to that date.
3    Q.    When did you run this report?
4    A.    April 11th.
5    Q.    Of 2006?
6    A.    I printed it April 11th.
7          Yes.
8    Q.    Okay.
9    A.    And it ran to April 11th.
10   Q.    Okay.
11   A.    And I put in the earliest date,
12 because I wouldn't know what the earliest date
13 would be, so -- it would be whatever what was -- it
14 was inputted in the -- in the Title Express system,
15 because I'm not quite sure what date they actually
16 started with the Title Express system.
17   Q.    Did you ever add up how many
18 transactions there were?
19   A.    No.
20   Q.    Do you have a rough idea as to how
21 many there are?
22   A.    No.
23         MR. GORDON:  I have nothing further.
24         MR. MAY:  Okay. Thank you very

Page 100

1  much.
2          THE WITNESS:  Okay. You're welcome.
3          THE VIDEOGRAPHER:  This concludes
4  our video deposition. We are going off the record
5  at 44 minutes past 11:00 o'clock.
6          (11:44 a.m.)

MARIA ROZNIAKOWSKI

101

CERTIFICATE

I, Sean M. Fallon, a Certified Shorthand Reporter and Notary Public, do hereby certify that, prior to the commencement of the examination, the witness and/or witnesses were sworn by me to testify to the truth and nothing but the truth.

I do further certify that the foregoing is a true and accurate computer-aided transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further certify that I am neither of counsel nor attorney for any party in this action and that I am not interested in the event nor outcome of this litigation.

_____
Certified Shorthand Reporter
XI00840
Notary Public
My commission expires 4-29-08

Dated: _____