# EXHIBIT E

COPY

### In The Matter Of:

*Cohen*
*v.*
*Chicago Title Insurance Company*

---

### ELIZABETH RAY
### November 21, 2006

---

## REPORTING ASSOCIATES, LLC

*Certified & Registered Professional Reporters*

*Cherry Hill  --  Philadelphia  --  Trenton*

*(888) 795-2323*



*www.ReportingAssociates.com*

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 060873

--------------------
PEARL E. COHEN, on
behalf of herself
and all others
similarly situated,

    Plaintiff,

vs.

CHICAGO TITLE
INSURANCE COMPANY,
    Defendant.
--------------------

--------------------
Philadelphia, Pennsylvania
Tuesday, November 21, 2006
--------------------

VIDEOTAPED deposition of ELIZABETH C. RAY, as taken at the law offices of DONOVAN SEARLES, LLC, 1845 Walnut Street, Suite 1100, Philadelphia Pennsylvania, before Karen Friedlander, Registered Merit Reporter and Commissioner of Deeds of the Commonwealth of Pennsylvania, on the above date, commencing at 9:18 a.m.

## Page 2

1  APPEARANCES:
2
3      QUINN, GORDON & WOLF, CHTD
    RICHARD S. GORDON, ESQUIRE
    102 West Pennsylvania Avenue, Suite 402
4      Towson, MD 21204
    (410) 825-2300
5      rgordon@quinnlaw.com
    and
6      DONOVAN SEARLES, LLC
    BY: DAVID A. SEARLES, ESQUIRE
7      1845 Walnut Street, Suite 1100
    Philadelphia, PA 19103
8      (215) 732-6067
    dsearles@donovansearles.com
9      Attorneys for Plaintiff
10     BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
11     BY: DARRYL J. MAY, ESQUIRE
        STEVEN J. SNYDER, ESQUIRE
12     1735 Market Street, 51st Floor
    Philadelphia, PA 19103-7599
13     (215) 864-8103
    may@ballardspahr.com
14     snyder@ballardspahr.com
    Attorneys for Defendants
15
16 L
17 ALSO PRESENT:
18     Ron Sherr, Videographer

## Page 3

1              I N D E X
2  WITNESS
3  ELIZABETH C. RAY             PAGE
4      By Mr. Gordon             5
5      By Mr. May               134
6
7             E X H I B I T S
8
9  NUMBER     DESCRIPTION         PAGE
10 D-22       Schedule of rates    10
11 D-23       3-1-2000 TIRBOP manual   48
12 D-24 through 28  Addenda to TIRBOP manual  100
13 D-29       CTIC web site printout  124

## Page 4

1         THE VIDEO OPERATOR: This is the
2  videotaped deposition of Elizabeth C. Ray, taken by
3  Richard S. Gordon, Esquire in the matter of Pearl E.
4  Cohen, et al. versus Chicago Title Insurance Company
5  in the US District Court, Eastern District --
6  someone's got their Blackberry on -- Eastern
7  District of Pennsylvania.
8         This deposition is being held at 1845
9  Walnut Street, Philadelphia, Pennsylvania, on
10 November 21st, 2006. My name is Ron Sherr from the
11 firm of Reporting Associates with offices in
12 Philadelphia and Cherry Hill, New Jersey. And I'm
13 the videographer. The reporter is Karen
14 Friedlander, also from Reporting Associates. We're
15 going on the record at 9:19 a.m. Counsel will now
16 please state their appearances for the record.
17        MR. GORDON: Richard Gordon on behalf of
18 the plaintiffs, and with me today is David Searles
19 also on behalf of the plaintiffs.
20        MR. MAY: Darryl May on behalf of
21 defendant, and with me, Steve Snyder on behalf of
22 defendant.
23        THE VIDEO OPERATOR: The court reporter
24 will now please swear in the witness.
25        ELIZABETH C. RAY, having been first duly

ELIZABETH RAY

Page 5

1  sworn, was examined and testified as follows:
2        THE VIDEO OPERATOR: We may proceed.
3  EXAMINATION
4  BY MR. GORDON:
5    Q.  Good morning, Ms. Ray, how are you
6  today?
7    A.  Good morning. A little sick.
8    Q.  My name is Richard Gordon and I
9  represent the plaintiffs in this case and I was
10 wondering, have you ever had your deposition taken
11 before?
12   A.  Only through a car accident. It was a
13 personal car accident, and that's it, one time only.
14   Q.  And when was that?
15   A.  That was -- the accident occurred in
16 2003. It would have been April of 2003. And the
17 deposition actually took place this past year.
18   Q.  Well, let me go over the rules generally
19 for you, although you may recall them from the
20 deposition you gave before. I'm going to ask you a
21 series of oral questions to which I need oral
22 responses the court reporter over here is going to
23 be taking down your testimony. She cannot interpret
24 a nod or a gesture, so you need to verbalize your
25 response.

Page 6

1    A.  Okay.
2    Q.  If at any point you need me to restate
3  the question or to rephrase it, I'm happy to do it
4  so. If you don't ask me to restate it or rephrase
5  it, I'll work on the understanding that you
6  understand the question that was asked.
7    A.  Okay.
8    Q.  And if at any point you need to take a
9  break, please let me know and I'll try to
10 accommodate at a reasonable point. Any questions
11 about those rules?
12   A.  No, sir.
13   Q.  Okay. What did you do to prepare for
14 your deposition today?
15   A.  To prepare for the deposition, I was
16 asked upon -- as I understood, I was asked upon to
17 give this deposition because of Chelsea Abstract,
18 and I met with Mr. May.
19       MR. MAY: And that's -- and you can say
20 that you met with me but don't say anything about
21 what we talked about.
22   A.  Right, met with Mr. May.
23   Q.  When did you meet with him?
24   A.  The meeting was a couple weeks ago. I
25 don't recall the exact date.

Page 7

1    Q.  Just once?
2    A.  Yes.
3    Q.  Have you reviewed any documents in
4  preparation for your deposition?
5    A.  No, sir.
6    Q.  Did you review the Complaint?
7    A.  No, sir.
8    Q.  Have you ever seen the Complaint?
9    A.  No, sir.
10   Q.  Did you review Ms. Cohen's file?
11   A.  No, sir.
12   Q.  Okay. Did you talk to anyone else,
13 other than Mr. May about your deposition today?
14   A.  No.
15   Q.  Did you talk --
16   A.  I'm sorry.
17       MR. MAY: Mr. Snyder was with us today.
18   A.  Right.
19   Q.  Other than Mr. Snyder and Mr. May?
20   A.  I did not speak to Jodi Reimer, however,
21 I did speak to Joyce Folda and wasn't sure what was
22 -- you know, didn't know what was going on, so...
23   Q.  Do you recall what she told you?
24   A.  No, just -- not really. I didn't know
25 what was -- exactly what the case was about, so...

Page 8

1    Q.  Okay. What's your position with Chicago
2  Title?
3    A.  My position is I'm assistant
4  vice-president agency rep for the eastern
5  Pennsylvania region and Delaware.
6    Q.  And what does that entail?
7    A.  My role -- my job incurs servicing
8  agents, performing annual policy reviews, meaning
9  jacket inventory, mainly, and I'm basically
10 servicing agents and -- as well as, you know,
11 increase -- you know, try to get market share as
12 well.
13   Q.  Are you the go-to person for agents if
14 they have any questions?
15   A.  I'm the go-to person for service,
16 however, I'm not the go-to person for underwriting
17 questions.
18   Q.  Okay. So if they have any questions as
19 to exceptions or something else, with respect to the
20 underwriting, they would go to somebody else?
21   A.  Correct.
22   Q.  Who would they go to?
23   A.  Our underwriting counsel, any of our
24 underwriting counsel of Chicago Title.
25   Q.  What if they have questions about rates,

