ELIZABETH RAY

Page 69

1    of the computer programs that's used in the title
2    industry?
3        A.   There's several.  There's Ram Quest,
4    there's Title Express, there's Soft Pro, there's
5    Closer's Choice.
6        Q.   Land Tech?
7        A.   I don't know about Land Tech, but, yeah,
8    I guess so.
9        Q.   Those are the big ones, are they not?
10       A.   They are pretty, I think -- I guess.  I
11   don't know.
12       Q.   Do you know of any other ones?
13       A.   No.
14       Q.   Do you have any familiarity with those
15   software programs?
16       A.   Very little.
17       Q.   Have you ever used them?
18       A.   I've seen -- I've seen some of them,
19   seen one of them do it.  I have used Title Express
20   and Soft Pro.
21           (Mr. Snyder enters.)
22   BY MR. GORDON:
23       Q.   For the agents who are using the
24   computer programs, that information is stored in the
25   computer for the individual transactions, is it not?

Page 70

1        A.   I guess, I don't know.
2        Q.   Okay.  Now, the closing papers are what
3    comes next, after the title commitment is issued?
4        A.   Not necessarily.
5        Q.   Well, let's back up a step.  When the
6    title commitment is issued, does the borrower
7    typically have a say in which title insurance
8    company is going to issue their insurance?
9        A.   Absolutely.
10       Q.   How does that happen?
11       A.   If they request it.
12       Q.   Okay.  So if a borrower comes forward
13   affirmatively and says I want Chicago Title or I
14   want Stewart Title, that that would be honored?
15       A.   Absolutely.  Anything that the borrower
16   requests.
17       Q.   How often does that happen, Ms. Ray?
18       A.   I don't know.
19       Q.   Do you know of it ever happening?
20       A.   Yes.
21       Q.   What was the circumstance?
22       A.   Whether it be an employee or a sister or
23   a relative that knows somebody in the industry, I've
24   heard it happen.
25       Q.   Okay.

Page 71

1        A.   In my own personal, just sold a house in
2    Texas, I wasn't paying for title insurance, I didn't
3    care.
4        Q.   So you didn't make a request --
5        A.   No.  If I was paying the premium for the
6    title insurance, I would do my investigation, I
7    would care.  I would direct it to who I would know
8    do -- you know, who I know.
9        Q.   Chicago Title?
10       A.   Yeah.
11       Q.   But since you were the seller, you
12   didn't care?
13       A.   Correct.
14       Q.   In the vast majority of circumstances,
15   though, the borrower doesn't get involved in the
16   decision on which title insurer will be issuing the
17   policy, do they?
18           MR. MAY:  Object to form.
19       A.   Again, you know, it could vary, you
20   know.  I don't know.
21       Q.   Really?
22       A.   I guess I'm not understanding your
23   question.
24       Q.   I guess you're not.  In the vast
25   majority of circumstances, does the borrower get

Page 72

1    involved in the decision as to which title insurer
2    will be issuing the policy?
3        A.   They should.
4        Q.   Okay.  That wasn't my question, Ms. Ray.
5    Do they?
6        A.   Some do, some don't, you know.  A lot --
7    oftentimes the borrower relies on the real estate
8    agent or the mortgage broker as to where to go.
9        Q.   So is it your testimony that the real
10   estate agent chooses the title insurance company,
11   Ms. Ray?
12       A.   Sometimes, sometimes not.
13       Q.   And that's your experience in the
14   industry?
15       A.   Whether -- again, whether it be like
16   either a real estate agent or a -- other agent or
17   their mortgage broker.
18       Q.   Okay.  Maybe I should ask it a different
19   way, because I think I'm a little confused.  Are
20   they -- is the real estate agent involved in the
21   selection of the title agent or of the insurance
22   company that's issuing the policy?
23       A.   The real estate agent, it's their
24   choice, whether they want to go to an agent or a
25   direct office underwriter.

ELIZABETH RAY

Page 73

1   Q.   Okay. Of the policies that were written
2   in the Eastern District of Pennsylvania last year,
3   what percentage were directly written by Chicago
4   Title?
5   A.   I don't have that figure, I don't know.
6   Q.   Do you know what percentage it would be?
7   A.   No.
8   Q.   Is it less than five percent?
9   A.   I don't know.
10  Q.   Is that information readily available to
11  you?
12  A.   No. I've never asked for it. I would
13  ask my manager.
14  Q.   Have you ever looked at the numbers?
15  A.   No.
16  Q.   Do you have any knowledge, whatsoever,
17  as to what percentage it is?
18  A.   No.
19  Q.   Okay. So I'm going to ask my question
20  again. Is it your understanding that the real
21  estate agents choose the title insurers who issued
22  policies, or do they choose the title agent often?
23      MR. MAY: Object to form. Go ahead.
24  A.   Again, they would choose either an agent
25  or an underwriter, go to a direct office, you know,

Page 74

1   it varies.
2   Q.   But you don't know, really, do you?
3   A.   Yeah, I don't.
4   Q.   Okay. What happens after the title
5   commitment is issued?
6   A.   Typically, the conveyancing part of it
7   would need to be met, based on the information in
8   the commitment for title insurance. And the
9   conveyancing part would include, again, if we're
10  referring to this particular case. In this case I
11  would assume that an employee from the agent, from
12  the agency would be in contact with the buyer to
13  obtain certain information to get payoffs, to get,
14  you know, get their permission, to get tax
15  information, et cetera. You know, a question about
16  any sort of, you know, in this case, it seems like
17  water and sewer were due and in this case as well.
18  Q.   And I'm sorry, I missed that. Who would
19  be in contact with the --
20  A.   An employee of the agent.
21  Q.   Okay.
22  A.   It would be a -- I guess they are called
23  a conveyancer. So they would try to gather all the
24  information together to remove items that are placed
25  in Section B-1 of the commitment. Or get evidence

Page 75

1   of any sort of -- removal of the items, in Schedule
2   B Section 1.
3   Q.   And with respect to the Cohen's
4   transaction, that would be on page 0048, of
5   Deposition Exhibit 5, correct?
6   A.   0046, 0047.
7   Q.   Okay.
8   A.   And 0048.
9   Q.   Beyond what's in Schedule B, Section 1,
10  does the conveyancer try to get any other
11  information from the borrower, to the best of your
12  knowledge?
13  A.   I don't know what else they would get,
14  other than what's in connection with it.
15  Q.   Okay. Assuming that all the conditions
16  of Schedule B-1 have been satisfied, what happens
17  next?
18  A.   Scheduling a settlement date and hoping
19  you get the papers on time.
20  Q.   Settlement date is also known as the
21  closing?
22  A.   Correct.
23  Q.   And that's handled by the agent, is it
24  not?
25  A.   Yes, it is.

Page 76

1   Q.   And the agent is in control of the
2   closing on the loan, are they not?
3       MR. MAY: Object to form.
4   A.   I don't know if any closer has any
5   control over a loan, to be honest. We rely on other
6   third parties to bring everyone together at the
7   table.
8   Q.   But they are the hub of the closing, are
9   they not?
10  A.   Try to accommodate everybody involved in
11  the transaction, whether it be the -- No. 1 and most
12  important the borrower, the mortgage lender or the
13  mortgage broker. So relying on --
14  Q.   In most instances isn't this typically
15  the first time that the borrower or buyer meets the
16  title company?
17  A.   Typ --
18      MR. MAY: Object to form. You can
19  answer.
20  A.   Yeah, typically, yeah.
21  Q.   And at this point, prior to the closing,
22  the borrower has not seen the title commitment, have
23  they?
24  A.   Some agents do send it out, some agents
25  don't. I don't know, really.

Page 77

1    Q.   Okay. And the policy typically is not
2  issued unless it's a short form policy, at the
3  closing?
4    A.   Correct.
5    Q.   In 2002, when the Cohen transaction took
6  place, did Chicago Title have any form or any other
7  disclosure that advised the consumers of the
8  availability of a reissue rate?
9    A.   No.
10   Q.   How about the same question for the
11 refinance rate?
12   A.   Oh, no.
13   Q.   How about presently, does Chicago Title
14 have a form disclosure advising consumers of the
15 availability of a reissue rate?
16   A.   Presently, based on the changes of the
17 updated TIRBOP manual of 2005, it is now required
18 for agents to put that information within their
19 commitment for title insurance.
20   Q.   Okay.
21   A.   Disclose it.
22   Q.   And the same for the refinance rate?
23   A.   Corr -- I'm not -- and I'm talking about
24 reissue, typically.
25   Q.   Okay. Is there any form disclosure that