ELIZABETH RAY

9

1  would they go to you?
2      A.  Not really, no.
3      Q.  Could they ask you questions about that?
4      A.  They could, however, I would certainly
5  recommend that they talk to the underwriting
6  counsel.
7      Q.  Okay.  Are you familiar with the rates
8  that Chicago Title has?
9      A.  Yes, sir.
10     Q.  Do you know how they work?
11     A.  There is --
12         MR. MAY:  Object to the form.
13     A.  Can you -- I'm not understanding exactly
14 what your question is.
15     Q.  Certainly.  If you were asked to
16 determine a rate for a hundred thousand dollar
17 lender's policy, would you be able to do that?
18     A.  Yes, by looking at -- actually, I'd go
19 online for the rates.  Anybody can do a Google
20 search and do a rate search online to the public.
21     Q.  It's also simply a matter of simple
22 mathematical calculation, isn't it?
23     A.  Typically, I go to the rates that are
24 set forth in the TIRBOP manual.
25     Q.  Okay.  And it's all right there, set

10

1  forth?
2      A.  Correct.
3          (D-22, marked for identification.)
4  BY MR. GORDON:
5      Q.  I'm going to show you what's been marked
6  as Deposition Exhibit No. 22, which was handed to me
7  prior to this deposition.  And this is similar to
8  Deposition Exhibit No. -- if you could bear with me
9  a sec -- No. 5, which I'm also going to show you.
10     A.  Okay.
11     Q.  And it's my understanding from your
12 counsel that the Deposition Exhibit No. 22, which is
13 the schedule of rates, is a small -- I guess it's
14 about a 7 by 7 card that's handed out to agents.
15     A.  Mm-hmm, that's correct.
16     Q.  Is this -- is Exhibit 22 the current
17 rate schedule that's handed out to agents?
18     A.  No, sir.
19     Q.  Okay.  Is there a new one that was put
20 together?
21     A.  There -- this rate card no longer
22 applies, obviously, because of the employees of the
23 office.
24     Q.  Okay.
25     A.  And so, therefore, we don't use this

11

1  rate card.
2      Q.  Okay.  And what you're referring to is
3  on the top half of the Deposition Exhibit, it says,
4  Philadelphia office?
5      A.  Correct.
6      Q.  These are the employees who handled the
7  Eastern District for Chicago Title?
8      A.  Correct.
9      Q.  And does it list you?
10     A.  Yes.
11     Q.  And where are you listed?
12     A.  Under Elizabeth Churbe, which is my
13 maiden name.
14     Q.  Okay.  That confused me for a sec.
15         When was a new card created?
16         MR. MAY:  You mean after this?
17         MR. GORDON:  After this.
18         THE WITNESS:  You mean after this?
19 BY MR. GORDON:
20     Q.  Well, let me state it a different way.
21 It says on the front of the card that it's -- the
22 schedule of rates effective January 1, 2002.  Do you
23 see that?
24     A.  Correct.
25     Q.  Would that be generally the time frame

12

1  that this card started to be used?
2      A.  Generally, yes, because their rate --
3  there is a rate -- a change effective January 1st of
4  2002.
5      Q.  Okay.
6      A.  As well as now there is a new updated
7  TIRBOP manual effective of '05, so...
8      Q.  And in -- when this rate schedule was
9  handed out in 2002, was it something -- you said it
10 was handed out to agents, correct?
11     A.  Correct.
12     Q.  Is it something that the agents rely
13 upon?
14     A.  Not necessarily.
15     Q.  You don't know?
16     A.  I don't know.
17     Q.  Okay.  But this is what is handed out to
18 them?
19     A.  At that time, yes.
20     Q.  Other than noting differences in the
21 Philadelphia office on Deposition Exhibit 22, what
22 other changes are there to the current schedule of
23 rates?
24     A.  Well, we don't have the staff on there.
25     Q.  Okay.

ELIZABETH RAY

13

1    A.   Because we just don't, and there has not
2  been new rate cards prepared -- there was new rate
3  card prepared, but I think the only difference is
4  the staff is not shown on there.
5    Q.   Other than that, the rate card is
6  substantially the same?
7    A.   There has not been a new rate card
8  prepared after the TIRBOP manual changes of '05, to
9  my knowledge.
10    Q.   Okay. I guess what I'm wondering is
11  when was this rate card changed?
12         Well, let me state it a different way.
13    A.   I'm sorry, I'm not understanding the
14  question.
15    Q.   Okay. I'll try to state it a different
16  way. When did Chicago Title produce a new schedule
17  of rate card to be handed out to their agents, to
18  replace what is Deposition Exhibit 22?
19    A.   There was another rate card, again,
20  without the staff on there. I believe agents were
21  complaining about it only went up to the hundred
22  thousand, and obviously there are higher sales
23  transactions. So, therefore, I think it was -- I
24  don't recall, really, when a new one was done,
25  because I don't even have a copy of it.

14

1    Q.   Would it have been in the last couple of
2  years?
3    A.   I would say it would have been the last
4  three years or so.
5    Q.   Okay.
6    A.   But I don't recall, really.
7    Q.   So prior to that, is it fair to say that
8  the schedule of rates that are in front of you as
9  Deposition Exhibit 22 was the card that was handed
10  out to agents?
11    A.   Yes, sir.
12    Q.   For their use?
13    A.   Yes, sir.
14    Q.   Okay. Would you agree that the schedule
15  of rates does not include a refinance rate?
16    A.   If you're referring to the substitution
17  rate, there is a basic in the reissue and then
18  there's also a substitution.
19    Q.   I believe the substitution rate is the
20  same as the refinance rate under the manual?
21    A.   Okay. I refer to a substitution rate.
22         MR. GORDON: Mr. May, can we stipulate
23  that substitution rate and refinance rate for our
24  purposes today are the same thing?
25         MR. MAY: We can stipulate to that and

15

1  we could also stipulate that the document speaks for
2  itself as to what the rate card refers to.
3         MR. GORDON: Okay.
4  BY MR. GORDON:
5    Q.   So is there anything on the schedule of
6  rates that refers to the refinance rate or the
7  substitution rate?
8    A.   I don't see it on there.
9    Q.   To the best of your knowledge, is there
10  anything referring to the refinance rate or the
11  substitution rate on the new card?
12    A.   I don't -- again, I haven't seen the new
13  card or the revised card without it, so I think it's
14  the same thing.
15    Q.   That it would not include information
16  about the substitution rate or refinance rate?
17    A.   Anything prior to 2005, that's correct.
18    Q.   Okay. I'm asking about the new card?
19    A.   There is no new card, as of after the
20  2005 updated change manual.
21    Q.   Oh, okay.
22         MR. MAY: I think Mr. Gordon's question
23  was the newer card, the revised rate card.
24         THE WITNESS: Oh, okay. As stated
25  before, the only difference would be the increase of

16

1  the unit of insurance, as well as removing the staff
2  members from the Philadelphia office.
3  BY MR. GORDON:
4    Q.   Okay. So the current card that's used,
5  other than those two changes that you just
6  described, where the employees of the Philadelphia
7  office are taken off and there's a more extensive
8  list of rates beyond a hundred thousand dollars,
9  other than those two changes, it's your
10  understanding that the rate card given out to agents
11  is still the same?
12         MR. MAY: Object to form.
13    A.   The updated rate cards that were given
14  out, they're no longer giving out because of the
15  updated rate manuals from 2005, the TIRBOP manual.
16    Q.   So there really is no current schedule
17  of rate cards given out?
18    A.   That's correct.
19    Q.   Okay. That clarifies it.
20         How big the Eastern District territory?
21  Where does it run from?
22    A.   Eastern District runs from -- basically
23  if you take Pennsylvania and the 63 counties and
24  split it down the middle to center county, the
25  Philadelphia office is responsible for the eastern

**Page 17**

1  side. So if you have a picture of the state of the
2  Pennsylvania and you split it down the middle, we're
3  responsible for those -- that part of -- those
4  counties.
5      Q.  How many counties would that be?
6      A.  I don't -- I don't know off the top of
7  my head. Several.
8      Q.  And how many agents are you in charge
9  of?
10     A.  I'm no charge of 65 agents.
11     Q.  And that's exclusively in the Eastern
12 District of Pennsylvania, or does that include
13 Delaware as well?
14     A.  That includes Delaware as well.
15     Q.  Okay. What about just in the Eastern
16 District of Pennsylvania how about agents are you
17 responsible for?
18     A.  60.
19     Q.  So Delaware has five?
20     A.  Correct. I have five agents in
21 Delaware.
22     Q.  And one of your agents used to be
23 Chelsea?
24     A.  That was a former agent of mine.
25     Q.  Okay. When did it stop being an agent?