Page 78

1  is given to the consumer presently by Chicago Title
2  or their agents relating to the availability of the
3  refinance rate?
4    A.   Other than Internet sites that you could
5  rely on. Anyone can Google, PA title insurance.
6    Q.   I'm talking about a form disclosure
7  that's given to the consumer.
8    A.   There's no form disclosures that we are
9  prepare to give to agents.
10   Q.   With respect to refinance rates?
11   A.   Correct.
12   Q.   And at the closing, what happens?
13   A.   Typically, at closing your -- the
14 lender's instructions come, title agent prepares a
15 settlement sheet based on instructions and based on
16 information found in the conveyancing aspect and
17 puts a settlement sheet together and -- excuse me --
18 and closes the transaction. And collects
19 identification, et cetera, notarizes certain
20 documents on behalf of the lender, the settlement.
21   Q.   And after that, what happens?
22   A.   Settlement agent will then proceed to
23 disburse the proceeds, the loan -- as soon as they
24 get the loan proceeds and send the documents for
25 recording. And we will set that file aside and make

Page 79

1  sure that it gets recorded and recording comes back
2  and the agent issues the policy?
3    Q.   Does the agent also, at some point along
4  the way, conduct a bring-to-date search?
5    A.   Yes.
6    Q.   And when does that happen?
7    A.   That typically happens the day before or
8  two days before settlement.
9    Q.   And you said that thereafter, the policy
10 is actually issued?
11   A.   Okay.
12   Q.   When does Chicago Title get a copy of
13 the policy?
14   A.   Typically, six months after the
15 transaction closes with the premium. Sometimes
16 it's -- you know, some agents are -- cut checks at
17 settlement, some don't. Some have escrow accounts
18 or actually another account set aside for the
19 underwriter's portion of the premium, and, you know,
20 could be six months, could be nine months. It
21 varies.
22   Q.   And is there a remittance log that is
23 sent to Chicago Title by the agent?
24   A.   Some agents do send in the remittance
25 log, some agents do not.

Page 80

1    Q.   Okay. I ask you to take a look at
2  Deposition Exhibit 4 that's been previously marked
3  in this case. Is that a remittance log?
4    A.   It's a register detail from our company.
5    Q.   How -- what is this? Do you know --
6  have you ever seen this before?
7    A.   Yeah, it's through the company. What's
8  been remitted in from an agent.
9    Q.   From the company, you mean corporate?
10   A.   Correct, corporate?
11   Q.   And this is based upon information that
12 is given to Chicago Title by the agent?
13   A.   Correct.
14   Q.   This isn't all the information, though,
15 that's given?
16       MR. MAY:  Object to form.
17   A.   No, it's not.
18   Q.   Okay. I see up at the top it says
19 Fidelity National Financial.
20   A.   Mm-hmm. Which is the former parent
21 company of Fidelity National Title Group.
22   Q.   Okay. So when you say that it's done
23 out of corporate --
24   A.   Mm-hmm.
25   Q.   -- do you mean that it's done by

ELIZABETH RAY

Page 81

1  Fidelity National?
2     A.  It's done by Fidelity National Financial
3  which is the corporate.  This is a system -- what
4  this report is it's a system generated through what
5  they call the National Agency Solutions.
6     Q.  National Agency Solutions?
7     A.  Mm-hmm, NAS.
8     Q.  Is that a -- it's a computer program
9  used by all the Fidelity National companies?
10    A.  Correct.
11    Q.  And can reports be generated off of
12 this?
13    A.  This is one particular report.
14    Q.  The answer is yes?
15    A.  Yes.
16    Q.  If you, for example, as a
17 representative, wanted to obtain information about
18 all of the policies that were listed about a
19 particular agent for a particular time period, you
20 could get that information, could you not?
21    A.  No.
22    Q.  Why do you say you couldn't get it?
23    A.  Because National Agency Solutions, the
24 NAS system, was incorporated in 2000.  So anything
25 prior to 2000, I did not have access to.

Page 82

1     Q.  I'm asking you from today, if you wanted
2  to go back in time and get a report for a particular
3  agent for a particular time period, you could do
4  that?
5     A.  If I was going to request a report after
6  the year 2000, I could.
7     Q.  And you could get various types of
8  information about the transactions that took place,
9  could you not?
10    A.  Basically, the reports limit to exactly
11 what you see here.  I have a policy number, a file
12 number, a policy date, a policy amount, gross,
13 percentage, commission, net, and that's it, and
14 batch numbers.  That's typically what would be on
15 the report.  This is the only information that we
16 would see.
17    Q.  Have you ever asked for a report that
18 had more information?
19    A.  No.
20    Q.  Can a report with more information be
21 generated?
22        MR. MAY:  Object to form.
23    A.  I don't know.
24    Q.  Could be?
25    A.  I don't know.  I really don't.

Page 83

1     Q.  Okay.  Who, in your office would have
2  information of National Agency Solutions' database?
3     A.  Myself, my manager and my coworker as
4  well, Betty Wilcox of our office.  She does agency
5  accounting, and that's it.
6     Q.  Is the information that's contained on
7  this spreadsheet inputted at your office or at
8  corporate?
9     A.  This is inputted in corporate.
10    Q.  Okay.  So there is something that goes
11 to corporate from your office?
12    A.  Downloaded, right.
13    Q.  Okay.
14    A.  Typically -- yeah.  Typically, when the
15 remittance -- some -- some agents will remit locally
16 because we like to see a copy of the final -- the
17 final policy, with the -- with the remittance.  So
18 typ -- some agents do send in a copy of the owner --
19 the final owners and loan policy with their
20 remittances.  And that's then submitted locally and
21 then downloaded in Chicago, which is where the
22 agency accounting is, one part of the agency
23 accounting.
24    Q.  And looking at this data base, it's easy
25 to determine, it is it not, whether or not an agent

Page 84

1  gave a particular borrower or buyer the reissue
2  rate?
3     A.  Based on the gross premium, I mean, I
4  mean --
5     Q.  You could go look it up?
6     A.  You could, I guess.
7     Q.  Or you could do a simple mathematical
8  calculation and figure it out?
9     A.  Correct.
10    Q.  How can you tell, based upon the
11 spreadsheet, whether it's an owner's policy or a
12 lender's policy, that was issued?
13    A.  Well, I know that the 72106 prefix --
14    Q.  You are talking about policy number?
15    A.  Policy number.
16    Q.  Okay.
17    A.  The 72106 prefix is the owner's policy,
18 and 72107 is typically a lender policy.
19    Q.  Okay.  So based upon this spreadsheet,
20 Deposition Exhibit No. 4, does it appear or would
21 you agree that the owner's policies are all listed
22 first and then the lender's policies are listed
23 after that?
24    A.  Correct.  So it's very difficult for me
25 to look at this report and see whether or not a

ELIZABETH RAY

85

1  quick premium is charged, being that they're not
2  back to back. On a typical sell, an owner's
3  policy -- if -- if the buyer pays for an owner's
4  policy, they can -- under a simultaneous issuance,
5  they get the loan policy for free. So, you know,
6  this report is not that great detailed.
7      Q.   Okay. What does it mean, though, if you
8  could turn, for example, to Page 0554.
9      A.   My number is cut off. Is it Page 10 on
10 the bottom?
11     Q.   Page 10, yeah.
12     A.   Okay.
13     Q.   In the file number there what's it say,
14 S-I-M. Does that mean simultaneous issue?
15     A.   It could be simultaneous -- yeah, I
16 assume that would be -- I don't know. I assume it
17 would be simultaneous issue.
18     Q.   Okay. And if we look up at the top --
19 let's look at the second transaction, or the second
20 one listed, it's 72107, which indicates that it's a
21 lender's policy, correct?
22     A.   Correct.
23     Q.   And then it says, dash 359345 --
24     A.   Mm-hmm.
25     Q.   -- as the policy number. And there

86

1  are one, two, three, four that have that same policy
2  number?
3      A.   Correct.
4      Q.   Does that indicate that they were
5  endorsements? What does that indicate to you?
6      A.   It indicates that there are endorsements
7  under the loan policy.
8      Q.   And does it also indicate that there was
9  a simultaneously issued policy?
10     A.   I'd have to go back and -- on what it
11 says, the file number. Again, I'm not familiar with
12 a lot of these codes on here, so I don't know.
13     Q.   Do you know what batch number means?
14     A.   No, not really. My understanding of a
15 batch number is basically the -- how the agent
16 submits in a batch of policies to the underwriter.
17 So -- so it seems like a lot of these have the same
18 batches. This policy is reported all in one batch.
19     Q.   Do you recall if Chelsea used a
20 remittance log to send its policies to Chicago
21 Title?
22     A.   I don't recall.
23     Q.   If you wanted a printout of whether or
24 not Chelsea gave the reissue rate or the refinance
25 rate in any particular transaction, would you be

87

1  able to get a printout of that?
2      A.   No.
3      Q.   Is that available in the Chicago Title
4  system?
5      A.   I don't know.
6      Q.   You don't know?
7      A.   Unh-uh.
8      Q.   Okay. You do know, however, that the
9  numbers are reported to the State of Pennsylvania?
10     A.   Yes.
11     Q.   And that is it reported how many reissue
12 rate and how many refinance rate transactions took
13 place?
14     A.   I'm aware of it.
15     Q.   Excuse me?
16     A.   I am aware of that.
17     Q.   So at some point place in the Chicago
18 Title computer system, that information has to
19 appear?
20     A.   I'm sure, I guess.
21     Q.   Do you know if in Pennsylvania, Chicago
22 Title and its agents have an obligation to only
23 charge the consumer the best rate for which they
24 apply? I'm sorry, the best rate that applies to
25 their transaction. Strike that. Let me ask the

88

1  question again.
2      A.   Okay.
3      Q.   Do you know in Pennsylvania if Chicago
4  Title and its agents have an obligation to only
5  charge the consumers the best rate that applies to
6  their particular transaction?
7          MR. MAY: Object to form. You can
8  answer.
9      A.   I'm sorry, can you repeat the question.
10 I'm not understanding it.
11         MR. GORDON: Could you read it back,
12 please?
13         (Pertinent portion of the record is read
14 back.)
15     A.   The agents and underwriters must charge
16 the rate that's applicable with the TIRBOP manual.
17     Q.   So is that a yes, they have to give them
18 the best rate that's applicable?
19     A.   What's applicable based on the TIRBOP
20 manual. They have to follow the rules and
21 regulations that are in the TIRBOP manual.
22     Q.   Okay. I guess I'm confused. Does that
23 mean that Chicago Title and its agents have to apply
24 the best rate that is applicable under the TIRBOP
25 manual for the particular transaction?