**Page 18**

1      A.  In, I believe -- of course, I don't
2  recall the dates exactly, but it was in 2002? I
3  believe in 2002, or it could have been 2003. I
4  don't know the exact date.
5      Q.  Who did you deal with there?
6      A.  I dealt with a bookkeeper, actually,
7  because the owner was never -- was never around. He
8  was always out of town or conveniently unavailable.
9      Q.  Do you remember the bookkeeper's name?
10     A.  No, I do not.
11     Q.  You mentioned that one of your areas of
12 responsibility is increasing market share?
13     A.  Mm-hmm.
14     Q.  That would be sales?
15     A.  That would be -- one of the parts is
16 also finding good agents to see if our company would
17 recommend entering into an issuing agency contract.
18     Q.  And that's because the agents are really
19 the customers of Chicago Title, are they not?
20         MR. MAY:  Object to form.
21     A.  Can you rephrase the question? I don't
22 understand your question, actually.
23     Q.  Okay. Do you view the agents of Chicago
24 Title as the customers of Chicago Title?
25     A.  No, sir.

**Page 19**

1      Q.  No? How are they viewed?
2      A.  Since we're entering into an issuing
3  agent contract between the underwriter and the
4  agent, you are entering into a relationship -- I
5  guess you could say a customer.
6      Q.  But you're entering into a principal
7  agent relationship?
8      A.  Correct.
9      Q.  Where that agent will be acting on
10 behalf of Chicago Title?
11     A.  That's correct. Or acting on behalf of
12 issuing the Chicago Title policies, owners and loan
13 policies, performing settlements, et cetera.
14     Q.  Okay. I would like to show you what has
15 been marked as Deposition Exhibit 19 in this case,
16 which are the documents produced by Chelsea to the
17 plaintiffs. And the testimony was that the top
18 portion of it is the check register that would --
19 that was all the policies that Chelsea issued on
20 behalf of Chicago Title. But after that, starting
21 on, approximately page Chelsea 0042 -- if you look
22 at the bottom, there are bate stamped numbers.
23 Starting there, going back, constitutes the name
24 Pearl Cohen, the named plaintiff in this case. And
25 could you take a minute and look through that file

**Page 20**

1  and familiarize yourself with it?
2          MR. MAY:  I'm just going to instruct the
3  witness that, you know, obviously you can't read
4  everything unless you would take hours. So I think
5  just -- I think the instruction is just thumb
6  through, get a sense of what's in there, but there
7  will be specific questions. And then when you have
8  specific questions, take as much time as you need
9  for those particular documents.
10         MR. GORDON:  That's fair, and I thank
11 you Mr. May.
12         MR. MAY:  And I take it, Richard, that I
13 should have brought my copy of the exhibits used in
14 prior depositions to have a copy of myself.
15         MR. GORDON:  I thought the agreement was
16 that we just would continue using the same exhibits.
17         MR. MAY:  They were. I just didn't
18 think to bring a set of copies.
19         MR. GORDON:  I apologize.
20         MR. MAY:  Dave, you don't have an extra
21 set do you?
22         MR. SEARLES:  Just the one set.
23         MR. MAY:  Off the record. We don't need
24 this on the record.
25         THE VIDEO OPERATOR:  Hold on. Let me go

ELIZABETH RAY

**Page 21**

1  off the record. We're going off the record at
2  9:38. Hold on, please.
3      (Discussion held off the record.)
4      THE VIDEO OPERATOR: Okay. We're back
5  on the video record at 9:39.
6  BY MR. GORDON:
7      Q.  Now, Ms. Ray, you don't recall the
8  Cohens, do you?
9      A.  No, sir.
10     Q.  No. You weren't involved in their
11 transaction at all?
12     A.  No, sir.
13     Q.  But you are generally familiar with how
14 a closing file looks?
15     A.  Sure, yeah.
16     Q.  Does there appear to be anything usual
17 about this file?
18         MR. MAY: Object to the form.
19     A.  I don't see a settlement sheet in here.
20     Q.  Settlement sheet would be at 0058?
21     A.  Well, the broker fees are pretty high on
22 the settlement sheet.
23     Q.  From a closing perspective, from a
24 Chicago Title perspective, does it appear to be a
25 typical type transaction?

**Page 22**

1          MR. MAY: Object to the form.
2      A.  Can you rephrase the question? I'm
3  sorry, I didn't understand exactly your question.
4      Q.  Okay.
5      A.  Excuse me.
6      Q.  Well, sure. Let's look through the file
7  together. There's a title commitment at page 0043.
8      A.  Mm-hmm.
9      Q.  There's the policy at 0052. There's the
10 HUD-1 at 0058. There's the disbursement sheet at
11 0059.
12         MR. MAY: Richard, could you just go a
13 little bit slower. She's trying to keep up with
14 you.
15         MR. GORDON: Sure.
16 BY MR. GORDON:
17     Q.  HUD-1, then there's the disbursement
18 sheet at 0059. There's the abstract documents which
19 are towards the back at 0133.
20     A.  Well, it appears to be copies of a
21 closing settlement file.
22     Q.  Does it appear to be sort of the typical
23 documents you would find in a closing file?
24         MR. MAY: Object to form.
25     A.  Well, being that I haven't done

**Page 23**

1  settlements in quite awhile, it looks like it. I
2  mean, I really can't answer, you know, truthfully
3  that -- what it, you know, way back when, when I was
4  doing settlements, it looks like it. I haven't
5  looked exactly through everything to see if, you
6  know, something is missing or not missing or an
7  affidavit, et cetera. So, you know...
8      Q.  You didn't find anything missing?
9      A.  I don't have -- I haven't even looked
10 through all this stuff. I -- just is president just
11 now, so I can't really answer that.
12     Q.  Okay. But as far as you know, it
13 appears to be a typical Chicago Title closing file,
14 correct?
15         MR. MAY: Object to form.
16     A.  Can you rephrase the question? I don't
17 understand exactly Chicago --
18     Q.  You do not understand the word
19 "typical"?
20     A.  I don't understand typical Chicago Title
21 closing file. That's what I don't understand.
22     Q.  Okay. Are there certain documents that
23 are always going to be in a file where Chicago Title
24 has issued a title policy?
25     A.  There are certain documents, for

**Page 24**

1  example, the policy, or the endorsements, et cetera.
2      Q.  And is that in this file?
3      A.  It does appear to be in this file.
4      Q.  Okay. The abstract documents will also
5  be in the file, will they not?
6      A.  Yeah. They should be in the file as
7  well.
8      Q.  Closing instructions will be in the
9  file?
10     A.  You know, sometimes, some agents keep
11 closing instructions, sometimes they don't.
12     Q.  Okay. There will always be a title
13 commitment in the file, will there not?
14     A.  Yes.
15     Q.  In every instance?
16     A.  There should be a commitment for title
17 insurance in the file.
18     Q.  And there will always be a disbursement
19 sheet?
20     A.  There should be a disbursement sheet in
21 the file.
22     Q.  Okay. So with that in mind, what other
23 documents should be in the file that you are aware
24 of?
25     A.  Affidavits.

25

Q. Okay. Did you see any affidavits in the file?
A. I did not.
Q. Okay. If you could turn to --
A. Here's one. I see one now.
Q. That's the owner's affidavit?
A. 0087?
Q. Mm-hmm.
A. Mm-hmm, okay --
Q. And that's another document you would typically expect to find?
A. Yeah, I didn't see that. Copies of driver's license, yes.
Q. How long have you worked for Chicago Title?
A. Going on six years. I began January 1st, 2001.
Q. Have you always handled the same area, same territory?
A. When I began with Chicago Title, I was not a agency rep, I was a commercial closer for the Center City office.
Q. Starting in 2001?
A. Yes.
Q. Okay.