ELIZABETH RAY

89

1  MR. MAY: Object the form because it
2  misstates a prior answer, but...
3  A.  They are supposed to charge what's based
4  in the TIRBOP manual, agents and underwriters.
5  Q.  Is it your opinion that they don't have
6  to give the best rate that's available?
7  MR. MAY: Object to form.
8  A.  I'm not understanding your question,
9  actually.
10  Q.  Okay. How is it determined, based upon
11  the TIRBOP manual, what rate applies to a particular
12  insurance policy that's being issued?
13  A.  Okay. Based on, you know, the
14  applicable charges that are available, based on the
15  TIRBOP manual, depends on, each case scenario, each
16  transaction.
17  Q.  And if a borrower comes in and qualifies
18  for the reissue rate, are they required to get it?
19  A.  If they -- I'm sure, yeah, absolutely.
20  If they require -- I mean, I'm sure if they produce
21  certain evidence to the agent, in order to get the
22  reissue rate, for example, a copy of the HUD
23  statement or a copy of the prior policy --
24  Q.  Okay.
25  A.  -- would be typically -- would be --

90

1  what would be typical to have the borrow...
2  Q.  I'm asking you right now, if a borrower
3  qualifies for the reissue rate, are they required to
4  get the reissue rate?
5  A.  Yes.
6  Q.  If the borrower qualifies for a better
7  rate, the refinance rate, are they required to get
8  the refinance rate instead?
9  A.  Yes.
10  Q.  So I'll ask my question again. If a
11  borrower qualifies for a particular rate, is -- are
12  Chicago Title and its agents required to provide the
13  best rate possible?
14  MR. MAY: I'm going to object to form
15  again. You can answer.
16  A.  Sure, yes.
17  Q.  They can't, for example, give someone
18  the standard rate if the individual qualifies for
19  the refinance rate?
20  A.  They cannot, you said?
21  Q.  That's not permissible, is it?
22  A.  If the borrower qualifies for the re --
23  for the substitution rate, the agent is supposed to
24  charge the substitution rate or the reissue rate or
25  the basic rate, whichever applies.

91

1  Q.  The best rate that's available for the
2  consumer?
3  A.  Correct.
4  Q.  Okay. Now, the during the time period
5  that you have been employed by Chicago Title, that's
6  been a boom year for the industry, hasn't it?
7  MR. MAY: Object to form. We're also
8  getting into the -- well, I'll let the questioning
9  develop, but object to form.
10  A.  From the time of 2001 to present,
11  interest rates were extremely low at five percent,
12  meaning that there were a lot of -- a lot more
13  activity in the real estate industry.
14  Q.  Hasn't that time period, in fact, been
15  the largest number of refi's in the history of the
16  industry?
17  A.  I don't know.
18  Q.  It's been a boom, hasn't it?
19  A.  There was a boom in the nineties, so...
20  I don't know.
21  Q.  As big as the boom from 2001 to 2005,
22  Mrs. Ray?
23  A.  I don't know.
24  Q.  You don't know?
25  A.  I don't know.

92

1  Q.  You don't know if it was a boom period?
2  A.  You know, there is a boom period in the
3  nineties, there was a period, you know -- you know,
4  after 2001. I don't know.
5  MR. MAY: You know, you're asking the
6  witness about economic data in the U.S. economy.
7  I'm sure there's experts on that. But you can go
8  ahead.
9  MR. GORDON: No, I'm asking the witness
10  in her experience have there been a lot of refi's
11  from the period 2001 to let's say 2005.
12  A.  There is a lot of activity, kind of
13  declined, I understand in 2005, versus 2004. It
14  could have stayed the same. I really don't know.
15  Q.  Okay.
16  A.  Okay.
17  Q.  Is it your understanding that during
18  this time period sometimes people refinance multiple
19  times?
20  A.  Yeah.
21  Q.  I'd like you to take a look at
22  Exhibit 18, please. I'll hand it to you.
23  A.  Okay.
24  Q.  This is a two-page document. I just
25  want you to focus on the first page. The second

93

 1  page is a list of lawsuits.
 2       I want to ask you specifically about the
 3  first page. This was prepared by your counsel, and
 4  it's a representation --
 5       MR. MAY: He's just asking about the
 6  first page. You don't have to look at the second
 7  page.
 8       THE WITNESS: Oh, okay, I'm sorry.
 9       MR. GORDON: I thought I said that.
10       MR. MAY: You did.
11       THE WITNESS: You did.
12       MR. MAY: But the witness was still
13  looking at the second page.
14  BY MR. GORDON:
15       Q.  I would also like you to look at
16  Deposition Exhibits 12 through 17.
17       A.  Okay.
18       Q.  We're going to reference those as we go
19  through. Have you ever seen Deposition Exhibits 12
20  through 15, or reports similar to those?
21       A.  No.
22       Q.  Those are reports that were produced to
23  us as the reports that are submitted to the State of
24  Pennsylvania on the number of transactions -- the
25  number of policies that are issued, and Deposition

94

 1  Exhibit No. 18 in particular -- you can look at
 2  Deposition Exhibit No. -- well, let's look at one in
 3  the middle. Let's look at the 2002 spreadsheet.
 4  Can you identify that? Or I'll take a look and I'll
 5  hand it to you.
 6       This is where I learned that I'm getting
 7  older, from the print.
 8       MR. MAY: I just got new glasses.
 9  BY MR. GORDON:
10       Q.  This is Deposition Exhibit No. 15.
11  These are the summary sheets provided for 2002, and
12  if you could turn to Pages 9 and 10, the
13  representation from your counsel -- and please
14  correct me if I'm wrong, Mr. May, is that it is off
15  of Pages 9 and 10 that deposition (sic) No. 18 was
16  compiled.
17       MR. MAY: Let me defer to Mr. Snyder on
18  that since he's the one who compiled the -- you want
19  for me to have him take a look at that?
20       MR. GORDON: Sure.
21       MR. MAY: While he's doing that --
22       MR. GORDON: It was actually in the
23  record that it was said, but...
24       MR. MAY: I'm sure it is. I'm not --
25  challenge you, I just don't know.

95

 1       But let me just remind the witness that
 2  this is not an endurance thing. We have been going
 3  about two hours. If you do need a break, you're
 4  entitled to a break.
 5       MR. SNYDER: I don't recall, whatever I
 6  put on the record at the last deposition. I thought
 7  it was correct. I'd have to look at it again and
 8  redo the numbers.
 9       MR. MAY: Richard, we'll accept your
10  representation as to what we sent.
11       MR. GORDON: Okay. Thank you.
12  BY MR. GORDON:
13       Q.  Just for the record, though, to make
14  sure it's crystal clear, the representation, I
15  believe, was made on Page 100 of Jodi Reimer's
16  deposition transcript, that is was Pages 9 and 10 of
17  each report. And if you could take a look, it says
18  at the bottom, it says, All policies. Do you see
19  that line? At the very bottom.
20       A.  Mm-hmm.
21       Q.  It says number -- it says basic rate is
22  10,673. The reissue rate, 4168, and then there's
23  nothing for refinance rate. And if you take a look
24  at Deposition Exhibit No. 18, if you look over in
25  the owner's policy column, it says --

96

 1       MR. MAY: What year, what year?
 2       MR. GORDON: 2002. The 4168 matches up.
 3  Then if you add that to what is on the form of the
 4  basic rate, which is 10,673, you end up with a total
 5  of 14,841. Okay?
 6       A.  Okay.
 7       Q.  If you turn to Page 10, these are for
 8  the lender's policies, same type of summary. And if
 9  you look at the totals, it will say that there's
10  basic rate was given 5,954 times. Do you see that?
11       A.  Yes.
12       Q.  The reissue rate was given 5,032 times.
13       A.  Mm-hmm.
14       Q.  And the refinance rate was given 1,304
15  times. And if you add together 1,304, 5,032 and
16  5,954, going over to the column, Deposition Exhibit
17  No. 18 where it says lender's policy, you will get
18  to the total 12,290.
19       A.  Okay.
20       Q.  Okay? But I'm curious. If you look,
21  again, on the same page of the exhibit, but where it
22  says Page 11, you have a column for ALTA short form
23  residential policy.
24       A.  Mm-hmm.
25       Q.  And that's 4,863?