26

A. So I was not an agency rep.
Q. When did you become an agency rep?
A. I did not become an agency rep until February of '02 -- January, February, of '02.
Q. And that would have been --
A. I'm sorry, I'm sorry, I take that back. Yeah, it was '02, it was about a year later.
Q. And that would have been considered a promotion?
A. Correct.
Q. Prior to working for Chicago Title, did you work for -- or what did you do prior to working for Chicago Title?
A. I was a -- an escrow officer in Texas. I worked for an agent.
Q. What was the name of the agent?
A. Ticor Title Agency of San Antonio.
Q. Okay. Is that connected to Ticor Title, the insurer?
A. It would -- the owner had a relationship, obviously, to carry on the Ticor name.
THE COURT REPORTER: I'm sorry?
A. However -- I'm sorry, to carry on the Ticor brand. And that was part of his logo. But it didn't necessarily mean that the agent, my former

27

boss, was still able to underwrite with any underwriter. He still -- it wasn't an exclusive contract, so he was able to write -- I had seven different underwriters to choose from.
Q. Had it been an exclusive contract, would it have been improper in your view?
MR. MAY: Object to form.
A. I don't understand your question.
Q. If the agency agreement required that all of the title insurance be referred to Ticor, and be underwritten by Ticor, would that have been improper?
MR. MAY: Well, I instruct the witness that if she had any opinion about that at the time, she can answer the question. But if she's -- if there's some legal authority that she's supposed to be giving a legal opinion, she's not here to do that.
MR. GORDON: I'm not asking for a legal opinion.
MR. MAY: But if she had an opinion about whether that would have been improper, she can say what her attitude was.
MR. GORDON: I'll withdraw the question.
BY MR. GORDON:

28

Q. Chicago Title is now part of a larger network of title insurers, is it not?
MR. MAY: Object to form.
A. Can you -- I don't understand.
Q. Who owns Chicago Title?
A. Fidelity National Title Group owns Chicago Title.
Q. And how many other companies, to the best of my knowledge, are owned by Fidelity National?
A. Fidelity National Title has Security Union, Ticor, Fidelity, Alamo, to my knowledge.
Q. And Chicago?
A. And Chicago.
Q. Do you have any communication with the Fidelity National office?
A. Not direct communication. I know the reps in that office and they are my competitors.
Q. Okay. So Chicago Title in Pennsylvania operates as a separate distinct entity?
A. Correct.
Q. Okay. Of the 60 agents that you work with in the Eastern District of Pennsylvania, how many are title companies?
A. I don't understand by title companies

**29**

1  your question. They are agencies.
2  Q. Okay. How many are agencies versus
3  attorneys?
4  A. Oh, I don't know.
5  Q. Do you handle any attorneys?
6  A. Yes.
7  Q. Is it half?
8  A. Well, it could be, yeah, it could be
9  about half. Of course, you know, I don't have the
10 exact count off the top of my head. But it's a good
11 estimation.
12 Q. Okay. Would the attorneys be giving the
13 approved attorney rate?
14 A. No.
15 Q. How does -- how do attorneys get to
16 charge the approved attorney rate?
17 A. An approved attorney must be affiliated
18 with an agent in order to qualify. And typically,
19 an approved attorney, they don't have the
20 capabilities. An approved attorney is not able to
21 issue a title policy or issue -- even issue a
22 commitment for title insurance. An approved
23 attorney typically closes for his clients and
24 charges reduced rate, in exchange, probably, for
25 larger attorney fee, and, and, since it filed to the

**30**

1  agent, the agent issues the policy.
2  Q. Do any of the 65 agents that you are in
3  the liaison to, do any of them charge the approved
4  attorney rate?
5  A. Well, I guess I'm not -- again, it's
6  hard to answer that question, because there's so
7  many layers involved in that. If there is an -- I
8  do have an agent, yes, that is an attorney, that, you
9  know, he's also -- he has the option of charging
10 approved attorney rate as well on his transactions.
11 Q. Okay.
12 A. But most of the time an approved
13 attorney is affiliated with a particular agent, and
14 they are the ones that charged -- usually charge the
15 discounted -- approved attorney rate pursuant to the
16 TIRBOP manual.
17 Q. Other than the one agent that you know
18 of, are there any others within the other 59 agents
19 in the Eastern District of Pennsylvania that are
20 permitted to charge the approved attorney rate?
21    MR. MAY: Object to form.
22 A. Again, I'm not understanding your
23 question.
24 Q. Well, I'm trying to find out, of these
25 60 agents that you handle, how many charged the

**31**

1  rates that would be set forth in, for example, the
2  schedule of rates, which is Deposition Exhibit No.
3  22, or the current rates that apply, but the ones
4  that were off of that schedule of rates, and how
5  many were permitted to charge the approved attorney
6  rate?
7  A. At that time? Or present? I don't
8  know.
9  Q. Let's do in 2002.
10 A. I don't know.
11 Q. How about at present?
12 A. I would say -- I guess at present, it
13 would be less than half, could charge an approved
14 attorney rate. But depending on, if the agent --
15 again, typically, if the agent is also an attorney,
16 they can charge the approved attorney rate. If the
17 agent is not an attorney, then they deal with
18 attorneys in their area that they deal with
19 directly, that they would charge approved attorney
20 rates. So I don't know exactly how many charged an
21 approved attorney rate.
22 Q. You said the approved attorney rate is
23 lower than the standard rate?
24 A. Yes, sir.
25 Q. How much lower?

**32**

1  A. I don't know. It's a -- I don't have
2  -- I don't know off the top of my head.
3  Q. Would that be identified in the TIRBOP
4  manual?
5  A. Yes, sir.
6  Q. Okay. Now, you mentioned that you
7  conduct agency reviews?
8  A. Mm-hmm.
9  Q. What does that entail?
10 A. Again, that's an annual policy, jacket
11 policies. During the time in 2002, agents had --
12 and some agents still to today have physical
13 inventory.
14 Q. Mm-hmm.
15 A. Of the owner's jackets and the loan
16 jackets and my role is to basically do an agent --
17 an account -- a review on the jackets that were on
18 hand if there haven't been -- you know, to see what
19 the inventory was on the agent jackets, owners of
20 loan policies.
21 Q. You don't conduct audits, do you?
22 A. No, I conduct policy reviews.
23 Q. Is the policy review part of the audit?
24 A. Typically part of the policy review also
25 is -- I also, on an annual basis obtain copies of

Page 33

1  the agents E and O insurance as well as the fidelity
2  bond and the surety bond and just make sure that
3  their license is good. Their individual and
4  business license is still valid with the State of
5  Pennsylvania.
6      Q.  Do you ever review whether the agent is
7  charging the property rates for title insurance?
8      A.  No, I don't.
9      Q.  Do you know if anyone in your
10 office does that?
11     A.  Corporate usually does the complete
12 full, full audit. That would include escrows, file
13 reviews, as well as, you know, get the insurances,
14 et cetera.
15     Q.  Do you know if one of the things in the
16 audit that is reviewed is whether or not the agent
17 is properly charging the consumer, the reissue rate
18 versus the standard rate?
19     A.  No.
20     Q.  You don't know or they don't know do it?
21     A.  I don't know.
22     Q.  Okay. And the same question with
23 respect to the refinance rate versus the standard
24 rate?
25     A.  I don't know.

Page 34

1      Q.  You don't know. Have you ever heard
2  that they do?
3      A.  I'm sorry?
4      Q.  Has anyone ever told you as part of the
5  audit that's something that Chicago Title looks at?
6      A.  Again, we relied on corporate to -- the
7  corporate auditors to do so, and I don't know
8  exactly what their -- like I said, they have their
9  own rules, you know, et cetera.
10         MR. GORDON: Okay. I think, Mr. May, we
11 stipulated in this case that there was no audit that
12 you found for Chicago -- for Chelsea.
13         MR. MAY: Correct. And let me just, if
14 I could.
15         MR. GORDON: Actually, if you're going
16 to make a speech or a speaking objection, I'm happy
17 to let you do it but I'd like the witness to leave
18 the room.
19         MR. MAY: No, I was just going to try to
20 help out the situation, but I won't. But as far as
21 what the stipulation was, it's whatever the
22 stipulation was, and I mean -- we put it on the
23 record and that stands. I mean, I don't -- I just
24 can't remember exactly what the stipulation was and
25 I don't want to rephrase it. But I do believe we

Page 35

1  had a stipulation and that stands.
2          MR. GORDON: Okay.
3  BY MR. GORDON:
4      Q.  I want to make sure that I understand
5  some of the definitions in this case. What is a
6  lender's title insurance policy?
7      A.  A mortgagee, mortgagee -- actually, a
8  loan policy that's issued to a lender upon request.
9      Q.  And it's issued only once?
10     A.  In connection with a transaction, if
11 requested and --
12     Q.  And the premium equals the loan amount?
13         MR. MAY: I object to form.
14     A.  Well, not understanding the question
15 again.
16     Q.  Do you know if the premium is based upon
17 the amount of the mortgage loan?
18     A.  Typically, if -- in order to issue a
19 mortgagee -- a loan policy, the amount that's
20 requested by the lender would reflect in -- again,
21 we would go back to our TIRBOP manual to reflect the
22 rates.
23     Q.  Okay. Who's the beneficiary of the
24 title insurance policy?
25     A.  The lender.