ELIZABETH RAY

Page 97

1   A.   Mm-hmm.
2   Q.   There's no indication for any of those
3   that the reissue rate was ever given, is there?
4   A.   No.
5   Q.   And there's no indication for any of
6   those that the refinance rate was ever given, is
7   there?
8   A.   No.
9   Q.   And that would still be -- the ALTA
10  short form, other than the $125 amount that has to
11  be added on would be the exact same -- would be
12  subject to the same rates as any other policy?
13  A.   Correct.
14       MR. GORDON:  Okay.  So, Mr. May, I will
15  put this to you.  It appears that Deposition Exhibit
16  No. 18 is incorrect because it does not add in any
17  of the ALTA short form policies.
18       MR. MAY:  You may be correct.  If you
19  had raised this with us beforehand, we would have
20  been happy to investigate and make a statement at
21  the deposition.
22       MR. GORDON:  Well, I would ask you to
23  investigate.
24       MR. MAY:  We will, absolutely.
25       MR. GORDON:  And I will suggest that

Page 98

1   Deposition Exhibit 18 is incorrect and inaccurate
2   and leaves off the ALTA short form policies.
3        MR. MAY:  Well, let me state for the
4   record, No. 1, counsel prepared this, so if there's
5   an error in it, we take responsibility for it.  No.
6   2, we do not want to have errors in what we provide
7   to you.  No. 3, if you had told us coming into this,
8   we would have investigated and had a response, but
9   we don't.  But No. 4, now that you raise it, we
10  will.  Because as I repeat, we don't want to have
11  errors in what is -- what is submitted to you and
12  then what likely will ultimately be submitted to the
13  court.  And then finally, that -- Ms. Ray had
14  nothing to do with the preparation of this.
15       MR. GORDON:  I'm not suggesting that she
16  did, nor am I suggesting that it was an intentional
17  oversight.  But nonetheless, if you would recall
18  from one of our other cases, it's the same oversight
19  that we had discussed before in leaving out the ALTA
20  short form policies, which need to be added in for
21  the total number of policies that were issued.
22       MR. MAY:  I understand the issue, I do
23  not mean to -- if there is an error, this is not
24  meant as an excuse or whatever, but I was -- I did
25  not prepare this directly, but I will make sure that

Page 99

1   we -- that we revisit that issue and issue to you a
2   corrected one, if it's -- if that's correct.
3        MR. GORDON:  Okay.  For the record, I've
4   gone through the various forms and for the year
5   2000, there were no ALTA short form issued by
6   Chicago Title.  From 2001, there were 12.  In 2002,
7   as noted on Deposition Exhibit No. 15, there were
8   4,863.  In 2003, there were 3,082.  In 2004, there
9   were 976.  And in 2005, there were 292.
10       MR. MAY:  What was the 2004?
11       MR. GORDON:  2004 was 976.
12  BY MR. GORDON:
13  Q.   And Ms. Ray, I'm wondering just -- I
14  mean these numbers seems to peak in 2002 after being
15  almost nonexistent before that, and then they
16  quickly go down.  Do you know why there was such a
17  drop in the ALTA short form policies.
18  A.   No.
19  Q.   Okay.  And with that, I understand that
20  we're at the end of the tape.  This might be a good
21  time to take a break.
22       THE VIDEO OPERATOR:  Everybody hold on
23  hold on, please.  We are going off record at 11:21.
24  This concludes tape No. 1.
25       (Brief recess.)

Page 100

1        (Mr. Searles not present.)
2        THE VIDEO OPERATOR:  We are back on the
3   video record, 11:37 a.m.  This is tape No. 2.
4        (D-24 through D-28 marked for
5   identification.)
6   BY MR. GORDON:
7   Q.   Ms. Ray, I just have a couple documents
8   I want to give you right now.  These are other
9   versions of the TIRBOP manual that were produced to
10  us during discovery.  This is Exhibit 24 and
11  Exhibit 25.  And I believe that the first one that I
12  gave you, which is the latest one that would have
13  been in place during the Cohen transaction, was
14  Exhibit 23.
15  A.   Okay.
16  Q.   This is Exhibit 25.  And I'd also like
17  to give you -- and this is in the order that it was
18  received from counsel, during the production of
19  documents, Exhibit 26, 27 and 28.
20       Now these all relate to the TIRBOP
21  manual which is, as I think we have discussed either
22  in this deposition or one of the others, the
23  official product of the Rating Bureau for the
24  Commonwealth of Pennsylvania.  Is that your
25  understanding as well?

101

1  A. Yes, sir.
2  Q. And do you know which schedule goes with
3  which? Schedules are Deposition Exhibits 26, 27 and
4  28. I would have put them with the proper TIRBOP
5  manual but I didn't want to presume that one went
6  with another, without asking you. But are these, in
7  fact, the addendum to the TIRBOP manuals?
8  A. Yes. One of the addendums.
9  Q. This is the one that would show the rate
10  that would be available to charge a particular
11  consumer for a particular type of insurance, would
12  it not?
13  A. Yes, except these rates don't have the
14  refinance which is in a different part of the
15  manual. The substitution rate, excuse me.
16  Q. Okay. And again, for purposes of our
17  discussion today, the substitution rate and the
18  refinance rate are referring to the same thing?
19  A. Substitution rate is set forth -- hold
20  on.
21  Q. Well, let's look at Section 5.6 of the
22  --
23  MR. MAY: I think we have stipulated
24  that it's synonymous.
25  MR. GORDON: Yeah. Well, let's just

102

1  look at Section 5.6 of the TIRBOP manual.
2  A. Okay.
3  Q. You can use Exhibit 23 since that's the
4  one during the Cohen transaction.
5  A. Okay.
6  Q. And if you look at Section 5.6.
7  A. Uh-huh.
8  Q. How does it refer to the rate?
9  A. When a refinance or a substitution loan
10  is made within three years from the date of closing
11  of a previously insured mortgage or fee interest and
12  the premises to be insured are identical to or part
13  of the real property previously insured and there
14  has been no charge in the fee simple ownership, the
15  charge shall be 80 percent of the reissue rate.
16  Q. I thank you for reading that. But how
17  is the rate described in Section 5.6? What's the --
18  MR. MAY: The top, what's the name?
19  BY MR. GORDON:
20  Q. The caption.
21  A. Oh. Refinance and substitution loans.
22  Q. Okay. So again, just for purposes of
23  clarification, I'm going to call it the refinance
24  rate because that's how I've seen it.
25  A. Okay.

103

1  Q. Especially in the forms produced to the
2  Commonwealth of Pennsylvania.
3  A. Okay.
4  Q. If you would like to refer to it as
5  substitution rate, that's fine, just as long as we
6  understand that we're talking about the same thing.
7  A. Okay.
8  MR. MAY: And I'll stipulate that they
9  are synonymous.
10  BY MR. GORDON:
11  Q. So is it your testimony that there is
12  another addenda that sets out the refinance rate?
13  A. No.
14  Q. Okay.
15  A. I'm sorry. The addendum I was referring
16  to is the 5.6.
17  Q. Okay. And then how would one go from
18  the addendum, which only lists the basic and reissue
19  rate to calculating the refinance rate?
20  A. Simple mathematics.
21  Q. Simple mathematics. You take another 20
22  percent off?
23  A. Of the reissue rate.
24  Q. Okay. I'm going to ask you some more
25  questions about this in a couple minutes but I just

104

1  want to go back a little bit because I'm curious.
2  Is there an underwriting manual or escrow guidelines
3  that Chicago Title has?
4  A. There is escrow guidelines.
5  Q. Is that given to your agents?
6  A. Yes.
7  Q. They each have a copy it?
8  A. Yes. It's escrow account for agents,
9  you know, how to make sure that they are in format,
10  what we would like to see as an underwriter for
11  the -- pursuant to the escrow account.
12  Q. Okay. Is there anything in the escrow
13  guidelines that addresses the issue of reissue rates
14  or refinance rates?
15  A. No.
16  Q. Is there an underwriting manual?
17  A. The underwriting manual, that we give is
18  the TIRBOP manual.
19  Q. That's the only instruction?
20  A. Correct.
21  Q. And obviously, that does have
22  information in it about refinance rates and reissue
23  rates?
24  A. Correct.
25  Q. And it's the law, is it not?

ELIZABETH RAY

---

105

1       MR. MAY: Object to form.
2       A.   In the State of Pennsylvania, this --
3   all agents must abide by the TIRBOP manual.
4       Q.   Other than what is in TIRBOP manual,
5   does Chicago Title have any other manuals, forms,
6   documents that they give to their agents regarding
7   the applicability of reissue rates or refinance
8   rates?
9       A.   No.
10      Q.   Does Chicago Title have any seminars
11  that they've held specifically for agents on when to
12  provide the refinance rate or the reissue rate?
13      A.   No.
14      Q.   When a new issue comes in and becomes
15  part of the Chicago Title family, other than giving
16  the agent a copy of the TIRBOP manual, is there any
17  specific training on whether -- on the circumstances
18  under which the agent is to give the reissue or the
19  refinance rate?
20      A.   No.
21      Q.   Now, I'd like you to take a look at the
22  TIRBOP manual and let's look specifically at No. 23,
23  Exhibit 23.
24      A.   Okay.
25      Q.   How is the manual structured?