Page 36

1      Q.  Not the owner of the house?
2      A.  An owner's policy is the beneficiary of
3  the owner.
4      Q.  Okay. So a lender's policy only
5  benefits the lender?
6      A.  Correct.
7      Q.  Does the borrower ever get a copy of the
8  lender's policy?
9      A.  Typically the borrower would see the
10 commitment for title insurance which would all be in
11 the same format in the schedule A and B, and B --
12 AB, B1 and B2.
13     Q.  Well, that's not my question, Ms. Ray.
14 Does the borrower typically get a copy of the
15 lender's policy?
16     A.  No.
17     Q.  Does the borrower ever get, to the best
18 of your knowledge, a copy of the lender's policy?
19     A.  If requested, they would, but typically,
20 no.
21     Q.  Okay. What is -- what is ALTA?
22     A.  American Land Title Association.
23     Q.  Is that the national industry group?
24     A.  Yes.
25         MR. MAY: Object to the form.

ELIZABETH RAY

Page 37

1  A. American Land Title Association is ALTA.
2  Q. Okay. And is that the national industry
3  group for the title industry?
4  A. American Land Title Association is -- it
5  is what it is.
6  Q. Is Chicago Title a member of the
7  American Land Title Association?
8  A. Yes.
9  Q. Are you a member of the American Land
10 Title Association?
11 A. Not personally.
12 Q. Is anyone in your office a member of the
13 American Land Title Association?
14 A. I don't know.
15 Q. What is the PLTA?
16 A. The Pennsylvania Land Title Association.
17 Q. And is that the local version of the
18 American Land Title Association?
19 A. Yes, sir.
20 Q. And is Chicago Title a member of the
21 PLTA?
22 A. Yes, sir.
23 Q. And to the best of your knowledge, does
24 Chicago Title adhere to the rules of procedures and
25 policies and standards of the American Land Title

Page 38

1  Association?
2      MR. MAY: Object. Lack of foundation.
3  A. Again, I don't understand your question.
4  Q. Does the American Land Title Association
5  have certain policies that it puts in place for its
6  members?
7  A. I don't know.
8  Q. Do you know if there are certain
9  industry standards that are set forth by the
10 American Land Title Association?
11 A. I don't know.
12 Q. You don't know. How about with the
13 Pennsylvania Land Title Association?
14 A. I don't know -- I don't think -- no.
15 Again, I'm not understanding your question, either.
16 Q. Do you know what the term ALTA policy
17 means?
18 A. It's an approved policy that is approved
19 by the American Land Title Association.
20 Q. Okay. So there are policies that are
21 approved by the American Land Title Association?
22 A. Correct.
23 Q. And does Chicago Title use those
24 policies?
25     MR. MAY: I'm going to object to form.

Page 39

1  A. Can -- again, I'm not understanding your
2  question.
3  Q. What don't understand about it, Ms. Ray?
4      MR. MAY: My objection is very simple.
5  I won't make it if you don't want me to say so. But
6  I think it would clarify the matter.
7      MR. GORDON: Go ahead, Mr. May.
8      MR. MAY: Policies can be -- the word
9  can be two different things. It can be policies of
10 insurance or, like, a policy of an organization,
11 like the things that should be followed. I just
12 want to clarify whether when you were talking about
13 ALTA policies, which kind you're talking about.
14     MR. GORDON: At the moment I'm talking
15 about the paper, the actual policy form that's
16 issued.
17 A. Okay.
18 Q. Did you not understand that?
19 A. There are several policy forms that are
20 prepared by the American Land Title Association,
21 however, does not necessarily mean that each state
22 of the 50 states are authorized to use those policy
23 forms.
24 Q. Pennsylvania is, however, is it not?
25 A. Pennsylvania has some approved policy

Page 40

1  forms from ALTA, not all.
2  Q. Which ones doesn't it have, Ms. Ray?
3  A. I don't know.
4  Q. Do you know which forms it uses?
5  A. The ALTA 1992 policy is the most used.
6  Q. Okay. And that's a term of art, is it
7  not, the ALTA 1992 policy?
8  A. Correct.
9  Q. That's the standard policy?
10 A. That's the standard policy used in
11 Pennsylvania.
12 Q. What does that policy, to the best of
13 your knowledge, insure against?
14 A. On the lender's policy? The ALTA -- I'm
15 sorry, I don't understand your question, because we
16 went from one thing to another. I'm not exactly --
17 could you repeat your question?
18 Q. Let's go with the lender's policy. What
19 does the ALTA 1992 policy insure against?
20 A. The 1992 policy insures against a number
21 of things that could come up. Prior liens, IRS
22 liens. It could -- even local taxes. Philadelphia,
23 PGW puts gas liens on it, on the properties, the gap
24 period.
25 Q. Are these all things that should have

41

1  been uncovered during the abstract?
2      MR. MAY: I'm going to object to this
3  line of questioning because -- and I've thought a
4  lot about this, because we've had it before. This
5  complaint -- this questioning --
6      MR. GORDON: Mr. May, I'm happy to allow
7  you to make whatever speech you want, but I will ask
8  the witness to leave the room.
9      MR. MAY: I'm going to instruct the
10 witness not to answer, so it doesn't really matter.
11     MR. GORDON: On what basis?
12     MR. MAY: This Complaint expressly
13 states plaintiff in the class do not challenge the
14 title insurance premium rates approved by the
15 Pennsylvania Insurance Department.
16     MR. GORDON: We do not.
17     MR. MAY: So when you go into the
18 question of what rates are insured again -- what
19 risks are insured against, all that, it has nothing
20 to do with the question of whether given the words
21 of the rate manual what were the conditions under
22 which a discount rate should have been given.
23     So the -- so if you want to get into the
24 issues of the risk involving title insurance and the
25 premiums for those, I'm happy to do it. We'll enter

42

1  into a stipulation that the Complaint is not correct
2  when it states this, that those issues are at issue
3  in the lawsuit, and we could go back to Judge
4  Sanchez and revisit the jurisdictional motion.
5      But we're not going to get into the
6  issue -- I mean I've went back and I've looked at
7  the transcript from prior depositions and we're
8  talking about what risks are insured, only past
9  risks be insured. That has nothing to do with the
10 issues in this lawsuit, which ordinarily might be
11 okay, except when the Complaint in order to avoid a
12 jurisdictional issue, expressly disclaims that by
13 saying you do not challenge the title insurance
14 premium rates approved by the Pennsylvania Insurance
15 Department.
16     MR. GORDON: How was my question, Mr.
17 May, about by title insurance premium rates?
18     MR. MAY: Because it goes to what risks
19 are being insured against, and aren't those all
20 covered by -- aren't those all covered by the time
21 of the lien. And then subsequent questions in past
22 depositions go to the premiums for those rates and
23 it has nothing to do with the issues of this
24 lawsuit. It has nothing to do with whether someone
25 gets a -- a discounted rate or not. How does that