---

106

1       MR. MAY: Object to form.
2   BY MR. GORDON:
3       Q.   It's set out in its table of contents,
4   isn't it?
5       A.   Correct.
6       Q.   Pretty easy to follow?
7       A.   Correct.
8       Q.   And if we turn to Section 2.1 of the
9   manual, which is under general rules.
10      A.   Mm-hmm.
11      Q.   Could you please read that first
12  sentence?
13      A.   All charges for title insurance coverage
14  provided by approved policies, endorsements be made
15  as set forth in this manual.
16           You may continue.
17      Q.   And that means that the manual has to be
18  followed?
19      A.   Correct.
20      Q.   And if we continue to look through
21  TIRBOP manual, we see that Section 5.1 relates to
22  owner's title insurance?
23      A.   Correct.
24      Q.   Actually Section 5 generally relates to
25  policies and rates, correct?

---

107

1       A.   Correct.
2       Q.   Section 5.1 relates to owner's title
3   insurance?
4       A.   Correct.
5       Q.   And then if we turn to Section .5 3.
6       A.   Okay.
7       Q.   What does 5.3 relate to?
8       A.   A reissue rate.
9       Q.   And could you please read the reissue
10  rate section?
11      A.   A purchaser of title insurance policy
12  shall be entitled to purchase this coverage at the
13  reissue rate and the real property to be insured is
14  identical or is part of real property insured ten
15  years immediately prior to the date of the entered
16  transaction closes when the evidence of the earlier
17  policy is produced, notwithstanding the amount of
18  coverage provided by the prior policy.
19      Q.   Now, you would agree that this provision
20  does not state who has to produce the prior
21  evidence, is that correct?
22           MR. MAY: Object to the form. I'm going
23  to instruct the witness to answer if she had an
24  answering in her mind she can testify to that. But
25  she's not here to do the linguistics of the

---

108

1   document.
2            MR. GORDON: I'm asking her whether or
3   not her understanding is does the rate say who has
4   to produce the evidence.
5       A.   It does not.
6       Q.   Could be the agent?
7       A.   Could be, you know, generalized, you
8   know. My guess could be the agent, it could be the
9   borrower. It could be the real estate agent. It
10  could be the broker could produce it.
11           MR. MAY: I'm going to instruct the
12  witness not to guess.
13           THE WITNESS: Oh, okay.
14           MR. MAY: Just state what your
15  understanding was, if you had an understanding.
16           THE WITNESS: Okay.
17  BY MR. GORDON:
18      Q.   Do you have any understanding,
19  whatsoever as to who has to produce the evidence?
20      A.   Typically, the borrower would produce
21  the evidence.
22      Q.   Okay. And where do you gain that
23  understanding from?
24      A.   Because they would be the person that
25  would have the -- either a prior HUD or a prior

---

### 109

1  policy.
2  Q. What evidence of the prior policy --
3  what's -- strike that. How is evidence of a prior
4  policy satisfied?
5  A. By producing a prior policy.
6  Q. Okay. Prior policy. A prior HUD-1?
7  A. A prior HUD-1 also.
8  Q. Prior mortgage?
9  A. No.
10 Q. A prior note?
11 A. No.
12 Q. And where do you gain this understanding
13 from, Ms. Ray?
14 A. Because when an owner's policy is sent
15 to the owner, then they would have access to their
16 own HUD-1 or their own owner's policy.
17 Q. Okay. Is it your understanding that the
18 owner has the obligation to produce that prior
19 policy?
20 A. Yes.
21 Q. And is it your understanding that the
22 agent has no obligation to obtain evidence of a
23 prior policy?
24 A. Yes.
25 Q. You would agree, wouldn't you, that --

### 110

1  and I think that you've already stated this in your
2  testimony, that the borrower does not obtain a copy
3  of the lender's title insurance policy?
4  A. That's correct.
5  Q. And evidence of a prior lender's title
6  insurance policy also is sufficient?
7  A. Correct. That would -- the borrower
8  would have access to their HUD-1.
9  Q. So is it your suggestion that only
10 producing the HUD-1 entitles a borrower to the
11 reissue rate, based upon the prior --
12 A. Sure.
13 Q. -- lender's policy?
14 A. Yes.
15 Q. Is there any other evidence whatsoever
16 that you can possibly think of that would entitle
17 the borrower to the reissue rate based upon the
18 prior lender's policy?
19 A. No.
20 Q. So if the borrower does not
21 affirmatively produce the HUD-1, they would not
22 receive from Chicago Title the reissue rate?
23 A. I don't know.
24 Q. Well, what do you tell your agents?
25 A. Prior to the 2005 manual update, it now

### 111

1  sets it out exactly what needs -- you know, what is
2  to be produced. Prior to that, we basically, you
3  know, the agents would determine whether -- whatever
4  information is provided to them would determine
5  whether or not to charge a basic or a reissue rate.
6  Q. And Chicago Title didn't provide any
7  training to their agents in that regard, did they?
8  A. No.
9  Q. And you didn't provide any training to
10 your agents in that regard, did you?
11 A. No.
12 Q. And there were no other instructions
13 whatsoever to the agents on what constituted prior
14 evidence?
15 A. Other than the items set forth in the
16 TIRBOP manual, they are supposed to abide by.
17 Q. Okay. And this version of the TIRBOP
18 manual doesn't enumerate any circumstances, does it?
19     MR. MAY: Objection. Speaks for itself.
20 A. It is what it is on the --
21 Q. Does it set forth any circumstances,
22 Ms. Ray?
23 A. It just says trans -- it says part of
24 the real property insured ten years immediately
25 prior to the day of the -- closes when evidence of

### 112

1  earlier policy is produced, notwithstanding the
2  amount of coverage provided by the prior policy.
3  That's what it says.
4  Q. And it's your understanding that Chicago
5  Title left this completely up to the agent to decide
6  what this meant?
7  A. Correct.
8  Q. Okay. Now, if we could turn to --
9  before I ask my next question, and if is there is no
10 evidence whatsoever of that prior policy, either a
11 prior owner's policy or a prior lender's policy
12 produced by the borrower, as you've testified, then
13 that borrower would not obtain the reissue rate?
14 A. I don't know if they would or not.
15 Q. Okay. I thought that that was your
16 testimony, though, that it's the borrower's
17 obligation.
18     MR. MAY: No, that's a misstatement of
19 her testimony. You asked her --
20     MR. GORDON: Well, the record will speak
21 for itself as to what the witness said.
22     MR. MAY: Right. So when you misstated
23 your her testimony, I wanted to lodge that
24 objection.
25 BY MR. GORDON:

### Page 113

1  Q. Whose obligation is it?
2      MR. MAY: Object to form.
3  BY MR. GORDON:
4  Q. Whose obligation is it to obtain prior
5  evidence under the reissue rate section of the
6  TIRBOP manual?
7      MR. MAY: Objection. Asked and
8  answered. You asked two separate questions, what
9  her opinion was versus what agents actually do and
10 then you confused the two.
11     THE WITNESS: Yeah.
12     MR. GORDON: Mr. May -- Mr. May, I
13 appreciate your objection. As I told you, you can
14 make any objections you want if the witness is not
15 in the room. I would ask you at this point,
16 however, limit your objection to objection to form,
17 because that's all that's permissible under the
18 Federal Rules. Anything more than that --
19     MR. MAY: Well, I don't know about that.
20     MR. GORDON: -- we can ask the witness
21 to leave the room. I feel very strongly about this
22 at this point. Because you're now testifying rather
23 than the witness.
24     MR. MAY: I'm -- first of all, I will
25 not say anything more, I will not say anything more.

### Page 114

1  But what I did was not testify. What I did was
2  object to your misstatement of testimony.
3      MR. GORDON: Could you please answer the
4  question?
5      THE WITNESS: Could you repeat the
6  question?
7      MR. GORDON: Sure. Could you repeat the
8  question?
9      (Pertinent portion of the record is read
10 back.)
11 A. Typically, it would be from the
12 borrower.
13 Q. Who else?
14 A. Sometimes the real estate agent would
15 have access to that information by their
16 relationship with the borrower. Maybe the borrowers
17 gave it to their mortgage broker or their lender,
18 you know, it could be, you know...
19 Q. Anyone else?
20 A. No. I don't know.
21 Q. Would Chicago Title's agents, in your
22 view, have any obligation or duty to obtain evidence
23 of the prior policy?
24 A. They should inquire.
25 Q. They should ask?