43

1  question have to do with whether someone got a
2  discount rate per the provision s of the TIRBOP
3  manual. What's --
4      MR. GORDON: I would like the witness to
5  leave the room, Mr. May.
6      MR. MAY: Okay, that's fine.
7      THE VIDEO OPERATOR: Hold on, please.
8  We're going off the record at 10:06. Everyone hold
9  on, please.
10     (The following is off the video record:)
11     MR. GORDON: I'm permitted to ask
12 questions relating to the witness's knowledge of the
13 industry in which she purports to be an employee.
14 That's what my questions are going to be.
15     MR. MAY: Not when your Complaint
16 expressly disclaims that your -- anything about what
17 goes into the rates.
18     MR. GORDON: And I have not asked her a
19 single question about whether or not the rates are
20 proper. We don't challenge the rates themselves.
21     MR. MAY: What --
22     MR. GORDON: The Complaint speaks for
23 itself. Please, let me finish, Mr. May. My
24 question is perfectly permissible. If you would
25 like to instruct her not to answer the question,

44

1  that's fine, we can take it up with Judge Sanchez.
2      MR. MAY: That's fine.
3      MR. GORDON: But I can assure you that
4  you are completely off base. I am permitted to ask
5  her background questions on her knowledge of the
6  industry. I have not asked her a single question
7  about whether or not a rate is permissible. I can
8  assure you that I'm not going to.
9      MR. MAY: What is the -- what is the
10 point of asking what does a title insurance insure
11 for, doesn't a title insurance only insure for past
12 risk, shouldn't all those risks be identified by the
13 time of title policy.
14     MR. GORDON: Goes to her knowledge of
15 the industry in which she purports to be an employee
16 which relates to the scope of her knowledge in this
17 deposition.
18     MR. MAY: This is not a test about
19 things that are relevant just to prove whether she
20 knows the industry or not.
21     MR. GORDON: I'm just trying to find out
22 what she knows and what she doesn't know.
23     MR. MAY: Okay. And I'm going to
24 instruct her not to answer those types of questions.
25 Anything relating to the manual, when the rates are

45

1  given, you know that I've always permitted those
2  questions. But when I go back and I look at what
3  the questions you're asking and see that you do not
4  challenge the premium rates and then ask questions
5  probing her basically about, you know, what the
6  title insurance industry insures against, and -- and
7  what kind of risks there are and shouldn't those
8  risks have been identified by the time you get to
9  the closing, by the time the policy is issued, it's
10 completely inconsistent with this, and if you want
11 to stipulate that you are challenging what goes into
12 a title insurance policy, I'm happy to do it and we
13 can go back to the judge.
14         MR. GORDON: No, the Complaint speaks
15 for itself, and I have not asked any questions about
16 the policy rates or whether or not they are
17 adequate, permissible or proper, nor will I ask any
18 of those questions in this deposition, except as
19 they pertain to the specific claims as to whether or
20 not your client gave the proper rate under the
21 TIRBOP rule.
22         MR. MAY: I'm saying, I've never
23 objected to those questions.
24         MR. GORDON: I just think you are
25 completely off base. I would ask you to rethink

46

1  your instruction, Mr. May. I am perfectly entitled
2  to ask this witness background questions.
3          MR. MAY: And in light of what you say
4  specifically in the Complaint about disclaiming what
5  you're doing in order to avoid a jurisdictional
6  issue, I'm going to stick with that instruction and
7  if we deal with it with Judge Sanchez, we did deal
8  with it.
9          MR. GORDON: My question has nothing to
10 do with the rates. It has to do with the types of
11 policy that are issued.
12         MR. MAY: Well, the types of policies
13 that are issued have nothing -- if you're talking
14 about the type of rates, that's what the case is
15 about. But the types of policies have nothing to
16 do. The policies are approved by the Pennsylvania
17 Insurance Department. So once you start asking
18 about the types of policies as opposed to the rates
19 given, that is the basic reissue, or substitution,
20 you're dealing with what you expressly disclaimed to
21 be dealing with in paragraph 2.
22         MR. GORDON: I think you are completely
23 off base, and I will continue to ask my questions
24 about different types of policies to find out if the
25 witness knows what they are, because some of these

47

1  policies may carry different rates approved by
2  TIRBOP and some may not. I'm permitted to ask about
3  those. I'm not challenging the rates in the TIRBOP
4  manual themselves.
5          MR. MAY: If you want to ask whether a
6  type of policy -- first of all, we're here about
7  three rates, basic, reissue, substitution.
8          MR. GORDON: You call it substitution.
9  It's the refinance rates under the TIRBOP manual.
10         MR. MAY: Yeah. Well, most people --
11 she calls it the substitution.
12         MR. GORDON: We can agree it's the
13 refinance rate.
14         MR. MAY: We can agree it's the
15 refinance rate.
16         MR. GORDON: Okay.
17         MR. MAY: It's synonymous terms. We're
18 here about those three. Whether those discounts
19 attach to this kind of policy or that kind of policy
20 is neither here nor there. And -- and in light
21 of -- in light of what you expressly disclaim, I
22 think these questions are inappropriate and you can
23 ask them and I'll just instruct her not to answer.
24         MR. GORDON: I'm going to ask some
25 additional questions about one policy in particular.

48

1  If you instruct the witness not to answer the
2  question, we will get Judge Sanchez on the line.
3          MR. MAY: If you want to do that, that's
4  fine.
5          MR. GORDON: Fine. Can we bring the
6  witness back in, please.
7          (The following is on the video record:)
8          THE VIDEO OPERATOR: We're back on the
9  video record at 10:12. Someone's got their
10 Blackberry on.
11 BY MR. GORDON:
12    Q.  Ms. Ray, you're familiar with the TIRBOP
13 manual, are you not?
14    A.  Yes, sir.
15         (D-23 marked for identification.)
16 BY MR. GORDON:
17    Q.  Ms. Ray, I've just handed you Deposition
18 Exhibit No. 23 and ask you if you could confirm that
19 that's one version of the TIRBOP manual?
20    A.  This is the 3-1-2000 version, yes.
21    Q.  Would that have been the version that
22 would have been in place when Ms. Cohen's
23 transaction took place?
24    A.  I don't know when Ms. Cohen's
25 transaction took place.

ELIZABETH RAY

Page 49

Q. That was the last version of the TIRBOP manual that was produced to us by your counsel?
A. Okay.
MR. GORDON: Mr. May, is there another version that you can produce to us as part of discovery?
MR. MAY: I could go back and look. I don't know of any offhand.
MR. GORDON: Okay.
BY MR. GORDON:
Q. The TIRBOP manual governs --
MR. MAY: Usually there are exhibits. I don't know whether they attached this one without -- it's a thinner document that I'm used to seeing. I haven't gone back to see if there were exhibits that are missing, but it's thinner than I'm used to seeing.
MR. GORDON: Well, this is the --
MR. MAY: But the text of it appears to be on here.
MR. GORDON: Well, with there is an addendum A which has vary rates, which --
MR. MAY: Right. The addenda do not appear to be attached.
MR. GORDON: But this appears to be the

Page 50

TIRBOP manual itself.
MR. MAY: Okay.
BY MR. GORDON:
Q. And the ALTA 1992 policy is governed by the TIRBOP manual, is it not?
A. Let me look at this real quick. Typically, the 1992 policy is in here, however, the addendums attached would have actual copies of the formal of the policy.
Q. Okay. I guess I should restate my question. The rates to be charged for the ALTA 1992 policy would be governed by this TIRBOP manual, would it not?
A. Would be, yes.
Q. Okay. As would every other type of policy that's issued by Chicago Title, correct?
MR. MAY: Object to form.
A. Again I'm not understanding your question.
Q. What is the ALTA short form policy?
A. The ALTA short form policy is a tip -- is a -- like a one-page policy form that you're able -- the agents are able to also -- another type of format of a policy. I think it's -- usually on the typical 1992 policy has four pages attached to

Page 51

it before the inserts, the schedule A and B inserts. Whereas the short form is, like a one-pager. It's condensed. Everything is condensed into one page with endorsements on it.
Q. And how does the short form policy differ from the 1992 policy in practice?
A. I'm sorry, what do you mean by "in practice." I'm not -- I'm not understanding your question.
Q. Is there a difference in coverage between the 1992 policy and the ALTA short form policy?
A. No.
Q. When would the ALTA short form policy be used versus the ALTA 1992 policy?
A. Upon request from a lender.
Q. Okay. Is it fair to say that the ALTA short form policy is typically a policy that can be issued at the time of closing?
A. Yes.
Q. Versus a 1992 policy, which may be issued a month or so after the closing takes place?
A. Typically, after they receive the recorded documents back from the courthouse.
Q. Okay. And the ALTA short form policy is