### Page 115

1  A. They should ask, yeah. I mean...
2  Q. What should they ask?
3  A. Ask their customer if, you know, if they
4  have a prior HUD-1 or a prior title policy.
5  Q. Let's turn to section 5.6, Ms. Ray.
6  A. Okay.
7  Q. And that's the section on refinance and
8  substitution loans. And I know that you've read it
9  before. I'm going to ask you to just, for purposes
10 of continuity just read it one for time for me.
11 A. Okay. When a refinance or substitution
12 loan is made within three years from the date of
13 closing of a previously insured mortgage or fee
14 interest, and the premises to be insured are
15 identical to or part of the real property previously
16 insured and there has been no change in fee simple
17 ownership, the charge shall be 80 percent of the
18 reissue rate.
19 Q. Now, would you agree that Section 5.6
20 doesn't require evidence to be produced?
21     MR. MAY: Object to form.
22 A. I can't really generalize on that.
23 Q. Well, does the rate say anything about
24 evidence being produced the same way that Section
25 5.3 did?

### Page 116

1  A. It does not.
2  Q. And isn't it, in fact, true that any
3  title agent who's conducted the abstract will have
4  all this information?
5      MR. MAY: Object to form.
6  A. No.
7  Q. Okay. Well, they will -- will they know
8  that there has been a previously -- a previous
9  mortgage loan within the previous three years? They
10 know that.
11 A. By looking at the -- by looking at the
12 search. Basically, the search is just going to show
13 everything of record.
14 Q. And that will always show whether or not
15 there's been a mortgage in the previous three years,
16 correct?
17 A. It will show if there was a mortgage
18 within the previous three years, correct, I guess,
19 yeah, if it's of record.
20 Q. And there's been previous testimony in
21 this case that pretty much every loan, every lender
22 requires that there be title insurance taken out?
23     MR. MAY: Object to form. Object to
24 mischaracterization of prior testimony.
25 A. Not necessarily.

**117**

1  Q. Do you know of any lender that doesn't
2  require title insurance, Ms. Ray?
3  A. I have heard of some lenders that do not
4  require title insurance.
5  Q. Name them.
6  A. Although I cannot name them, there are
7  certain, like, credit unions -- for example, my own
8  personal transaction. I got a loan with Ditech and
9  they did not require title insurance.
10  Q. Was that a first mortgage or a second
11  mortgage?
12  A. It was a second mortgage.
13  Q. A second mortgage.
14  A. Yeah, but --
15  Q. Do you know of any first mortgages that
16  do not require title insurance?
17  A. I have heard of some, actually.
18  Q. Okay. Again, I want to get more
19  specific. Who have you heard doesn't require it for
20  a first mortgage?
21  A. Certain smaller credit unions that have
22  a lower threshold. For example, if they're going to
23  lend under a certain amount, maybe, you know, it
24  could be 125,000 or something, they don't require
25  title insurance, they rely on an attorney opinion

**118**

1  letter. Again, I can't really give you that,
2  because all I deal with are the files that require
3  title insurance, so -- but I have heard, there are
4  lenders.
5  Q. But, in fact, you can't name one of them
6  today, can you?
7  A. Again, I know it's out there and, you
8  know, again, I deal with the files that do require
9  title insurance.
10  Q. But can you name any?
11  A. There are some.
12  Q. Can you name any?
13  A. I cannot name off the top of my head.
14  Q. Okay. If at any point after this
15  deposition you obtain the name of any that do not
16  typically require title insurance, I would invite
17  you to please provide it to me.
18  A. Okay.
19  Q. Because I don't think there are any.
20  MR. MAY: Objection. That's arguing
21  with the witness as opposed to asking questions. So
22  you don't have to respond to that.
23  BY MR. GORDON:
24  Q. You've never dealt specifically with any
25  credit union or lender in any circumstance that

**119**

1  didn't require title insurance for a first mortgage,
2  have you?
3  A. Again, personally, my Ditech loan was
4  paid in my full and my release wasn't filed on my
5  first, so, you know -- they went into first lien
6  position because my release of lien was not filed on
7  my first, so they didn't require title insurance.
8  Q. Would you be willing to produce those
9  documents for me?
10  A. Sure.
11  MR. MAY: Well -- no, you're not going
12  to -- no. I'm not going to have the witness start
13  producing her own personal files of her own
14  transactions.
15  A. And I'd rather not.
16  Q. Was it a second mortgage or a first
17  mortgage?
18  A. It was a second mortgage.
19  Q. Okay. Can a borrower ever produce
20  evidence of the lender's policy? Did they ever
21  produce the lender's policy?
22  A. If the borrower calls their lender and
23  requests a copy of it.
24  Q. Okay. Is that something that just as
25  easily a title company could do?

**120**

1  A. Sure. They can actually -- the borrower
2  can actually go back to that agent, wherever they
3  close before and request a copy.
4  Q. And so can the agent, the current agent
5  that they're dealing with?
6  A. Typically other agents don't like to
7  share information.
8  Q. Okay.
9  A. So -- because they're not allowed to --
10  they don't have access to that file, it's not
11  theirs. Typically, the borrower would control that
12  file.
13  Q. Okay. Ms. Ray, in your understanding of
14  5.6 of the TIRBOP manual in front of you --
15  A. Okay.
16  Q. -- what evidence is necessary in order
17  for a consumer to get the refinance rate?
18  A. It would be a -- could you repeat the
19  question?
20  Q. Is there any evidence that is required
21  under the written terms of section 5.6 for a
22  consumer to obtain the reissue rate -- I'm sorry,
23  the refinance rate?
24  MR. MAY: Again, what was your
25  understanding?

**121**

1  A. My understanding, the borrower does not
2  have to -- like I said, I don't know what they
3  would -- what they would require or not, you know.
4  It is what it is. The rate is what it is.
5  Q. Well, what was Chicago Title telling its
6  agents was required?
7  A. Well, if they have -- if they have
8  evidence that a loan was made within three years and
9  it was previously insured, then the customer is
10 entitled to 80 percent of the reissue rate.
11 Q. Is that essentially what was in 5.6?
12 A. Yeah.
13 Q. Okay. I will ask you again, the Section
14 5.6, doesn't have the word evidence in it, does it?
15 A. No, it does not.
16 Q. And isn't it, in fact, true that Chicago
17 Title really didn't give their agents any
18 instruction beyond the TIRBOP manual?
19 A. Correct. Can I back that up? I can't
20 speak for Chicago Title Insurance. I'm speaking for
21 myself. So...
22 Q. Well, you are the agency liaison, aren't
23 you?
24 A. I'm the agency rep. If a question was
25 asked upon our underwriting counsel from the agent,

**122**

1  about specific rates, that question wouldn't come to
2  me, it would go to my underwriter.
3  Q. Okay. Did any agent ever ask you that
4  question?
5  A. No.
6  Q. Under the new TIRBOP manual, has any
7  agent ever asked you that question?
8  A. No, because it really establishes clear
9  after the updated 2005. No.
10 Q. Okay. So the update in 2005 clarified
11 what was necessary in order to obtain the rate?
12     MR. MAY: Object to form -- the rate
13 that was necessary.
14 A. It clarified a lot more of the reissue
15 rate.
16 Q. Okay. Could you please turn to Exhibit
17 No. -- I think it's 26.
18 A. Okay.
19 Q. I just want to see how the refinance
20 rate and the reissue rate work.
21     Let's say, for example, a Chicago Title
22 agent determines that someone is entitled to their
23 reissue rate.
24 A. Mm-hmm.
25 Q. For $100,000 of title insurance. Now,

**123**

1  just to make sure we're operating off the same one,
2  what is the Bates No., off of the bottom of that
3  exhibit?
4  A. CHI10227. D-26, correct?
5  Q. Okay, let's go with that one. $100,000.
6  A. Mm-hmm.
7  Q. Is the basic rate for $100,000 in title
8  insurance is?
9  A. You're asking me?
10 Q. I'm asking you.
11 A. I'm sorry. 100,000 is 828.75.
12 Q. And that's something that you just look
13 up on the sheet?
14 A. Correct.
15 Q. And then if you want to determine what
16 the reissue rate is, how do you determine that?
17 A. Look on the sheet.
18 Q. Look on the sheet. And what does that
19 come out to?
20 A. 745.88.
21 Q. And then if we want to determine beyond
22 that if someone is entitled to the refinance rate,
23 what do we do to that that 745.88?
24 A. Subtract for the -- subtract 20 percent.
25 80 percent of the reissue.