Page 52

also covered by the TIRBOP manual, is it not?
A. Yes, it is.
Q. What section number.
A. 5.15, Page 12.
Q. Okay. Can you turn to that, please. And there is a fairly lengthy discussion about the ALTA short form residential loan policy on Page 12, is there not?
A. That's correct.
Q. Section 5.15?
A. Mm-hmm. Yes.
Q. To the best of your knowledge, is there any difference in the premium that's charged for a ALTA short form policy versus a standard 1992 policy?
A. During the time of this -- I guess this is 10-1-99. During time, according to the TIRBOP manual, there is an additional 125 charge in addition to the applicable charge.
Q. Okay. Other than that additional charge of $125, is there any other difference in the premium?
A. I believe that the 125 dollar charge it included endorsements, as well. The 100 and 300, which you would typically charge separately on an

### 53

1  ALTA 1992 policy.
2      Q.   Okay.
3      A.   So the 125 is basically incorporating
4  the 100 and 300 endorsement.
5      Q.   And if a homeowner purchased -- the
6  homeowner had a previous mortgage issued within the
7  prior 10 years and had a lender's policy issued on
8  their property, that homeowner who's getting an ALTA
9  short form residential loan policy issued would also
10 be eligible for the reissue rate, would they not?
11     MR. MAY:  Object to form.
12     A.   Again, I'm not understanding your
13 question.
14     Q.   Okay.  Is there any difference other
15 than the kicker of $125 that's paid?  Is there any
16 difference in the standard rate that would then be
17 charged in addition to $125 for the ALTA short form
18 policy?
19     A.   The difference is the ALTA short form
20 policy includes the 100/300 endorsement, whereas a
21 1992 policy is charged separately.  It would be 50
22 bucks apiece.
23     Q.   Okay.  I guess I should restate my
24 policy, then.  For a 1992 policy there's a standard
25 rate that would be charged, the basic rate?

### 54

1      A.   For a 1902 policy, there could be,
2  either a basic reissue or substitution rate.
3      Q.   Okay.  And for the ALTA short form
4  policy, that's also true, is it not, there could be
5  the basic, the reissue or the refinance rate?
6      A.   That's correct.
7      Q.   Okay.  And is it the agent who chooses
8  which type of policy is put in place, the ALTA short
9  form or the 1992?
10     A.   No.
11     Q.   Who chooses that?
12     A.   Whatever's requested by the lender.
13     Q.   Would that be set forth at all times in
14 the closing instructions?
15     A.   Typically, what is requested by the
16 lender is in the closing instructions.
17     Q.   How are agents of Chicago Title in
18 Pennsylvania compensated?
19     A.   In Pennsylvania there's an 85/15 split
20 of the rates, plus endorsements.  So an agent would
21 retain 85 percent of the premium.
22     Q.   And that would be true for the
23 endorsement, as well?
24     A.   Correct, correct.
25     Q.   So you take the total policy premium

### 55

1  plus the total cost of the endorsements and 85
2  percent goes to the agent?
3      A.   Correct.
4      Q.   15 percent is retained by--
5      MR. MAY:  She was just -- hadn't
6  finished the answer.
7      MR. GORDON:  That's fine.
8      A.   85 percent is retained by the agent and
9  they remit in the 15 percent to the underwriter.
10     Q.   Is there any variation from the 85/15
11 split in Pennsylvania?
12     A.   Sometimes.
13     Q.   And how is that determined?
14     A.   Upper management.
15     Q.   Do you have any agents of the 60 agents
16 that are you are the liaison to in Pennsylvania that
17 have a deviation from the 85/15 split?
18     A.   Yes.
19     Q.   How many agents?
20     A.   Less than ten.  I'm guessing.
21     Q.   Is the split closer to 90 or closer to
22 80 for the agent on those 10?
23     A.   Closer to 90.
24     Q.   Okay.  So it's a more favorable split
25 for the agent in those circumstances?

### 56

1      A.   Correct.
2      Q.   And when the agent, as part of the
3  process, issues the title commitment, they're acting
4  on behalf of Chicago Title, are they not?
5      A.   They would issue a title policy under
6  Chicago Title.
7      Q.   Are you familiar with the term title
8  commitment?
9      A.   Yes, I am.  They're acting on -- they
10 would put it under Chicago Title paper if it was an
11 approved agent with Chicago Title.
12     Q.   Okay.  Now I'm confused.
13     A.   Yeah, so am.
14     Q.   Let's talk solely about the title
15 commitment at this point.
16     A.   Okay.  The commitment for title
17 insurance.
18     Q.   And what is the title commitment?  What
19 is it.
20     A.   Oh.  It's the commitment to the owner or
21 to the lender, to that -- that they would -- that
22 they would be getting -- they would be -- the
23 commitment to issue a -- either a loan or an owner's
24 policy.
25     Q.   It's the binding agreement that says

ELIZABETH RAY

57

1  that Chicago Title will issue the policy?
2      A.   Correct.
3      Q.   In a particular circumstance?
4      A.   Correct.
5      Q.   And that's issued by the agent?
6      A.   Yes.
7      Q.   And at that point, the agent is binding
8  Chicago Title to issue a particular type of policy?
9      A.   Correct.
10     Q.   It's a standard form also, isn't it,
11 that's used?
12         MR. MAY:  Object to form.
13         MR. GORDON:  I'll ask a different
14 question.
15 BY MR. GORDON:
16     Q.   Is it a standard form that's used?
17     A.   It varies.  Some people put -- there's
18 certainly what's typical in Pennsylvania is a
19 schedule A and then the schedule B1, which are the
20 items that would need to be identified prior to
21 closing, and then schedule B2 would be the
22 exceptions of the title.  Some people put a schedule
23 C in there, some people don't, whereas they put the
24 legal description.
25     Q.   Okay.

58

1      A.   So it, you know -- that's typically, you
2  know, the commitment format for this period.
3      Q.   And it will always have the same
4  standard information in it?
5          MR. MAY:  Object to form.
6      A.   Again, the commitment for title
7  insurance is also an approved -- there's an approved
8  format within TIRBOP that agents are supposed to put
9  the information.
10     Q.   Okay.  And that would include, for
11 example, the name of the borrower?
12     A.   Yes.
13     Q.   It will always be in there?
14     A.   Well, no.  You say "borrower."  You say
15 buyer.  There's a difference between a borrower and
16 a buyer.
17     Q.   Okay.  Let's talk about a lender's
18 policy.
19     A.   Okay.
20     Q.   The borrower's name will always be on
21 the title commitment?
22     A.   Yes, sir.
23     Q.   With an owner's policy, the buyer's name
24 will always be on the title commitment?
25     A.   Say that again, I'm sorry.

59

1      Q.   With an owner's policy, the buyer's name
2  will always be on a title commitment?
3      A.   Correct.
4      Q.   And the property address will always be
5  on either one?
6      A.   Not necessarily.  Because we don't
7  insure property addresses, we insure legal
8  descriptions.
9      Q.   Okay.  You mentioned that the standard
10 split between agents and Chicago Title in
11 Pennsylvania is 85/15?
12     A.   Yes, sir.
13     Q.   Is that embodied in a standard agency
14 contract?
15     A.   It would be -- it would be written in
16 the issuing agency contract between the underwriter
17 and the agent.
18     Q.   Is that a standard contract that is used
19 in Pennsylvania?
20         MR. MAY:  Object to form.
21         MR. GORDON:  I'll ask a different
22 question.
23 BY MR. GORDON:
24     Q.   Is there a standard contract that
25 Chicago Title uses with respect to its agents in

60

1  Pennsylvania?
2      A.   Currently, there is a standard form that
3  has been approved by corporate.  So again, you know,
4  there are other variations of different contracts
5  prior to my, I guess, becoming a rep.
6      Q.   Okay.  So for the most part, though, is
7  the same information contained in the agency
8  contract?
9      A.   Yes.
10     Q.   I'd like to understand the protocol in
11 Pennsylvania.  I think it's the same, pretty much as
12 any other state, but I want to make sure that it is.
13 What's -- let's say someone's taking out a refinance
14 loan.  How -- what's the first step that takes place
15 in connection with the ultimate issuance of title
16 insurance?  What has to happen?
17         MR. MAY:  Object to form.
18     A.   That depends between the buyer and the
19 seller -- the buyer and the lender -- the borrower
20 and the lender.
21     Q.   Okay.  Well, let me ask a question this
22 way.  Is there a referral to a title agent?
23     A.   You mean an order placed?  I'm not --
24     Q.   Sure, an order placed or a referral made
25 to the title agent.