**124**

1  Q. Again, a simple mathematical
2  calculation?
3  A. Correct.
4  Q. But there are other ways to determine
5  the applicable policy rate, aren't there?
6  A. Yes.
7  Q. You could go on Chicago Title's web
8  site, can't you?
9  A. Well, I've never been on the web site.
10 It would -- anything on Chicago Title would have the
11 rates as listed pursuant to the TIRBOP, but there
12 are other -- if you Google, like I said, Google, PA
13 title -- PA title rate, a screen would appear to
14 come up for Pennsylvania rates. That would show all
15 of the applicable rates.
16 Q. Have you ever have you ever been to
17 Chicago Title's web site?
18 A. Occasionally. Not necessarily. I
19 mainly go through my corporate web site.
20 Q. Okay. I show you what's been marked as
21 Deposition Exhibit 29.
22     (D-29 marked for identification.)
23     MR. GORDON: Mr. May, quite surprising,
24 this appears to be the only copy that I have of this
25 and I would be happy to go out and get you another

125

1  copy or you can look on with the witness.
2      MR. MAY: I'll look on with the witness.
3  BY MR. GORDON:
4      Q.  Okay. Deposition Exhibit No. 29. And
5  if you type in www.ctic.com, which is Chicago Title
6  Insurance Company, this is the screen that comes up.
7  And on that very first opening page, it says, rate
8  calculator, click here.
9      A.  Mm-hmm.
10     Q.  Have you ever seen that before?
11     A.  I knew that there are several Chicago
12 Title web sites available and I wouldn't rely on
13 this rate calculator, because I don't know how state
14 specific it would be.
15     Q.  Well, let's see how state specific it
16 can be. If you turned --
17         MR. MAY: With all these questions, just
18 answer what you know.
19     A.  Okay.
20     Q.  Let's see how state specific it is.
21 Because if you go in, you click on rate calculator,
22 you turn to the third page of the Deposition
23 Exhibit. It has an opening screen and it asks for
24 the zip code. Would that indicate to you that it
25 can potentially get very rate -- very state

126

1  specific?
2      A.  I guess.
3      Q.  And could you please read that first
4  paragraph, underneath where it says Chicago Title
5  rate calculator?
6      A.  As a service to our customers we have
7  added rate calculators to our site in order to
8  provide you an idea of possible costs for your
9  transaction. Circumstances may vary, causing actual
10 rates to differ than those given to you by these
11 calculations. The rates provided are based on the
12 sales prior or loan amount of your transaction.
13     Q.  Okay. And what the site instructs you
14 to do is to put your zip code in, then it says
15 submit and you click on that. Do you see that?
16     A.  Mm-hmm, yes.
17     Q.  And what pops up next is the next page,
18 where more specific information is asked for. And
19 if you look towards the middle, there's information
20 that we need to fill. The zip code 19144 happens to
21 be for Ms. Cohen. That's where she lives. And if
22 you look, it asks for the county and the State of
23 Pennsylvania. I believe those actually pop up
24 automatically. And it asks for the amount of the
25 transaction.

127

1      A.  Mm-hmm.
2      Q.  And in Ms. Cohen's case it was 57,600?
3      A.  Mm-hmm.
4      Q.  Does that sound correct to you?
5      A.  That's what it says here.
6      Q.  Okay. Does that sound correct to you
7  from Ms. Cohen's transaction? And if you could
8  please take a look at Deposition Exhibit No. 19.
9  You can look at the title commitment in this regard.
10     A.  Do you have a copy of the mortgage?
11     Q.  I'm sure it's all in there, but I think
12 that all this information can be taken off the title
13 commitment?
14     A.  I agree, 57,6.
15     Q.  Okay. Is that taken off the title
16 commitment?
17     A.  No.
18     Q.  Can you turn to the title commitment?
19     A.  Sure.
20     Q.  Can you determine what the mortgage
21 amount is from the title commitment?
22     A.  57,6.
23     Q.  Okay.
24     A.  $57,600.
25     Q.  So that's yes?

128

1      A.  Yes.
2      Q.  Then it asks for prior amount. Can you
3  determine from the title commitment what the prior
4  amount -- what the prior mortgage was?
5      A.  There's several prior mortgages listed
6  of record.
7      Q.  Okay. How about for the most recent
8  one. Is there one in March of 1999?
9      A.  Appears to be, yes.
10     Q.  What was the amount of that mortgage?
11     A.  44,175.
12     Q.  And we got that information right off
13 the title commitment?
14     A.  It's of record.
15     Q.  Okay. And putting that in, it also asks
16 for the prior date. And can we get that off the
17 title commitment as well?
18     A.  Well, the assigned -- it assigned it in
19 12-14-99, but the original mortgage was recorded on
20 3-19-99.
21     Q.  Okay. So that information we can get
22 off the title commitment as well. Now, it appears
23 that I have to do a -- make up -- I put February
24 24th, 1999 in, but it doesn't -- wouldn't make any
25 difference whether it's February 24th, 1999 or the

129

1  March 1999 date, would it, for purposes of
2  determining what rates are appropriate?
3      A.   Yes, it would make a difference.  You
4  would have to go off the 3-19-99 date -- well, I
5  would -- that was assigned to First National Bank in
6  December of 1999, whereas the original mortgage was
7  put of record on 3-5-1999.
8           MR. MAY:  I'm going to just take this
9  opportunity to do a standing objection, so I don't
10 have to object each time, on the ground that the
11 transaction is a 2002 transaction and there's no
12 foundation that this version of this web site
13 existed in 2002.
14 BY MR. GORDON:
15     Q.   And then if you hit submit, do you know
16 what happens at that point, after you put all this
17 information in?
18     A.   Not familiar with the web site, but I
19 bet I'll find out.
20     Q.   It will give you a rate, won't it?
21     A.   I guess, yeah.
22     Q.   Okay.  Well, we will have to all sit in
23 suspense, since apparently I don't have that rate
24 attached -- oh, I'm sorry, I do.  I don't have that
25 attached to my book.  If I -- if you don't mind I'm

130

1  going to look on with you.
2           You turn to the next page and then what
3  happens?  It tells you all of the proper rates, does
4  it not, that could apply to this loan.
5           MR. MAY:  Richard, I'm going to just say
6  that based on your reputation, I will stipulate that
7  this is what happened when you did the web site, but
8  that the witness has testified repeatedly, she's
9  never done it.  In other words, you've done
10 something that she hasn't done, so her testimony is
11 not based on her knowledge.
12          MR. GORDON:  Right.
13          MR. MAY:  It's based on hearing what
14 you're having to say.
15          MR. GORDON:  I am running through with
16 her what the Chicago Title web site itself will do
17 with respect to calculating rates.
18          MR. MAY:  I agree.
19          MR. GORDON:  That's what I'm doing.
20          MR. MAY:  I agree that's what you're
21 doing and I would be willing to accept your
22 representations on it versus having basically the
23 witness listing to what you're saying and then
24 saying, yeah, that comes next, that comes next.
25          MR. GORDON:  Okay.  I'm not asking her

131

1  to go calculate it on the web site, if that's what
2  your concern is.  I will represent that I put this
3  information in myself and this is what the result
4  was.  So what does it state down there?  Does it
5  have a rate for the refinance rate?
6      A.   It does have a rate for the refinance
7  rate, but this is affective after the 2005 update.
8      Q.   I understand.
9      A.   So anything prior to 2005, it would not
10 be correct.
11     Q.   This would not be the actual rate that
12 Ms. Cohen should have received, but because the rate
13 changed?
14     A.   Because of the update of the TIRBOP
15 manual after 2005.
16     Q.   I understand.  But if someone were going
17 in today to calculate what their rates should be,
18 they can easily determine that?
19     A.   Seems like it gives all the available
20 options.
21     Q.   And you would agree that the only
22 information that you need is all readily available
23 on the title commitment?
24     A.   No.
25     Q.   For purposes of this rate calculator?

132

1  Ms. Ray, did we look anywhere else other than -- do
2  we need to look anywhere else other than the title
3  commitment?
4      A.   It's not transaction specific, so every
5  transaction is completely different.
6      Q.   Okay.  That's not really responsive to
7  my question, Ms. Ray.  Did you look anywhere other
8  than the title commitment to determine what to put
9  into Chicago Title's own rate calculator?
10          MR. MAY:  In the exercise you just went
11 through?
12 BY MR. GORDON:
13     Q.   In the exercise we just went through?
14     A.   Correct.  In the exercise that we just
15 went through, correct, what you had guided me on.
16     Q.   Everything was in the title commitment?
17     A.   Mm-hmm, yes.
18     Q.   Okay.  Are you familiar with Premier
19 Help System?
20     A.   I'm sorry?
21     Q.   The Premier Help computer system?
22     A.   No.
23     Q.   Have you ever heard that term before?
24     A.   No.
25     Q.   No?