**Page 61**

1  A.   I wouldn't call it referral, I would say
2  placing an order with the title agent.
3  Q.   Okay. And in the case of a refinance
4  that could be done by the lender?
5  A.   Could be done by the lender or the
6  borrower.
7  Q.   Or it could be done by the mortgage
8  broker if there is a mortgage broker involved?
9  A.   Could be done by the mortgage broker as
10 well.
11 Q.   Okay.
12 A.   Typically on a refinance, it would be
13 the mortgage broker, the lender or the borrower.
14 Q.   Okay. What happens after that?
15 A.   Once the agent has an order, a request
16 to open title insurance, they would obviously order
17 a search.
18 Q.   Okay. A title search?
19 A.   A title search.
20 Q.   Or an abstract?
21 A.   On an abstract, correct.
22 Q.   At this point, does the borrower have
23 any contact with the title agent, generally?
24       MR. MAY: Let me just do this. If you
25 want me to object to the form each time, I will, or

**Page 62**

1  I can just take a general objection to this line of
2  questioning, at your preference.
3        MR. GORDON: You can note your objection
4  to the line of questioning. So noted.
5        MR. MAY: Okay. I mean, just through
6  this line of questioning about what is the standard,
7  you know, protocol or whatever, just note my
8  objection and that way I won't have to interject
9  each time.
10       MR. GORDON: Okay. Only with respect to
11 this line of questioning, though?
12       MR. MAY: Correct.
13       MR. GORDON: Mr. May, I don't know how
14 long I can go on out without you objecting to form.
15       MR. MAY: I think each one has been
16 well -- from my perspective -- appropriate. So if
17 it disappoints you, I can do it on an individual
18 basis as opposed to taking it as to a line a
19 questioning.
20       MR. GORDON: As pleasurable as that
21 would be, I think that we'll just do an objection to
22 the line of questioning.
23       MR. MAY: Very well.
24       MR. GORDON: Would you please read back
25 the question.

**Page 63**

1        (Pertinent portion of the record is read
2  back.)
3  A.   I don't know.
4  Q.   Does the borrower participate in the
5  title search?
6  A.   No.
7  Q.   Do they perform the abstract?
8  A.   The borrower?
9  Q.   The borrower.
10 A.   Unless it's their own property, I
11 don't -- you know...
12 Q.   It's the title company that does it,
13 correct?
14 A.   Independent searchers, agents are able
15 to use independent searchers to get their abstracts.
16 Q.   Okay. What's the next step in the
17 process? The abstract's been completed, what
18 happens?
19 A.   Typically, the file would have to be
20 examined and in order to -- after the examination of
21 the file --
22 Q.   And that's known in the industry as the
23 title examination, is it not?
24 A.   Correct.
25 Q.   Okay. And what happens there?

**Page 64**

1  A.   And then from the examination
2  perspective, that would tell -- that would -- the
3  next step would be preparing the commitment for
4  title insurance.
5  Q.   Okay. With respect to the title
6  examination, that again is not something that the
7  borrower or the homeowner would participate in?
8  A.   No.
9  Q.   And at this point, typically, does the
10 borrower or homeowner have contact with the title
11 company?
12 A.   Sometimes. I don't know. Occasionally
13 they would, you know. It depends.
14 Q.   Okay. You don't know?
15 A.   I don't know.
16 Q.   How far in advance of the loan closing
17 is the -- are the abstract and the title examination
18 done?
19 A.   It varies. It could be anywhere from
20 five days to two weeks, you know.
21 Q.   Or longer?
22 A.   Or longer.
23 Q.   Could be a month out?
24 A.   Could be. Multiple variations.
25 Q.   And once the title examination is

ELIZABETH RAY

65

1  finished, by that point, the agent will know which
2  one of its title insurers will be issuing the
3  policy, correct?
4      A.  When the commitment is being prepared.
5      Q.  Okay.  And the title commitment will
6  always have on it which title insurer is issuing
7  that policy?
8      A.  Correct.
9      Q.  Could you please look back at Deposition
10 Exhibit, I think it's No. 5 -- I'm sorry, No. 19,
11 which is the Cohen file produced by Chelsea.
12         MR. MAY:  Let me just ask the witness,
13 are you comfortable or do you need a break?
14         THE WITNESS:  I'm okay.
15         MR. MAY:  Keep going?  Good.
16 BY MR. GORDON:
17     Q.  And could we take a look at the title
18 commitment for the Cohens which is found at 0043.
19 And I believe it would run through 0049.
20         (Mr. Snyder exits.)
21     A.  Okay.
22     Q.  And this is the standard Chicago Title
23 commitment that we discussed before, correct?
24     A.  Does appear to be.
25     Q.  Okay.  And this contains the name of Mr.

66

1  and Mrs. Cohen?
2      A.  Under item No. 2, Schedule A, the record
3  owner, as well as the proposed insured.
4      Q.  Okay.  And --
5      A.  But it's crossed out.  There is an
6  amount crossed out under the owners.
7      Q.  And from the -- and the title commitment
8  also in schedule B1, has a list of prior mortgages?
9      A.  Mm-hmm.
10     Q.  And it will always -- the title
11 commitment will always have a list of prior
12 mortgages, will it not?
13     A.  Sure, if any is on, you know...
14     Q.  Okay.  And the title commitment also
15 will identify when the property was purchased by
16 this particular borrower, would it not, or buyer,
17 depending on the circumstances?
18     A.  Typically in the being clause in the
19 legal description, which is 0051, which is the last
20 paragraph.
21     Q.  Okay.  And it also contains the property
22 address right above that, does it not?
23     A.  This one does.
24     Q.  And when the property was purchased by
25 this particular homeowner will always be in the

67

1  title commitment?
2      A.  Typically in Pennsylvania, the being
3  clause is in the commitment for title insurance.  I
4  can't speak for other states.
5      Q.  I'm just asking you about Pennsylvania
6  right now.
7      A.  Okay.  The being clause is typically
8  under -- right after the legal description.
9      Q.  Okay.  And the standard Chicago Title
10 form is something that is provided by Chicago Title
11 to its agents, is it not?
12         MR. MAY:  Object to form.
13     A.  Well, it's also in the TIRBOP manual,
14 too, as far as the approved form.
15     Q.  Okay.  What I'm trying to get at,
16 though, is that this is something that's actually
17 generated by the computer ultimately, is it not, by
18 the individual agents?
19     A.  By the individuals agents.  Some agents
20 do have title software, some agents do not.
21     Q.  Okay.
22     A.  I have middle of the state that they're
23 still typing their settlement sheets and some of
24 them are on a carbon, three-ring, you know, typing
25 all this.

68

1      Q.  Is that the vast minority, though, these
2  days?
3          MR. MAY:  Object to form.
4      A.  You know, some agents do have the title
5  software, some do not.
6      Q.  Do most have the title software?
7      A.  Today?  Presently, most of them do.
8      Q.  Okay.  Of your 60 agents, how many are
9  still working with carbon paper?
10     A.  It would be about five or so, four, and
11 that's when you get into the middle of the state,
12 where the attorneys are.
13     Q.  The larger agents all have the computer
14 system?
15     A.  Yes.
16     Q.  Okay.  And when the abstract is done,
17 just to go back a couple of steps, when the abstract
18 is done typically for the title examination,
19 information off of the abstract is inputted into the
20 computer system by the agents, is it not?
21         MR. MAY:  Object to form.
22     A.  If they have a computer, or it's being
23 typed.
24     Q.  Okay.  So for those that use the
25 software, the information will be inputted into one