Case 2:06-cv-00873-JS    Document 28-16    Filed 12/04/2006    Page 17 of 20

ELIZABETH RAY

**133**

1  A. Well -- no.
2  Q. Do you know what internal computer
3  system Chicago Title uses?
4  A. Again, the National Agency, the NAS
5  system. I don't have access to a Premier system, my
6  stuff.
7  Q. All this is collected out in Chicago by
8  the Fidelity National companies?
9  A. Yeah. There's two agency accounting
10 offices. There's one in Chicago, one in Florida.
11 Q. Okay. Is it ultimately captured,
12 however, back up at the office in Chicago?
13 A. I believe for this region, it is.
14 Q. Okay. Let me take two minutes. I may
15 be done.
16     THE VIDEO OPERATOR: Hold on please.
17 We're going off record at 12:19.
18     (Brief recess.)
19     (Mr. Snyder exits.)
20     THE VIDEO OPERATOR: Back on the video
21 record at 12:21.
22     MR. GORDON: Ms. Ray, thank you very
23 much. I have no further questions.
24     THE WITNESS: All right, thank you.
25     MR. MAY: Before you go off the video

**134**

1  record, Ms. Ray, I'm sorry to say that I just have a
2  couple of follow-up questions.
3  EXAMINATION
4  BY MR. MAY:
5  Q. Earlier in the deposition you testified
6  that subsequent to the 2005 revision of the TIRBOP
7  manual there's a disclosure of the reissue rate to
8  the consumer, but not of the refinance rate. Is it
9  your understanding that whatever is required to be
10 disclosed by the 2005 TIRBOP manual, the Chicago
11 Title form disclosure complies with the manual?
12 A. Correct.
13     MR. GORDON: I'm going to object as to
14 form.
15 BY MR. MAY:
16 Q. Well, you don't have the 2005, the post
17 2005 disclosure form in front of you, do you?
18 A. No, I do not.
19 Q. So is it -- would it be your
20 understanding that whatever the disclosure in that
21 form is, is the disclosure?
22 A. Correct.
23 Q. Okay. And do you have any understanding
24 as to whether that post 2005 disclosure complies
25 with whatever is required by the TIRBOP manual?

**135**

1     MR. GORDON: Objection as to form.
2  A. No, I don't.
3  Q. You don't know one way or the other?
4  A. No.
5  Q. Would you agree that -- well, strike
6  that.
7     You were asked about questions
8  concerning purchase of title insurance in connection
9  with first mortgages.
10 A. Mm-hmm.
11 Q. Does it occur that what may be a first
12 mortgage at one point but -- I'm sorry, that what
13 may be a second mortgage at one point can become a
14 first mortgage?
15 A. Yes.
16 Q. How does that happen?
17 A. By lenders not filing the proper release
18 of liens of record.
19 Q. And does it happen in any other
20 circumstances?
21 A. Yeah, if, again, you know -- I deal with
22 my -- I deal with the title insurance files, and
23 that's it.
24 Q. What if a first mortgage position is
25 paid off?

**136**

1  A. Typically, the lender is supposed to
2  file a release of lien which does not happen
3  oftentimes. Sometimes it does, sometimes it
4  doesn't.
5  Q. And would it then appear to a subsequent
6  title searcher -- what would it appear to a
7  subsequent title searcher, in terms of what the
8  previously second mortgage lien looks like?
9     MR. GORDON: Objection as to form. And
10 as to lack of foundation.
11 BY MR. MAY:
12 Q. Well, in the circumstances that you are
13 referring to, if there had previously been a second,
14 what would that look like to a title searcher?
15     MR. GORDON: Objection as to form.
16 A. They would see the first lien of record
17 as well as any other liens of record, but it doesn't
18 necessarily show you that it's still active.
19 Sometimes loans are paid off and lenders don't file
20 release of liens.
21 Q. When you were asked earlier to testify
22 to -- you -- the question, I believe, was -- strike
23 that.
24    I believe your testimony was that agents
25 should inquire of someone as to the existence of

Pages 133 to 136
Reporting Associates, LLC   1-888-795-2323

ELIZABETH RAY

137

1  evidence of a prior policy. Do you recall that
2  testimony?
3       A.   Yes.
4       Q.   Okay. Was that based on any legal
5  analysis that you're aware of, or legal
6  understanding, or is that just your feeling of
7  what --
8       A.   Just my feeling.
9            MR. MAY: That's all the questions I
10 have.
11           MR. GORDON: Ms. Ray, thank you very
12 much.
13           THE VIDEO OPERATOR: Okay. Hold on,
14 please, hold on. This deposition is now concluded
15 at 12:26.
16           (12:24 p.m.)
17
18
19
20
21
22
23
24
25

138

CERTIFICATE

       I, Karen Friedlander, a Registered Merit
Reporter and Commissioner of the Commonwealth of
Pennsylvania, do hereby certify that prior to the
commencement of the examination, the witness and/or
witnesses were sworn by me to testify to the truth
and nothing but the truth.
       I do further certify that the foregoing
is a true and accurate computer-aided transcript of
the testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth.
       I do further certify that I am neither
of counsel nor attorney for any party in this action
that I am not interested in the event nor outcome of
this litigation.


       _____
       Registered Merit Reporter


Dated: _____

**A**

**AB (1)**
36:12
**abide (2)**
105:3 111:16
**able (8)**
9:17 27:1,3
  29:20 50:23
  50:23 63:14
  87:1
**absolutely (4)**
70:9,15 89:19
  97:24
**abstract (12)**
6:17 22:18 24:4
  41:1 61:20,21
  63:7 64:17
  68:16,17,19
  116:3
**abstracts (1)**
63:15
**abstract's (1)**
63:17
**accept (2)**
95:9 130:21
**access (6)**
81:25 109:15
  110:8 114:15
  120:10 133:5
**accident (3)**
5:12,13,15
**accommodate...**
6:10 76:10
**account (4)**
32:17 79:18
  104:8,11
**accounting (4)**
83:5,22,23
  133:9
**accounts (1)**
79:17
**accurate (1)**
138:10
**acting (4)**
19:9,11 56:3,9
**action (2)**

1:2 138:15
**active (1)**
136:18
**activity (2)**
91:13 92:12
**actual (4)**
39:15 50:8
  126:9 131:11
**add (3)**
96:3,15 97:16
**added (3)**
97:11 98:20
  126:7
**addenda (3)**
3:12 49:23
  103:12
**addendum (4)**
49:22 101:7
  103:15,18
**addendums (2)**
50:8 101:8
**addition (2)**
52:19 53:17
**additional (3)**
47:25 52:18,20
**address (2)**
59:4 66:22
**addresses (2)**
59:7 104:13
**adequate (1)**
45:17
**adhere (1)**
37:24
**advance (1)**
64:16
**advised (1)**
77:7
**advising (1)**
77:14
**affective (1)**
131:7
**affidavit (2)**
23:7 25:6
**affidavits (2)**
24:25 25:1
**affiliated (2)**

29:17 30:13
**affirmatively ...**
70:13 110:21
**agencies (2)**
29:1,2
**agency (24)**
8:4 18:17 25:21
  26:1,2,3,17
  27:9 32:7
  59:13,16 60:7
  74:12 81:5,6
  81:23 83:2,4
  83:22,22
  121:22,24
  133:4,9
**agent (82)**
17:24,25 19:3,4
  19:7,9 26:15
  26:16,25
  29:18 30:1,1,8
  30:13,17
  31:14,15,17
  32:16,19 33:6
  33:16 54:7,20
  55:2,8,22,25
  56:2,11 57:5,7
  59:17 60:22
  60:25 61:2,15
  61:23 65:1
  72:8,10,16,16
  72:20,21,23
  72:24 73:22
  73:24 74:11
  74:20 75:23
  76:1 78:14,22
  79:2,3,23 80:8
  80:12 81:19
  82:3 83:25
  86:15 89:21
  90:23 105:16
  105:18 108:6
  108:8,9
  109:22 112:5
  114:14 116:3
  120:2,4,4
  121:25 122:3

122:7,22
**agents (79)**
8:8,10,13 10:14
  10:17 12:10
  12:12 13:17
  13:20 14:10
  16:10 17:8,10
  17:16,20,22
  18:16,18,23
  24:10 28:22
  30:2,18,25
  32:11,12 33:1
  50:23 54:17
  55:15,15,19
  58:8 59:10,25
  63:14 67:11
  67:18,19,19
  67:20 68:4,8
  68:13,20
  69:23 73:21
  76:24,24
  77:18 78:2,9
  79:16,24,25
  83:15,18
  87:22 88:4,15
  88:23 89:4
  90:12 104:5,8
  105:3,6,11
  110:24 111:3
  111:7,10,13
  113:9 114:21
  120:6 121:6
  121:17 136:24
**ago (1)**
6:24
**agree (12)**
14:14 47:12,14
  84:21 107:19
  109:25 115:19
  127:14 130:18
  130:20 131:21
  135:5
**agreement (3)**
20:15 27:9
  56:25
**ahead (3)**

39:7 73:23 92:8
**al (1)**
4:4
**Alamo (1)**
28:12
**allow (1)**
41:6
**allowed (1)**
120:9
**ALTA (33)**
36:21 37:1
  38:16 39:13
  40:1,5,7,14,19
  50:4,11,20,21
  51:11,14,15
  51:17,25 52:7
  52:14 53:1,8
  53:17,19 54:3
  54:8 96:22
  97:9,17 98:2
  98:19 99:5,17
**American (13)**
36:22 37:1,4,7
  37:9,13,18,25
  38:4,10,19,21
  39:20
**amount (15)**
35:12,17,19
  66:6 82:12
  97:10 107:17
  112:2 117:23
  126:12,24
  127:21 128:2
  128:4,10
**analysis (1)**
137:5
**ANDREWS (1)**
2:10
**and/or (1)**
138:6
**annual (3)**
8:8 32:10,25
**answer (18)**
23:2,11 27:15
  30:6 41:10
  43:25 44:24